FILED

AUG 2 8 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

Name **Hancock**        **Jeff**        **J**
    (Last)            (First)        (Initial)

Prisoner Number **V-49474**   *Avenal State Prison*

Institutional Address **#8 Kings Way Avenal, CA 93204**

- **E-filing**        UNITED STATES DISTRICT COURT        **C 07 4469**

NORTHERN DISTRICT OF CALIFORNIA                **CW (PR)**

**JEFF JAY HANCOCK**

Full Name of Petitioner                    Case No.(To be provided by the
                                           clerk of court)

                vs.

**D. SEDLEY**                PETITION FOR A WRIT OF HABEAS CORPUS
    Name of Respondent            **EVIDENCIARY HEARING**
    (Warden or jailor)              **REQUESTED**

Read Comments Carefully Before Filling In

When and Where to File

You should file in the Northern District if you were convicted and sentenced in one of these
counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San
Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in this
district if you are challenging the manner in which your sentence is being executed, such as loss of good
time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

If you are challenging your conviction or sentence and you were not convicted and sentenced in
one of the above-named fifteen counties, your petition will likely be transferred to the United States
District Court for the district in which the state court that convicted and sentenced you is located. If you
are challenging the execution of your sentence and you are not in prison in one of these counties, your

1

petition will likely be transferred to the district court for the district that includes the institution where you are confined. Habeas L.R. 2254-3(b).

<u>Who to Name as Respondent</u>

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are no<u>t</u> proper respondents.

If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g., detainers), you must name the person in whose custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack was entered.

A. <u>INFORMATION ABOUT YOUR CONVICTION AND SENTENCE</u>

1.     What sentence are you challenging in this petition?

(a) Name and location of court that imposed sentence (for example; Alameda County Superior Court, Oakland):

<u>Santa Clara County Superior Court</u>     <u>Sunnyval Facility</u>
Court                                    Location

(b)     Case number, if known <u>EE402396   Direct Appeal 4027917</u>
(c)     Date and terms of sentence <u>9/3/04  11 years at 85%</u>
(d)     Are you now in custody serving this term? (Custody means being in jail, on parole or probation, etc.) Yes ☒ No

Where? <u>Avenal State Prison #8 Kings Way Avenal, Ca. 93204</u>
(Name of Institution)          (Address)

2.     For what crime were you given this sentence? (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are challenging more than one sentence, you should file a different petition for each sentence.)

<u>ADW§245(a)(1) Enhanced for alleged §211 prior conviction, case #102499 as both a strike §667(b)-(i) and a serious prior §667(a)</u>

3.     Did you have any of the following?

Arraignment: Yes __ No __   Preliminary Hearing: Yes __ No __ Motion to Suppress: Yes __ No __

4.    How did you plead?

Guilty _____    Not Guilty _X_    Nolo Contendere _____

Any other plea (specify) _____

5.    If you went to trial, what kind of trial did you have?

Jury _X_    Judge alone _____    Judge alone on a transcript _____

6.    Did you testify at your trial?   Yes _X_ No ___

7.    Did you have an attorney at the following proceedings:

(a)    Arraignment   Yes _X_    No ___
(b)    Preliminary hearing       Yes _X_       No ___
(c)    Time of plea   Yes _X_    No ___
(d)    Trial   Yes _X_       No ___
(e)    Sentencing   Yes _X_    No ___
(f)    Appeal   Yes _X_    No ___
(g)    Other post-conviction proceeding   Yes ___       No _X_

8.    Did you appeal your conviction?   Yes _X_ No ___

(a)    If you did, to what court(s) did you appeal?

| | | | |
|---|---|---|---|
| Court of Appeal | Yes _X_ | No ___ | 2006 Denial 3/24/06 |
| | | | (Year)                    (Result) |
| Supreme Court of California | Yes _X_ | No ___ | 2006 Denial 7/19/06 |
| | | | (Year)                    (Result) |
| Any other court | Yes ___ | No ___ | |
| | | | (Year)                    (Result) |

(b)    If you appealed, were the grounds the same as those that you are raising in this petition?
        Yes _X_ No _X_

(c)    Was there an opinion?      Yes ___   No _X_

(d)    Did you seek permission to file a late appeal under Rule 31(a)?
        Yes ___      No _X_

4

If you did, give the name of the court and the result:

---

9.    Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal?    Yes          No ___

Note: If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition. You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28 U.S.C. § 2244(b).

(a)    If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding. Attach extra paper if you need more space.

I.    Name of Court _Caliernia Supreme Court_

Type of Proceeding _State Habeas Corpus_

Grounds raised (Be brief but specific):

a. _Self Incrim., Due Process 5th, 14th_

b. _Pros. Misconduct, Fair Trial, Due Process 6th 14th_

c. _Knowing use of perjured testimony by Pros. to_

d. _obtain conviction, Fair Trial, Due Process 6th, 14th_

Result _Denied_                Date of Result _7/25/07_

II.    Name of Court _California Supreme Court_

Type of Proceeding _State Habeas Corpus_

Grounds raised (Be brief but specific):

a. _Trial Counsel I.A.C. Self Incrim. Due Process_
_5th, 6th, 14th_

b. _Sentencing Counsel I.A.C. Due Process 6th, 14th_

c. _Pros. Suppression of evidence, Self-Incrim Fair Trial Due_

Result _Denied_                Date of Result _7/25/07_ Process
_5th, 6th 14th_

III.    Name of Court _____

Type of Proceeding _____

Grounds raised (Be brief but specific):

a. _____

b. _____

c. _____

d. _____

Result _____ Date of Result _____

    (b)    Is any petition, appeal or other post-conviction proceeding now pending in any

court?    Yes ☐ No ☒

_____

**(Name and location of court)**

## B. GROUNDS FOR RELIEF

    State briefly every reason that you believe you are being confined unlawfully. Give facts to

support each claim. For example, what legal right or privilege were you denied? What happened? Who

made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you need

more space. Answer the same questions for each claim.

    Note: You must present ALL your claims in your first federal habeas petition. Subsequent

petitions may be dismissed without review on the merits. 28 U.S.C. § 2244(b); McCleskey v. Zant, 499

U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).

Claim One: Self-Incrim., Due Process Violations 5th, 14th Amendments

Claim Two: Pros. Misconduct Fair Trial Due Process
Violations 6th and 14th Amendments
Claim Three: Pros. Knowing use of perjured testimony to obtain conviction Fair Trial Due Process 6th, 14th Amend.
Claim Four: Trial Counsel I.A.C., Self-Incrim. Fair Trial Due Process 5th, 6th, 14th Amendments
Claim Five: Sentencing Counsel I.A.C. Due Process 6th, 14th Amendments
Claim Six: Pros. Suppression of evidence, Self-Incrim. Fair Trial Due Process 5th 6th 14th Amendments
Claim Seven: Trial Counsel I.A.C. Failure to investigate and present crucial exculpatory and mitigating evidence 6th Amendment

Supporting Facts: See Attached Writ

_____

_____

_____

If any of these grounds was not previously presented to any other court, state briefly which

grounds were not presented and why:

_____

_____

_____

8

List, by name and citation only, any cases that you think are close factually to yours so that they are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning of these cases: _____ *See Attached Writ* _____

_____

_____

Do you have an attorney for this petition?    Yes ☐    No ☒

If you do, give the name and address of your attorney:

_____

WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

Executed on  8/7/07 _____         *Duff Hancock* _____
                    /Date                         /Signature of Petitioner

( rev. 5/96)

9

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| TABLE OF AUTHORITIES |  | b |
| PETITION FOR HABEAS CORPUS |  | 1 |
| VERIFICATION |  | 7 |
| STATEMENT OF CASE |  | 8 |
| STATEMENT OF FACTS |  | 8 |
| SUPPORTING FACTS |  |  |
| Grounds 1-3 |  | 9,10,11 |
| Grounds 4-6 |  | 12,13,14 |
| POINTS AND AUTHORITIES |  |  |
| Grounds 1-3 |  | 15,17,19 |
| Grounds 4-6 |  | 22,26,28 |
| CONCLUSION |  | 30 |

CALIFORNIA SUPREME COURT

| DENIAL Writ of Habeas Corpus | S150880 | 32 |
| DENIAL Writ of Habeas Corpus | S151947 | 33 |
|  |  | 34 |
| TRANSCRIPTS AND EXHIBITS |  | A39 |
| TABLE OF CONTENTS GROUND 7 ........................... | | ii |
| TABLE OF AUTHORITIES GROUND 7 ...................... | | iii,iv |

a.

# TABLE OF AUTHORITIES

## GROUNDS 1-6

| CASES | PAGE |
|---|---|
| Avila v. Galaza,  297 F.3d 911 (9th Cir. 2002) | 25 |
| Bagley v. United States,  473 U.S. 667 (1985) | 17,18,19,30 |
| Brady v. Maryland, 373 U.S. 83 (1963) | 18 |
| Haynes v. Washington  373 U.S. 503 (1963) | 25 |
| Hovery v. Ayers, 458 F.3d 892 (9th Cir. 2006) | 19 |
| Kyles v. Whitley,  514 U.S. 419 (1995) | 17,18,20 |
| Miranda v. Arizona,  384 U.S. 486 (1966) | 16 |
| Moran v. Burbine,  475 U.S. 412,423-24 (1986) | 15 |
| Napue v. Illinois,  360 U.S. 264,269 (1959) | 19 |
| Nunes v. Mueller,  350 F.3d 1045,1052 [13] (9th. Cir. 2003) | 27 |
| Oregon v. Elstad, 470 U.S. 298 (1985) | 16 |
| Ortiz v. Stewart,  149 .3d 923,936 (9th Cir. 1998) | 19 |
| Pope v. Zenan, 69 F.3d 1018 [1][2] (9th Cir. 1995) | 16 |
| Rhode Island v. Innis,  446 U.S. 300-02 (19800 | 15 |
| Rogers v. Richmond, 365 U.S. 534,540-44 (1961) | 25 |
| Silva v. Woodford,  279 F.3d at 838 (9th Cir. 2002) | 26 |
| Strickland v. Washington,  446 U.S. 668,691 (1984) | 22,24,25,27 |
| Thomas v. Goldsmith,  979 F.2d 746,749-50 (9th Cir. 1992) | 18,30 |
| Turner v. Duncan, 158 F.3d 499 (9th Cir. 1998) | 22 |
| United States v. Blaylock, 20 F.3d 1458,1466 (9th Cir. 1994) | 27 |
| United States v. Endicott,  869 F.2d 452,455 (9th Cir. 1989) | 19 |
| United States v. Hanna,  55 F.3d 1456 (9th Cir. 1995) | 18 |
| United States v. LaPage,  23 F.3d 488 (9th Cir. 2000) | 19 |
| United States v. Polizzi,  801 F.2d 1543,1549 (9th Cir. 1986) | 20 |
| United States v. Sherlock, 962 F.2d 1349,1364 (9th Cir. 1989) | 20 |
| United States v. Valenzuela-Bernal, 458 U.S. 858 (1982) | 24 |
| Williams v. Woodford, 306 F.3d at 720 (9th Cir. 2000) | 26 |

| STATUTES | |
|---|---|
| Penal Code §1054.1(b) | 18 |
| UNITED STATES CONSTITUTION | |
|     Fifth Amendment | 14,16,25,28 |
|     Sixth Amendment | 21-23,25,30 |
|     Fourteenth Amendment | 14,17-19,24 |

## STATEMENT OF FACTS

On August 7, 2003, appellant and his roommate, Craig Davis, both heavy alcoholics who were drunk at the time, had a disagreement in which appellant ended up jabbing Mr. Davis in the shoulder with a small kitchen knife. (RT 61, 311.) According to Davis, appellant simply came out to the place he was sitting and stabbed him after they had had words (RT 61); appellant, however, said he had jabbed Mr. Davis during a fight between the two men, only after Mr. Davis had hit him in the head with a frying pan. (Augmented CT 30-31, RT 308-309, 311-313.)

A neighbor who stopped by and saw Mr. Davis's injuries convinced appellant that they should call the paramedics, which, he testified, necessarily meant calling the police. (RT 141.) He suggested that appellant leave, but appellant, who did not want to go, merely went into his bedroom. When he tried to come out into the living room after about ten minutes, he ran into police officers. (RT 141, 319

## STATEMENT OF THE CASE

On May 24, 2004, appellant was convicted after jury trial of assault with a deadly weapon, a knife. (Pen. Code, §245, subd. (a)(1).) After admitting a prior "strike" conviction, appellant was sentenced to 11 years in state prison. (CT 283.)

<u>GROUND ONE</u>:  PETITIONER'S INCRIMINATING ADMISSION
WAS OBTAINED DURING POLICE INTERROGATION IN WHICH
PETITIONER WAS DENIED THE RIGHT TO HAVE COUNSEL
PRESENT.  THIS VIOLATED PETITIONER'S PROTECTION
AGAINST SELF-INCRIMINATION AS GUARANTEED BY THE
UNITED STATES CONSTITUTION'S 5th. AND 14th. AMEND-
MENTS.

### SUPPORTING FACTS

On August 12, 2003, petitioner was interrogated by Detective
Craig Anderson at the Santa Clara County Main Jail, South Facil-
ity, shortly after being released from the jail hospital. Peti-
tioner was still in custody awaiting arraignment on a charge
of assault with a deadly weapon (Penal Code § 245(a)(1)). Prior
to petitioner entering the interview room, Detective Anderson
testified he turned on his hidden microcassette recorder. (R.T.,
Volume III., page 223, lines 2-3)

Initially, while speaking with petitioner, Detective Anderson
made false and misleading statements as to what petitioner was
charged with as well as asking questions pertaining to the alleged
offense. This all happened prior to petitioner being read the
Miranda admonishment.

After this incident with Detective Anderson and prior to
trial, David Hardin, retained defense counsel, informed peti-
tioner: "I've listened to the tape. I heard Detective Anderson
state that you were charged with battery. I believe Detective
Anderson violated corpus, and I'm going to move for suppression
of the tape recording."

However, shortly after that conversation with petitioner,
Mr. Hardin was hospitalized and received a heart transplant which
required several months of recuperation. Petitioner subsequently

hired another attorney. Petitioner mentioned the conversation with Mr. Hardin about suppression of the incriminating tape recording from Detective Anderson (Exhibit 26) to his newly hired attorney, Eben Kurtzman, and the circumstances surrounding the tape recording. Nothing was done by Mr. Kurtzman concerning the suppression of this tape recording.

On May 20, 2004, during petitioner's trial, the prosecution played a _portion_ of that tape recording for the jury. The prosecution also gave the jury an _edited_ _transcript_ (Exhibit 27) to coincide with the portion of the tape the prosecution played during the trial. The edited transcript started with Detective Anderson introducing himself as a Sunnyvale (inaudible) officer and shortly thereafter reading petitioner the Miranda admonishment. (See People's Exhibit, 2,3)

GROUND TWO: PROSECUTORIAL MISCONDUCT DEPRIVED PETITIONER OF HIS CONSTITUTIONAL RIGHTS. THIS VIOLATED PETITIONER'S RIGHT TO A FAIR TRIAL AS GUARANTEED BY THE UNITED STATES CONSTITUTIONAL AND THE 6th. AND 14th. AMENDMENTS

## SUPPORTING FACTS

On May 18, 2004, during petitioner's trial, prosecution witness Peter Craven informed prosecutor Jim Demertzis of an alleged confession made by petitioner to him (Craven) on the night of the charged offense, August 7, 2003. (R.T., Volume III., page 192, lines 4-11) Prosecutor Demertzis failed to disclose the alleged confession made by petitioner to the defense prior to prosecution witness Craven's testimony. Had the defense been made aware of this severely incriminating upcoming testimony alleging a confession made by petitioner to Craven, the defense

could have chosen to discontinue trial proceedings without peti-
tioner's testifying and before petitioner's prior serious felony
conviction was raised by the prosecution to impeach petitioner,
enabling petitioner to receive a lesser sentence.

> **GROUND THREE:** THE PROSECUTOR KNOWINGLY USED
> PERJURED TESTIMONY AND/OR FAILED TO CORRECT KNOWN
> FALSE TESTIMONY TO OBTAIN PETITIONER'S CONVICTION.
> THIS VIOLATED PETITIONER'S RIGHT TO A FAIR TRIAL
> AS GUARANTEED BY THE UNITED STATES CONSTITUTION
> AND THE 6th. AND 14th. AMENDMENTS

### SUPPORTING FACTS

On May 24, 2004, prosecutor Jim Demertzis knowingly used
and failed to correct perjured testimony from the victim, Craig
Davis, in order to obtain a conviction against petitioner. (R.T.,
Volume IV., page 467, lines 12-8)  This was the last testimony
that the jury heard in a five-day trial.  Prosecutor Demertzis
knew from previous preliminary hearing testimony by witness Davis
that he (Davis) did not even remember entering petitioner's apart-
ment (C.T., page 28, lines 16-18); didn't remember seeing witness
Steve Duncan inside the apartment (C.T., page 23, lines 24-26);
and didn't remember talking to police officers inside the apart-
ment. (C.T., page 22, lines 9-15)

Police officers Kirk Kim and Andrew Zarrielo, petitioner,
Steve Duncan, and victim Craig Davis were all present inside
the apartment. Craig Davis was previously caught by the defense
committing perjury during his earlier testimony. (R.T., Volume
III., page 124, lines 24-25)

GROUND FOUR:  PETITIONER'S CONVICTION WAS A RESULT OF CUMULATIVE ERRORS, I.E., ERRORS THAT, ALTHOUGH NOT PREJUDICIAL INDIVIDUALLY, ARE CUMULATIVELY PREJUDICIAL. THIS VIOLATED PETITIONER'S RIGHTS TO DUE PROCESS AND EFFECTIVE ASSISTANCE OF COUNSEL, AS GUARANTEED BY THE U.S. CONSTITUTION, AND THE 5th., 6th., AND 14th. AMENDMENTS THERETO

## SUPPORTING FACTS

On 5/17/04, petitioner's trial counsel, Eben Kurtzman, failed to make a timely suppression motion due to his failure to properly conduct pre-trial discovery. (██████████CT pages 14-34)  I informed Mr. Kurtzman that my previous trial counsel, David Hardin, had stated: "I listened to the tape (EXHIBIT 26) and I heard Detective Craig Anderson say battery on the tape. I'm going to move for suppression of the tape because I believe Anderson violated corpus."

I told Mr. Kurtzman that: (a) Detective Craig Anderson told me I was charged with battery; (b) Detective Anderson was dressed in plainclothes and never identified himself as a police officer; and (c) I'd just recently been released from the jail hospital after suffering a grand mall seizure in which I fell off my bunk and hit my head on the concrete jail floor. The medication I'd been prescribed was different from the one I'd taken for years previously.

GROUND FIVE: PETITIONER'S COUNSEL WAS INEFFECTIVE AT SENTENCING BY FAILING TO PRESENT MITIGATING EVIDENCE. THIS VIOLATED PETITIONER'S RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL, AS GUARANTEED BY THE UNITED STATES CONSTITUTION, AND THE 5th. AND 6th. AMENDMENTS

## SUPPORTING FACTS

On 9/3/04, newly retained sentencing/Romero Hearing counsel Wesley Shroeder told Judge John Garibaldi during the aforemen-

tioned proceeding, "I've had extensive discussions with my client about this action, and we've determined it's in his best interest to proceed as we are this morning." This statement was untrue. Attorney Shroeder approached petitioner, who was handcuffed waiting in the jury box, 60 seconds before Judge John Garibaldi entered the courtroom. Mr. Shroeder then stated, "I've been an attorney for over 20 years and I have it on a reliable source, I mean a real reliable source, that if you go through with this Romero Hearing, Judge John Garibaldi is going to deny striking your prior strike, and he's going to give you 14 years at 85%." Ten seconds later the bailiff said, "All rise."

Petitioner retained Mr. Shroeder to represent him one time at petitioner's sentencing/Romero Hearing. Mr. Shroeder raised absolutely no mitigating evidence when there was plenty of it to be raised.

> GROUND SIX: THE PROSECUTION FAILED TO ALLOW THE
> DEFENSE INSPECTION OF EVIDENCE RELEVANT, MATERIAL,
> AND FAVORABLE TO THE DEFENSE. THIS VIOLATED PETI-
> TIONER'S RIGHT TO A FAIR TRIAL ALONG WITH HIS DUE
> PROCESS RIGHTS AS GUARANTEED BY THE UNITED STATES
> CONSTITUTION, AND THE 5th., 6th., AND 14th. AMEND-
> MENTS THERETO

## SUPPORTING FACTS

Petitioner was arrested on 8/8/03. After petitioner's third court appearance he met his Public Defender, Mark Camperi, who stated: "They've got the tape. They've got a weapon. It's a slam-dunk!" The tape Mr. Camperi was referring to was a taped interrogation of petitioner made by Detective Craig Anderson prior to petitioner's being arraigned; while petitioner was in custody; within 48 hours of petitioner's release from the jail

hospital after suffering a grand mall seizure, falling off his bunk and hitting his head on the concrete floor; under the influence of a prescribed medication different from his usually prescribed medication of the previous 5 years; and that not only was petitioner unaware that plainclothed Detective Craig Anderson was a police officer, Detective Anderson also asked petitioner if he (petitioner) had been arraigned yet as well as stating petitioner was charged with battery prior to Detective Anderson "Mirandizing" petitioner, and that the aforementioned would be revealed by listening to the beginning of THE TAPE.

Petitioner requested to listen to the tape (EXHIBIT 26) numerous times the first 4 months he was in custody. Petitioner was finally brought a supposed duplicate of the tape approximately 75 days after he was arrested. This duplicate was brought to the jail by Public Defender Mark Camperi to be played for petitioner. It was duplicated at a 78 RPM speed. Not only could one not understand 90% of the tape, the other 10% sounded like a conversation between two mice. Petitioner exclaimed, "This is ridiculous; you can barely understand it much less determine who's saying what!" Public Defender Camperi said, "I've listened to it 3 or 4 times on the way to the jail." Petitioner then asked, "Has the District Attorney tested the knife for fingerprints yet?" Mr. Camperi replied, "No." Petitioner asked Mr. Camperi, "Why can't we have the taped interrogation recording that's at the normal (understandable) speed?" Mr. Campari said, "The District Attorney is reluctant to give up the original."

Had petitioner been given a more accurate likeness of the

cont.

original tape from the prosecution, then the strategy of the defense would have changed dramatically. Petitioner would not have felt compelled to testify, and probably would have received a lesser sentence if not, in fact, been found not guilty.

## POINTS AND AUTHORITIES

**GROUND ONE:**  PETITIONER'S CONFESSION WAS OBTAINED DURING POLICE INTERROGATION IN WHICH PETITIONER WAS DENIED THE RIGHT TO HAVE COUNSEL PRESENT. THIS VIOLATED PETITIONER'S PROTECTION AGAINST SELF-INCRIMINATION AND THE 5th. AND 14th. AMENDMENTS TO THE UNITED STATES CONSTITUTION

On August 12, 2003, petitioner was interrogated by Detective Craig Anderson while in custody at the Santa Clara County Main Jail, South Facility, shortly after being released from the jail hospital. Petitioner was taking medication to prevent him from experiencing another grand mal seizure similar to the one he'd suffered and been hospitalized for just days earlier. Petitioner was awaiting arraignment on the Penal Code § 245(a)(1) charge.

Detective Anderson was not in uniform nor wearing a badge, nor did he inform petitioner that he was a police officer. He turned on his hidden microcassete recorder prior to petitioner entering the room. (R.T., Volume III., page 223, lines 2-3)

Initially, Detective Anderson made false and misleading statements such as, "Have you been arraigned yet?" and "you are charged with battery." These statements occurred _prior_ to petitioner being advised of his Miranda rights and were recorded at the beginning of the tape. (Exhibit 26 at the trial). Petitioner believes that Detective Anderson used a two-step interrogation technique referred to as question first, of which the manifest purpose is to get a confession the person being questioned would not make if he understood his rights at the outset, which is in direct violation of Miranda.

In petitioner's case, the Miranda warning was purposefully withheld to obscure both the practical and legal significance

15

of the admonishment when it was finally given.  The two-step technique permits the accused to conclude that the right not to respond did not exist when the earlier incriminating statements were made.  The strategy is based on the assumption that Miranda warnings will tend to mean less when recited mid-interrogation, after inculpatory statements have already been obtained by the questioner.  This tactic relies on intentional misrepresentation of the protection that Miranda offers and does not serve any legitimate objectives that otherwise justify its use.  The technique creates too high a risk that post-warning statements will be obtained when a suspect was deprived of "knowlege essential to his ability to understand the nature of his rights and the consequences of abandoning them." Moran v. Burbine, 475 U.S. 412, 423-24 (1986)

When an interrogation uses this deliberate two-step strategy, predicated upon violating Miranda during an extended interview, post-warning statements must be excluded absent specific curative steps.

Interrogation is defined not only as express questioning but its "functional equivalent." Moreno-Flores, 33 F.3d at 1169, quoting Rhode Island v. Innis, 446 U.S. at 300-01.  "The police surely cannot be held accountable for the unforeseeable results of their words or action, the definition of interrogation can extend only to words or action on the part of police officers that they should have known were reasonably likely to elicit an incriminating a response." Innis, 446 U.S. at 301-02.

The conduct of the police in this case is precisely what

the Supreme Court had in mind in <u>Oregon v. Elstad</u> 470 U.S. 298
(1985) when it exempted "deliberately coercive or improper tactics
in obtaining the initial statement" from the ordinary rule that
subsequent statements are not to be measured by a "tainted fruit"
standard but by whether they are voluntary.  Detective Anderson
used pre-advisement interrogation, "you're charged with battery,"
to open petitioner up and undermine Miranda.  <u>Pope v. Zenon</u>, 69
F.3d 1018 (9th. Cir. 1995)

The Superior Court improperly admitted statements obtained
in violation of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

In reiterating my previous trial testimony, Detective Ander-
son mentioned that I was charged with "battery," that he was
there to try and "wrap things up," as well as asking, "have you
been arraigned yet?"  (R.T., Volume III., page 349, lines 5-23)

> GROUND TWO:   THE PROSECUTION SUPPRESSED EVIDENCE
> FAVORABLE TO THE PETITIONER.  THIS VIOLATED PETI-
> TIONER'S DUE PROCESS RIGHTS AS GUARANTEED BY THE
> 6th. AND 14th. AMENDMENTS TO THE UNITED STATES
> CONSTITUTION

On May 18, 2004, while speaking to prosecution witness Peter
Craven, prosecutor Jim Demertzis was made aware of an alleged
confession made by the petitioner to Peter Craven the night of
the charged offense.  (R.T., Volume III., page 192, lines 4-11)

Prosecutor Jim Demertzis failed to disclose this alleged
confession made by the petitioner to the defense prior to prose-
cution witness Peter Craven testifying.  (R.T., Volume II., page
138, lines 21-24)

This was objected to by defense attorney Eben Kurtzman.
The defense moved for a mistrial, stating that the prosecutor

17

violated Penal Code § 1054.1(b) for failing to immediately dis-
close statements made by defendant. (████ ██, Volume II., page
146, lines 14-17)  The Honorable Judge John Garibaldi denied
the motion for mistrial on May 20, 2004.  (R.T., Volume III.,
page 196, lines 17-28)

Had the defense been made aware of this severely incrimin-
ating upcoming testimony alleging a confession made by petitioner,
defense could have chosen to discontinue trial proceedings without
petitioner's testifying and before petitioner's prior serious
felony was raised by the prosecution, enabling petitioner to *possibly*
receive a^more lenient sentence.

Suppressed evidence is held to be material "if there is
a reasonable probability that had the evidence been disclosed
to the defense the result of the proceeding would have been dif-
ferent."  <u>Kyles v. Whitley</u>, 514 U.S.419, 115 S.Ct. at 1565 (quot-
ing U.S. v. Bagley, 473 U.S. at 682, 105 S.Ct. at 3383, plurality
opinion)  "A reasonable probability of a different result is
... shown when the Government's evidentiary suppression undermines
confidence in the outcome of the trial."  <u>Kyles v. Whitley</u>, 514
U.S. 419, 115 S.Ct. at 1566 (quoting <u>Bagley</u>, 473 U.S. at 678,
105 S.Ct. at 3381).

Prosecutor Jim Demertzis knew from previous trial, prelim-
inary hearing, as well as the police report statements that the
victim, Craig Davis, was not only a friend of petitioner's, he
(a) did not want to go to the doctor from the scene, (b) did
not want to press charges, (c) did not call the police, (d) did
not remember talking to police at the scene (████ ██ C.T., page

18

22, lines 9-15), (e) did not remember being inside the apartment (C.T., page 28, lines 12-18), (f) didn't remember a puncture wound occuring (C.T., page 28, lines 5-9), (g) didn't remember seeing a weapon (▬▬ ▬▬, C.T., page 14, lines 14-16), and (h) totally forgives petitioner and doesn't have any hard feelings. (C.T., page 16, lines 7-9)

Given this previous testimony by the only eyewitness to the alleged crime, it's understandable that the prosecution may have believed in a reasonable probability of a different result had it not suppressed the upcoming testimony of prosecution wit-ness Peter Craven in violation of Penal Code § 1054.1(b).

A defendant has a constitutional privilege to obtain from the prosecution evidence material to his guilt or relevant to punishment imposed. Brady v. Maryland, 373 U.S. 83 (1963). Prior statements of a witness that are both material and incon-sistent with his anticipated testimony fall within the Brady rule. Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); U.S. v. Hanna, 55 F.3d 1456 (9th. Cir. 1995)

A prosecutor's duty to reveal such evidence does not depend on a request by the defense. U.S. v. Bagley, 473 U.S. 667, 683, 105 S.Ct. 3375, 3384, 87 L.Ed.2d 481 (1985); Thomas v. Goldsmith, 979 F.2d 746, 749-50 (9th. Cir. 1992)

> GROUND THREE:  THE PROSECUTOR KNOWINGLY USED PER-
> JURED TESTIMONY OR FAILED TO CORRECT KNOWN FALSE
> TESTIMONY TO OBTAIN PETITIONER'S CONVICTION.  THIS
> VIOLATED PETITIONER'S RIGHT TO A FAIR TRIAL AS
> GUARANTEED BY THE U.S. CONSTITUTION AND THE 6th.
> AND 14th. AMENDMENTS

On May 24, 2004, prosecutor Jim Demertzis deliberately recalled victim Craig Davis on the final day of trial to testify

to one question: "Did you hit Mr. Hancock with a frying pan? "No." "That's all the questions I have." (R.T., Volume IV., page 467, lines 12-15)

Prosecutor Jim Demertzis was well aware from previous trial and preliminary hearing testimony not only of Craig Davis, but from other prosecution witnesses' testimonies as well, that Davis's testimony was not only false but perjurious. "Where a prosecutor knows that his witness has lied, he has a constitutional duty to correct false impression of the facts. The failure to correct prosecutorial testimony known to be false may have made a difference to the outcome of the case." U.S. v. LaPage, 231 F.3d 488 (9th. Cir. 2000)

If a prosecutor knowingly uses perjured testimony or knowingly fails to disclose that testimony is false, the conviction must be set aside if "there is any reasonable likelihood that the false testimony could have affected the jury verdict." U.S. v. Endicott, 869 F.2d 452, 455 (9th. Cir. 1989); Ortiz v. Stewart, 149 F.3d 923, 936 (9th. Cir. 1998), citing U.S. v. Bagley, 473 U.S. 667, 678-80, 105 S.Ct. 3375, 3381, 87 L.Ed.2d 481 (1985).

Prosecutor Jim Demertzis violated Napue v. Illinois, 360 U.S. 264, by failing to correct certain false testimony by victim Craig Davis. Hovey v. Ayers, 458 F.3d 892. Craig Davis, the only eyewitness to the alleged crime, save petitioner, had 102 memory lapses in the preliminary hearing alone. Prosecutor Demertzis spoke with Craig Davis on 10 different occasions in the 9 months preceding the trial. (R.T., Volume II., page 83, lines 9-12, 25-28)

Without a doubt, Craig Davis does not recall the alleged crime. (R.T., Volume II., page 85, lines 7-11) "A conviction obtained by the knowing use of perjured testimony must be set aside if there is any reasonable likelihood that the false testimony could have affected the outcome of the trial." U.S. v. Sherlock, 962 F.2d 1349, 1364 (9th. Cir. 1989); U.S. v. Polizzi, 801 F.2d 1543, 1549-51 (9th. Cir. 1986)

On May 19, 2004, during prosecution witness Peter Craven's trial testimony, he was asked by prosecutor Jim Demertzis: "Did you ask Craig (victim) what happened?"

Craven: "Yes."

Demertzis: "What did he tell you?"

Craven: "Craig told me he got rolled in the park, Fairoaks Park."

Demertzis: Did you believe him?"

Craven: "No."

Demertzis: "Why not?"

Craven: "Jeff [petitioner] had combative injuries to his hands."

Demertzis: "O.K. Tell us about that."

Craven: "His hands were swollen and cut up. It looked like he had been beating on Craig, which...." (R.T., Volume II., page 134, lines 9-14)

On May 20, 2004, prosecution witness Officer Andrew Zariello, who was one of the officers at the scene of te alleged crime on August 8, 2003, responded to defense questioning:

Defense: "And if he [petitioner] had any injuries or swelling or cuts or anything like that, you would ... or bruising you would have noted that, right?"

Zariello:  "Yes."

Defense:  "How about his hands?"

Zariello:  "Not to my recollection."  (R.T., Volume III., page 211, lines 13-16, 22-25)

A defendant who has been convicted on the basis of false testimony has been denied due process of law. <u>Napue v. Illinois</u>, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217.

<u>GROUND FOUR</u>:  PETITIONER'S CONVICTION WAS THE RESULT OF CUMULATIVE ERRORS OF COUNSEL, I.E., ERRORS THAT, ALTHOUGH NOT PREJUDICIAL INDIVIDUALLY, ARE CUMULA-TIVELY PREJUDICIAL. THIS VIOLATED PETITIONER'S RIGHTS TO DUE PROCESS AND EFFECTIVE ASSISTANCE OF COUNSEL, AS GUARANTEED BY THE UNITED STATES CONSTITUTION AND THE 5th., 6th., and 14th. AMEND-MENTS THERETO

Petitioner informed trial counsel Eben Kurtzman during their first interview, one week before trial, that his previous attor-ney, David Hardin, was going to move for suppression of the taped interrogation (EXHIBIT 26) on the grounds that Detective Craig Anderson violated "corpus" while conducting the interrogation prior to "Mirandizing" petitioner. Mr. Hardin said to petitioner, "While I listened to the tape (EXHIBIT 26) I heard Detective Anderson say your charge was battery." Petitioner also informed newly-retained trial counsel Mr. Kurtzman that Detective Anderson asked, "Have you been arraigned yet? I'm just here to try and get your side of the story so we can wrap things up. I do inter-views for the Sunnyvale Police Department. It would be better for the judge before you go to court to hear your side of the story." Petitioner explained this to defense counsel Eben Kurtz-man.

Mr. Kurtzman "has a duty to make reasonable investigations

or to make a reasonable decision that makes particular investigations unnecessary." <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 384, citing <u>Strickland v. Washington</u>, 466 U.S. at 691; <u>Turner v. Duncan</u>, 158 F.3d 499 (9th. Cir. 1998)

The only eyewitness to the alleged Penal Code § 254(a)(1) violation were the petitioner and petitioner's best friend, the alleged victim, Craig Davis. The alleged victim Craig Davis: did not want to press charges (police report); did not want to receive medical attention (police report); did not call paramedics or police; did not want to testify (CT 6, lines 5-10); said petitioner was "a good guy and didn't want to see him get in trouble" (CT 30, lines 6-11); said "he's never seen petitioner act violently" (CT 44, lines 25-28); had multiple police encounters in the 7 years preceding; had over 100 memory lapses during the preliminary hearing (CT 1-87). Alleged victim Craig Davis had previous assault encounters as well as convictions.

Craig Davis testified in the preliminary hearing to assaulting petitioner. (CT 40, line 28) The alleged victim Craig Davis testified in the preliminary hearing that he didn't remember the encounters he had the night of the incident while inside petitioner's apartment. Encounters with Officer Kim (CT 30, 31), witness Steve Duncan (CT 38, 39 lns 27, 28 and lns 1, 2) who were both physically with him inside the apartment as was petitioner just minutes earlier. It should be obvious to the layman that victim Craig Davis doesn't remember being inside the apartment.

Keeping the aforementioned in mind, petitioner's counsel, Eben Kurtzman, complained during the initial interview that was

23

held one week before trial, "I've got to read the whole preliminary transcript! It's almost 100 pages!"

At the close of petitioner's trial it became obvious that Mr. Kurtzman did not familiarize himself with the preliminary hearing transcript. The last testimony that the jury heard was that of alleged victim Craig Davis who had been recalled by Prosecutor Demertzis to be asked, "Did you hit Mr. Hancock (petitioner) in the head with a frying pan?" Mr. Davis replied, "No." Mr. Demertzis said, "I have no further questions." The judge asked, "Would you like to cross?" Mr. Kurtzman said, "No."

How can alleged victim Craig Davis answer that question when he's already testified to not remembering numerous encounters which occurred inside the apartment. If he doesn't remember being inside the apartment, how can he remember if he hit someone with the frying pan? The frying pan was inside the apartment, half cockeyed on the stove burner. (See EVIDENTIARY PICTURES)

Witness Steve Duncan was inside petitioner's apartment with alleged victim Craig Davis when police and paramedics arrived. Petitioner was nowhere to be seen. Sunnyvale Police Department interviewed witness Duncan, took his shirt as evidence, then told him to leave. All of this was done before Sunnyvale police officers made any visual or verbal contact with petitioner. Why wasn't Steve Duncan charged with the crime of Penal Code § 245(a)(1)? Why wasn't Duncan called as a defense or prosecution witness? Why was Steve Duncan given a deal by the prosecution of 6 years at 85% just prior to petitioner going to his preliminary hearing? Could it have been that a material witness was

being made unavailable to the defense in violation of petitioner's right to due process as guaranteed by the United States Constitution and the 14th. Amendment? <u>United States v. Valenzuela-Bernal</u>, 458 U.S. 858 (1982).

The incriminating statements made by petitioner on the evidentiary tape (EXHIBIT 26), that was only partially played to the jury, led petitioner to believe than only he could explain the reason for the remarks by testifying himself. Without the evidentiary tape, petitioner would never have testified. The jury would never have heard of petitioner's prior arrest history, nor would they have heard of any incriminating statements made by petitioner. The presiding judge, John Garibaldi, prior to trial stated that "should he testify" (R.T. Vol. II, page 22, line 5); as well as Prosecutor Demertzis's statement "if he testifies" (R.T. Vol. II, page 21, line 3) then the jury should and will be made aware of his prior convictions insofar as it sheds light on his credibility. (R.T. Vol. II, page 21, lines 3-5; page 22, lines 4-7)

Given the fact that petitioner's case rested largely on (RT Vol II pg 85) petitioner's statements versus the victim's statements, (petitioner's friend), and the aforementioned circumstances, testimony, and evidence, defense counsel Kurtzman's "performance fell below an objective standard of reasonableness under prevailing professional norms. There is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."

Strickland v. Washington, 466 U.S. 668, 68788, 694.

Petitioner believes that had his trial counsel, Mr. Kurtzman, listened to the beginning of the evidentiary taped interrogation (EXHIBIT 26), it would have been obvious that petitioner's Miranda Rights were circumvented by Detective Craig Anderson's psychologically coercive question-first tactics, "Have you been arraigned yet? You're charged with battery," are no pre-booking questions.

A lawyer who fails adequately to investigate, and to introduce evidence that demonstrates his client's actual innocence, or that raises sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance. Avila v. Galaza, 297 F.3d 911 (9th. Circ. 2002)

Petitioner believes that because of the admittance of the coercively obtained confession on the evidentiary taped interrogation (EXHIBIT 26), he was compelled to be a witness against himself. This violated the 5th. Amendment. Rogers v. Richmond, 365 U.S. 534, 540-41; Haynes v. Washington, 373 U.S. 503, 513.

> GROUND FIVE: PETITIONER'S COUNSEL WAS INEFFECTIVE AT SENTENCING BY FAILING TO PRESENT MITIGATING EVIDENCE. THIS VIOLATED PETITIONER'S RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL, AS GUARANTEED BY THE UNITED STATES CONSTITUTION AND THE 6th. AMENDMENT

Petitioner's prior arrest history clearly shows that he has never been convicted of a weapons charge. Petitioner's 10-year old Penal Code § 211 conviction was modified at preliminary hearing 11/26/85 to a 2nd. degree robbery because it did not involve a weapon.

Alleged victim Craig Davis testified in reference to petitioner!

"He's never seen him (Petitioner) act violently" (CT. page 44 @2528). He's a good guy and doesn't want to see him get in trouble" (CT. page 30 @6-11). He gave testimony as to assaulting petitioner (CT. page 40 @28). "He doesn't want to press charges" (Police Report). "He doesn't want medical attention" (Police Report). "He didn't want to testify. He's my friend" (CT. page 6 @9).

Sentencing counsel Wesley Shroeder by not conducting any investigation into petitioner's criminal background and by not informing the petitioner of the potential significance of mitigating evidence violated petitioner's 6th. Amendment right to effective assistance of counsel. Williams v. Woodford, 306 F.3d, 720 (9th Cir. 2002) citing; Silva v. Woodford, 306 F.3d, 838 (9th Cir. 2002). Sentencing counsel Wesley Shroeder had a month to discover this mitigating evidence and yet just 60 seconds prior to the judge entering the courtroom, while his client is standing shackled in a jury box, he hurriedly convinces him that, "if he doesn't agree to accept an 11 year sentence and forego his Romero Hearing then Judge John Garibadi is going to deny striking his 18 year old strike and sentence him to a prison term of 14 years at 85%.

"The 6th. Amendment right to effective assistance of counsel guarantees more than the 5th. Amendment right to a fair trial – it serves to protect the reliability of the entire trial process" United States v. Baylock, 20 F.3d, 1458,1466 (9th Cir. 1994) quoting; United States v. Day, 969 F.2d, 39,45 (3rd Cir. 1992); Nunes v. Mueller, 350 F.3d, 1045,1052 [13] (9th Cir. 2003).

Furthermore, Judge John Garibaldi stated that he was "inclin-
ed to follow" the probation department's recommendations (RT. Vol.
IV. page 543 @1-2) part of which was to "strike the additional
punishment of 12022.7(a)" (RT. Vol. IV. page 543 @27-28, page 544
@1-4) which would have amounted to an additional 3 three reduction
or the petitioner. Petitioner's sentence would have been reduced
from 14 years to 11 years. Judge John Garibaldi was "inclined to
follow" probation's recommendations prior to asking "if counsel
would like to be heard?"

There is a reasonable probability that, but for counsel's un-
professional errors, the result of the proceeding would have been
different." Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052
80, L.ed. 2d. 674 (1984.

> **GROUND 6**  THE PROSECUTION FAILED TO ALLOW THE DE-
> FENCE INSPECTION OF EVIDENCE RELEVANT, MATERIAL,
> AND FAVORABLE TO THE DEFENSE.  THIS VIOLATED PE-
> TITIONER"S RIGHTS AGAINST SELF INCRIMINATION, A
> FAIR TRIAL, AND DUE PROCESS, AS GUARANTEED BY THE
> UNITED STATES CONSTITUTION, AND THE 5th., 6th.,
> AND 14th. AMENDMENTS THERETO.

Petitioner requested that defense counselor Mark Camperi ac-
quire the evidenciary taped police interrogation from the prosecu-
tion on numerous occasions prior to his court appearances in order
to point out psychologically coercive tactics that were used by
police interviewing officer, Detective Craig Anderson.  Petitioner
informed defense counselor Mark Camperi that detective Craig An-
derson obtained an admission while using illegal questioning tac-
tics, that I would be able to point those tactics if he obtained
the tape (Exhibit 26).

Just days prior to petitioner's Preliminary Hearing, defense

28.

counselor Mark Camperi came to the jail to play a "duplicate" recording of the police interrogation, and it was duplicated at 78 speed where 9 out of 10 words were uncomprehendable!

"A defendant has a constitutional privilege to obtain from the prosecution evidence material to his guilt or relevant to punishment imposed." Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1175, 10 Led. 2d., 215 (1963). Not only did petitioner make this request to Public Defender Mark Camperi, he also made the same request to newly retained defense counsel David Hardin. Defense counsel David Hardin told petitioner, "I heard Detective Craig Anderson say, 'you're charged with battery' when I listened to the tape. I'm going to move for suppression of the taped interrogation. I believe Detective Anderson violated corpus." Defense attorney David Hardin was then abruptly hospitalized with pneumonia. One month later he received a heart transplant. Petitioner was forced to retain another defense counsel Eben Kurtzman, who petitioner informed that previous defense counsel David Hardin had the intention to file a motion to suppress the prosecution's im? terrogation tape (Exhibit 26), however defense counsel Eben Kartzman never acted on the motion.

"A prosecutor's duty to reveal such evidence does not depend on a request by the defense." U.S. v. Bagley, 473 U.S. 667,683 105 S.Ct. 3375,3384 87 Led. 2d. 481 (1985); Thomas v. Goldsmith, 979 F.2d. 746, 749-50 (9th Cir. 1992) This taped interrogation (Exhibit 26), as given to the defense (petitioner) was made so uncomprehendable (78 speed), it was made unusable to the defense so as to violate petitioner's right against self-incrimination, a fair trial, and his due process rights.

29.

The petitioner's case was based largely on the alleged victim's word against the petitioner's word! The alleged victim was a local transient panhandler, with a criminal record, who was well known to local police, including those who testified for the prosecution. The amount of hard evidence that the prosecution had in it's favor would have been minute without the taped interrogation. "Suppressed evidence is held to be material if there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different." Kyles v. Whitﬆey, 514 U.S. 419, 115 S.Ct. at 1565.

## CONCLUSION

Petitioner's Petition for Habeas Corpus established a prima face case that his Fifth, Sixth, and Fourteenth Amendment rights were violated.

Petitioner's Fifth Amendment right against self-incrimination was violated by Detective Anderson giving a false pre-warning statement in order to obtain an incriminating post-warning statement. This incriminating statement obtained by deliberately circumventing Petitioner's Fourth Amendment right was then played by the prosecution for the jury violating petitioner's Fifth Amendment right.

Petitioner's Sixth Amendment right to effective assistance of counsel was violated when both the trial and sentencing counsel refused to investigate and present crucial mitigating evidence. The petitioner's Sixth Amendment right to a fair trial and Fourteenth Amendment due process rights were violated when Prosecutor

30.

Jim Demertzis failed to immediately disclose statements allegedly made by the defendant (confession) made to prosecution witness prior to that witness testifying during trial, (a violation of Penal Code 1054.1(b)). Prosecutor Jim Demertzis knowingly and repeatedly used perjured testimony in order to obtain a conviction against the petitioner.

All of the aforementioned violations unreasonably prejudiced against the petitioner, and therefore, the conviction must be reversed.

31.

EXHIBIT 12

S150880

# IN THE SUPREME COURT OF CALIFORNIA

### En Banc

---

In re JEFF HANCOCK on Habeas Corpus

---

The petition for writ of habeas corpus is denied. (See *In re Clark* (1993) 5 Cal.4th 750.)

Werdegar, J., was absent and did not participate.

SUPREME COURT
FILED

JUL 2 5 2007

Frederick K. Ohlrich Clerk

_____
Deputy

**GEORGE**
_____
Chief Justice

37

*Exhibit 15*

S151947

# IN THE SUPREME COURT OF CALIFORNIA

### En Banc

In re JEFF HANCOCK on Habeas Corpus

The petition for writ of habeas corpus is denied.  (See *In re Clark* (1993) 5 Cal.4th 750.)

Werdegar, J., was absent and did not participate.

SUPREME COURT
FILED

JUL 2 5 2007

Frederick K. Ohlrich Clerk

_____
Deputy

**GEORGE**

_____
Chief Justice

33

# TABLE OF CONTENTS    GROUND SEVEN

Table of Authorities ................................................................................... iii

STATEMENT OF THE CASE.................................................................... 2

STATEMENT OF FACTS .......................................................................2

ARGUMENT ........................................................................................ 14

PETITIONER'S PETITION FOR HABEAS CORPUS ESTABLISHED
A PRIMA FACIE CASE THAT HIS SIXTH AMENDMENT RIGHT
TO EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED
WHEN COUNSEL REFUSED TO INVESTIGATE AND PRESENT
EVIDENCE OF PETITIONER'S LONG-STANDING SERIOUS
BRAIN INJURY AND PSYCHIATRIC DISORDER

A. Factual Background ......................................................................... 14

B. A "Tactical" Decision Falls Below the Standards of Reasonably
   Competent Counsel, Where, as Here, it is Not Supported
   By Investigation Into Potentially Meritorious Defenses ................. 15

C.  Counsel's Choice Not To Investigate Petitioner's Medical and

i

**TABLE OF CONTENTS, cont.**

Psychiatric History Also Fell Below The  Standards Of Reasonably
Competent Counsel Because it Was Unreasonable in Itself........... 23

1.  Reasonably competent counsel would have used an expert
    to explain the legitimate reasons for the discrepancies
    between petitioner's trial testimony and his confession............. 27

2.  Reasonably competent counsel would have presented petitioner's
    medical and psychiatric history as evidence that petitioner was
    not sufficiently aware of the true circumstances at the time of the
    incident (knowledge) to be culpable of assault ......................... 29

3.  Reasonably competent counsel would have presented petitioner's
    medical and psychiatric history as a circumstance removing
    petitioner from the Three Strikes statutory scheme................... 29

4.  Reasonably competent counsel would have presented petitioner's
    medical and psychiatric history as a factor in mitigation.......... 31

D.  Counsel's Refusal To Investigate Crucial Exculpatory And Mitigating
    Evidence Was Prejudicial.  ............................................................. 31

1.  It is reasonably probable that the jury would not have convicted
    petitioner that had it heard expert testimony  regarding  his long-
    standing brain injury and psychiatric disorder.  ......................... 32

2.  It is reasonably probable that the court would have imposed a
    more lenient sentence had it heard expert testimony regarding
    petitioner's long-standing brain injury and psychiatric
    disorder. .................................................................................... 37

CONCLUSION ....................................................................................... 39

# TABLE OF AUTHORITIES    GROUND SEVEN

**Cases** ............................................................................................ **Page**

*Berryman v. Morton* (3d Cir. 1996) 100 F.3d 1089 ............................................ 24

*Bloom v. Calderon* (9th Cir.1997) 132 F.3d 1267 ............................................. 26

*Daniels v. Woodford* (9th Cir. 2005) 423 F.3d 1181 ......................................... 17

*Glover v. United States* (2001) 531 U.S. 198 ..................................................... 37

*Hendricks v. Vasquez* (9th Cir. 1992) 974 F.2d 1099 ...................................... 17

*In re Cordero* (1988) 46 Cal.3d 161 ..................................................... 15, 16, 23

*In re Jones* (1996) 13 Ca      l.4th 552 ................................................................ 17, 24

*In re Lucas* (2004) 33 Cal.4th 682 ....................................................................... 19

*In re Marquez* (1992) 1 Cal.4th 584 ............................................................. 15, 19

*Jennings v. Woodford* (9th Cir.2002) 290 F.3d 1006, 1010 .................................. 25

*People v. Freeman*  (1994) 8 Cal.4th 450 ............................................................ 16

*People v. Frierson* (1979) 25 Cal.3d 142 ............................................................ 21

*People v. Howard* (1987)190 Cal.App.3d 41 ...................................................... 32

*People v. Ledesma* (1987) 43 Cal.3d 171, 222 ...................................... 15,16, 24, 32

*People v. Lopez* (1986) 188 Cal.App.3d 592 ............................................ 12, 20, 29

*People v. Mitcham* (1992) 1 Cal.4th 1027 ......................................................... 32

*People v. Pope* (1979) 23 Cal.3d 412 ........................................................... 15-16

*People v. Robertson* (2004) 34 Cal.4th 156 ....................................................... 31

*People v. Shaw* (1984) 35 Cal.3d 535 ................................................................ 21

*People v. Torres* (1995) 33 Cal.App.4th 37 ....................................................... 15

*People v. Williams* (1998) 17 Cal.4th 148 ......................................................... 30

*People v. Williams* (2001) 26 Cal.4th 779 ................................................ 12, 20, 29

iii

## TABLE OF AUTHORITIES, cont.

*Sanders v. Ratelle* (9th Cir. 1994) 21 F.3d 1446 ..................................................22

*Seidel v. Merkle* (9th Cir.1998) 146 F.3d 750, 755-56 ...........................................26

*Silva v. Woodford* (9th Cir.2002) 279 F.3d 825 ....................................................23

*Strickland v. Washington* (1984) 466 U.S. 668 ............................16, 19, 22, 24, 32

*United States v. Tucker* (9th Cir.1983) 716 F.2d 576 ...........................................23

*Wiggins v. Smith* (2003) 539 U.S. 510 .......................................................21,22,30

### Statutes

Penal Code,

     section 245, subd. (a)(1)................................................................................2

### Constitutions

California Constitution, article I, section 15 .....................................................15

United States Constitution, Sixth Amendment ........................................ █ 15

### Other

ABA Stds. for Crim. Justice (3d ed. 1993) std. 4- 4.1, p. 181..........................19

California Rules of Court,

     rule 4.423, subd. (b)(2).................................................................................31
██████ ................................................................................................█

GROUND 7: PETITIONER'S TRIAL COUNSEL WAS INEFFECTIVE WHEN COUNSEL REFUSED TO INVESTIGATE AND PRESENT CRUCIAL EXCULPATORY AND MITIGATING EVIDENCE. THIS VIOLATED PETITIONER'S RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AS WELL AS TO BE PROTECTED AGAINST SELF-INCRIMINATION, AS GUARANTEED BY THE SIXTH AND FIFTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

## STATEMENT OF THE CASE

On May 24, 2004, appellant was convicted after jury trial of assault with a deadly weapon, a knife. (Pen. Code, §245, subd. (a)(1)[1].) After admitting a prior "strike" conviction, appellant was sentenced to 11 years in state prison. (CT 283.)

## STATEMENT OF FACTS

The charges arose from a drunken scuffle between petitioner and Craig Davis, a homeless man petitioner had befriended and sheltered for several months. During the altercation, petitioner jabbed Davis with a small kitchen paring knife. Davis, who acknowledged that he "may have socked [petitioner] in the eye once" (Vol. II. RT 182), said petitioner stabbed him for no reason. Petitioner, who testified on his own behalf, said he only jabbed Davis with the paring knife in self-defense after Davis hit him on his face with a frying pan. (Vol. III RT 308-309-311.)

[1]All further statutory references are to the Penal Code, unless otherwise noted.

A2

Davis's testimony was both vague and contradictory: Davis, a self-described alcoholic, did not remember all the events of August 7, 2003. (Vol. II RT 49-50.) He testified that the two men had attended a picnic that day. When they returned home, petitioner told Davis he had been rude. (Vol. II RT 54.) After a "rather loud discussion," petitioner punched and kicked Davis for one or two minutes; Davis was unsure whether he had punched petitioner. (Vol. II RT 95, 56.) Petitioner dragged Davis over the concrete walkway and pushed his face into the concrete. (Vol. II RT 57, 60.) Petitioner went into the apartment, then came out to the place where Davis was sitting and stabbed him. (Vol. II RT 61.) Davis believed he had been stabbed because he felt a sharp pain in his back. (Vol. II RT 62.) He did not think petitioner even knew what he was doing, but believed he was in a blackout from his drinking. (Vol. II RT 65, 66.)

At trial, Davis said he believed petitioner stabbed him a second time in the hand as he held his arms in front of his face (Vol. II RT 66-67), but he had testified at the preliminary hearing that he did not remember how he received the wounds on his hand (Vol. II RT 112) and that he first felt the pain in his hand when he and petitioner were rolling around on the concrete, not when he was standing upright. (Vol. II RT 113.) The Stanford doctor who examined him noted no injuries to his hands. (Vol. III RT 258.)

3

Davis was "kind of vague" about what happened next, but thought that Peter Craven, a neighbor, had helped him into petitioner's apartment. (Vol. II RT 68.) Craven, however, testified that he had stopped by petitioner's apartment and found Davis sitting in a chair in the front room, with petitioner cleaning his wounds. (Vol. II RT 130-131.)

At trial, Craven said for the first time that he had asked petitioner what Davis had been stabbed with and petitioner had showed him a paring knife held at a depth of three to four inches, saying "I stabbed him this deep." (Vol. II RT 137-140.) Craven did not tell the police who interviewed him at the scene that petitioner had made those statements or shown him the knife; he offered no explanation for his failure to do so (Vol. II RT 144-145.)

Craven convinced petitioner that they should call the paramedics, which, he testified, necessarily meant calling the police. (Vol. II RT 141.) He suggested that petitioner leave, but petitioner, who did not want to go, merely went into his bedroom. When he tried to come out into the living room after about ten minutes, he ran into police officers. (Vol. II RT 141, Vol. III RT 319.)

Davis initially told police that he had gotten jumped in the park because he did not want to get petitioner into trouble. (Vol. II RT 69.) He

4

was taken to the hospital, where he was treated for abrasions and bruises on his face and a one to two centimeter puncture wound below his left shoulder. Vol. II RT 237.) There, he told Officer Kim that defendant had wanted him to leave and had beaten him up. He did not know if he had been stabbed. (Vol. II RT 167.) Some of the bruises were yellow and could have been a week or two old . (Vol. III RT 255.) Three days earlier, Davis had fallen in the bathroom, smashing into the slab of the sink and cracking it. (Vol. III RT 327, 331.) Although Davis had testified that he believed his ribs were broken, the treating doctor had not noted any such fractures. (Vol. III, RT 258.) The doctor estimated that the injury to Davis's shoulder would take about a week to heal. (Vol. III, RT 261.) Officer Kim acknowledged that Davis's injuries might be consistent with somebody on the losing end of a fight. (Vol. II, RT 182.)

Petitioner was arrested on the scene and taken to jail. (Vol. III. RT. 199, 202, 205-208) Petitioner never made any incriminating statements to the police at the scene nor to police after he was taken to jail the night of the alleged incident.

Ten minutes after petitioner returned from the park Craig Davis stopped by, entered petitioner's apartment, and proceeded to consume alcohol with the petitioner. (Vol. III. RT. page 291) A discussion ensued pertaining to Davis' recent abusive behavior both at the park and around petitioner's apartment complex in recent weeks. (Vol. III. RT. pages 292-97) Petitioner then stated: "Okay Craig, the bottle is gone now. You have to go." (Vol. III page 298) Davis was unresponsive. Petitioner told Davis once again that he couldn't stay with him and Davis left the apartment.

Ten minutes later, petitioner found that Davis had passed out on the cement outside his door. (Vol. III. pages 299-300) Petitioner slapped him lightly on the face for three minutes or so, walking him into the apartment after he woke up. (Vol. III. page 302) Davis' face was red and had a trickle of blood on it. Petitioner told him to get in the shower. (Vol. III. RT. page 303)

After Davis had showered and dressed in petition's clean clothes,

petitioner told him once again that he would have to leave. When Davis did not respond, petitioner grabbed him and tried to get him to go to the door. (RT 305-307.) At some point in the struggle, Davis hit petitioner on the left-hand side of his face with a pan off the stove. (RT 308-309.) Petitioner fell back, caught his balance with his hand on the kitchen counter where a knife was sitting, grabbed the knife and jabbed it towards Davis. (RT 310-311.) The knife punctured Davis, who continued to stand there. (RT 311.) Petitioner put paper towels ━━ ◀━━━ on the wound. (RT 313.)

Petitioner explained at trial that his statement to police had not been complete because he had been suffering from the after-effects of a seizure when he was interviewed. He had a history of "grand mal" seizures for which he had been hospitalized seven or eight times. (Vol. III RT 343.) He had suffered one of these seizures and fallen from his bunk while in jail; when interviewed by Officer Anderson less than 48 hours after his release from the jail hospital, he still felt groggy, both from the seizure and because the medication he'd been prescribed for it (Librium) was different than his usual, and it had affected his ability to properly understand. (Vol. III. RT. 332-33, 346)

During most of the interview, he had just listened to the officer, "waiting for him to stop talking so I can say yeah, uh-huh, or no, or shake my head, or whatever so that he'll go on." (Vol. III RT 344.) For a part of

7

the time, petitioner was just "paying lip service" to the officer, so the interview was inaccurate in some respects. (Vol. III RT 334.) It did not describe the way the stabbing happened, for instance. (Vol. III RT 335.) During the interview, petitioner believed that the officer was just there to "wrap things up," that his charge would be reduced, and he would be charged with a battery for which he would do some county jail time. (Vol III RT 348-349.) He didn't want to get Davis, who was his friend, in trouble, so he didn't tell the officer that Davis had hit him with a pan. (Vol III RT 347.)

Before and during trial, both petitioner and his mother told trial counsel that petitioner did, in fact, have a long-standing seizure disorder that was affecting him at the time he made his "confession," and that they could provide him with extensive medical records documenting the disorder and the after-effects of his seizures. (Declaration of Mary Margaret Smith attached as Dec. 1[2], ¶¶ 4,5,6,7,8; Declaration of Jeff Hancock, attached as Dec. 2, ¶¶ 1-6.) Counsel, however, refused to obtain or examine petitioner's medical records, hire an expert to review them, put on a medical expert, or present any other evidence that petitioner did, in fact, suffer from a long-term seizure disorder, had a serious brain injury, and had a history of serious

[2]All references to Exhibits are to Exhibits attached to the Petition for Habeas Corpus.

8

psychiatric disorder. (**Dec.3** ████, ¶ 7, Declaration of Eben Kurtzman, attached

as **Dec.3** ████, ¶ 2,3,4.)

Trial counsel explains his refusal to obtain petitioner's medical records

and retain a medical expert to interpret them as follows: He did not believe

petitioner's medical history to be relevant to defense of the offense itself

because petitioner had not said he was suffering from a seizure at the time

of the offense and because assault is a general intent crime. (**Dec.3** ████, ¶ 3.) He

did not try to use the medical evidence to keep out petitioner's confession

because he wanted it to come in. He believed its good aspects out-weighed

the bad, as it included information he believed would render petitioner

more sympathetic to the jury, including that petitioner had allowed Davis to

stay with him and had paid for his food. It also showed that he was remorseful

and had not meant to hit Davis. (*Id.*, ¶ 4.) Counsel was aware that petitioner

wanted to testify but hoped to dissuade him from doing so because defendants'

testimony usually contains at least some inconsistencies that the district

attorney can be expected to capitalize upon. (*Id.* at ¶ 5.) Counsel did not

remember when petitioner first told him about being hit in the face with a

frying pan, but felt that having an expert testify that petitioner was

incapacitated during his interview only as to his recollection of the frying

pan would have encouraged the jury to dismiss the entire defense. (*Id.* at ¶

9

¶ 6, 7.) Petitioner's unrefuted declaration establishes that he did, in fact, tell counsel that he only jabbed Mr. Davis after Mr. Davis had hit him in the head with a frying pan well before trial, when he met with counsel at the jail. (See petitioner's supplemental declaration, attached to letter of February 24, 2006, to Court of Appeal.)

The prosecution capitalized on counsel's failure to present this exculpatory and mitigating evidence by arguing that the jury should not believe petitioner at all because no evidence corroborated his testimony that he had been suffering from a seizure when police interviewed him. It urged that petitioner was not credible because he had testified that his "confession" had been affected by "a grand mal seizure that we don't have any evidence of. (Vol. IV, RT 502.) It argued: "If you're going to get on the stand and say you had a seizure and that's why parts of the tape are not accurate, okay, did you have a seizure? Are you on medication? And if you had a seizure and you were on medication and you are kind of groggy, how is it that the parts that help you are accurate? It doesn't work like that. Don't buy that." (Vol. IV, RT 502.) (J.H.A.R. 8652)

Had counsel obtained petitioner's medical records and hired an expert to interpret them, he could have deprived the prosecution of the argument described above. That expert could have testified, as Dr. John Shields, a clinical and

10

forensic psychologist, declared in petitioner's petition for habeas corpus,

after reviewing approximately 200 pages of petitioner's medical records

and a transcript of petitioner's "confession" to police, that: "Mr. Hancock

has an extensive and well documented medical and psychiatric history which

is remarkable for a brain injury due to blunt trauma and possible

neuropsychological impairment due to recurrent seizure activity....there is

no dispute about the authenticity of Mr. Hancock's claim to have a history

of seizures." (Declaration of Dr. John Shields, attached as Dec.5, p. 3, ¶ 5.)

Petitioner's brain injury is "notable and significant." (*Id*. at ¶ 6.)   The

medical records show "that Mr. Hancock had a seizure shortly after his

arrest" (*Id*. at ¶ 9), and that after past seizures, it has taken him several days

to regain his faculties." (*Id*. at p. 5, ¶ 7.) According to Dr. Shields, petitioner's

records demonstrate not only a forensically significant medical condition,

but a "notable psychiatric history...marked by the presentation of symptoms

of severe mental illness and/or a severe compromise in his mental status, "

so extreme that petitioner has required involuntary psychiatric commitment.

(*Id*. at  p. 4, ¶ 8.)

Because the arresting officer on 8/8/03, "indica-
ted that Mr. Hancock had 'no' psychiatric/mental health
history" (AAF. 4052); (Id. at p.5 ¶10), it did not
appear to Dr. Shield that interrogation Detective Craig
Anderson was aware that petitioner's mental status may
have been                                        11

compromised at the time petitioner "confessed". (Id. at
p.5 ¶12) Accordingly, on 8/12/03 Interrogation Detec-
tive Craig Anderson did not take any precautions to
ensure that petitioner, impaired and suggestible, waived
his Miranda rights in a knowing and intelligent manner.
(Id. at p.7 ¶15,16,17)

Dr. Shields also found that petitioner appeared to have been "rather
suggestible" during the interview (Id. at p. 5, ¶¶ 13) as a result of "the fact
that he was recently post-seizure at the time of the interview, that he has a
notable psychiatric history and may have had compromised mental faculties,
and that he has brain impairment." (Id. at pps. 6-7, ¶ 15.) The interviewing
officer appeared to use "suggestive interrogation techniques" that would be
most effective on a vulnerable subject. (Id. at p. 6, ¶ 15.)

In Dr. Shields's view, had trial counsel obtained petitioner's medical
records and consulted an expert such as himself, he would have had reasonable
grounds to raise issues at trial such as: 1) whether petitioner had knowledge
of the relevant factual circumstances that made his act illegal[3]; 2) whether

---

[3]Dr. Shields actually uses the phrase: "whether or not the defendant
was able to form specific intent." (Id. at p. 8, ¶ 19.) Since assault is a
general intent crime, specific intent is not at issue. The same point,
however, is relevant to a determination whether petitioner was aware "that
the illegal act is being done within the terms of the statute. This is
knowledge, not specific intent. (People v. Lopez (1986) 188 Cal.App.3d
592, 598.) This concept applies to assault, as explained in People v.
Williams (2001) 26 Cal.4th 779, 790 [defendant must have "knowledge of
the relevant factual circumstances."].)

12

petitioner was able to waive his *Miranda* rights intelligently; 3) whether petitioner committed the current offense while in a compromised mental state; 4) whether petitioner was vulnerable to suggestibility during his "confession." (*Id.* at p. 8, ¶ 19.)

**ARGUMENT**

**PETITIONER'S PETITION FOR HABEAS CORPUS ESTABLISHED A PRIMA FACIE CASE THAT HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED WHEN COUNSEL REFUSED TO INVESTIGATE AND PRESENT EVIDENCE OF PETITIONER'S LONG-STANDING SERIOUS BRAIN INJURY AND PSYCHIATRIC DISORDER.**

## A. Factual Background

Both petitioner and petitioner's mother told counsel that petitioner had a long-standing seizure disorder, marked by myriad hospitalizations. Both offered to provide to him the same medical records appellate counsel provided to Dr. Shields, whose declaration supports petitioner's petition for habeas corpus. (■■■■, ¶5, 7; Ex. B, ■■) Counsel refused to review the medical records or to hire a medical expert to analyze them. (■■■■, ¶ 3,4.) His asserted "tactical" reasons for that refusal fall below the level of reasonably competent counsel, both because they were not based on adequate investigation of potentially meritorious defenses, and because they ignored the myriad ways in which petitioner's medical and psychiatric history could have been used to petitioner's benefit.

14

B.    A "Tactical" Decision Falls Below the Standards of
      Reasonably Competent Counsel, Where, as Here, it is Not
      Supported By Investigation Into Potentially Meritorious
      Defenses .

The Sixth Amendment of the United States Constitution and article

I, section 15 of the California Constitution guarantee a criminal defendant a

right to effective assistance of counsel. (*People v. Torres* (1995) 33

Cal.App.4th 37, 48.) The right of a criminal defendant to counsel " 'entitles

the defendant not to some bare assistance but rather to effective assistance.' "

(*In re Cordero* (1988) 46 Cal.3d 161, 180.) "Specifically, he is entitled to

the reasonably competent assistance of an attorney acting as his diligent

and conscientious advocate. [Citation.] This means that before counsel

undertakes to act, or not to act, counsel must make a rational and informed

decision on strategy and tactics founded upon adequate investigation and

preparation." (*In re Marquez* (1992) 1 Cal.4th 584, 602.)

"Counsel's first duty is to investigate the facts of his client's case

and to research the law applicable to those facts." (*People v. Ledesma*

(1987) 43 Cal.3d 171, 222) Among the basic duties that must be performed

by defense counsel in a criminal case is the careful investigation of "all

defenses of fact and law that may be available to the defendant." (*People v.*

*Pope* (1979) 23 Cal.3d 412, 425.) The nature of the investigation that needs to be undertaken depends on the circumstances of each case, but counsel must investigate the facts of any available and viable defense. (*People v. Ledesma, supra*, 43 Cal.3d at 222; *Strickland v. Washington* (1984) 466 U.S. 668, 691.)

While appellate court review of counsel's performance is deferential, deference is not unlimited, and in certain cases, may "be altogether unjustified." (*In re Cordero , supra*, 46 Cal.3d at 180.) In short, "deference is not abdication; it must never be used to insulate counsel's performance from meaningful scrutiny and thereby automatically validate challenged acts or omissions." (*Ibid.*, quoting *People v. Ledesma, supra*, 43 Cal.3d. at 217.)

Counsel's refusal to investigate petitioner's mental and medical history is not insulated from appellate review as a "tactical decision" because it was not based on investigation or actual information. Counsel has a baseline responsibility, before making a tactical decision, to investigate the facts of the case, including those pertaining to potential meritorious defenses. A tactical decision is only shielded from appellate review when it was "within the range of reasonably competent representation." (*People v. Freeman* (1994) 8 Cal.4th 450, 498.) Where, as here, it is not based upon

16

adequate investigation, it may be unreasonable for that factor alone. (*In re Jones* (1996) 13 Cal.4th 552, 564-565.)

Further, counsel's *refusal* to investigate leads of potential beneficial to the defendant is more egregious than a mere failure to explore all possibilities Federal courts have repeatedly reversed convictions for ineffective assistance where counsel "neither conducted a reasonable investigation nor made a showing of strategic reasons for failing to do so." (*Daniels v. Woodford* (9th Cir. 2005) 423 F.3d 1181, 1203 [first degree murder conviction reversed for counsel's failure to perform adequate pre-trial investigation, among other things]; see also *Hendricks v. Vasquez* (9th Cir. 1992) 974 F.2d 1099, 1109 [vacating judgment of district court where it was not possible to "determine if counsel's decision was a strategic one, and if so, whether the decision was a sufficiently informed one."].)

In this case, counsel's actions were not "tantamount" to a refusal to investigate -- they *were* a refusal to investigate. Counsel declined Mrs. Smith's and petitioner's offer to provide him with the almost 200 pages of documents evidencing petitioner's medical and mental history of serious neurological injury and dysfunction. Without so much as looking at the evidence offered to him, counsel "concluded" that it was not relevant to the defense because assault is a general intent crime and petitioner did not

17

tell him he was suffering a seizure at the time of the offense, and because he did not want to use it to try and exclude petitioner's confession. (**Dec.3** ▬, ¶¶ 3,4.) This conclusion, however, was inherently unreasonable because it was not informed by the basic facts.

Had counsel allowed Mrs. Smith to provide him with petitioner's records, and bothered to have an expert analyze them, he would have discovered that petitioner's long-standing and serious medical and psychiatric history could, in fact, be used to support petitioner's defense in a number of ways he had not contemplated. For example, counsel's simplistic and unnuanced opinion that "having an expert testify that Mr. Hancock was incapacitated during the interview only as to his recollection of the frying pan would have encouraged the jury to dismiss the entire defense" (**Dec3** ▬, ¶ 7), which was made without benefit of review of petitioner's records, either by counsel or by a qualified expert, is essentially worthless, because it was based on nothing more than guess, speculation, and assumption, rather than on a sober investigation and analysis of the actual facts of the matter.

While "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," strategic choices made after less than complete investigation "are reasonable precisely

to the extent that reasonable professional judgments support the limitations

on investigation." (*Strickland v. Washington, supra*, 466 U.S. at, 690-691.)

In other words, trial counsel has a duty to conduct a reasonable investigation

or to make a reasonably informed decision that a particular investigation is

unnecessary. That duty includes conducting a prompt investigation and the

exploration of all potentially relevant avenues. (ABA Stds. for Crim. Justice

(3d ed. 1993) std. 4- 4.1, p. 181.) Failure to perform this duty constitutes

ineffective assistance. (*Strickland v. Washington, supra,* 466 U.S. at 691.)

As the California Supreme Court noted only last year, as it reversed

a death penalty case for ineffective assistance of counsel, "a thorough

investigation is the foundation for a sound trial strategy." (*In re Lucas*

(2004) 33 Cal.4th 682, 726-727.) Although "counsel may reasonably decide

not to put on mitigating evidence, ... to make that decision counsel must

understand what mitigating evidence is available and what aggravating

evidence, if any, might be admissible in rebuttal." (*Id.* at 727, citing *In re*

*Marquez, supra,* 1 Cal.4th at 606.) In *Marquez*, as in *Lucas,* the Court

reversed a death penalty case because it found counsel's investigation of

potential mitigating evidence to be constitutionally inadequate.

Counsel here failed to determine what evidence was available before

deciding that he would not use it. He refused to review or have an expert

review the extensive documentation of petitioner's long-standing brain injury and seizure disorder. Thus his opinion that the information would not be useful in petitioner's defense was a mere seat-of-the-pants assumption with little basis in fact. If counsel had accepted petitioner's mother's offer to provide him with the almost 200 pages of medical records evidencing petitioner's psychiatric and medical problems, he would have seen that evaluation by an expert could have led to valuable changes in his trial and sentencing strategy. As Dr. Shields has declared, introduction and discussion by an expert of petitioner's medical history could have raised issues concerning: 1) whether petitioner had knowledge of the relevant factual circumstances that made his act illegal[4]; 2) whether petitioner was able to waive his *Miranda* rights intelligently; 3) whether petitioner committed the current offense while in a compromised mental state; and 4) whether petitioner was vulnerable to suggestibility during his "confession." (*Id.* at p. 8, ¶ 19.) Further, as discussed in sections C and D, *infra*, petitioner's medical and

---

[4]Dr. Shields actually uses the phrase: "whether or not the defendant was able to form specific intent." (*Id.* at p. 8, ¶ 19.) Since assault is a general intent crime, specific intent is not at issue. The same point, however, is relevant to a determination whether petitioner was aware "that the illegal act is being done within the terms of the statute. This is knowledge, not specific intent. (*People v. Lopez* (1986) 188 Cal.App.3d 592, 598.) This concept applies to assault, as explained in *People v. Williams* (2001) 26 Cal.4th 779, 790 [defendant must have "knowledge of the relevant factual circumstances."].)

20

mental history could have been important factors at sentencing.

By failing to perform adequate investigation into potentially meritorious defenses, "counsel deprived himself of the reasonable bases upon which to reach informed tactical and strategic trial decisions. [E]ven tactical decisions may demonstrate incompetence if made without the benefit of substantial factual inquiry." (*People v. Shaw* (1984) 35 Cal.3d 535, 541, quoting *People v. Frierson* (1979) 25 Cal.3d 142, 163.)

Recent authority from the United States Supreme Court is clear: counsel may not fail to investigate important exculpatory or mitigation evidence, then claim the protection of a "tactical decision." In *Wiggins v. Smith* (2003) 539 U.S. 510, the United States Supreme Court reversed a death penalty case on the basis that counsel's failure to fully investigate mitigating behavior, which counsel claimed and respondent urged was insulated from review as a "tactical decision," fell below prevailing professional norms. The Court held that in assessing the reasonableness of an attorney's investigation, "[e]ven assuming [counsel] limited the scope of their investigation for strategic reasons, *Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy." (*Wiggins*

21

*v. Smith, supra,* 539 U.S. at 527.)

Counsel here refused to make even a cursory investigation into the potential forensic gold mine of petitioner's well-documented medical and psychiatric disorders. As in *Sanders v. Ratelle* (9th Cir. 1994) 21 F.3d 1446, 1456, trial counsel was deficient for "fail [ing] to conduct even the minimal investigation that would have enabled him to come to an informed decision about what defense to offer." Here, as in *Sanders*, where the Ninth Circuit reversed a murder conviction because counsel had failed to interview a key exculpatory witness, "[d]escribing [counsel]'s conduct as 'strategic' strips that term of all substance." (*Ibid.*)

"A lawyer's first duty is zealously to represent his or her client. Given this obligation, [trial counsel's] refusal even to listen to critical information from a key exculpatory witness regarding the basis of his client's most important defense cannot be deemed a permissible strategy." (*Ibid.*) No reasonably diligent counsel here would have refused Mrs. Smith's offer to provide petitioner's records of long-standing and serious mental disorder; no reasonably competent counsel would have failed to have those records evaluated by an expert before "deciding" that they were not relevant to petitioner's defense. Counsel's refusal to investigate potentially exculpatory evidence here was professionally unreasonable, and establishes the first

22

prong of ineffective assistance of counsel.

    **C.    Counsel's Choice Not To Investigate Petitioner's Medical and Psychiatric History Also Fell Below The Standards Of Reasonably Competent Counsel Because it Was Unreasonable in Itself.**

"Certain defense strategies may be so ill-chosen that they may render counsel's overall representation constitutionally defective." *(Silva v. Woodford* (9th Cir.2002) 279 F.3d 825, 846, quoting *United States v. Tucker* (9th Cir.1983) 716 F.2d 576, 586). Counsel's refusal here to investigate petitioner's long-standing history of brain injury and serious psychiatric disorder was one of those strategies, not only because it was not based on adequate investigation, but because no reasonable counsel would have ignored the various ways petitioner's medical and psychiatric history could have been used in his defense. Accordingly, counsel's actions fellow below the standards of reasonably competent counsel.

While appellate court review of counsel's performance is deferential, deference is not unlimited, and in certain cases, may "be altogether unjustified." *(In re Cordero* , *supra,* 46 Cal.3d at 180.) In short, "deference is not abdication; it must never be used to insulate counsel's performance from meaningful scrutiny and thereby automatically validate challenged acts or omissions." *(Ibid.*, quoting *People v. Ledesma, supra*, 43 Cal.3d. at 217.)

23

Thus when counsel's decisions  fall outside the wide range of reasonable professional assistance that might be considered "sound trial strategy," they may constitute ineffective assistance of counsel. (*Strickland v. Washington, supra,* 466 U.S. at 689.) In *In re Jones* (1996) 13 Cal.4th 552, for example, the California Supreme Court found that counsel's conscious, strategic decision to risk eliciting highly prejudicial hearsay was unreasonable, and constituted ineffective assistance of counsel. (*Id.* at 570-571.) Counsel's decision to seek pre-trial exclusion of prior crimes not only was "clearly unreasonable," but "suggested that defense counsel's 'tactical decisionmaking was grossly flawed by an unwillingness or inability to distinguish between evidence that was innocuous or potentially beneficial, and that which was highly prejudicial." (*Id.* at 586.) Federal courts are in accord: in *Berryman v. Morton* (3d Cir. 1996) 100 F.3d 1089, 1099-1100, for example, the state courts had upheld a conviction challenged on grounds of ineffective assistance of counsel, holding that counsel's actions constituted a protected tactical decision. The federal courts, however, found that counsel's chosen strategy was unsound and unreasonable. Because it was "foolhardy," it was not protected; accordingly, the Third Circuit affirmed the district court's reversal of the conviction. (*Ibid.*)

Here, as in *Jones*, counsel's choice not to review petitioner's extensive

24

history of neurological injury was "clearly unreasonable," because it failed to distinguish evidence of great potential benefit. As in *Berryman*, counsel's choice was "foolhardy." No reasonably competent counsel, once alerted to the existence of defendant's extensive neurological history, would have failed to obtain and review that history to see how it could be used in the defense. Petitioner may only have mentioned his medical history as it related to his performance during the police interview, but any reasonably competent counsel would have seen this as an alert to exculpatory material of great potential value.

Federal courts have repeatedly held that defense counsel was ineffective where there was some evidence of the defendant's mental illness in the record that could have been used to reduce the defendant's culpability, but counsel failed to investigate it . In *Jennings v. Woodford* (9th Cir.2002) 290 F.3d 1006, 1010, 1014-16, for example, the Ninth Circuit reversed a murder conviction for ineffective assistance of counsel, because "trial counsel failed adequately to investigate and present considerable evidence regarding petitioner's psychological and family history that might have ... defeated the jury's finding of the requisite intent for first degree murder in the guilt phase." The court reached a similar result in *Seidel v. Merkle* (9th Cir.1998) 146 F.3d 750, 755-56, where it reasoned that counsel was prejudicially

25

ineffective for failing to conduct reasonable investigation of guilt phase mental defenses where there was evidence in record that defendant had previous psychiatric treatment in jail. In *Bloom v. Calderon* (9th Cir.1997) 132 F.3d 1267, 1277, the court held: "The complete lack of effort by Bloom's trial counsel to obtain a psychiatric expert until days before trial, combined with counsel's failure to adequately prepare his expert and then present him as a trial witness, was constitutionally deficient performance."

So here, counsel's "strategy" to ignore evidence of petitioner's neurological and psychiatric disorders was constitutionally deficient. Counsel cited two reasons for not obtaining petitioner's medical records or having an expert analyze them. First, he did not believe it relevant to defense of the offense because assault is a general intent crime and because petitioner did not tell him he was suffering a seizure at the time of the offense. Second, he did not want to use it to keep out petitioner's confession, because he believed the good aspects of the confession outweighed the bad. (Dec.3 ████, ¶¶ 3,4.) Reasonably competent counsel, however, would not have stopped the analysis there, because petitioner's brain injury and serious psychiatric dysfunction could have been used: 1) to bolster petitioner's credibility by explaining discrepancies between his "confession" and his trial testimony, and to show why that confession omitted important exculpatory facts; 2) to show that

26

petitioner was not sufficiently aware of the true circumstances at the time of the incident (knowledge) to be culpable of assault; 3) to show that petitioner fell outside the Three Strikes statutory scheme so that the court should have granted his motion to dismiss the strike prior; and 5) as a factor in mitigation in sentencing.

      *1.*     *Reasonably competent counsel would have used an expert to explain the legitimate reasons for the discrepancies between petitioner's trial testimony and his confession.*

Counsel chose not to challenge admission of petitioner's confession because he felt that the "good" aspects of the confession would render petitioner more sympathetic to the jury. He knew, however, that petitioner wanted to testify in his own behalf, and that such testimony was likely to contain inconsistencies that the district attorney would leap upon. (**Dec.3**, ¶¶ 4,5.)

An expert like Dr. Shields could have explained to the jury that petitioner was suffering from the after-effects of a long-standing, legitimate seizure disorder, as well as from a brain injury and neurological impairment, at the time he was interviewed by police. He could have explained that petitioner was, in fact, medicated at the time of the seizure, and that a combination of the medication and petitioner's post-seizure condition made him especially suggestible and vulnerable. He could have explained under

27

the circumstances, petitioner could just have gone along with whatever the officer said. (**Dec.5**, ¶¶ 6,7, 13-15, 18.)

Such testimony would have plugged the huge gap in the defense - the gap between petitioner's trial testimony and his confession. The district attorney happily exploited that hole,  urging that petitioner's testimony was not credible because he had claimed to suffer "a grand mal seizure that we don't have any evidence of. (Vol. IV, RT 502.) He argued: "If you're going to get on the stand and say you had a seizure and that's why parts of the tape are not accurate, okay, did you have a seizure? Are you on medication? And if you had a seizure and you were on medication and you are kind of groggy, how is it that the parts that help you are accurate? It doesn't work like that. Don't buy that." (Vol. IV, RT 502.)

In fact, according to Dr. Shields, it *does* work like that. (**Dec.5**, ¶¶ 13-15, 18.) Reasonably competent counsel would have accepted petitioner's offer to supply him with the relevant records, would have had them reviewed by an expert, and would have adopted a trial strategy to mitigate the effect of inconsistencies in petitioner's trial testimony.

> 2. *Reasonably competent counsel would have presented petitioner's medical and psychiatric history as evidence that petitioner was not sufficiently aware of the true circumstances at the time of the incident (knowledge) to be culpable of assault.*

28

Dr. Shields has declared that if he or a similarly qualified expert had testified at trial, reasonably competent counsel could have raised the issue "whether or not the defendant was able to form specific intent." (*Id.* at p. 8, ¶ 19.) Since assault is a general intent crime, specific intent is not at issue. Dr. Shield's point, however, is relevant to a determination whether petitioner was aware "that the illegal act is being done within the terms of the statute. This is knowledge, not specific intent. (*People v. Lopez* (1986) 188 Cal.App.3d 592, 598.) The requirement that a defendant be aware of the relevant factual circumstances applies to assault, as explained in *People v. Williams* (2001) 26 Cal.4th 779, 790 [defendant must have "knowledge of the relevant factual circumstances."].) Accordingly, reasonably competent counsel could have introduced evidence of petitioner's medical and psychiatric history to support an argument that he believed that petitioner had to stick Davis in self-defense, hence did not possess the requisite knowledge of the relevant factual circumstances to be found guilty of assault.

3. *Reasonably competent counsel would have presented petitioner's medical and psychiatric history as a circumstance removing petitioner from the Three Strikes statutory scheme.*

Petitioner's strike prior was more than 15 years old. (RT 221.) Counsel initially made a Motion to Strike Strike Prior in the Interests of Justice (RT 217), which made cursory reference to petitioner's "alcohol problem." (RT

29

221). That motion was eventually withdrawn and taken off calendar by sentencing counsel, for reasons that do not appear in the appellate record. (Vol. IV RT 542.) However, had counsel not refused to obtain and present evidence of petitioner's medical and psychiatric history, petitioner's "extensive and well-documented history" of "notable and significant brain injury," "possible neuropsychological impairment due to recurrent seizure activity," and "notable psychiatric history...marked by the presentation of symptoms of severe mental illness and/or a severe compromise in his mental status" (Dec. 5, p. 3, ¶ 5, 6, 8) would have constituted compelling evidence that he was not one of the defendants to which the Three Strikes law was meant to apply. (*People v. Williams* (1998) 17 Cal.4th 148, 161.) This failure to investigate and present crucial mitigating evidence alone constituted ineffective assistance of counsel. (See, e.g. *Wiggins v. Smith, supra,* 539 U.S. 510, [failure to fully investigate mitigation evidence IAC requiring reversal of death penalty even though counsel claimed it was insulated from review as a "tactical decision."]

> 4.    *Reasonably competent counsel would have presented petitioner's medical and psychiatric history as a factor in mitigation.*

Had an expert like Dr. Shields testified that petitioner's brain injury and psychiatric disorder were such that he believed that he was acting in

self-defense when he jabbed Davis with the paring knife (See, e.g., ~~Dec.5~~,
¶¶ 8, 19), counsel would have had a strong argument for a mitigated sentence.
While it does not appear that a California appellate "court has ever found
unreasonable self-defense to be a defense against the crime of assault with a
deadly weapon (*People v. Robertson* (2004) 34 Cal.4th 156, 183, Kennard
J., diss. opn. ), certainly petitioner's inability to discern the true state of
affairs could have been invoked as a factor in mitigation (California Rules
of Court, rule 4.423, subd. (b)(2) ["defendant was suffering from a mental
or physical condition that significantly reduced culpability for the crime."])
No reasonably competent counsel would have failed to obtain and present
this valuable mitigation evidence.

### D.    Counsel's Refusal To Investigate Crucial Exculpatory And Mitigating Evidence Was Prejudicial.

To establish constitutionally ineffective assistance, a defendant must
show not only that counsel's representation fell below an objective standard
of reasonableness under prevailing professional norms, but that "counsel's
representation subjected the defendant to prejudice, i.e., there is a reasonable
probability that, but for counsel's failings, the result would have been more
favorable to the defendant." (*People v. Mitcham* (1992) 1 Cal.4th 1027,
1057-1058; see *Strickland v. Washington*, *supra*, 466 U.S. 668, 687-696.)

The defendant need not show "that counsel's deficient conduct more likely than not altered the outcome in the case," (*Strickland v. Washington, supra,* 466 U.S. at 693) but only a "significant but something-less-than-50 percent likelihood of a more favorable verdict." (*People v. Howard* (1987)190 Cal.App.3d 41, 48.) In short, a reasonable probability is a probability sufficient to undermine confidence in the outcome. (*Strickland v. Washington,* supra, 466 U.S. at 698.) Counsel's error here was prejudicial because there is a reasonable probability that had he introduced evidence that petitioner was suffering from a long-standing brain injury and serious psychiatric disorder, either the jury would have refused to find petitioner guilty, or the court would have imposed more lenient sentence.

> 1. *It is reasonably probable that the jury would not have convicted petitioner that had it heard expert testimony regarding his long-standing brain injury and psychiatric disorder.*

As the prosecution itself acknowledged, this case came down to a credibility contest between petitioner and Davis. The charge was assault with a deadly weapon, and the crux of the case was whether or not petitioner had jabbed Davis in self-defense. Davis, who acknowledged that he "may have socked [petitioner] in the eye once (Vol. II RT 182), said petitioner stabbed him for no reason; on the other hand, petitioner said he only jabbed Davis with the paring knife after Davis bashed him in the head with a

32

frying pan. The prosecution framed the contest like this:

> If you don't believe the defendant, if you throw out the
> defendant's testimony, then you have zero evidence of self-
> defense. None. You could go back there and all vote guilty
> right away, because there is simply no evidence of self-defense
> before you. It is not your job to create a defense.
> You took an oath to apply the evidence, the facts you heard
> from the witness stand, of the exhibits, to the law. I submit to
> you that the defendant was lying. I used the word "lie" a few
> times, because he lied. And that Mr. Davis's version is accurate.
> (Vol. IV RT 520-521.)

The evidence, however, suggested otherwise. Davis was a self-
confessed long-time alcoholic. Although he testified that his admittedly
seriously impaired memory had been defying the usual laws of nature by
"getting better" since the time of the preliminary hearing (Vol. II RT 84),
he did not remember whether petitioner had been so upset at his behavior at
the picnic that he asked him to leave (Vol. II RT 92); was "kind of vague"
as to whether he and petitioner were inside the apartment before the incident,
as he had testified at the preliminary hearing (Vol. II RT 93); was unsure
whether petitioner had given him a washcloth to clean up his face (Vol. II
RT 94, 98); and was not sure whether he had thrown a punch at petitioner.
(Vol. II RT 96.) When asked if petitioner had "just walked right up and
stabbed you," he replied, "I'm pretty sure that's how that happened." (Vol.
II RT 99.) He testified that petitioner stabbed him in the back, and then in

the front, on his hand, but did not remember petitioner coming around him to do so. (Vol. II RT 101.) Asked if the neighbor had helped him back into petitioner's apartment, he said, "I think that's how it happened. You'd have to ask Pete. He would know.... I just don't really remember a whole lot about that last part of it there, just bits and pieces." (Vol. II RT 102.) Asked if he remembered that it was actually one of the paramedics who told him he had been stabbed, he said "I don't remember that." (Vol. II RT 103.) Reminded that he had testified to that effect at the preliminary hearing, he said, "Yeah, that's probably correct." (Vol. II RT 103.) He "kind of" remembered falling into the top of the marble countertop in the bathroom three days before the incident (Vol. II RT 104) and when asked if he remembered that he hit it so hard that it actually shifted, answered: "Probably." (Vol. II RT 104.) He could have hit it with his back or his hip or perhaps his torso - but he didn't remember. (Vol. II RT 104.)

He did not remember telling Officer Kim he had told petitioner that he needed to get some papers out of the house; he "may have said it. I just don't remember -- I don't have like total recall of that night." (Vol. II RT 109.) He acknowledged that his memory of being stabbed was "pretty foggy." (Vol. II RT 112.) He did not remember if he was taken into the kitchen to clean up; asked if that could explain the fact that his blood was in

34

the kitchen although he testified that the stabbing took place outside, he
said, "It's a possibility too," and acknowledged that he did not remember
clearly. (Vol. II RT 119.) Asked on re-direct if it was true that the first time
he realized he had been stabbed is when his neighbor told him about it, he
replied: "It may have been. I'm not a hundred percent positive, but it's --
most likely, seems to me." (Vol. II RT 123.) It was not until he was
coached very specifically that he remembered to say he believed he was
stabbed when petitioner came out of the apartment:

> Q: Let me ask you a more direct question. Were you telling
> me the truth earlier today about what happened that day?
> A. Oh, yes.
> Q. So when Jeff came back out of the apartment, you did feel
> a sharp pain?
> A. Yes.
> Q. And you did think that you got stabbed?
> A. Yes.
> Q. Now, you hesitated for a moment. Why did you hesitate?
> A. You know, when it happened I just couldn't believe this
> was happening. I didn't want to believe it.
> Q. And you knew that it was Jeff that just stabbed you.
> A. Yeah. (Vol. II RT 123.)

On re-cross, however, Davis changed his story again, re-affirming
that the first time he realized he had been stabbed ▒▒▒ was when the
neighbor told him. (Vol. II RT 124.) At the preliminary hearing, he testified
that he did not remember how he received the wounds on his hand; he and
petitioner were rolling around on the concrete and he felt a sharp pain in his

hand. At trial he said that this statement had been the truth (Vol. II RT 112-113), but he also testified - contradictorily - that petitioner had stabbed him in the hand as he was standing outside, not rolling around on the ground. (Vol. II RT 123.)

In sum, Davis, on whose testimony the entire case rested, was a profoundly unimpressive witness  whose story, rife with lacunae and contradiction, shifted with the breeze of each new examination. Petitioner, on the other hand, had a clear recollection of the evening, and a credible explanation for not wanting to tell the police that the man he had been supporting for three months "out of the goodness of his heart"[5] had hit him in the head with a frying pan. His black and blue eye supported his account (Vol. II RT 157), as did the fact that Davis's blood had been found in the kitchen, where petitioner said the jabbing took place. (Vol. II RT 119.)

Had an expert like Dr. Shields testified, the discrepancies between petitioner's testimony and his "confession" would have been explained in a way that made petitioner more, rather than less, sympathetic and credible. As the only evidence that petitioner had not stabbed Davis in self-defense came from a forgetful, confused, contradictory and uncompelling witness, it is reasonably probable that if the jury had heard the medical and psychiatric

[5]Davis's own words. (RT 44, 120.)

36

testimony that supported petitioner's account, it would have refused to convict.

    2.    *It is reasonably probable that the court would have imposed a more lenient sentence had it heard expert testimony regarding petitioner's long-standing brain injury and psychiatric disorder.*

A defendant suffers prejudice when counsel's ineffective performance leads to an increased sentence for the defendant. (*Glover v. United States* (2001) 531 U.S. 198, 202-05, 121 S.Ct. 696, 148 L.Ed.2d 604.) Petitioner is now serving 11 years in state prison for a drunken fight with a drinking buddy, based on a prior serious felony conviction that was fully 15 years old at the time of sentencing. (RT 221.) It is reasonably probable that if counsel had introduced evidence of petitioner's long-standing brain injury and psychiatric disorder, the court would have imposed a lesser sentence.

The court demonstrated its openness towards lenience when it struck the great bodily injury enhancement. (Vol. IV RT 543-544.) Had it heard evidence of petitioner's serious medical and psychiatric dysfunction, it is reasonably probable that it would have imposed the low term, rather than the mid-term, or, had reasonably competent counsel presented this evidence in support of a motion to dismiss the strike prior, granted the motion and sentenced petitioner outside the Three Strikes statutory scheme. In either case, petitioner's sentence would have been lighter. Accordingly, counsel's

37

failures and omissions were prejudicial.

## CONCLUSION

Petitioner's Petition for Habeas Corpus established a prima facie case that this Sixth Amendment right to effective assistance of counsel was violated when counsel refused to investigate and present crucial exculpatory and mitigating evidence. Petitioner believes the judgement should be reversed.

A 38

# PROOF OF SERVICE BY MAIL

I THE UNDERSIGNED, CERTIFY THAT I AM OVER THE AGE OF EIGHTEEN (18) YEARS OF AGE. THAT I

CAUSED TO BE SERVED A COPY OF THE FOLLOWING DCOUMENT:

ENTITLED: Federal Writ for Habeas Corpus Application, Request for Counsel, and Attachments

BY PLACING THE SAME IN AN ENVELOPE, SEALING IT BEFORE A CORRECTIONAL OFFICER,

AND DEPOSITING IT IN THE [ *UNITED STATES MAIL* ] AT AVENAL STATE PRISON AND ADDRESSEDIT

TO THE FOLLOWING: Clerk of the United States District Court for the Northern District of California 450 Golden Gate Avenue P.O. Box 36060 San Francisco, CA. 94102

EXECUTED ON August , 22, 20 07 AT AVENAL STATE PRISON, AVENAL CALIFORNIA

I, Jeff Hancock DECLARE UNDER THE PENALTY OF PERJURY UNDER THE LAW

OF THE STATE OF CALIFORNIA THAT THE FOREGOING IS TRUE AND CORRECT.

_____
SIGNITURE OF DECLARANT

_____
PRINT NAME OF DECLARANT

PRO PER.