E-filing

C 07 4469 CW

Exhibit A (PR)

Curriculum Vitae of
John D. Shields, Ph.D., ABPP

# JOHN D. SHIELDS, PH.D., ABPP

CLINICAL & FORENSIC PSYCHOLOGY
DIPLOMATE, FORENSIC PSYCHOLOGY

LICENSED PSYCHOLOGIST  PSY 13804

DIPLOMATE, AMERICAN BOARD OF PROFESSIONAL PSYCHOLOGY
FELLOW, AMERICAN ACADEMY OF FORENSIC PSYCHOLOGY

235 MONTGOMERY ST., SUITE 1020
SAN FRANCISCO, CA 94104

415-434-4037
415-434-2412 FAX

**Updated:**     October 2005

**E-mail:**     jdpshields@sbcglobal.net

**Education:**

| | | |
|---|---|---|
| 1989-1992 | California School of Professional Psychology, Alameda, California Ph.D., Clinical Psychology (American Psychological Association full accreditation) | |
| 1987-1989 | California School of Professional Psychology, Alameda, California M.A., Clinical Psychology (American Psychological Association full accreditation) | |
| 1986-1987 | Ohio State University, Columbus, Ohio Clinical Child Psychology | |
| 1985-1986 | Ohio State University, Columbus, Ohio M.A., Education Special Education Emphasis Area | |
| 1980-1985 | University of California, Los Angeles, Los Angeles, California B.S., Psychobiology (Department of Psychology Highest Honors) | |

**Professional License & Board Certifications:**

California Board of Psychology
License:  Psychologist
License No.:  PSY 13804
Issued:  3 March 1994

American Board of Professional Psychology
Diplomate, in Forensic Psychology
Issued:  April 2003

**Hospital Privileges/Affiliation:**

1997-present     California Medical Facility, California Department of Corrections
Vacaville, California
Staff psychologist, Medical staff privileges

**Hospital Privileges/Affiliation (Continued):**

1994-1999      Mt. Zion Medical Center of the University of California at San Francisco
               San Francisco, California
                    Department of Psychiatry
                         Consulting supervisor:  psychotherapy &
                              psychodiagnostic assessment

1994-1999      Mt. Zion Medical Center of the University of California at San Francisco
               San Francisco, California
                    Department of Psychiatry
                    Associate Medical Staff, privileges

**Professional Organization & Society Memberships:**

American Academy of Forensic Psychology
     Fellow [since 2003]

American Board of Forensic Psychology
     Diplomate [since 2003]
     *Forensic Diplomate Oral Examination, Examiner [since 2005]

American Board of Professional Psychology
     Diplomate, Forensic Psychology [since 2003]

American Psychological Association [since 1993]
     American Psychology-Law Society (Division 41)
     Division of Psychoanalysis       (Division 39)

Association for Conflict Resolution  [since 2004]
     Family Section
     Court Section

Association of Family & Conciliation Courts [since 2005]
     AFCC, California Chapter

Psi Chi National Honors Society in Psychology  [since 1985]

Society for Personality Assessment  [since 1996]

**Professional Work & Clinical Experience:**

1994-present      Clinical Psychologist, private practice
                  San Francisco, California
                       Forensic Psychology; civil, juvenile and criminal evaluations
                       and consultation to prosecution, plaintiff and defense counsel
                       on psychological matters relevant to legal proceedings;
                       consultation regarding evaluation of psychiatric and
                       psychological testimony used in civil litigation and criminal
                       and juvenile proceedings.  Panel evaluator for independent and
                       court-appointed psychological evaluations.
                       Psychotherapy of adolescents and adults; psychological testing
                       and assessment of children, adolescents, and adults.
                       Consultation in both clinical and forensic matters related to
                       child development, early childhood, adolescents, and adults.
                       Consultation to attorneys regarding psychotherapy,
                       psychological assessment, professional ethics, and psycho-
                       legal matters related to practice and evaluation.

**Professional Work & Clinical Experience (Continued):**

1996-present    California Department of Corrections, California Medical Facility
Vacaville, California
Staff Psychologist, part-time
The California Medical Facility (CMF) is a state prison primarily for inmates who have significant psychiatric and/or medical conditions that warrant specialized attention and care during incarceration. This position involves providing individual and group treatment as well as psychological assessment of incarcerated inmates, many of whom having significant psychiatric and criminal histories. This position is on the unit for HIV-positive inmates. Inmates at CMF have a broad spectrum of psychopathology; from adjustment disorders related to incarceration and chronic illness, to severe psychopathology [including the major affective disorders and the entire psychotic spectrum], as well as severe character pathology. In-patient treatment for severely and acutely mentally ill inmates is arranged with the Dept. of Mental Health, both at CMF and Atascadero State Hospital.

Special Assignments:
Nov. 1997: Quality Improvement Team, member
Dec. 1997: Quality Assurance Council, representative
Feb. 1998-Nov. 1999: Unit IV Suicide Prevention Coordinator
Jul. 2000-Apr. 2002: Medical Staff Bio-Ethics Committee
Nov. 2002-Apr. 2004: Facilitator/Presenter of weekly assessment and clinical case conference
Nov. 2002-Nov. 2004: Psychological Assessment & Forensic Issues Consultant; Board of Prison Terms evaluations
Sept. 2005-present: Mental Health [MHSDS] Intake Evaluations; Board of Prison Terms evaluations

**Current Forensic Psychology Practice/Panels:**

**Court Panels:**

1996- present    San Francisco City & County, Superior Court
Criminal Court Division, Alienist Panel

1994- present    San Francisco City & County, Superior Court
Juvenile Court Division, Delinquency Panel
panel evaluator

1995-present    Contra Costa County, Superior Court
Criminal Court Division,
panel evaluator

1996-present    Sacramento County, Superior Court
Criminal & Juvenile Court Division,
panel evaluator

**Court Panels (Continued):**

| | |
|---|---|
| 1996-present | Alameda County, Superior Court<br>Criminal & Juvenile Court Division,<br>panel evaluator |
| 2001-present | Marin County, Superior Court<br>Criminal & Juvenile Court Division,<br>panel evaluator |

**Past Professional Work & Clinical Experience:**

1994- 1999    Mt. Zion Medical Center of the University of California at
San Francisco, San Francisco, California
Clinical Supervising Consultant, Department of Psychiatry
Mt. Zion Medical Center psychotherapy clinic is an outpatient
facility for the diagnosis and treatment of children and adults,
and a psychoanalytically oriented training center. This
position includes providing supervision and consultation to
both pre- and post-doctoral level interns on individual
psychotherapy and psychological assessment.

1994- 1995    Forensic Health Care, Inc.
California Forensic Assessment Project
San Francisco, California
panel evaluator
This position involved conducting psychological
testing and assessment in a forensic setting, and
offering consultation on treatment planning and
interventions. Most patients evaluated were in one
of the following categories: not guilty by reason of
insanity (1026 PC), incompetent to stand trial
(1370 PC), mentally disordered offender (2962
PC), or mentally disordered sex offender (6313
WC). Forensic Health Care, Inc. is contracted with
the Forensic Services Branch of the California
Department of Mental Health, State Hospitals
Division, to provide psychological evaluation and
consultation to statewide Conditional Release
Programs.
Douglas R. Korpi, Ph.D.-Project Director
Phillip Erdberg, Ph.D.-Chief Project Consultant

1994- 1995    Orinda Psychology Group
Orinda, California
Clinical Psychologist
Private practice; psychotherapy of children,
adolescents, adults and families; psychological
assessment; psychoeducational testing; child custody
evaluation; California Dept. of Social Services
consultative evaluations and psychological
assessments for disability qualification.

**Past Professional Work & Clinical Experience (Continued):**

1994-1995     California Institute of Psychology
              San Francisco, California
                   Clinical Psychologist
                        Private practice; psychotherapy and psychological
                        assessment of children, adolescents, and adults.
                        Forensic psychological consultation and evaluations
                        of children and adults.

1993-1994     California Institute of Psychology
              San Francisco, California
                   Registered Psychological Assistant (PSB 21250)
                   Psychoanalytic psychotherapy, psychological assessment,
                   consultation
                   Supervisor:  John F. Fielder, Ph.D.  (PSY 6375)

1990- 1994    Orinda Psychology Group
              Orinda, California
                   Registered Psychological Assistant (CA Reg. No. PSB 16989)
                   Private practice; treating children, adolescents, adults and
                   families; psychological assessment; psychoeducational
                   testing; child custody evaluation.
                   Supervisor:  Alf Johnson, Ph.D.  (PSY 9531)

1992-1993     Registered Psychological Assistant (CA Reg. No. PSB 19747)
              San Jose, California
                   Private practice; treating children, adolescents, adults and
                   families, and psychological assessment including disability
                   evaluations.
                   Supervisor:  Martin Diner, Ph.D.  (PSY 6665)

1990-1992     West Coast Children's Center, Albany, California (CA Reg. No. PSB 18755)
                   Contract Staff, Psychological Testing & Diagnostic
                   Assessment Psychological evaluation and assessment of
                   children, adolescents, adults, and families
                   Supervisor:  Barbara Mercer, Ph.D. (PSY 7356)

1989 -1990    University of California, San Francisco, Adolescent & Family Project
                   Research Assistant
                        The Adolescent & Families Project was a clinical research
                        project that tested the relative effectiveness of three forms of
                        treatment for adolescent substance abusers:  Group Therapy,
                        Family Therapy, and Multi-Family Treatment.  This position
                        included conducting clinical intake interviews, and
                        determining suitability for treatment.  This position also
                        included conducting data gathering assessment sessions,
                        administering questionnaires, conducting interviews, and
                        administering videotaped family interviews.

1988-1989     Mid-Peninsula Support Network, Mountain View, California
                   Coordinator of Men's Services
                        This position included conducting individual and group
                        psychotherapeutic counseling for male batterers.  Public
                        education, in-service training, and consultation with the legal
                        justice system were also part of this position.

**Past Professional Work & Clinical Experience (Continued):**

1987-1988    United Methodist Children's Home, Worthington, Ohio
Child Care Worker
This position included treatment of delinquent adolescents in a residential treatment facility. The Positive Peer Culture (PPC) was the treatment modality of choice.

1986 -1987    Project PASSAGE, Inc., Columbus, Ohio
Clinical Counselor
As a group facilitator, this position included both adolescent counseling, and parent counseling    responsibilities. Groups were arranged for adolescents having problems in the home, school, or community, as well as for juvenile offenders who had committed serious crimes.

1986-1987    Ohio State University, Columbus, Ohio
Graduate Research Associate
This position allowed for teaching and program development in special education classrooms and training facilities throughout Columbus, Ohio.

1986-1987    Children's Hospital Learning Disabilities Clinic, Columbus, Ohio
Educational Consultant
This position focused on working with students with learning disabilities and their parents in a clinical setting.  School visits were also germane to this position, and allowed for working with all school personnel to develop academic and behavioral programming for learning disabled students.

1981-1982    San Bernadino County School District , San Bernadino, California
Special Education Teaching Aide
This position involved behavioral programming for severely emotionally disturbed students in a Special Education classroom setting.

**Clinical Training Experience:**

Sept. 1991- Aug. 1993*

Mt. Zion Medical Center of the University of California at San Francisco, San Francisco, California
Intern, Department of Psychiatry
*- Post-Doctoral Intern, May 1992-Aug. 1993

Mt. Zion Medical Center psychotherapy clinic is an outpatient facility for the diagnosis and treatment of children and adults, and a psychoanalytically oriented training center. The Department of Psychiatry also provided inpatient care for adults. Treatment and training was psychoanalytic, with emphasis on theory and technique of psychoanalytic psychotherapy, psychoanalysis and child psychotherapy. In this post-doctoral training internship, both long and short term psychoanalytic psychotherapy was provided to primarily adult patients with some child cases. Patients ranged from neurotically disordered to psychotic spectrum and characterological disorders.

Clinical Supervisors: Julie Friend, LCSW
Private Practice, Berkeley, CA
Melvyn Schupack, MD
Supervising & Training Analyst
San Francisco Psychoanalytic
Institute, San Francisco, CA
Jess Ghannam, Ph.D.
Mt. Zion Department of Psychiatry
Director, Out-patient Psychiatry

Sept. 1990-Aug. 1991

The Redwood Center, Berkeley, California
This internship provided both psychodynamic and family systems treatment to families, couples, and individual adult patients. Family therapy was provided both from a systemic and object relations orientation, with live supervision of family cases. Individual treatment of adult patients with neurotic or character disorders was informed by both psychodynamic and systemic perspectives.

Clinical Supervisors:     Rick Maisel, MFCC
Karen Seager, Ph.D.

Sept. 1989-Aug. 1990

West Coast Children's Center, Albany, California
This internship provided psychoanalytic/psychodynamic oriented psychotherapy to children from pre-school through adolescence. Educational components included early child development, infant and toddler assessment, development of attachment, and cognitive development. Treatment was primarily individual, long-term, or family therapy. Patients presenting problems ranged from neurotic disorders to more severe characterological disorders, conduct disorders, thought disorders, and often with histories of physical and/or sexual abuse. As part of the assessment team, my position also included conducting psychodiagnostic assessments and evaluations of young children, adolescents, and adults. Supervision was psychoanalytic, and informed by Jungian theory with an emphasis on sand play.

Clinical Supervisor: Suzy Spradlin, Ph.D.

**Clinical Training Experience (Continued):**

Jan. 1989-Feb. 1990

Richmond YMCA Mental Health Services, Richmond, California
This practicum included individual and family therapy to adolescents and families identified by the Richmond School District. The treatment orientation was psychodynamic, and psychoanalytic. This practicum was chosen from 400 internship programs and given the American Medical Association's Adolescent Health Congress Award, Outstanding Internship Training Program Award for 1989-90.
Clinical Supervisor: Yvette Guerrero, Ph.D.
Adjunctive Supervisor: Alf Johnson, Ph.D.

Sept. 1988-Jan. 1989

Mid-Peninsula Support Network, Mountain View, California
This position included conducting individual and group psychotherapeutic counseling for male batterers. Training and clinical experience was in adult psychotherapy, with emphasis on diagnostic treatment planning and consulting with adjunctive services. Many referrals were court ordered and presented dangerous and violent behavior.
Clinical Supervisor: Alexandra Gotsch, MFCC

Mar. 1984- Jun. 1985

Neuropsychiatric Institute, University of California at Los Angeles, Los Angeles, California
This position was in the inpatient school of the Neuropsychiatric Institute, Division of Early Childhood. Treatment was both educational and behavioral taking place in an academic setting. The children in this setting were long-term inpatients with severe psychopathology. Student clinicians were part of a treatment team working in conjunction with the Department of Psychiatry staff on treatment planning, case management, and academics for child patients.
Supervisor: Ellen Ritchey, M.A.

Mar. 1981- Sept. 1981

Developmental Disabilities Immersion Program, University of California at Los Angeles, Los Angeles, California
This was a full time training program and provided clinical, dydactic, and research training in both theory and practice in working with mentally retarded and developmentally disabled individuals. The program was based at Pacific State Hospital, San Bernadino County, California, and was sponsored by the Department of Psychiatry of the UCLA School of Medicine. Clinical training involved working with a wide range of both mentally retarded children and adults many of whom were severely retarded and institutionalized. Clinical experience was based in a state hospital setting as well as in sheltered workshops and classrooms. Classroom experience and consultation was provided for children and adults with a wide range of disabilities, and with various degrees of mental retardation.

**Clinical Training Experience (Continued):**

Sept. 1980- Jun. 1985

Department of Pediatrics Child Development Program, University of California at Los Angeles, Los Angeles, California
This position was one of volunteer work with the Child Development Program which worked within the inpatient division of the Department of Pediatrics. The clinical work was exclusively play therapy with hospitalized children. My interests and work centered around children with chronic and terminal illness and their families, primarily children with cancer and cystic fibrosis. The work was both play therapy and educational in preparing children for invasive treatment procedures.
Supervisors: Brian Fallgren, M.A., & Sue Clark, M.A.

**Publications:**

Shields, J. D. (1996). Hostage of the fee: Meanings of money and countertransference issues of a beginning therapist. *Psychoanalytic Psychotherapy, 10(3)*, 233-250.

Shields, J. D., & Green, R. J. (1996). "POETICS." : A systems approach to solving behavior problems in the classroom. *Elementary School Guidance & Counseling, 30(3)*, 181-193.

Shields, J. D., Green, R. J., Cooper, B., & Ditton, P. (1995). The impact of adults' communication clarity versus communication deviance on adolescents with learning disabilities. *Journal of Learning Disabilities, 28(6)*, 372-384.

Shields, J. D., Heron, T. E., Rubenstein, C., & Katz, E. R. (1995). The eco-triadic model of educational consultation for students with cancer. *Education and Treatment of Children, 18 (2)*, 184-200.

Shields, J. M., Abrams, P., & Siegel, S. (1985). An alternative health care setting for children with cancer: A residential summer camp. *Children's Health Care, 13*, 135-138.

Shields, J. M., & Garcia, C. E. (1981). Unexplained arteriosclerosis in mentally retarded children. *Pacific State Archives, 6*, 91-100.

Shields, J. M., & Heron, T. E., (1989). Teaching organizational skills to students with learning disabilities. *Teaching Exceptional Children, 21*, 8-13.

Reprinted in: (1990). Teaching organizational skills to students with learning disabilities. In K. Freiberg (Ed.) *Educating Exceptional Children, (5th ed.)*, (pp. 72-75). Guilford, CT: The Dushkin Publishing Group, Inc.

Reprinted in: (1992). Teaching organizational skills to students with learning disabilities. In K. Freiberg (Ed.) *Educating Exceptional Children (6th ed.)*, (pp. 72-75). Guilford, CT: The Dushkin Publishing Group, Inc.

Shields, J. M., & Johnson, A. C. (1992). Collision of law and ethics: Consent for treatment with adolescents. *Bulletin of the American Academy of Psychiatry and the Law, 20 (3)*, 309-323.

**Submitted or In Preparation for Publication:**

none at present

**Unpublished Manuscripts:**

Shields, J. M. (1987).  An overview of the implications of sexual abuse of children and implications of interface with the legal justice system.  Unpublished manuscript, filed with the library of The Domestic Violence Institute of the Psychological Services Center, Berkeley, California.

Shields, J. M., Dudley, J. P., Fuller, M. L., Kucia, J., & Bulinski, J. C. (1987).  Effects of sera from cystic fibrosis heterozygotes on mucociliary activity and secretion in ciliated epithelia.

**Presentations & Trainings:**

Shields, J. D., "Forensic Psychological Consultation."  Presentation to the Mental Health Services Delivery System staff & interns, California Department of Corrections, California Medical Facility, Vacaville, CA, 2 Feb. 2005.

Shields, J. D., "Forensic Evaluation of Juveniles:  Juvenile Trial Competency & Competency to Waive Miranda Rights,"  Invited guest lecture, University of San Francisco School of Law, San Francisco, CA, 20 Nov. 2003.

Shields, J. D. "St. Peter & the Vampire:  Forensic Psychological Assessment, Exotic Behavior and Exotic Pathology."  Clinical Case Presentation, California Department of Corrections, California Medical Facility, Vacaville, CA. 31 Oct. & 7 Nov. 2002.

Shields, J. D. "A Tale of Two Cities:  Distortion on the MMPI-2 in a Correctional Setting."  Clinical Case Presentation, California Department of Corrections, California Medical Facility, Vacaville, CA. 3 Oct. 2002.

Shields, J.D. "Juvenile Fitness (W&I 707) Evaluations:  The Role of the Forensic Psychologist."  San Francisco Juvenile Public Defenders Office, San Francisco, CA.  1 June 2001.

Shields, J. D. "Assessment of Psychopathology in a Correctional Setting:  Malingering and its Clinical Presentation."  American College of Forensic Psychology, 16th Annual Symposium, Newport Beach, CA, 9 Apr. 2000.

Shields, J. D. "Barjona:  Divine 'Assistance,' or a Logical Fallacy in a Malingered Symptom of Psychosis."  Clinical Case Presentation, California Department of Corrections, California Medical Facility, Vacaville, CA. 16 & 23 Mar. 2000.

Shields, J. D. "Simulation/Dissimulation of Psychopathology in a Correctional Setting:  Malingering & Factitious Conditions and their Clinical Presentation."  Presentation to the Medical Staff, California Department of Corrections, California Medical Facility, Vacaville, CA. 2 Nov. 1999. [Approved for 1.0 hr. of CME credit for physicians].

Shields, J.D. & Zatopa, M.  "Comprehensive and Interdisciplinary Juvenile Justice Training: Understanding Educational Issues in the Juvenile Justice System-Special Education."  Sponsored by the John D. & Catherine T. MacArthur Foundation, directed by The Youth Law Center. Oakland, California, 3 March 1999. [Approved by the State Bar for 3.0 hrs. of MCLE credit for attorneys].

Shields, J.D. "Special Education:  For Minors Before the Court, What's So Special?"  San Francisco Juvenile Public Defenders, Juvenile Probation, and Juvenile District Attorneys.  San Francisco, California, 26 January 1999. [Approved by the State Bar for 1.0 hr. of MCLE credit for attorneys].

Shields, J.D.  "The Rat-man Reconsidered:  Legal and Ethical Issues and Selected Topics."  The Psychotherapy Institute, Berkeley, California, 17 & 24 September 1997.

## Presentations & Trainings (Continued):

Shields, J.D. "Law and Ethics for Mental Health Professionals: Selected Topics." The Psychotherapy Institute, Berkeley, California, 18 & 25 September 1996.

Shields, J. D. "Parental depression: Detecting it in your clients and its impact on children." Office of the Public Defender-Juvenile Division, Dependency Court Attorneys, San Francisco, California, 26 January 1996.

Shields, J. D. "Hostage of the fee: Meanings of money, countertransference, and the beginning therapist." American Psychological Association's Division of Psychoanalysis Spring Meeting 1995, Loews Santa Monica Beach Hotel, Santa Monica, California, 25-30 April 1995.

Shields, J. D. "Fees and the meanings of money in psychotherapy: Values, ethics, and clinical issues." Bay Area Psychotherapy Training Institute, Lafayette, California, 18 April 1995.

Shields, J. D. "The special case of special education: Education law and the rights of minors with identified special educational needs." Office of the Public Defender-Juvenile Division, Delinquency Court Attorneys, San Francisco, California, 23 March 1995.

Shields, J. D. "The dreams of children: Theoretical aspects and their use in clinical practice." A seminar given at New Perspectives, San Rafael, California, 9 December 1993.

Shields, J. M., & Johnson, A. "Collision of law and ethics: Consent for treatment of adolescents." California State Psychological Association (in conjunction with the American Psychological Association's Division of Clinical Psychology) Annual Convention, 1-4 March 1990, San Francisco, California.

Shields, J. M., & Heron, T. E. "Teaching organizational skills to students with learning disabilities: A key component for successful programming," International Conference on Learning Disabilities, Louisville, Kentucky, 14 October, 1988.

Shields, J. M. "Men who batter women: Who they are, and why they do it," MPD Lecture Series, Medical Grand Rounds, Veteran's Administration Hospital, Menlo Park, California, 29 April, 1988.

Shields, J. M. "The male batterer: Psychodynamics and implications for treatment," guest lecturer at Foothill College, Los Altos, California, 16 February 1988.

Dudley, J. P., Miles, D. D., & Shields, J. M. "Effect of penicillin and oxocillin on adherence to tracheal and pharyngeal mucosa of *Pseudomonas aerguginosa, Neisseria species,* and *Staphylococcus aureus.* " Association for Research in Otolaryngology, Annual Meeting, Anaheim, California, 22 October 1983.

## Research Grants:

National Cystic Fibrosis Foundation Research Grant Award #H027 4-01. Effect of cystic fibrosis serum on cilia, 23 February 1983, J. M. Shields principle investigator.

UCLA Undergraduate Research Fellowship Grant. Quantifying mucus secretions induced by cystic fibrosis heterozygote and control serum on ciliated epithelia, 31 May 1983, J. M. Shields principle investigator.

**Other Work/Volunteer Experiences:**

| | |
|---|---|
| 2005-present | Center for Human Development, Conflict Resolution Panels<br>Pleasant Hill, California<br>community mediation, small claims court mediation,<br>probate court guardianship mediation, restraining<br>order/harassment mediation |
| 1986-1987 | Ohio Council for Learning Disabilities, Executive Board |
| 1980-1985 | UCLA Department of Pediatrics, Child Development Program |
| 1980-1985 | UCLA Department of Surgery, Research Technician |
| 1983-1985 | UCLA Department of Pediatrics, Research Technician |
| 1983-1985 | Southern California Children's Cancer Service Summer Camp<br>Committee |
| 1982-1984 | Southern California Children's Cancer Service, Summer Camp |
| 1982-1984 | Cystic Fibrosis Camp of Southern California |
| 1984 | Southern California Children's Cancer Service<br>Psychosocial Advisory Board |
| 1984 | UCLA Neuropsychiatric Institute<br>Special Education, Division of Early Childhood |
| 1982 | Cystic Fibrosis Foundation<br>Council for Fund Raising<br>Council for Public Education |

**Teaching Certificates:**

| | |
|---|---|
| 1986 | Education, Special Education K-12, Franklin County, Ohio<br>Developmental Handicaps<br>Multiple, Severe, & Profoundly Retarded |
| 1986 | Severe Behaviorally Handicapped & Learning Disabled  (Temporary),<br>Franklin County, Ohio |

**Honors:**

| | |
|---|---|
| 1985 | UCLA Alumni Association, Outstanding Senior Student |
| | UCLA Department of Psychology, Highest Academic Honors |
| | UCLA Chancellor's Marshall Award for Outstanding Scholarship & Service |
| | UCLA Center for the Health Sciences, Outstanding Volunteer Scholarship |
| 1984 | UCLA Undergraduate Presidential, Research Fellowship Award |
| | UCLA Center for the Health Sciences, Rehabilitation Service Guild<br>Scholarship Award |

**Honors (Continued):**

| | |
|---|---|
| 1983 | National Cystic Fibrosis Foundation, Student Traineeship Research Award |
| | UCLA Center for the Health Sciences, Outstanding Volunteer Scholarship |
| 1982 | Psi Chi National Honors In Psychology |
| | UCLA Center for the Health Sciences, Outstanding Volunteer Scholarship |

**Research Experience:**

| | |
|---|---|
| 1990-1992 | Doctoral dissertation:  The effects of adults' communication clarity versus deviance on the cognitive performance of learning disabled  adolescents.  Chair:  Robert J. Green, Ph.D. |
| 1989-1990 | University of California, San Francisco, Adolescent & Family Project Research Assistant  The Adolescent & Families Project was a clinical research project that tests the relative effectiveness of three forms of treatment for adolescent substance abusers:  Group Therapy, Family Therapy, and Multi-Family Treatment. |
| 1988-1989 | Using the Rorschach to assess communication deviance  in parents of schizophrenics and parents of learning disabled individuals, California School of Professional Psychology, Alameda, California |
| 1986-1987 | Rescoring of the Rosenzweig Picture-Frustration Test, Ohio State University |
| 1985-1986 | Models of Educational Consultation, Ohio State University |
| 1980-1985 | Serology of Cystic Fibrosis Heterozygotes, Univ. of Calif., Los Angeles |
| 1980-1983 | Bacterial Adherence, Univ. of Calif., Los Angeles |

**Research Interests:**

forensic criminal and juvenile evaluation and intervention, risk and resiliency factors in children and adolescents, psychotherapy ethics and law, child development, childhood chronic illness, personality  and psychodiagnostic assessment, educational consultation, learning disabilities and parental communication

**Professional Training:**

"Child Abuse Prevention Workshop", California School of Professional Psychology, 16-17 April 1988

"Human Sexuality & Treatment of Sexual Disorders", California School of Professional Psychology, 8-9 October 1988

"Addictions in the 90's:  Treatment of Substance Abuse", California School of Professional Psychology, 28-29 January 1989

**Professional Training (Continued):**

> Psychological Testing & Assessment Courses & Training:
>> General Psychological Assessment, Ohio State University, Oct.-Dec., 1986, 3 hrs. per week
>> Projective Assessment of Children, Ohio State University, Jan.-Mar., 1987, 3 hrs. per week
>> Intelligence Testing Practicum, California School of Professional Psychology,
>>> Jan.-May, 1988, 3 hrs. per week
>> Psychological Assessment I, California School of Professional Psychology,
>>> Sept.-Dec., 1988, 4 hrs. per week
>> Psychological Assessment II, California School of Professional Psychology,
>>> Jan.-May, 1989, 4 hrs. per week
>> West Coast Children's Center, Albany, California; Psychological Assessment Team, 1989-90
>>> Psychodiagnostic assessment & evaluation of children and adolescents
>>> Training and supervision:  Barbara Mercer, Ph.D.
>> West Coast Children's Center, Albany, California; Psychological Assessment Team, 1990-1992
>>> Psychodiagnostic assessment & evaluation of children and adolescents
>>> Contract Staff position

1994- 1995    Psychoanalytic Continuous Case Conference
> This is an ongoing case conference for practicing clinicians.  The focus is on following psychoanalytic cases and discussing both relevant theory and technique, from a psychoanalytic perspective.
> Conference Facilitator:  J. Samuel Chase, M.D.
>> Supervising & Training Analyst
>> San Francisco Psychoanalytic Institute, San Francisco, California

1994    Forensic Assessment of Juvenile Delinquents-private consultation
> This training provided consultation and supervision on the assessment of juvenile delinquents referred for psychological evaluation by the San Francisco Juvenile Probation Office, and as ordered by the Superior Court.
>> Consultation provided by Douglas R. Korpi, Ph.D.

**Continuing Education/Professional Meetings:**
**Psychotherapy & Psychoanalysis:  Theory & Technique**
> "Understanding Hallucinations and Delusions:  Issues in Assessment," A symposium, San Francisco Psychological Association, University of California, San Francisco, San Francisco, California, 21 November 1992.  (CA Psych. Assoc. CE category-A, 3 hrs.)

> "Dream Interpretation in Psychoanalytic Psychotherapy," Extension Division Seminar, San Francisco Psychoanalytic Institute, San Francisco, California, April-May 1993.  Instructor:  Steven Goldberg, MD, Member, San Francisco Psychoanalytic Institute, Asst. Clinical Professor, University of California, San Francisco. 16 hrs.

**Psychological Testing & Assessment  (SEE also "Forensic Evaluation" below)**
> "Psychological Assessment for Disability Evaluation," Disability Evaluation Division, Oakland Branch, Oakland, California, 25 February 1993.  (2 hrs.)

> "Advanced Assessment of Risk Utilizing Rorschach & MMPI-2 Data," presented by Phil Erdberg, Ph.D., Federal Reserve Bank Bldg., San Francisco, California, sponsored by California Forensic Mental Health, 26 June 1995. (MCEP 6.25 hrs.)

> "Rorschach Assessment of DSM-IV Personality Disorders," presented by Phil Erdberg, Ph.D. & Reid Meloy, Ph.D., Marina Marriott, Berkeley, California, 3 & 4 May 1996. (MCEP 14 hrs.)

- 14 -

**Continuing Education/Professional Meetings (Continued):**
   Psychological Testing & Assessment  (SEE also "Forensic Evaluation" below)

   "Adult Cognitive Assessment:  Wechsler Adult Intelligence Scales-III (WAIS-III) & the Wechsler
      Memory Scale-III (WMS-III), sponsored by the California Psychological Association, Conference
      Center, South San Francisco, 27 Sept. 1997.  (MCEP 7hrs.)

Legal:  Law & Mental Health/ Legal & Ethical Issues
   "Clinical Work with Children and Families:  Legal and Ethical Considerations," presented by  Daniel
      O. Taube, Ph.D., J.D., West Coast Children's Center, El Cerrito, CA, 6 & 13 May 1995.
      (MCEP 6 hrs.)

   "Task Force to Review Juvenile Crime and the Juvenile Justice Response:  Transfer of Knowledge
      Workshop," San Jose, CA, 17-18 August 1995.

   "Ethical Issues in Forensic Psychology," presented by Alan M. Goldstein, Ph.D., conference of the
      American Academy of Forensic Psychology, Long Beach, CA, 15 January 2003.  (MCEP 7 hrs.)

   "Excusing and the New Excuses, [Sanity, Insanity and Related Criminal Defenses & Prosecution
      Issues]," presented by Stephen Morse, J. D., Ph.D., conference of the American Academy of
      Forensic Psychology, Long Beach, CA, 16 January 2003.  (MCEP 7 hrs.)

   "Laws & Ethics Update," presented by A. Steven Frankel, Ph.D., J.D., ABPP, Psycho-Legal
      Associates, Inc., Sacramento, CA  20 February 2004 (MCEP 6 hrs.)

Mediation/Dispute Resolution/Divorce-Child Custody/Special Master-Family Court
      [Courses fulfilling requirements of California Family Code Secs. 1816 (Domestic Violence
      training), 3110.5 (Child Custody evaluator); & California Rules of Court Secs. 5.210
      (Child Custody mediation), 5.220, 5.225 (Child Custody evaluator training), 5.230]

   ∞[Total Hours of Mediation Training:  136 hrs. as of Mar. 2005]

   "Child Custody Evaluation & Mediation," California School of Professional Psychology,
      Sep.-Dec., 1990, 2 hrs. per week (32 hrs.)

   "Mediation in a Medical Setting:  Bioethics & Mediation Training," by Robert J. Wagener, President,
      The Center for Medical Ethics and Mediation, Solano State Prison, Vacaville, CA, 25-27 Oct.
      2000.  (15 hrs.)

   "Divorce Mediation," [including child custody & domestic violence] by Nancy J. Foster, J.D., &
      Jessica Notini, J.D., Northern California Mediation Center, Greenbrae, CA, 7-8 Oct. 2004 (16 hrs.)

   "Mediation Training," [corporate, interpersonal dispute, divorce, & custody mediation] by Steven
      Rosenberg, J.D., Mill Valley, CA, 13-22 Oct. 2004 (MCEP/MCLE 40 hrs.)

   "Conflict Resolution Training," [Community Mediator certification course] Center for Human
      Development, Pleasant Hill, CA  19-29 Jan. 2005 (25 hrs.)

   "Conflict Resolution Advanced Training:  Guardianship Mediation & Small Claims Court Mediation,"
      Center for Human Development, Pleasant Hill, CA  31 Jan. 2005 (5 hrs.)

   "Conflict Resolution Advanced Training:  Civil Harassment & Restraining Order Mediation," Center
      for Human Development, Pleasant Hill, CA  4 Feb. 2005 (3 hrs.)

   "Comprehensive Child Custody Evaluations," [case law, statutes, practice guidelines, child abuse,
      domestic violence, parental alienation] by Steven N. Sparta, Ph.D., American Academy of
      Forensic Psychology Workshop, La Jolla, CA, 4 Mar. 2005 (MCEP 8 hrs.)

**Continuing Education/Professional Meetings (Continued):**

    **Mediation/Dispute Resolution/Divorce-Child Custody/Special Master-Family Court**
        [Courses fulfilling requirements of California Family Code Secs. 1816 (Domestic Violence
        training), 3110.5 (Child Custody evaluator); & California Rules of Court Secs. 5.210
        (Child Custody mediation), 5.220, 5.225 (Child Custody evaluator training), 5.230]
        (Continued):

        SEE ALSO:
            "Domestic Violence:  Assessment & Treatment [of victims, perpetrators, and impact on children],"
            under the "General Psychology" heading

**Forensic Psychology & Forensic Evaluation**

    "Forensic Assessment of Risk of Violence and Psychological Decompensation Using the Rorschach
        and MMPI-II," presented by Phil Erdberg, Ph.D., Federal Reserve Bank, San Francisco,
        California, 27 May 1994.  7 hrs.

    "Risk Assessment:  Implications for Evaluation, Intervention and Decision-Making," presented by Kirk
        S. Heilbrun, Ph.D., conference of the American Academy of Forensic Psychology, San Deigo, CA,
        19-21 January 1995.  6 hrs.

    "Diagnostic & Structured Interviewing:  Applications to Forensic Evaluations," presented by Richard
        Rogers, Ph.D., conference of the American Academy of Forensic Psychology, San Deigo, CA, 19-
        21 January 1995.  6 hrs.

    "The Psychologist in the Legal System," presented by Arthur D. Williams, Ph.D. and Pamela A.
        Thatcher, J.D., Holiday Inn, San Francisco, CA, 21 Oct. 1995.   (MCEP 6 hrs.)

    "Forensic Mental Health Symposium," sponsored by the Forensic Mental Health Association of
        California.  Topics included:  "Quality Control with Psychological Assessments of Violence
        Potential and of Mentally Disordered Offenders," "Predictors of Recidivistic Violence in the
        Criminally Insane" (MCEP 1 hr.), "Assessment and Treatment of Women who Murder their
        Children," and" Adolescent Sexual Abuse Perpetrators:  Assessment, Placement, and Treatment."
        San Francisco State University Downtown Center, San Francisco, CA, 3 Nov. 1995. (6 hrs. total;
        MCEP 1 hr.)

    "Rorschach Use in Assessing Potential Violence Among Mentally Disordered Offenders and Insanity
        Aquitees:  Personality Disorders & Sex Offenders," presented by Phil Erdberg, Ph.D., Federal
        Reserve Bank, San Francisco, California, 19 July 1996. (MCEP 6 hrs.)

    "Evaluating Sex Offenders," presented by Gary Zinik, Ph.D., 2nd Annual Mental Health Symposium,
        San Francisco State University Downtown Center, San Francisco, CA, 25 Oct. 1996. (MCEP 2.0
        hrs.)

    "Psychological Assessments of Sexually Violent Predators (SVP's) as Defined by WIC 6600,"
        presented by Douglas Korpi, Ph.D., 2nd Annual Mental Health Symposium, San Francisco State
        University Downtown Center, San Francisco, CA, 25 Oct. 1996. (MCEP 2.0 hrs.)

    "The Clinical and Forensic Use of the Hare Psychopathy Checklist-Revised (PCL-R)," Forensic Mental
        Health, presented by Carl Gacono, Ph.D., San Francisco, CA, 28-29 Mar. 1997.   (MCEP 12.0
        hrs.)

    "Trial Competency and Criminal Responsibility Assessment:  A Practical Guide," American Academy
        of Forensic Psychology, presented by Charles R. Clark, Ph.D., San Francisco, CA, 4 Apr. 1997.
        (MCEP 6.0 hrs.)

    "The MMPI-2 and Rorschach in Court," American Academy of Forensic Psychology, presented by J.
        Reid Meloy, Ph.D. and Richard Lewak, Ph.D., San Francisco, CA, 5 Apr. 1997.   (MCEP 6.0 hrs.)

- 16 -

**Continuing Education/Professional Meetings (Continued):**
  **Forensic Psychology & Forensic Evaluation (Continued)**

"Clinical Assessment of Malingering and Deception," presented by Phillip Resnick, M.D., San Jose, CA, 19 Nov. 1998. (MCEP 7.0 hrs.)

"Personal Injury Evaluations: Ethics, Case Law, and Practice," American Academy of Forensic Psychology, presented by David Vore, Ph.D., Monterey, CA, 14 Jan. 2000. (MCEP 7.0 hrs.)

"On the Same Page as the Judge: Psychiatric & Psychological Evidence & Testimony Benchbook," American Academy of Forensic Psychology, presented by Eric Drogin, J.D., Ph.D., Monterey, CA, 16 Jan. 2000. (MCEP 7.0 hrs.)

"16th Annual Symposium of the American College of Forensic Psychology," Newport Beach, CA, 6-9 Apr. 2000. child custody; employment evaluation; trial competency; general forensic practice. (MCEP 19.0 hrs.)

Napa State Hospital 2nd Annual Visiting Psychiatry Scholars Program, "Legal Concepts and Perspectives Regarding Adult Competency to Stand Trial," by Richard Bonnie, LLP, and "Competency to Stand Trial," by Norman Poythress, Ph.D., Napa, California, 30 Apr. 2001. (3.0 hrs.)

"Advanced Topics in Forensic Psychology," [evaluation of competency to waive Miranda rights; Competency to stand trial; Criminal responsibility (sanity); Death penalty cases and psychological consultation] presented by Alan M. Goldstein, Ph.D., conference of the American Academy of Forensic Psychology, Albuquerque, NM, 9 April 2003. (MCEP 7 hrs.)

"Cross-Examination of the Forensic Psychology Expert Witness," by Diane Follingstad, Ph.D. conference of the American Academy of Forensic Psychology, San Diego, CA, 5 March 2005. (MCEP 7 hrs.)

**Criminology & Correctional Forensic Psychology**
"Advanced Sexual Offender Profiling: Behavioral Analysis of Violent Crime Scenes," [psychological and behavioral profiling; crime scene analysis] presented by Roy Hazelwood, FBI (ret.), Sacramento, CA, 26 &27 Feb. 1998 (MCEP 14.0 hrs.)

"Forensic Neuropsychology: Evaluation of Criminal Offenders," presented by Myla Young, Ph.D., California School of Professional Psychology, Alameda, CA, 21 Oct. 1999. (MCEP 8.0 hrs.)

"Clinician Assisted Deception in a Correctional Setting," (malingering & psychopathy), presented by Carl Gacono, Ph.D., Garret Esseres, Ph.D. & Larry Dizmang, M.D., sponsored by the California Department of Corrections, live satellite broadcast, California Medical Facility, Vacaville, CA, 10 June 1999. (MCEP 2.0 hrs.)

"Forensic Profiling: Behavioral analysis and personality assessment," [psychological and behavioral profiling; crime scene analysis] presented by Phil Erdberg, Ph.D., and Kathleen Puckett, FBI Special Agent, sponsored by Forensic Health Care, Commonwealth Club of California, San Francisco, CA, 14 Apr. 2000. (MCEP 8 hrs.)

The Rorschach: A Clinical and Forensic Update, by Phil Erdberg, Ph.D., a workshop by the Sacramento Valley Psychological Association, Forensic Division, Sacramento, CA, 27 Oct. 2001. (MCEP 6.0 hrs.)

Assessing Psychopathy: Clinical & Forensic Applications of the Psychopathy Checklist-Revised, by Robert Hare, Ph.D., & Adelle Forth, Ph.D., San Francisco, CA, 9-10 Feb. 2002. (MCEP 13.0 hrs.)

**General Psychology**

"Substance Abuse Training," presented by the California Psychological Association, South San Francisco, CA, 20 Oct. 1995. (MCEP 7 hrs.)

"Domestic Violence: Assessment & Treatment [of victims, perpetrators, and impact on children]," presented by Alyce LaViolette, MS [Psycho-Legal Associates, Inc.], Emeryville, CA, 25 April 2004. (MCEP 7 hrs.)

"Myths & Realities of Growing Old: Aging & Long-Term Care in California," presented by Joan Spiegel, Ph.D., Sunnyvale, CA  30 Jan. 2005 . (MCEP 6 hrs.)

**Forensic Experience:**

Areas of Relevant Clinical Experience:
clinical psychology; child, adolescent, & adult psychotherapy; psychological testing and assessment of children, adolescents, & adults; psychoeducational testing; psychodiagnostics; child development; special education; learning disabilities; child custody; consultation on civil litigation cases involving psychiatric and psychological testimony/relevance; criminal evaluation, competence, mental state, fitness; juvenile court evaluations

Testimony Experience & Areas of Qualification as Expert Witness:
child custody, psychotherapy, psychodiagnostic evaluation and assessment [in Civil litigation (personal injury/emotional distress); Juvenile Delinquency; Juvenile Dependency; & Criminal courts], clinical psychology, child psychology, forensic psychology, juvenile fitness, issues in juvenile delinquency and dependency, child abuse in dependency court matters, trial competency, criminal responsibility (sanity/insanity) and restoration of sanity, risk assessment

Total Number of Forensic Cases Testifying as Expert Witness:  55      [last revised:  19 May 2005]

Total Number of Forensic Cases [Civil] Deposed as Expert Witness:  7

**Professionals Familiar with Professional Practice and/or Work Products:**

Douglas R. Korpi, Ph.D.
    110 Gough Street, Suite 203-B
    San Francisco, CA  94102
    415-333-4255

Marilyn Margiotti, Ph.D.
    235 Montgomery St., Suite 1020
    San Francisco, CA  94104
    (415) 433-9438

Patricia Lee, Esq.
    Office of the Public Defender
    Juvenile Division, Supervising Attorney
    City & County of San Francisco
    375 Woodside Ave.
    San Francisco, CA  94127
    (415) 753-7610

Joseph A. Bick, M.D.
    California Department of Corrections,
    California Medical Facility
    Chief Medical Officer, Unit IV
    P.O. Box 2000
    Vacaville, CA  95696-2000
    (707) 453-7008

*ଔ Additional names available on request, including attorneys and judges*

Civil Litigation Cases

| Date Closed | Retained By | Caption | Case No. | Plaintiff Attorney | Defense Attorney | Verdict or Settlement |
|---|---|---|---|---|---|---|
| 1995 | Plaintiff | Brown v. Pacific Building Assoc. Inc. | Bank. 92-30855LK | Gilbert Graham, Esq. | D. Ronald Ryland, Esq. of Sheppard, Mullin, Richter, & Hampton | Confidential Settlement |
| 1997 | Plaintiff | Fontanos et al. v. Roman et al. | San Francisco Sup. Crt. 966-558 | Bravo & Margulies | Eduardo Sandoval, Esq. | Settlement of $88,000 |
| 1998 | Defense | Kwan, Karen v. Wong, Antonio | San Francisco Mun. Crt. 145383 | William C. Wunsch, Esq. of Faulkner, Sheehan & Wunsch | Bravo & Margulies | Plaintiff withdraws after arbitration decision for defense |
| 1999 | Plaintiff | Yamamoto v. Clarke et al. | San Francisco Sup. Crt. 984-335 | Robert Carrow, Esq. | Stephen A. Roberts, Esq. of Kristine Jennings & Assoc. | Settlement of $350,000 |
| 1999 | Plaintiff | Budnick v. Pappas & Budnick v. Segales et al. | San Francisco Sup. Crt. 997284 | Andrew Zacks, Esq. | Charles Shea, Esq. of Cesari, Werner & Moriarty | Settlement of $150,000 |
| 1999 | Plaintiff | Glenn v. Palace Auto Center | San Mateo Co. Sup. Crt. 408008 | Silverman & Silverman Alan Silverman | Simpson, Ahern, & Garrity | Settlement of $7,000 |
| 1999 | Plaintiff | Brandt v. O'Brien | San Francisco Sup. Crt. 999855 | Bravo & Margulies | Dryden, Margoles, Schinaneck Kelly & Wait | Settlement of $27,500 |
| 2001 | Plaintiff | Ruiz v. K-Mart Corp. | Alameda Sup. Crt. No. 989790 | Bravo & Margulies | Ropers, Majeski, Kohn & Bentley | Settlement of $100,000 |
| 2001 | Defense | Turner v. Chilton | San Francisco Sup. Crt. 301711 | Kathleen Hull | Bravo & Margulies, and Wm. Dresser | settled |

| Date Closed | Retained By | Caption | Case No. | Plaintiff Attorney | Defense Attorney | Verdict or Settlement |
|---|---|---|---|---|---|---|
| 2002 | Plaintiff | Mack v. Chou | San Francisco Sup. Crt. 309880 | Bravo & Margulies | Jon York & Assoc. | Jury trial; verdict for plaintiff; $72,000 awarded |
| 2002 | Defense | Adauto v. Textron Financial Corp. | U.S. District Court, No. District C-01-1881 | Jill Telfer, Esq. | Matheny, Sears, Linkert, & Long | Confidential Settlement |
| 2002 | Defense | Waller v. Textron Financial Corp. | U.S. District Court, No. District | Jill Telfer, Esq. | Matheny, Sears, Linkert, & Long | Confidential Settlement |

Exhibit B

UCSF Stanford Health Care,
Stanford Hospital & Clinics,
Discharge Summary, dated 21 Jan. 1999

UCSF Stanford Health Care
Stanford Hospital and Clinics
Stanford, California 94305



151103

| | |
|---|---|
| NAME: HANCOCK, JEFF | DISCHARGE SUMMARY |
| NUMBER: 992-45-05 | ACCOUNT NUMBER: 010005031231 |

ATTENDING
PHYSICIAN:     GRIFFITH HARSH, M.D.
ADMISSION:     01/16/1999
DISCHARGE:     01/21/1999

**REASON FOR HOSPITALIZATION:**
Closed head injury secondary to trauma.

**HOSPITAL COURSE:**
The patient is a forty-year-old male who was found intoxicated in his apartment with evident craniofacial trauma. The patient was brought to the Stanford Hospital emergency room for evaluation and treatment. He was diagnosed with a left basilar skull fracture, a left facial laceration and a left frontal brain contusion. The patient was admitted initially on the trauma service and since his main injury was the bifrontal brain contusion, the patient was transferred to the Neurosurgical Service. The patient continued to be monitored and his neurologic status improved throughout the course of his hospital stay.

Due to the difficult social situation, social work and discharge planning have been involved with the case from the start. By the time of discharge the patient was afebrile with stable vital signs, was tolerating a regular diet, was ambulating without little difficulty and his pain was controlled with oral pain medications. The patient was felt to be safe to be discharged in the care of his mother who agrees to either be present or have someone else available to observe the patient until he has completely recovered.

Of note is that there had been a restraining order in effect preventing the patient from seeing his mother although the mother has made arrangements with the district attorney that this can be suspended for the duration of the illness. For full details, please see the chart.

**PROCEDURES PERFORMED:**
CT scan of the head.

**TREATMENT RENDERED:**
Medical.

**DIAGNOSES:**
1. Status post trauma involving a left basilar skull fracture, a left facial laceration and a bifrontal brain contusion.

**DISPOSITION:**
The patient was discharged to home.

**CONDITION OF THE PATIENT UPON DISCHARGE:**
Good.

Page 1 of 2

ORIGINAL

· 2283

UCSF Stanford Health Care
Stanford Hospital and Clinics
Stanford, California 94305

NAME:                HANCOCK, JEFF                          DISCHARGE SUMMARY
NUMBER:              992-45-05                      ACCOUNT NUMBER: 010005031231
ATTENDING
PHYSICIAN:           GRIFFITH HARSH, M.D.
ADMISSION:           01/16/1999
DISCHARGE:           01/21/1999

DIET:
Regular.

PHYSICAL ACTIVITY:
The patient is to ambulate as tolerated and as advised by physical therapy, that he be in an environment where
assistance is readily available.

MEDICATIONS:
1. Vicodin one to two tablets po q four to six hours PRN pain.
2. Colace 250 mg po bid for constipation.
3. Valium 5-10 mg po q six hours for spasms.
4. Dilantin 300 mg po q HS for seizure prevention.

FOLLOW UP:
The patient will follow up with Dr. Harsh in Neurosurgery Clinic in approximately one week.


GRIFFITH HARSH, M.D.                                      MARNIE ROBINSON, M.D.

d:   01/21/1999 3:08 P
t:   01/23/1999 5:31 P/cmt/ct
l:   01/23/1999 5:32 P/sg

CC:  GRIFFITH HARSH, M.D.
     MARNIE ROBINSON, M.D.

doc:1031101
15-1103

Page 2 of 2

ORIGINAL

Exhibit C

Winchester Hospital
Radiology Report,
prepared by R. P. Fortunato, MD,
dated 6 Aug. 1999

Winchester Hospital Imaging Services
**WINCHESTER HOSPITAL**
Winchester, Massachusetts
(781) 756-2342

Radiology          CT Scan
Nuclear Medicine   Ultrasound

NAME: HANCOCK, JEFF
UNIT NO.: 591922
DOB: 11/02/1958  AGE: 40    SEX: M
ACCT: 2173348    LOC: ER
EXAM DATE: 08/06/1999
ORD PHYS: HERNANDEZ, EDWIN J
PT TEL #: 4084286935

EXAMS:  HEAD/WITHOUT CONTRAST - 70450

CLINICAL INDICATION: SEIZURE/FELL HIT HEAD

BRAIN CT:

Scans of the brain demonstrate a low density area in the left frontal
region with central tissue nodule.  The appearance is consistent with
a neoplasm and surrounding edema.  No real change compared to 7/18/99.
There is no evidence of hemorrhage and no other significant findings
are seen.

IMPRESSION:  STABLE AREA OF APPARENT EDEMA AND LIKELY TUMOR NODULE IN
             THE LEFT FRONTAL REGION. PATIENT HAS REPORTEDLY HAD AN
             MRI SINCE THE LAST CT SCAN BUT NO AT THIS INSTITUTION.


REPORT REVIEWED BY:  ____

    ---------------------------------
    R. P. FORTUNATO, M. D.


    CC: EDWIN J. HERNANDEZ, MD

08/06/1999 (2225)
RAD (NMD)

PAGE 1            CHART COPY

WH 618 Rev 9/97

Exhibit D


Letter to Scott Co. Clerk of Court
from Michael A. Cronkleton, MD,
dated 31 August 1999
&
Psychiatric Report
by Angelika J. Peiffer,
dated 31 Sept. 1999

.esis East Letterhead
.ATIENT NAME:HANCOCK, JEFFERY    *Exhibit 18*                     BY:   JAM
D:08/31/99      14:05      T:08/31/99      15:10

August 31, 1999


Scott County Clerk of Court
Davenport, Iowa

RE: Hancock, Jeffery
DATE SEEN: 08/31/99
DATE OF BIRTH: 11/02/58
AGE: 40 years.

Dear Sir or Madam:

I am writing to request involuntary psychiatric commitment for Jeffery
Hancock. I evaluated him at Genesis Medical Center West Campus emergency
department today. He is disoriented and delusional. He has been
hallucinating. He demonstrates very impaired judgment and poor impulse
control. He is definitely a danger to himself. He has done such things as
undressing in public, approaching strangers at a restaurant and drinking
their water, and expressing the delusion that they are friends. He has a
seizure disorder. He has not been taking his medication. He has had
seizures recently. He has a history of a brain injury and of alcohol abuse
as well as exhibiting a serious psychiatric disorder. He is very restless
and tremulous.

He has no family or friends nearby to look after him. His mother lives in
California and has expressed the intention of coming to get him to take him
home; but, in the meantime, Mr. Hancock needs to be somewhere where he can
be kept safe.

Sincerely,


Michael A. Cronkleton, MD

D: 08/31/99  2:05 P
T: 08/31/99  3:10 P
jam JOB NO.:  45095
cc:
Authenticated by Michael A. Cronkleton, MD On 09-21-1999 at 3:29 pm

PRINTED BY: NORKUS
DATE     01/31/2005

# Exhibit E

Santa Clara Valley Health & Hospital System
Daily nursing note
dated 9 Aug. 2003



Santa Clara Valley
Health & Hospital System
Adult Custody Health Services
**PHYSICIAN'S ORDERS**
(PLEASE USE BALLPOINT PEN)

*Hancock, Jeff*
*0304/1987*
*BBI 263*    *11/2/58*

| DATE | TIME | PHYSICIAN'S ORDERS | CHECKED BY | TIME |
|------|------|-------------------|------------|------|

**SANTA CLARA VALLEY MEDICAL CENTER**
**ADULT INSTITUTIONS MEDICAL UNITS**

**ALCOHOL DETOXIFICATION ASSESSMENT & STANDARDIZED PROCEDURE**

8/9/03

### PATIENT HISTORY

1. Amount and Frequency of alcohol used _____    2. Date and Time of last drink    8/8/03
3. Duration of use of alcohol                        4. Use of any other Drugs
5. Past history of withdrawal from alcohol including any of    6. Age 65 or ___    Yes    No
the following: ____ Blackouts
                ____ Delirium Tremens
                ____ Seizure Disorder

### PAST MEDICAL HISTORY

Severe
Debilitation ____ COPD ____ Cirrhosis ____ Ascites ____    Identified High Risk
                                                            Type: ____

**DOCUMENTATION OF SYMPTOMS EXPERIENCED BY THE PATIENT:**

____ Anxiety ____ Insomnia ____ Nausea ____ Vomiting ____ Tremulousness ____ Diaphoresis

**PHYSICAL ASSESSMENT: DOCUMENTATION OF SIGNS OBSERVED BY NURSE:**

130/90 B/P    98 T    92 P    21 R    ____ Tremors    ____ Apprehension

**TREATMENT OPTIONS:**    No treatment necessary ____    **OR** (see below)
Initiate schedule as appropriate according to the criteria set forth in Standing Order C-1.

USE SCHEDULE 1
- CHLORDIAZEPOXIDE 50 MG PO QID FOR 2 DAYS, THEN
- CHLORDIAZEPOXIDE 50 MG PO TID FOR 1 DAY, THEN
- CHLORDIAZEPOXIDE 25 MG PO TID FOR 1 DAY, THEN
- CHLORDIAZEPOXIDE 25 MG PO BID FOR 1 DAY
- Thiamine 100 MG PO QD FOR 7 DAYS
- Prenatal Vitamins PO QD FOR 7 DAYS

**—OR—**

USE SCHEDULE 2
- Lorazepam (Ativan)  1.0 mg PO  Stat x 1,  then
- Lorazepam (Ativan)  0.5 mg PO  qid x 1 day, then
- Lorazepam (Ativan)  0.5 mg PO  tid x 2 days, then
- Lorazepam (Ativan)  0.5 mg PO  bid x 1 day
- Thiamine 100 MG PO QD FOR 7 DAYS
- Prenatal Vitamins PO QD FOR 7 DAYS

Initiate 72 hours alcohol detoxification assessment: ____

COPY TO PHARMACY (RN initial) ____

____ RN

8/9/03

# Exhibit F

Santa Clara County
Department of Correction
Agency Advisory Form
prepared by Off. Zariello
Dated 8 Aug. 2003

# SANTA CLARA COUNTY
## DEPARTMENT OF CORRECTION
### AGENCY ADVISORY FORM

ARRESTEES NAME: _HANCOCK, JEFF_    BOOKING #: _1303119187_    _11-02-58_

DATE: _08/08/03_    TIME: _____

This form must be completed by the arresting agency prior to the arrestee being received by the Santa Clara County Jail.

1.    Do you have any information or observations which would indicate that the arrestee has/had any of the following symptoms/problems prior to or during the contact that resulted in his/her arrest?

|      |                                                              | YES | NO |
|------|--------------------------------------------------------------|-----|-----|
| a.   | Loss of Consciousness                                        | ☐ | ☑ |
| b.   | Seizure                                                       | ☐ | ☑ |
| c.   | Respiratory Problem/Difficulty                               | ☐ | ☑ |
| d.   | Heart Problem                                                | ☐ | ☑ |
| e.   | Hypertension (High Blood Pressure)                           | ☐ | ☑ |
| f.   | Diabetes                                                     | ☐ | ☒ |
| g.   |                                                              |   | ☐ |
| h.   | Bizarre or Aggressive Behavior                               |   | ☐ |
| i.   | Psychiatric/Mental Health History/Developmentally Disabled   | ☐ | ☒ |
| j.   | Known or reported injury/illness                             | ☐ | ☑ |
| k.   | Any physical trauma                                          | ☐ | ☑ |
| l.   | Involved in a traffic collision                              | ☐ | ☑ |
| m.   | Disabilities, ie. hearing impaired                           | ☐ | ☑ |

Other_____

2.    Were any of the following used on the arrestee prior to or during the arrest?

|      |   |                                                         |   |   |
|------|---|---------------------------------------------------------|---|---|
| a.   | * | Chemical agents (O.C., Mace, etc.)                      | ☐ | ☑ |
| b.   | * | T.A.R.P. (Total Appendage Restraint Procedure)          | ☐ | ☑ |
| c.   | * | Carotid Restraint                                       | ☐ | ☑ |
| d.   | * | Taser/Any electric control/stun device                  | ☐ | ☑ |
| e.   |   | Baton (if yes, what part of the body was hit?_____) | ☐ | ☑ |
| f.   |   | Proned during handcuffing, approximate duration_____ | ☐ | ☑ |

\*    These conditions must be evaluated as indicated on the reverse side of this form.

3.    Was there any physical resistance by the arrestee prior to or during the arrest?    ☐    ☑
      APPROXIMATE DURATION_____(MINUTES)

4.    Is the arrestee on any type of Mental Health Hold (5150, W&I, etc.)?    ☐    ☑

_ZARIELLO_    _14183_    _0431650_
ARRESTING OFFICER    BADGE #    AGENCY

Reviewed by Receiving Officer:_____Badge #:_____

Any affirmative answers will be referred to a nurse for clearance prior to acceptance.

Reviewed by Medical/Mental Health:_____

Distribution:  Original Copy to Medical        Yellow Copy to Classification        Pink Copy to Administrative Booking File

Exhibit G


Page 43 of Transcript of Interrogation Interview
of J. Hancock, dated 12 Aug. 2003

43

Anderson:   Well, that's, that's, that's fine. You have trouble writing?

Hancock:    No.

Anderson:   Oh, no, I don't care if you have. It, it doesn't matter. I mean, I have, I get

            paid by the hour. So, take your time. I'll just read some of the other case.

Hancock:    I wish I got paid by the hour here.

Anderson:   Okay. So. and it's, it's however you want to write. I, to your friend, to

            the judge, to the DA, whatever, it doesn't matter.

Hancock:    Um, (inaudible) write.

Anderson:   You don't have to if you don't want to. That's totally up to you. Okay,

            so, some people choose to do it, 'cause they feel like it just gives,...

Hancock:    Um hum.

Anderson:   it's in their own writing, it's in their own words. This is, some people

            don't. I mean it's not a big deal. You, you, you can, can do it, or you

            don't have to. And, and it's kind of something if you feel like, you, you

            want to do that, you think it would help you out, then ah, it's your choice.

            But I'm not gonna push you to do it or not. It's totally up to you. Just an

            option I like to give the guys that have been cooperative and have told

            their side of the story. And if you were to be a jerk a say, you know, get

            out of here, then I wouldn't even, I'd say ah, whatever, you can just, we'll

            just leave it how it is, you know. And then it's kind of like, throw your

            cards in and take your chances with it. It's totally up to you. If you want

            to do it.

Hancock:    I'm just not quite sure how I should word it.

People v. Hancock
EE302496

44

# Exhibit H

# Page 2 of Transcript of Interrogation Interview of J. Hancock, dated 12 Aug. 2003

2

whole thing. I'll write it down. I'll submit the tape today. Hoping the DA can take a look at it tomorrow (inaudible). If that's something you're willing to do, I can read you the Miranda saying, then we can talk. Totally up to you if you want, if you want to leave your side of the story here, um, that's up to you. But ah, that's just (inaudible). Ah, let me, let me read this to you. And then if you want to talk about it, then you can. You have the right to remain silent. Anything you say may be used against you in court. You have the right to the presence of an attorney before and during any questioning. If you cannot afford to hire an attorney, one will be appointed to you free of charge before any questioning. Do you understand all that I read to you?

Hancock:     Yeah.

Anderson:   Okay. Ah, don't mind if I am saying what I read to you for you, is all I'm saying. And like I said, he ah, the night this happened, he didn't want to say anything. Um, the officer basically had to force him to talk about what happened. But, but I, I went and visited him today. He's doing all right. You know, he's pretty beat up. But ah, he's not gonna die or nothing like that, you know. Okay. And ah, that's kind of what he told me, is that ah, he said he just kind of lost (inaudible) bigger, bigger than him. And you got the best of him. That was kind of the story. Um, you want to talk a little bit about what the, what the deal with ah, with,

People v. Hancock
EE302496

3

EXHIBIT I



IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

Court of Appeal - Sixth App. Dist.

# FILED

MAR 2 4 2006

MICHAEL J. YERLY, Clerk

By _____
        DEPUTY

In re

JEFF JAY HANCOCK,                    H029763
                                     (Santa Clara County
        On Habeas Corpus              Super.Ct.No. EE302496)
_____/


THE COURT:


        The petition for writ of habeas corpus is denied.

              (Rushing, P. J., Elia, J., and Mihara, J. participated in this decision.)



Dated:    MAR 2 4 2006              RUSHING, P.J.
        _____            _____
                                          RUSHING, P.J.

EXHIBIT J

Court of Appeal, Sixth Appellate District - No. H029763
**S143150**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re JEFF HANCOCK on Habeas Corpus

Petition for review DENIED.

SUPREME COURT
**FILED**

JUL 1 9 2006

**Frederick K. Ohlrich Clerk**

DEPUTY

GEORGE

Chief Justice

DECLARATION OF MARY MARGARET SMITH

No. 1

I, Mary Margaret Smith, declare:

1. I am the mother of Jeff Hancock, defendant in Santa Clara Superior Court Case No. No. EE402396.

2. In 1999, Jeff suffered a head injury that left him subject to seizures. He has been hospitalized numerous times for those seizures since, and has been on anti-seizure medication - Dilantin - since the original incident.

3. After a seizure, Jeff is "not himself" for a period of some days afterwards. His cognitive reasoning is unclear and he is not fully alert.

4. I knew that Jeff had been hospitalized for a seizure shortly before he was interviewed by the police. I was concerned that at the time of the interview, Jeff might not have been restored to full consciousness and accurate thinking.

5. Before trial, I told Mr. Kurzman of Jeff's history of seizures and the fact that they left him with impaired cognitive abilities, but Mr. Kurzman said it did not matter.

6. During trial, when I heard Jeff's taped voice on the "confession," I told Mr. Kurzman that he did not sound like himself, that he sounded "doped up," groggy, "out of it," and not 100%. Again, Mr. Kurzman told me that it did not matter.

7. If Mr. Kurzman had been interested, I could have provided him with the medical records being submitted with this petition, which evidence Jeff's seizure disorder and history of disorientation following seizures.

8. I could also have testified of my own knowledge that Jeff was historically groggy and confused for days after suffering a seizure, and that his voice sounded "doped up," or groggy during the police interview.

The statements in this declaration are true under penalty of perjury under the laws of California on October 11TH, 2005, in Grants Pass, Oregon.

Mary Margaret Smith

No. 2

### DECLARATION OF JEFF HANCOCK

I, Jeff Hancock, declare:

1. In 1999, I suffered a head injury that left me subject to seizures. I have been hospitalized numerous times for those seizures since, and have been on anti-seizure medication (Dilantin) since the original incident.

2. For as long as five days after a seizure, I do not feel like myself. I am groggy, my thinking is confused, and I sometimes walk and talk as though drunk even when I have not been drinking.

3. When I was admitted to Santa Clara County Jail, I was not given the anti-seizure medication (Dilantin) on which I rely. As a result, on August 9, 2003, I suffered a seizure, fell out of my bunk on to the cement floor of the jail, and was injured. I was taken to the hospital, where I was given the wrong medication –Librium instead of Dilantin. This happened because an intake officer booked me in under the wrong personal file number, so my medical history did not come up on the screen. I've been treated there with the medication Dilantin in the past, to control my seizures!

4. On August 12, 2003, shortly after I was released from the hospital back to the jail, a police officer took me out of my cell to be interviwed by someone. I was still suffering the after-effects of the seizure, and I was still taking Librium, which makes me very groggy. As a result I felt drowsy and not completely "with it." Consequently, I did not really engage with the person interviewing me, and just gave "lip service" to whatever he told m. For instance, When he said things that I would have contradicted if I had been more alert, I just let them slide

5. Before trial, I told Mr. Kurtzman about my history of seizures, that I had just been discharged from the jail hospital after suffering a grand mal seizure, and hitting my head on the concrete floor. While being intrviewed, I was under the influence of the mdication Librium, which makes me drowsy, "out of it." Consequently, I was not fully aware of what was going on.

6. I told Mr. Kurtzman that the medical records of my hospitalization for seizures and the medical records from the jail would support what I was telling him.

7. I had thought Mr. Kurtzman had said that he would look into the issue. I was shocked and disappointed at trial when the taped admission was submitted without any objection or discussion of my confused and disoriented state when I made it. I never even heard him ask openly or move to suppress it.

The statements in this declaration are true under penalty of perjury under the laws of California on October 22, 2005, in Susanville, California.

Jeff Hancock

DECLARATION OF EBEN KURTZMAN                                    No. 3

I, Eben Kurtzman, declare:

1. I am a lawyer licensed to practice in California; I represented Jeff Hancock at trial in Santa Clara Case Superior Court Case No. EE402396.

2. Mr. Hancock advised me that he had a long-standing seizure disorder and brain injury, and had been suffering from the after-effects of a recent seizure at the time of his interview by police and subsequent confession.

3. I did not obtain Mr. Hancock's medical records or hire a medical expert to analyze them because I did not believe Mr. Hancock's medical condition to be relevant to his defense, both because he had not told me that he was suffering from a seizure at the time of the offense and because assault is a general intent crime.

4. I did not try to use Mr. Hancock's medical condition to keep his confession out because I wanted that confession to come in. It included information about Mr. Hancock taking care of Craig Davis, allowing him to stay with him and paying for his food, that I believed would render Mr. Hancock more sympathetic to the jury. It also showed that Mr. Hancock was remorseful for his act and had not meant to hurt Mr. Davis. I believed that these good aspects of the confession out-weighed the bad when viewed with the other evidence I expected to be admitted.

5. I was aware that Mr. Hancock wanted to testify at trial, but I had hoped to dissuade him from doing so. I prefer that my clients do not testify; in my experience, such testimony usually contains at least some inconsistencies, and the district attorney can be expected to seek to capitalize on them.

6. Mr. Hancock ultimately chose to testify because he wanted to tell the jury that Mr. Davis had hit him with a frying pan. I am not absolutely sure when Mr. Hancock first told me that Mr. Davis hit him with a frying pan , but I believe that it was after trial started.

7. I felt that having an expert testify that Mr. Hancock was incapacitated during the interview only as to his recollection of the frying pan would have encouraged the jury to dismiss the entire defense.

The statements in this declaration are true under penalty of perjury under the laws of California; this declaration was signed on December, 20, 2005, in San Jose, California.


_____
EBEN KURTZMAN

DECLARATION OF CANDACE HALE                           No. 4

I, Candace Hale, declare:

1. I am a lawyer authorized to practice before the State Bar of California. I am co-appellate counsel for Mr. Hancock in his pending appeal, No. H027917.

2. I first began investigating this petition in May of 2005. I called trial counsel Eben Kurtzman in June, 2005, and asked him if he had been aware of Mr. Hancock's long-standing seizure disorder at the time of trial, and whether he had obtained Mr. Hancock's medical records. Mr. Kurtzman did not remember the case clearly without the file, and promised to get back to me after reviewing the file.

3. Since that time, I have had more than 17 phone conversations with Mr. Kurtzman and his office, all to the end of obtaining a declaration from him so that I could file this petition. Although Mr. Kurtzman was cooperative, and returned my calls, often at times when he was clearly busy, he was not able to give me a declaration - or indeed, a final expression of his thinking - without reviewing Mr. Hancock's files. In late November, he advised me that he had remembered that Mr. Hancock's files had been passed on to sentencing counsel, but that he would give me a declaration once he had reclaimed the files. Those efforts took him longer than he expected, and he was not able to give me any meaningful information about his actions until the week of December 10, 2005.

4. I mailed Mr. Kurtzman a draft declaration on December 13, 2005.

5. I did not receive the signed declaration back from Mr. Kurtzman until January 4, 2006, despite the fact that it appears to have been signed on December 20, 2005. As it was not possible to put this petition into final form until I had Mr. Kurtzman's declaration in hand, this brief is being filed at the earliest possible opportunity after receipt of that declaration.

6. I respectfully request that the Court consider this petition in conjunction with Mr. Hancock's pending appeal, as its filing at this date is not indicative of any lack of diligence on the part of counsel or petitioner.

The statements in this declaration are true under penalty of perjury under the laws of California on January ____, 2006, in San Anselmo, California.

_____
CANDACE HALE

1  **John D. Shields, Ph.D., ABPP**
2  **235 Montgomery Street, Suite 1020**
3  **San Francisco, CA 94104**
4
5  **415-434-4037**
6  **415-434-2412 [FAX]**
7
8
9  at the request of:
10         Candace Hale, Esq.
11         Attorney at Law
12         P.O. Box 775
13         San Anselmo, CA 94979-0775
14         (415) 460-5428
15
16  Attorney For: HANCOCK, Jeff

17

18             IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

19                 IN AND FOR THE COUNTY OF SANTA CLARA

20                              CRIMINAL COURT

21  IN RE:  People                    )    Court of Appeal:  H027917
22                                     )
23       v.                           )    CASE NO.: EE302496
24                                     )
25       HANCOCK, Jeff                 )    DECLARATION OF:
26                                     )       JOHN D. SHIELDS, PH.D., ABPP
27                                     )
28                                     )
29                                     )
30  ---------------------------------------------/
31
32  JOHN D. SHIELDS, PH.D., ABPP, DECLARES AS FOLLOWS:

33  1. I am a licensed psychologist in the state of California.  I have experience in and qualified as an

34     expert witness in civil court matters, juvenile delinquency and dependency court matters, and in

35     criminal court matters.  I am on the Superior Court's panel of psychological evaluators in several

---

Superior Court of California, Santa Clara County, Court of Appeal
        Case No. H027917   [Sup. Crt. No. EE302496]               10/17/2005

DECLARATION of John D. Shields, Ph.D., ABPP                     - 1 -

1    counties in the state of California, wherein I have given expert testimony on psychological matters

2    on more than 50 occasions. I regularly consult with judges and attorneys, and have completed over

3    1000 psychological evaluations in a wide variety of forensic matters.

4

5    2. I am a clinical and forensic psychologist. I am a Diplomate in forensic psychology, board certified

6    by the American Board of Professional Psychology [ABPP], and the American Board of Forensic

7    Psychology, and I am a Fellow of the American Academy of Forensic Psychology. These boards

8    examine and certify those candidates whose experience, knowledge, and training in the area of

9    forensic psychology demonstrate an exemplary standard. To date, there are just over 200 ABPP

10   Forensic Diplomates in the United States.

11

12   3. Further, I have training and experience in child, adolescent, adult, and family psychotherapy and

13   psychopathology, as well as in diagnostic assessment of and treatment of children, adolescents, and

14   adults. I also have training and experience in the area of correctional psychology, and am familiar

15   with incarcerated criminal defendants; both pre- and post-trial. I am on the medical staff at the

16   California Medical Facility, a state prison located at Vacaville, CA where I have been employed

17   since 1996. For further details of my experience, training, and more than 200 hours of continuing

18   education, the reader is respectfully refer to my curriculum vitae. [SEE Exhibit-A attached]

19

20   4. I was asked by attorney Candace Hale, Esq. to review transcripts and medical records related to Mr.

21   Jeff Hancock, the defendant in the above-captioned case. I was provided with approximately 200

22   pages of records which included medical records and a transcript of the defendant's statement [on 12

1    Aug. 2003] to an investigating officer ["Officer Anderson"] just after his arrest on or about 8 Aug.

2    2003. In that interview, Mr. Hancock provides an admission of his role in the instant offense; one

3    which led to injury, including a stab wound, to the victim.

4

5    5. Noted in the records reviewed is that Mr. Hancock has an extensive and well documented medical

6       and psychiatric history which is remarkable for a brain injury due to blunt trauma and possible

7       neuropsychological impairment due to recurrent seizure activity. He also has a history of severe

8       alcoholism which has led to multiple hospitalizations and may be a contributing factor to both his

9       seizure activity and his psychiatric history. Unlike many incarcerated individuals, there is no dispute

10      about the authenticity of Mr. Hancock's claim to have a history of seizures. The following records

11      were reviewed and annotate Mr. Hancock's significant medical and psychiatric histories:

12          a.  UCSF Stanford Health Care, Stanford Hospital & Clinics, medical records

13          b.  Winchester Hospital, Winchester Massachusetts, medical records

14          c.  Boston Medical Center, Boston, Massachusetts, medical records

15          d.  Saint Clare's Hospital [presently called Saint Vincent's], New York, medical records

16          e.  El Camino Hospital, Mt. View, CA, medical records

17          f.  Santa Clara valley Health & Hospital Systems, [Main Jail Health Care], medical records

18          g.  Genesis Medical Center, Iowa, in-patient psychiatric records

19

20   6. Noted in the records reviewed is that Mr. Hancock has a notable and significant brain injury that

21      required hospitalization on several occasions. His condition has been described as, "trauma

---

Superior Court of California, Santa Clara County, Court of Appeal
            Case No. H027917   [Sup. Crt. No. EE302496]                    10/17/2005

DECLARATION of John D. Shields, Ph.D., ABPP                              - 3 -

Exhibit 17

1    involving a left basilar skull fracture, a left facial laceration, and a bifrontal brain contusion." [SEE

2    Exhibit-B attached].

3

4    7.  Elsewhere in the records reviewed, Mr. Hancock's condition was described following a CT scan of

5    his brain: "Scans of the brain demonstrate a low density area in the left frontal region with central

6    tissue nodule. The appearance is consistent with a neoplasm and surrounding edema. . . Stable area

7    of edema and likely tumor nodule in the left frontal region." [SEE Exhibit-C attached].

8

9    8.  Mr. Hancock also has a notable psychiatric history; one marked by the presentation of symptoms of

10    severe mental illness and/or a severe compromise in his mental status. In fact, the records reviewed

11    find that Mr. Hancock's condition has presented as so impaired, that he has required involuntary

12    psychiatric commitment. His condition has been described as:

13        "He is disoriented and delusional. He has been hallucinating. He demonstrates very impaired

14        judgment and poor impulse control. He is definitely a danger to himself. . . . He has had

15        seizures recently. He has a history of brain injury and of alcohol abuse as well as exhibiting a

16        serious psychiatric disorder." [SEE Exhibit-D attached]

17

18    9.  Review of the records provided finds that Mr. Hancock had a seizure shortly after his arrest. He was

19    admitted to the Santa Clara Valley Health & Hospital System when on 9 Aug. 2003 at 1100 hrs.

20    [Only hours after his arrest and 3 days prior to his statement to Officer Anderson] he was described

21    as having the following symptoms: "anxiety, insomnia, nausea, tremulousness, tremors,

22    apprehension, and seizure disorder." [SEE Exhibit-E attached]

---

1    10. Review of the records provided finds that despite a significant and well documented history of

2    psychiatric significance, upon admission to the Santa Clara County Jail on 8 Aug. 2003, the arresting

3    officer [Officer Zariello, Badge #14183], indicates that Mr. Hancock had <u>"no"</u> "psychiatric/mental

4    health history." [SEE Exhibit-F attached]

5

6    11: Elsewhere in the records reviewed, there is indication that in the past Mr. Hancock has had seizures

7    and required not only heavy sedation ["as much as 35 mg of Ativan], but has taken several days to

8    fully regain his mental faculties.

9

10    12. Given that Mr. Hancock has a significant psychiatric history, and given that the arresting officer

11    indicated that he had no psychiatric/mental health history of significance, it is this consultant's

12    opinion that the interviewing officer [Officer Anderson] was not aware that the defendant's mental

13    status may have been compromised at the time the statement was given on 12 Aug. 2003. Further,

14    this consultant's review of the transcript of that statement finds nowhere when Offc. Anderson

15    inquired as to the defendant's being on any medication, having any significant psychiatric status or

16    history, or asking any other question of the defendant that could have further elucidated both the

17    defendant's mental status at the time of the interview, and the need for precautions to be taken given

18    that the defendant's cognitive processes may have been compromised due to a brain injury that is

19    well documented.

20

21    13. This consultant's review of the transcript of the statement given on 12 Aug. 2005 finds that Mr.

22    Hancock appears to have been rather suggestible during the interview. Suggestibility is a construct

1    that indicates the extent to which a person can be persuaded to endorse ideas that are not true or are

2    not completely accurate.  The transcript finds that Offc. Anderson appears to use some of the tactics

3    common to investigators who are attempting to persuade defendants to give a statement of admission

4    of their role [or of a role] in a crime.  This consultant's review of and familiarity with the literature

5    on interrogation techniques and suggestibility finds that Offc. Anderson used such techniques in his

6    interview of the defendant.  For example, on pg. 43 of the transcript, Offc. Anderson tells Mr.

7    Hancock that his writing out a statement of admission of his role in the crime being investigated is

8    "not a big deal."  He goes on to tell Mr. Hancock that it is, "Just an option I like to give to the guys

9    that have been cooperative and have told their side of the story."  [SEE Exhibit-G attached]

10

11   14. This consultant's familiarity with persuasive interrogation techniques as they are summarized in the

12       literature suggests that both of the statements of Offc. Anderson are persuasive tactics given that

13       both are untrue.  It is a "big deal" when one writes a statement of "confession" or admission.

14       Second, such is not simply "an option given only to those who have been cooperative," but rather

15       something typically asked of all suspects regardless of their degree of cooperation or resistance.  The

16       former is obviously an incriminating document later admissible in court, and the later is an attempt

17       of the interrogator to convey that the suspect is being given "special treatment" which is favorable.

18

19   15. It is this consultant's opinion [congruent with the literature on the topic] that suggestive interrogation

20       techniques are most effective with subjects who have some vulnerability.  Vulnerability is present in

21       those subjects who have cognitive impairments [for whom the literature clearly indicates have higher

22       degrees of suggestibility], or for subjects who are vulnerable for other medical and/or psychosocial

1    reasons.  In this case, the defendant's vulnerability appears to include the fact that he was recently

2    post-seizure at the time of the interview, that he has a notable psychiatric history and may have had

3    compromised mental faculties, and that he has brain impairment.

4

5    16. Further, it is also noted from review of the interrogation transcript that when the Miranda warnings

6        were given to the defendant, there was no attempt on the part of the interrogator to insure that Mr.

7        Hancock was waiving these rights in a knowing and intelligent manner.  On page 2 of the transcript

8        appears the following exchange [SEE Exhibit-H attached]:

9                    Anderson: [after reading Miranda warning] Do you understand all that I read to you?

10                   Hancock: Yeah.

11                   Anderson: Okay.  Ah, don't mind if I'm saying what I read to you for you, is all I'm

12                       saying.

13

14   17. It is this consultant's opinion that not only is there an absence of validity to the assertion that the

15       defendant waived his rights "knowingly and intelligently," but that the interrogator himself was

16       rather confusing in the language used.  For example, the actual meaning of the statement

17       immediately following the "waiver," "Ah, don't mind if I'm saying what I read to you for you, is all

18       I'm saying," escapes this consultant's understanding.

19

20   18. There are a number of facts that appear to be omitted from the statement given, including the fact

21       that the defendant was allegedly struck by the victim in the instant case and was injured himself just

22       prior to inflicting a knife wound on the victim; that he was a <u>severe</u> alcoholic for more than 25 years,

---

Superior Court of California, Santa Clara County, Court of Appeal
    Case No. H027917   [Sup. Crt. No. EE302496]                    10/17/2005

DECLARATION of John D. Shields, Ph.D., ABPP                    - 7 -

1    and that the defendant himself had recently had a seizure while in custody and was medicated for

2    such at the time of the interrogation interview.

3

4    19. Given all of the above, it is this consultant's opinion, based on experience as a forensic psychologist

5        which includes consultation to trial counsel, that Mr. Hancock's history as well as the facts as

6        summarized here, suggest that trial counsel would have had reasonable grounds to raise issues at trail

7        such as:  1) whether or not the defendant was able to form specific intent; 2) whether or not the

8        defendant did in fact waive his rights knowingly and intelligently; 3) whether or not the defendant

9        was acting in the commission of the instant offense while in a compromised mental state such as he

10       had in his past [which is well documented]; or 4) whether or not the defendant was vulnerable to

11       undue suggestibility during the interrogation interview of 12 Aug. 2003.  These are only some of the

12       questions that could have been raised by trial counsel that had pertinence to the defendant's

13       psychiatric status and psychiatric history; neither of which was considered at trial.

14

15    I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS IN THE STATE OF

16    CALIFORNIA THAT THE FOREGOING IS TRUE AND CORRECT.

17

18

19    _____                    17 October 2005

20    John D. Shields, Ph.D., ABPP
21        Diplomate, Forensic Psychology
22            *American Board of Professional Psychology*
23            *American Board of Forensic Psychology*
24            *American Academy of Forensic Psychology*

---

Superior Court of California, Santa Clara County, Court of Appeal
        Case No. H027917    [Sup. Crt. No. EE302496]            10/17/2005

DECLARATION of John D. Shields, Ph.D., ABPP                    - 8 -

## EXHIBITS AND DECLARATIONS
### TRANSCRIPTS

| | |
|---|---|
| Curriculum Vitae of John Shields Ph.D., ABPP | Exhibit A 10/17/05 |
| UCSF Stanford Health Care, Stanford Hospital and Clinics, Discharge Summary | Exhibit B 1/21/99 |
| Winchester Hospital Radiology Report, by R.P. Fortunato, M.D. | Exhibit C 8/6/99 |
| Letter to Scott Co. Clerk of Court from Michael A. Cronkleton, M.D. | Exhibit D 8/31/99 |
| Santa Clara Co. Valley Health and Hospital System Daily Nursing Note | Exhibit E 8/9/03 |
| Santa Clara Co. D.O.C. Agency Advisory Form by Officer Zariello | Exhibit F 8/8/02 |
| Page 43 of Transcript of Interrogation Interview of Jeff Hancock | Exhibit G 8/12/03 |
| Page 2 of Transcript of Interrogation Interview of Jeff Hancock | Exhibit H 8/12/03 |
| Sixth Appellate District Denial Santa Clara County | Exhibit I 3/24/06 |
| California Supreme Court Denial | Exhibit J 7/19/06 |
| Declaration of Mary Smith | 1 |
| Declaration of Jeff Hancock | 2 |
| Declaration of Eben Kurtzman | 3 |
| Declaration of Candace Hale | 4 |
| Declaration of Dr. John Shields | 5 |
| Reporters Transcripts | RT 21-544 |
| Clerk Transcripts | CT 6-283 |
| P.E. | 2,3 |
| AAF | 4052 |
| Jail Hospital Administration Record | 8652 |
| Discharge Summary | MR#700168 |

A 39

1      THE WITNESS:  SORRY ABOUT THAT.

2    Q    (BY MR. DEMERTZIS)  AND THE REASON FOR THAT,

3    MR. DAVIS, IS SO THAT THE REPORTER CAN TAKE DOWN EVERYTHING

4    WE'RE SAYING AND THE RECORD WILL BE CLEAR.

5    A    OKAY.

6    Q    DO YOU KNOW A PERSON BY THE NAME OF JEFF HANCOCK?

7    A    YES, I DO.

8    Q    DO YOU SEE HIM IN THE COURTROOM NOW?

9    A    YES.

10   Q    PLEASE POINT HIM OUT, WHERE HE'S SITTING AND WHAT HE'S

11   WEARING.

12   A    HE'S SITTING RIGHT OVER HERE IN A TIE AND A BEIGE

13   SHIRT.

14        MR. DEMERTZIS:  YOUR HONOR, MAY THE RECORD REFLECT

15   MR. DAVIS HAS IDENTIFIED THE DEFENDANT?

16        THE COURT:  IT WILL.

17   Q    (BY MR. DEMERTZIS)  HOW DO YOU KNOW THE DEFENDANT?

18   A    HOW DO I KNOW HIM?

19   Q    YEAH, HOW DO YOU KNOW HIM?  WHEN DID YOU MEET HIM?

20   WHAT KIND OF RELATIONSHIP DID YOU HAVE?

21   A    WE WERE PRETTY GOOD FRIENDS.  I MET HIM PROBABLY A

22   COUPLE OF YEARS AGO.  A LITTLE FURTHER BACK THAN THAT.

23   MAYBE THREE YEARS.

24   Q    AT SOME POINT WERE YOU AND THE DEFENDANT LIVING

25   TOGETHER?

26   A    YES.

27   Q    WHERE WAS THAT?

28   A    WE LIVED OFF OF JOHANNA AND THEN OFF OF CALIENTE.

1    A    NOT REALLY DRUNK, NO.  I HAD A BUZZ ON, BUT I WASN'T

2    DRUNK, LIKE STUMBLING DRUNK, OR DRUNK OR ANYTHING.

3    Q    I DON'T MEAN TO EMBARRASS YOU, MR. DAVIS, SO THAT --

4    A    I AM EMBARRASSED.

5    Q    I KNOW.  I GOT TO ASK YOU A COUPLE OF QUESTIONS, AND I

6    WON'T SPEND MUCH TIME ON IT, BUT SO THE JURY WILL

7    UNDERSTAND.  AUGUST OF LAST YEAR WOULD YOU CONSIDER YOURSELF

8    AN ALCOHOLIC?

9    A    OH, YES.

10   Q    WOULD YOU CONSIDER YOURSELF AN ALCOHOLIC TODAY?

11   A    YEAH.  I'VE BEEN AN ALCOHOLIC FOR A LONG TIME.  I BEEN

12   IN RECOVERY ON AND OFF FOR YEARS.  I HAD LIKE ALMOST NINE

13   YEARS SOBER, AND I BLEW IT.

14   Q    WHEN DID YOU BLOW IT?

15   A    I REALLY WENT OFF THE WAGON REAL BAD WHEN MY WIFE

16   DIED.

17   Q    I'M SORRY TO HEAR ABOUT THAT.

18   A    YEAH, IT WAS A BUMMER.

19   Q    ON AUGUST 7TH OF LAST YEAR WOULD YOU CALL YOURSELF A

20   FUNCTIONING ALCOHOLIC?  DO YOU KNOW WHAT I MEAN BY THAT?

21   A    YES, I DO.

22   Q    WHAT IS YOUR UNDERSTANDING OF THAT PHRASE?

23   A    SOME PEOPLE DRINK AND GO TO WORK.  THAT'S A

24   FUNCTIONING ALCOHOLIC.

25   Q    AND THAT'S HOW YOU WOULD CHARACTERIZE YOURSELF AT THAT

26   TIME?

27   A    YES.  I HAD A PART-TIME JOB.  I DIDN'T MAKE MUCH

28   MONEY.  BUT I WOULDN'T REALLY CATEGORIZE MYSELF AS

1    FUNCTIONAL.

2    Q    WHAT I'M GETTING AT IS ALTHOUGH YOU WERE SOMEWHAT

3    DRUNK, OR WHATEVER YOUR STATE OF INTOXICATION WAS, DO YOU

4    REMEMBER EVENTS FROM AUGUST 7TH OF LAST YEAR?

5    A    MOST OF THEM.

6    Q    ALL RIGHT.

7    A    I HAD -- I'VE HAD SOME TIME TO THINK ABOUT IT, AND I

8    KIND OF HAD SOME RECOLLECTION ON -- MORE THAN I REMEMBERED

9    THE FIRST TIME I TESTIFIED.

10    Q    SURE.  THAT'S A COMMON EXPERIENCE.

11    A    I MEAN I WASN'T TRYING TO LIE OR ANYTHING.  I JUST

12    DIDN'T REMEMBER EVERYTHING.

13    Q    THAT'S FAIR.  WE'LL GET TO YOUR PREVIOUS TESTIMONY IN

14    JUST A MINUTE.  THE POINT I'M TRYING TO MAKE NOW IS YOU

15    WEREN'T -- OR AREN'T ONE OF THOSE PEOPLE THAT DRINKS AND

16    PASSES OUT AND FORGETS WHAT HE DID?

17    A    I'VE HAD BLACKOUTS.

18    Q    DID YOU HAVE ONE ON THIS DAY?

19    A    NO.

20    Q    SO YOU REMEMBER WHAT HAPPENED THAT DAY?

21    A    PRETTY MUCH, YEAH.

22    Q    WHEN YOU WENT BACK TO JEFF'S APARTMENT -- AND WHEN I

23    SAY "JEFF," YOU KNOW I'M TALKING ABOUT THE DEFENDANT; RIGHT?

24    A    YES.

25    Q    WHEN YOU WENT BACK TO JEFF'S APARTMENT, WERE YOU JUST

26    SITTING THERE?

27    A    I WAS JUST SITTING OUTSIDE THE DOOR.

28    Q    DID YOU FALL ASLEEP?

1    HERE AND DO THIS, YOU KNOW.

2    Q    LET ME ASK YOU, MR. DAVIS, DID THE DEFENDANT AT ANY

3    POINT PUT HIS HANDS ON YOU?

4    A    ONLY THAT ONE NIGHT.

5    Q    WELL, THAT'S WHAT WE'RE TALKING ABOUT.

6    A    YEAH.

7    Q    SO WHAT DID HE DO?

8    A    I HAVE TO GO OVER THIS AGAIN?  LITERALLY BEAT ME UP

9    AND STOMPED ON ME.

10   Q    HOW DID THAT START?  DID YOU HIT HIM?

11   A    NO.

12   Q    DID YOU CHALLENGE HIM --

13   A    NOT AT FIRST.  I MAY HAVE HIT HIM IN DEFENDING MYSELF

14   LATER.  BUT I'M NOT POSITIVE ON THAT EITHER.  I WAS PRETTY

15   GROGGED OUT AND BEAT UP.

16   Q    DID YOU CHALLENGE HIM TO FIGHT?

17   A    NO.

18   Q    ARE YOU THAT TYPE?

19   A    NOT AT ALL.  I'D BE A FOOL TO DO THAT.  HE'S WAY

20   BIGGER THAN ME.  I DON'T DO THAT -- YOU KNOW, IF SOMEBODY

21   WAS HURTING MY MOM OR MY BROTHERS OR, YOU KNOW, GIRLFRIEND

22   OR SOMETHING, THEN, YOU KNOW, I'LL DEFEND.

23   Q    SO ANY KIND OF PHYSICAL INTERACTION BETWEEN YOU AND

24   THE DEFENDANT WAS INITIATED BY HIM; IN OTHER WORDS, HE HIT

25   YOU FIRST?

26   A    YEAH.

27   Q    SEE, NOW, YOU HESITATED WITH THAT ANSWER.  IS THAT

28   BECAUSE YOU'RE TRYING TO PROTECT HIM?

1   BEAT UP PRETTY BAD.

2   Q     DID THE DEFENDANT KICK YOU?

3   A     YES.

4   Q     HOW MANY TIMES DID THE DEFENDANT KICK YOU?

5   A     ONE, TWO, MANY TIMES.

6   Q     HOW LONG DID THIS BEATING LAST?

7   A     IT DIDN'T LAST VERY LONG -- MINUTE, TWO MINUTES.

8   Q     WHILE HE WAS HITTING YOU, DID YOU DEFEND YOURSELF?

9   A     PUT MY ARMS UP, LIKE THIS (INDICATING).

10         MR. DEMERTZIS:  FOR THE RECORD MR. DAVIS HELD UP

11   BOTH OF HIS HANDS APPROXIMATELY EYE LEVEL IN FRONT OF HIS

12   FACE.

13         THE COURT:  FOR THE RECORD HE DID THAT.

14   Q     (BY MR. DEMERTZIS)  DID YOU PUNCH THE DEFENDANT?

15   A     I THINK I DID BUT, YOU KNOW, I'M NOT REAL POSITIVE ON

16   THAT.  YOU KNOW, I COULDN'T BE REAL POSITIVE.  I KNOW I WAS

17   GOING LIKE THAT (INDICATING), YOU KNOW.  I DON'T KNOW.  I

18   MAY HAVE.

19         MR. DEMERTZIS:  FOR THE RECORD DEFENDANT MADE

20   ESSENTIALLY THE SAME GESTURE BUT NOW KIND OF PUNCHED WITH

21   BOTH HANDS.

22         THE COURT:  YES.

23   Q     (BY MR. DEMERTZIS)  YOU'VE SEEN A BOXING MATCH WHERE

24   TWO GUYS ARE GOING AT IT, THEY'RE BOTH FIGHTING?

25   A     YES.

26   Q     WOULD YOU CHARACTERIZE WHAT WAS GOING ON THAT DAY AS A

27   BOXING MATCH, A FIGHT BETWEEN TWO GUYS?

28   A     NO.

1    Q    HOW WOULD YOU CHARACTERIZE IT?

2    A    I WOULD CHARACTERIZE IT AS ME GETTING JUMPED ON, YOU

3    KNOW.  I WASN'T SUSPECTING ANYTHING LIKE THAT WAS GOING TO

4    HAPPEN AND IT WAS A SURPRISE AND --.

5    Q    YOU TOLD US THAT YOU GOT JUMPED ON, WHICH BEGS THE

6    QUESTION, HOW WERE YOU POSITIONED WHEN THIS BEATING STARTED?

7    WERE YOU STANDING?  WERE YOU SITTING?  WERE YOU LAYING?

8    A    I WAS SITTING.  I GOT DRAGGED ON THE EXPOSED AGGREGATE

9    CONCRETE, AND JEFF GAVE ME A BOOT MASSAGE.

10   Q    I'M GLAD YOU CAN LAUGH ABOUT IT LATER.  YOU WERE

11   DRAGGED FROM WHERE TO WHERE?

12   A    ONLY A FEW FEET AWAY FROM THE FRONT DOOR, LIKE MAYBE,

13   YOU KNOW, TEN FEET.

14        MR. DEMERTZIS:  YOUR HONOR, SHOWING THE DEFENDANT

15   WHAT'S BEEN MARKED AS PEOPLE'S 8 FOR IDENTIFICATION.

16   Q    (BY MR. DEMERTZIS)  MR. DAVIS, WOULD YOU PLEASE TAKE A

17   LOOK AT THAT PHOTOGRAPH AND TELL ME IF YOU RECOGNIZE WHAT'S

18   SHOWN THERE.  DO YOU RECOGNIZE WHAT'S SHOWN THERE?

19   A    YES.

20   Q    IS THAT THE WALKWAY OUTSIDE OF JEFF'S APARTMENT?

21   A    YES.

22   Q    IS THAT THE AREA WHERE YOU WERE DRAGGED?

23   A    AROUND THE CORNER?

24   Q    YES.

25   A    YES.

26        MR. DEMERTZIS:  YOUR HONOR, AT THIS TIME THE

27   PEOPLE MOVE TO HAVE EXHIBIT 8 ADMITTED INTO EVIDENCE.

28        THE COURT:  ANY OBJECTION?

1   TALK ABOUT THEM YOU MAY REMEMBER MORE, BUT I ONLY WANT YOU

2   TO TELL US WHAT YOU REMEMBER HAPPENED.  SO LET ME ASK THE

3   QUESTION AGAIN.  DO YOU REMEMBER THE DEFENDANT GRINDING YOUR

4   FACE INTO THE ASPHALT?

5   A    YEAH.  YES.

6   Q    YOU DIDN'T HAVE ANY SORT OF WEAPON, DID YOU?

7   A    NO, I DON'T CARRY WEAPONS.  POCKETKNIFE ONCE IN A

8   WHILE, BUT I DIDN'T HAVE ONE THEN.

9   Q    WHEN YOU SAY POCKETKNIFE --

10  A    ONE OF THOSE LITTLE --

11  Q    SIR, I GOT TO GET THE QUESTION OUT OR IT WON'T MAKE

12  SENSE.  I'M SORRY.  I KNOW.  I DO THIS, AND YOU DON'T, AND

13  IT'S GETTING CONVERSATIONAL --

14  A    I'M A TAD NERVOUS HERE.

15  Q    WHEN YOU SAY POCKETKNIFE, WHAT ARE YOU TALKING ABOUT?

16  A    OH, ONE OF THOSE LITTLE SWISS ARMY ONES.

17  Q    WHAT DO YOU USE THAT FOR?

18  A    CLEANING YOUR FINGERNAILS.  GOT A FILE ON IT, A

19  TOOTHPICK, TWEEZERS.  I BEEN CARRYING A POCKETKNIFE SINCE I

20  WAS A LITTLE BOY.

21  Q    DID YOU PULL ANY KIND OF WEAPON ON --

22  A    NO, NO.

23  Q    DID YOU PULL ANY KIND OF WEAPON ON THE DEFENDANT?

24  A    NO.

25  Q    WERE YOU EVEN CARRYING ANY KIND OF WEAPON THAT DAY?

26  A    NO.  I DIDN'T HAVE A KNIFE WITH ME.

27  Q    AT SOME POINT THE BEATING STOPPED; RIGHT?

28  A    YES.

1   Q    WHERE WERE YOU WHEN THE BEATING STOPPED?

2   A    I WAS LAYING ON THE CONCRETE.

3   Q    WHERE EXACTLY?

4   A    LIKE AROUND THE CORNER FROM THE FRONT DOOR.  ABOUT TEN

5   FEET AWAY.

6   Q    THIS PICTURE ON THE PROJECTOR RIGHT NOW, IF YOU WERE

7   LAYING WHERE YOU WERE THAT DAY WHEN THE BEATING STOPPED,

8   WOULD WE BE ABLE TO SEE YOU IN THAT PICTURE?

9   A    NO, BECAUSE I WOULD BE RIGHT AROUND THE CORNER.

10  THAT'S WHEN I KIND OF CRAWLED OVER HERE, BY THE FRONT DOOR.

11  I REMEMBER DOING THAT.  IT WAS HARD.

12  Q    AFTER THE BEATING STOPPED, YOU CRAWLED BACK TOWARD THE

13  FRONT DOOR?

14  A    YES.

15  Q    WHERE DID THE DEFENDANT GO THAT YOU SAW?

16  A    HE WENT BACK INTO THE APARTMENT, INTO HIS ROOM.

17  Q    DID YOU SEE HIM AGAIN AT ANY POINT?

18  A    YEAH, HE CAME BACK OUT.

19  Q    HOW LONG WAS HE GONE?

20  A    MAYBE A MINUTE.

21  Q    WHAT HAPPENED WHEN HE CAME BACK OUT A MINUTE AFTER THE

22  BEATING STOPPED?

23  A    I'D LIKE MADE IT TO HERE.

24  Q    YOU'RE POINTING OUT THE PICTURE, WHICH IS PEOPLE'S 8.

25  A    AND I WAS SITTIN' UP, AND HE STABBED ME.

26  Q    HOW DO YOU KNOW HE STABBED YOU?

27  A    BECAUSE I FELT IT.

28  Q    WHAT DID YOU FEEL?

1    A    PAIN BACK HERE IN MY BACK AND --

2            MR. DEMERTZIS:  WHEN YOU MAKE A GESTURE, WE ALL

3    KNOW WHAT YOU DID, BUT WE NEED TO GET IT ON THE RECORD, SO

4    I'M GOING TO EXPLAIN IT.  YOU'RE USING YOUR --

5            THE COURT:  I DIDN'T SEE IT SO HAVE HIM EXPLAIN

6    WHAT HE DID, IF HE KNOWS.

7            MR. DEMERTZIS:  ALL RIGHT, YOUR HONOR.

8    Q    (BY MR. DEMERTZIS)  YOU JUST MADE A GESTURE WITH YOUR

9    LEFT ARM.  PLEASE DESCRIBE THAT GESTURE.  WHAT WERE YOU

10   DOING?

11   A    I WAS SITTING UP --

12   Q    NO, MY QUESTION IS HOW DO YOU KNOW YOU GOT STABBED,

13   AND YOU SAID I HAD A SHARP PAIN, AND YOU REACHED BEHIND YOUR

14   BACK.  DESCRIBE THE GESTURE YOU JUST MADE.

15   A    IT WAS RIGHT HERE.

16           MR. DEMERTZIS:  IF I MAY, FOR THE RECORD HE'S

17   REACHING BACK WITH HIS LEFT ARM TO MIDWAY ON YOUR BACK.

18           THE COURT:  IS THAT WHAT YOU DID?

19           THE WITNESS:  YES.

20           THE COURT:  THANK YOU.

21           MR. KURTZMAN:  ON THE LEFT-HAND SIDE.

22           THE COURT:  IS THAT RIGHT, LEFT-HAND SIDE?  I

23   WASN'T ABLE TO SEE IT.

24           THE WITNESS:  YES.

25           THE COURT:  VERY WELL.  THANK YOU.

26   Q    (BY MR. DEMERTZIS)  AFTER YOU FELT THIS SHARP PAIN,

27   DID YOU LOOK AT THE DEFENDANT?

28   A    YES.

1    Q      WHY DO YOU SAY THAT?

2    A      I THINK HE WAS IN A BLACKOUT FROM DRINKING.  HE'D

3    NEVER DONE ANYTHING LIKE THAT.  I'VE NEVER SEEN HIM GET LIKE

4    THAT BEFORE EVER.  I DON'T KNOW WHAT SNAPPED ON HIM BUT --

5    YOU DON'T BEAT UP ON YOUR FRIENDS.  I JUST DON'T THINK HE

6    KNEW WHAT HE WAS DOING, TO TELL YOU THE TRUTH.

7    Q      DO YOU KNOW HOW MUCH HE HAD TO DRINK THAT NIGHT?

8    A      HOW MUCH I HAD TO DRINK?

9    Q      NO, HOW MUCH HE HAD TO DRINK.

10   A      NO.

11   Q      SO YOU HAVE NO IDEA --

12   A      PROBABLY TOO MUCH.

13   Q      BUT YOU HAVE NO IDEA?

14   A      I PROBABLY HAD A LITTLE TOO MUCH TOO.

15   Q      BUT YOU HAVE NO IDEA WHAT HIS STATE OF SOBRIETY WAS?

16   A      I HAVE AN IDEA.

17   Q      OKAY, WHAT'S THAT IDEA?

18   A      THAT HE DRANK ENOUGH TO LIKE MAYBE GET INTO A

19   BLACKOUT.  THAT'S TOO MUCH DRINKING.  IT'S HAPPENED TO ME

20   BEFORE.

21          MR. DEMERTZIS:  YOUR HONOR, THE LAST COUPLE OF

22   ANSWERS THAT MR. DAVIS HAS GIVEN HAVE BEEN SPECULATION AS TO

23   THIS BLACKOUT, AND THE PEOPLE WOULD MOVE AS NONRESPONSIVE

24   AND TO HAVE REFERENCE TO BLACKOUT REMOVED FROM THE RECORD.

25          THE COURT:  WELL, I THINK IT'S RESPONSIVE TO YOUR

26   EARLIER QUESTION AS TO HIS IDEA OF HOW MUCH HE HAD TO DRINK.

27   I'M GOING TO OVERRULE THE OBJECTION.

28   Q      (BY MR. DEMERTZIS)  YOU DON'T KNOW HOW MUCH THE

1    DEFENDANT DRANK, DO YOU?

2    A      NOT EXACTLY, NO.

3    Q      OKAY, GIVE US AN IDEA THEN.

4           MR. KURTZMAN:  YOUR HONOR, AT THIS POINT I WILL

5    OBJECT AS SPECULATION.  THE PREVIOUS TESTIMONY IS THAT HE

6    LEFT THE PARK OVER AN HOUR BEFORE THE DEFENDANT DID.

7           THE COURT:  OVERRULED.

8           THE WITNESS:  WOULD YOU REPEAT THAT QUESTION,

9    PLEASE?

10   Q      (BY MR. DEMERTZIS)  DO YOU REALLY THINK THE DEFENDANT

11   DIDN'T KNOW WHAT HE WAS DOING, OR ARE YOU SAYING THIS NOW TO

12   MINIMIZE WHAT HE DID TO YOU AND TO TRY AND PROTECT HIM?

13   A      WELL, I'VE HAD A LOT OF TIME TO THINK ABOUT THIS, AND

14   I JUST THINK THAT HE WAS DRUNK, HE WAS OUT OF LINE BECAUSE

15   HE DIDN'T KNOW WHAT HE WAS DOING AT THE TIME AND, YOU KNOW,

16   MAYBE HE DID.  I CAN'T READ MINDS, YOU KNOW, BUT I DON'T SEE

17   WHY HE WOULD WANT TO DO THAT, THOUGH, UNLESS YOU'RE OUT OF

18   IT.

19   Q      WELL, YOU MIGHT NOT WANT TO DO IT.

20   A      I MIGHT -- NO.

21   Q      MR. DAVIS, DID THE DEFENDANT STAB YOU JUST THE ONE

22   TIME?

23   A      TWICE.

24   Q      WHAT WAS THE OTHER STABBING?

25   A      ONE RIGHT IN THE HAND HERE WHEN I WAS LIFTING MY HANDS

26   UP.

27   Q      COULD YOU DESCRIBE WHERE YOU'RE POINTING?

28   A      RIGHT HERE WHERE THAT SCAR IS.

1              MR. DEMERTZIS:  FOR THE RECORD YOUR HONOR,

2    MR. DAVIS IS POINTING TO THE AREA BETWEEN HIS LEFT INDEX

3    FINGER AND THUMB.

4              THE COURT:  YES, HE DID.

5    Q    (BY MR. DEMERTZIS)  HOW DID THAT SECOND STAB WOUND

6    HAPPEN?  ACTUALLY, I CALLED IT SECOND.  WAS THIS AREA ON

7    YOUR LEFT HAND, WAS THAT THE SECOND STABBING, SO IT HAPPENED

8    AFTER THE FIRST STABBING?

9    A    YEAH, YEAH.

10   Q    AND HOW DID THE SECOND STABBING HAPPEN ON YOUR LEFT

11   HAND?

12   A    I WAS JUST GOING LIKE THAT AND, YOU KNOW, "WHAT ARE

13   YOU DOIN'?"

14   Q    YOU WERE HOLDING YOUR ARMS UP IN FRONT OF YOUR FACE.

15   WHY?

16   A    TO TRY TO, YOU KNOW, DEFEND MYSELF.

17   Q    ANY OTHER STABBINGS OTHER THAN THE TWO YOU'VE

18   MENTIONED?

19   A    NO.

20   Q    AFTER THE SECOND STABBING WHAT DID THE DEFENDANT DO?

21        BEFORE YOU ANSWER THAT QUESTION, THE SECOND STABBING

22   YOU'RE STILL ON THE GROUND?

23   A    RIGHT.

24   Q    SITTING DOWN?  LAYING DOWN?  HOW ARE YOU ON THE

25   GROUND?

26   A    I WAS SITTING UP, AND THEN I JUST LAID DOWN, AND HE

27   WENT IN THE APARTMENT.

28   Q    AFTER THE SECOND STABBING YOU LAID DOWN, THE DEFENDANT

1    WENT INTO THE APARTMENT?

2    A    YES.

3    Q    WHAT HAPPENED NEXT?

4    A    THAT'S WHAT'S KIND OF VAGUE.  ONE OF THE -- OUR

5    NEIGHBORS, PETE, CAME OVER.  I GUESS HE HEARD SOME COMMOTION

6    OR SOMETHING.  HE HELPED ME THERE AND PATCHED ME UP, PUT A

7    WET RAG ON MY BACK AND MY FACE.

8    Q    WHEN YOU SAY PETE, ARE YOU TALKING ABOUT PETER CRAVEN?

9    A    YES.

10   Q    DO YOU KNOW WHERE HE LIVED AT THE TIME?

11   A    YEAH, LIKE TWO DOORS DOWN, SAME COURT.

12   Q    DID ANY OF THE OTHER PEOPLE, NOT THE DEFENDANT, DID

13   ANYONE ELSE BRING YOU INTO THE APARTMENT, INTO DEFENDANT'S

14   APARTMENT?

15   A    I THINK IT WAS JUST PETE.  I THINK NEAL UPSTAIRS CAME

16   DOWN BUT, YOU KNOW, THAT PART I DON'T REMEMBER EXACTLY.  I

17   CAN'T BE A HUNDRED PERCENT.

18   Q    WHAT DID THEY DO WHEN THEY BROUGHT YOU BACK IN THE

19   DEFENDANT'S APARTMENT?  DID THEY LAY YOU DOWN, SIT YOU ON A

20   CHAIR?  WHAT DID THEY DO?

21   A    THEY LAID ME DOWN AND TRYING TO CLEAN UP MY WOUNDS,

22   AND THEY CALLED THE PARAMEDICS.

23   Q    WHERE WAS THE DEFENDANT WHILE THESE FELLOWS WERE

24   TAKING CARE OF YOU?

25   A    JEFF WAS IN HIS ROOM.

26   Q    DID HE EVER COME OUT OF HIS ROOM?

27   A    NOT AT THAT TIME.

28   Q    THE PARAMEDICS DID SHOW UP THEN?

1   A    OH, YES.

2   Q    WERE YOU TAKEN TO A HOSPITAL?

3   A    YES, STANFORD.

4   Q    BEFORE YOU WERE TAKEN TO THE HOSPITAL, SO WE'RE STILL

5   AT JEFF'S APARTMENT, DID YOU TALK TO POLICE?

6   A    I BELIEVE I TALKED TO -- OFFICER KIM?

7   Q    YEAH, OFFICER KIM.  AN ASIAN OFFICER?

8   A    YEAH.

9   Q    DID OFFICER KIM ASK YOU WHAT HAPPENED?

10  A    HE PROBABLY DID.

11  Q    DO YOU REMEMBER --

12  A    YOU KNOW WHAT, I DON'T REMEMBER EXACTLY WHAT I TOLD

13  HIM, TO TELL YOU THE TRUTH.

14  Q    AT THE SCENE, AT JEFF'S APARTMENT DO YOU REMEMBER

15  TELLING OFFICER KIM A STORY ABOUT SOME HISPANIC GUYS AT THE

16  PARK THAT JUMPED YOU?

17  A    YEAH, STUPID.

18  Q    WHAT DID YOU TELL OFFICER KIM?

19  A    I TOLD HIM I GOT JUMPED IN THE PARK.

20  Q    WAS THAT TRUE?

21  A    NO, IT WAS A LIE.

22  Q    WHY DID YOU SAY THAT TO THE POLICE OFFICER?

23  A    BECAUSE I DIDN'T WANT TO SEE JEFF GET IN TROUBLE.

24  Q    YOU REMEMBER TESTIFYING AT THE PRELIMINARY HEARING;

25  RIGHT?

26  A    YES, I DO.

27  Q    WERE YOU AS ACCURATE AS YOU COULD HAVE BEEN IN YOUR

28  ANSWERS AT THAT PRELIMINARY HEARING?

1    Q    DO YOU REMEMBER ONE OF THE LADIES -- DO YOU REMEMBER

2    SITTING AT THE TABLE WITH THE LADIES?

3    A    YEAH.

4    Q    AND YOU HAD A PICNIC PLATE IN FRONT OF YOU; RIGHT?

5    A    POSSIBLY.  I DON'T REMEMBER EXACTLY WHAT WE HAD TO

6    EAT.

7    Q    DO YOU REMEMBER ONE OF THE LADIES GRABBING YOUR PICNIC

8    PLATE?

9    A    NO, I DON'T REMEMBER THAT.  COULD HAVE HAPPENED.

10   Q    COULD HAVE HAPPENED?

11   A    COULD HAVE.  LIKE I SAY, I DON'T REMEMBER.

12   Q    DO YOU REMEMBER ONE OF THE LADIES BEING SO UPSET WITH

13   YOU THAT SHE GRABBED YOUR PICNIC PLATE AND THREW IT AWAY

14   FROM THE TABLE AND TOLD YOU TO LEAVE?

15   A    MAYBE.  THAT MIGHT HAVE HAPPENED.  I DON'T REMEMBER,

16   TO TELL YOU THE TRUTH.

17   Q    AND THAT'S BASICALLY WHEN YOU DECIDED THAT, YOU KNOW,

18   IT WAS TIME TO GO?

19   A    BETTER HIT THE ROAD, YEAH.  I MIGHT HAVE GOT OUT OF

20   LINE.  CAN'T DENY THAT.  IT'S HAPPENED BEFORE.

21   Q    AND YOU WENT BACK TO JEFF'S AT THAT POINT; CORRECT?

22   A    YES.

23   Q    AND TWO OR THREE HOURS LATER JEFF CAME HOME; CORRECT?

24   A    YEAH, PROBABLY AROUND THEN.

25   Q    AND THAT WAS ABOUT TWILIGHT?

26   A    YEAH, MAYBE.  IT WAS AROUND THAT TIME.

27   Q    AND WHEN JEFF GOT HOME, YOU REMEMBER JEFF WALKING

28   AROUND THE CORNER OF THE APARTMENT?

```
1    A     YEAH, I REMEMBER HIM COMIN' UP.

2    Q     DO YOU REMEMBER SEEING HIM COMING UP THE WALKWAY?

3    A     YEAH.

4    Q     AND YOU WERE JUST SITTING THERE ON THE WALKWAY,

5    WAITING FOR HIM?

6    A     YEAH, THAT'S WHAT I REMEMBER.

7    Q     AND YOU HAD BEEN SITTING THERE FOR THE WHOLE TIME

8    WAITING --

9    A     I COULD HAVE BEEN SITTING THERE FOR TWO HOURS.  I --

10   YOU KNOW, I CAN'T TELL YOU EXACTLY.

11   Q     KICKING BACK, RELAXING?

12   A     YEAH, JUST SITTIN' THERE.  IT WAS A NICE EVENING.

13   Q     AND WHEN JEFF GOT HOME, YOU GUYS WENT INSIDE; CORRECT?

14   A     NO.  AS FAR AS I CAN REMEMBER WE DIDN'T AT THAT MOMENT

15   OF TIME.  KIND OF GOT IN A LITTLE VERBAL STUFF.  IT WASN'T

16   REALLY HEAVY, YOU KNOW.  I'D BEEN DRINKING AND HE'D BEEN

17   DRINKING AND JUST GOT -- YOU KNOW, IT ESCALATED INTO, YOU

18   KNOW, SOMETHING I WISH WOULD HAVE NEVER HAPPENED.

19   Q     DO YOU REMEMBER TESTIFYING EARLIER TODAY THAT WHEN

20   JEFF GOT HOME, YOU GUYS WENT INSIDE AND THEN CAME BACK

21   OUTSIDE?

22   A     I DON'T REMEMBER -- MAYBE I DID SAY THAT.  I DON'T

23   KNOW.

24   Q     DO YOU REMEMBER WHAT ACTUALLY HAPPENED?  DO YOU

25   REMEMBER IF YOU WENT INSIDE, ARE YOU CERTAIN THAT YOU DIDN'T

26   GO INSIDE, OR DO YOU NOT REMEMBER ONE WAY OR THE OTHER?

27   A     I'M KIND OF VAGUE ON THAT, TO TELL YOU THE TRUTH.

28   WHAT DIFFERENCE DOES IT MAKE IF I WENT IN, CAME BACK OUT?  I
```

1   DON'T UNDERSTAND WHAT YOU'RE DOING WITH THIS.

2   Q    I'M TRYING TO FIND OUT DO YOU REMEMBER WHETHER OR NOT

3   YOU WENT INSIDE THE HOUSE WITH JEFF AFTER JEFF GOT HOME FROM

4   THE PICNIC THAT NIGHT.

5   A    I CAN'T TELL YOU A HUNDRED PERCENT ON THAT.  MAYBE I

6   SAID I DID, BUT I DON'T REMEMBER, REALLY, EXACTLY.  I DO

7   REMEMBER GOING IN THERE AFTERWARDS, AFTER, YOU KNOW, THE

8   THING HAPPENED.

9   Q    BUT YOU DON'T HAVE ANY MEMORY ONE WAY OR THE OTHER

10  WHETHER OR NOT YOU WENT IN WITH JEFF BEFORE THE INCIDENT AND

11  AFTER THE PICNIC?

12  A    I MAY HAVE DONE THAT.

13  Q    DO YOU REMEMBER JEFF GIVING YOU A WASHCLOTH AND

14  TELLING YOU TO GO CLEAN UP YOUR FACE?

15  A    HE MIGHT HAVE DONE THAT.  I REALLY DON'T REMEMBER.  I

16  DON'T REMEMBER A WHOLE LOT AFTER THAT.

17  Q    AFTER THE PICNIC AND BEFORE THE FIGHT WITH JEFF DO YOU

18  REMEMBER HIM GIVING YOU A WASH CLOTH AND TELLING YOU TO GO

19  CLEAN UP?

20  A    NO.  I DON'T THINK THAT HAPPENED.

21  Q    AND IS IT THAT YOU DON'T REMEMBER OR YOU'RE SURE THAT

22  THAT DID NOT HAPPEN?

23  A    I'M SURE.

24  Q    YOU'RE WEARING GLASSES TODAY.  DO YOU TYPICALLY WEAR

25  GLASSES?

26  A    YES.

27  Q    WERE YOU WEARING YOUR GLASSES THE DAY OF THE INCIDENT?

28  A    MAYBE JUST TO READ, JUST READING GLASSES.

1    Q    NOW, AFTER MR. HANCOCK GOT HOME THAT NIGHT, YOU TWO

2    GOT INTO A VERBAL ALTERCATION; CORRECT?

3    A    YEAH.  WASN'T MAJOR.  BUT YEAH.

4    Q    AND AFTER THAT VERBAL ALTERCATION WHERE DID

5    MR. HANCOCK GO?

6    A    WELL, HE GOT PISSED OFF AND STAYED OUTSIDE, AND WE

7    KIND OF GOT IN A FIGHT THERE, IF YOU WANT TO CALL IT THAT.

8    Q    AND YOU GUYS GOT INTO A FIGHT RIGHT THERE IN FRONT OF

9    THE APARTMENT, IN FRONT OF THE WHOLE UNIVERSE; RIGHT?

10   A    RIGHT.

11   Q    AND YOU GUYS HAD A RATHER LOUD DISCUSSION BEFORE THE

12   PHYSICAL FIGHT BROKE OUT; RIGHT?

13   A    IT MIGHT HAVE BEEN LOUD.

14   Q    YOU GUYS WERE YELLING AT EACH OTHER FOR A FEW MINUTES

15   BEFORE ANYBODY THREW A PUNCH; RIGHT?

16   A    PROBABLY, YEAH, I BELIEVE SO.

17   Q    AND NOBODY CAME OUT AND CHECKED TO SEE WHAT THIS BIG

18   DISTURBANCE WAS, DID THEY?

19           MR. DEMERTZIS:  OBJECTION, FOUNDATION.

20           THE COURT:  EXPLAIN THAT A LITTLE BIT MORE, THE

21   OBJECTION.

22           MR. DEMERTZIS:  WE DON'T KNOW IF SOMEBODY PEEKED

23   OUT A WINDOW, STUCK THEIR HEAD OUT THE DOOR.

24           THE COURT:  I THINK THE QUESTION IS NO ONE CAME

25   OUTSIDE.  SO I'LL ASK YOU, SIR, TO ANSWER THAT IF YOU KNOW.

26   DID ANYONE COME OUTSIDE TO SEE -- AT LEAST AT THIS POINT

27   WE'RE WITH A VERBAL ARGUMENT YOU WERE HAVING WITH THE

28   DEFENDANT.  DID ANYBODY COME OUT TO SEE, TO YOUR KNOWLEDGE?

1      THE WITNESS:  AS FAR AS I CAN RECALL, NO.

2    Q    (BY MR. KURTZMAN)  AND EVENTUALLY THIS VERBAL

3    ALTERCATION BECAME PHYSICAL?

4    A    YEAH.

5    Q    JEFF'S HOUSE, HE'S GOT A WOODEN DOOR AND THEN A SCREEN

6    DOOR; RIGHT?

7    A    YEAH.

8    Q    IT WAS AUGUST, AND AT THAT POINT ONLY THE SCREEN DOOR

9    WAS CLOSED SO THE HOUSE COULD AIR OUT; RIGHT?

10   A    PROBABLY.

11   Q    TAKING ADVANTAGE OF THE TWILIGHT AND HOW IT WAS

12   COOLING OFF?

13   A    YEAH, PROBABLY SO.

14   Q    DO YOU REMEMBER THE WOODEN DOOR BEING OPEN AND THE

15   SCREEN DOOR CLOSED?

16   A    WHEN I FIRST GOT THERE, BOTH OF THOSE WERE CLOSED.

17   Q    RIGHT.  I'M TALKING ABOUT BEFORE THE FIGHT STARTED.

18   THE WOODEN DOOR WAS OPEN AND THE SCREEN DOOR WAS CLOSED?

19   A    I DON'T REMEMBER THAT.

20   Q    SO YOU HAD THE VERBAL ALTERCATION AND THEN IT BECAME

21   PHYSICAL; CORRECT?

22   A    YES.

23   Q    AND THIS IS ALL HAPPENING RIGHT THERE IN FRONT OF

24   JEFF'S DOOR; CORRECT?

25   A    THEREABOUTS.

26   Q    AND YOU DON'T KNOW, BUT YOU THINK YOU MAY HAVE THROWN

27   ONE PUNCH AT JEFF; CORRECT?

28   A    CORRECT.

1  Q    AND YOU HAVE MEMORY OF TRYING TO CRAWL IN THERE;

2  RIGHT?

3  A    YEAH.

4  Q    SO YOU DIDN'T STAND UP --

5  A    I THINK ONE OF THE NEIGHBORS CAME DOWN AT THAT TIME

6  AND HELPED ME.  I DON'T REMEMBER EVERYTHING ABOUT THAT

7  AFTERWARDS.

8  Q    SO IN BETWEEN THE TWO INCIDENTS YOU THINK ONE OF THE

9  NEIGHBORS CAME DOWN TO HELP YOU?

10  A    YEAH, YEAH.

11  Q    WHICH NEIGHBOR WAS THAT?

12  A    PETER.

13  Q    PETER?  OKAY.  AND PETER WAS HELPING YOU?

14  A    YES.

15  Q    AND AS WE'RE TALKING, SOUNDS LIKE THE MEMORY IS COMING

16  BACK TO YOU A LITTLE MORE CLEARLY.

17  A    YES, SOMEWHAT, YEAH.

18  Q    SO NOW YOU'RE FAIRLY CONFIDENT THAT IN BETWEEN THE TWO

19  INCIDENTS PETER CAME DOWN AND HELPED YOU; RIGHT?

20  A    YEAH.

21  Q    AND THEN MR. HANCOCK CAME BACK OUT?

22  A    I THINK THAT'S WHEN HE CAME OUT AND GAVE ME A

23  WASHCLOTH.  I THINK THAT'S WHAT YOU WERE REFERRING TO

24  EARLIER.

25  Q    SO MR. HANCOCK ACTUALLY CAME OUTSIDE AND GAVE YOU A

26  WASHCLOTH?

27  A    THAT WAS INSIDE, WHAT I REMEMBER.  HE MAY HAVE COME

28  OUTSIDE.  I DON'T THINK SO, THOUGH.  I THINK HE CAME OUT AND

1    HE WENT BACK IN HIS ROOM AND THE PARAMEDICS CAME AND ALL

2    THAT.

3    Q    THE SECOND TIME MR. HANCOCK CAME OUT OF THE APARTMENT,

4    DO YOU REMEMBER SEEING HIM COME OUT OF THE APARTMENT?

5    A    YOU KNOW, I THINK I HAD MY BACK TURNED.  BUT HE DID

6    COME OUT, BUT I DON'T REMEMBER WATCHING, YOU KNOW, VISIBLY

7    SEEING HIM COME OUT.  I DON'T REMEMBER THAT.

8    Q    YOU HAD YOUR BACK TO THE DOOR OF THE APARTMENT?

9    A    YEAH, I THINK SO.

10    Q    WHEN MR. HANCOCK CAME OUT OF THE APARTMENT, YOU THINK

11    -- THE SECOND TIME YOU THINK YOU HAD YOUR BACK TO THE DOOR?

12    A    I DON'T BELIEVE SO.

13    Q    AND THIS WAS BEFORE YOU WERE STABBED; CORRECT?

14    A    YES.

15    Q    SO YOU WERE TRYING TO CRAWL TOWARD THE APARTMENT, AND

16    THEN MR. HANCOCK CAME OUT; CORRECT?

17    A    YES.

18    Q    AND WHEN MR. HANCOCK CAME OUT, HE JUST WALKED RIGHT UP

19    AND STABBED YOU; CORRECT?

20    A    I'M PRETTY SURE THAT'S HOW THAT HAPPENED.

21    Q    YOU'RE PRETTY SURE.  YOU HAVE SOME DOUBTS NOW?

22    A    NO.  THAT'S WHAT HAPPENED.

23    Q    AND YOU WERE SITTING ON THE GROUND OR LAYING ON THE

24    GROUND WHEN THIS HAPPENED?

25    A    NO, I WAS SITTIN' UP, I THINK.

26    Q    WITH YOUR BACK TO THE DOOR?

27    A    YEAH.

28    Q    AND MR. HANCOCK CAME UP FROM BEHIND AND STABBED YOU;

1    WOUND ON YOUR HAND?

2    A    YES.

3    Q    AND YOU SAID THAT WAS ANOTHER STAB WOUND, DIDN'T YOU?

4    A    YES.

5    Q    THAT WAS FROM THE SAME KNIFE, WASN'T IT?

6    A    YES, I GUESS.  YEAH.

7    Q    DO YOU REMEMBER CLEARLY?

8    A    I JUST REMEMBER GOING LIKE THIS, KIND OF DEFENDING

9    MYSELF.  GOT NICKED ON THE HAND THERE.  NOTHING REAL

10   SERIOUS.

11   Q    AND THAT WAS AFTER YOU WERE STABBED IN THE BACK,

12   RIGHT?

13   A    YEAH.

14   Q    AND SO AFTER YOU WERE STABBED IN THE BACK, JEFF CAME

15   AROUND IN FRONT OF YOU AND ATTACKED YOU AGAIN WITH THE

16   KNIFE; RIGHT?

17   A    I DON'T REMEMBER THAT.  I COULD HAVE BEEN TURNIN' OR

18   (INDICATING) --

19   Q    WELL, UP UNTIL NOW YOU'VE ALWAYS TESTIFIED THAT YOU

20   HAD YOUR HANDS UP IN FRONT OF YOUR FACE.

21   A    RIGHT.  SO HE COULD HAVE BEEN IN FRONT OF ME, YEAH.

22   Q    DO YOU REMEMBER JEFF COMING AROUND THE FRONT OF YOU?

23   A    NOT EXACTLY.  LIKE I SAID, I DIDN'T SEE ANY WEAPON

24   SO --.

25   Q    DO YOU REMEMBER ADDITIONAL ATTACKS AFTER YOU WERE

26   STABBED IN THE BACK?

27   A    NO.  IT ENDED THERE.

28   Q    IT ENDED THERE?

1    A    YES.

2    Q    AND YET YOU'RE SAYING THAT YOU GOT AN ADDITIONAL STAB

3    WOUND ON YOUR HAND AFTER YOU WERE STABBED IN THE BACK;

4    RIGHT?

5    A    RIGHT.

6    Q    WHO GAVE YOU THE ADDITIONAL STAB WOUND IN THE HAND?

7    A    I WAS TRYING TO FIGHT OFF JEFF.  I THOUGHT HE WAS

8    GOING TO START DOING SOMETHING ELSE, SOMETHING.

9    Q    BUT YOU'VE JUST TESTIFIED MULTIPLE TIMES THAT JEFF

10   STABBED YOU IN THE BACK AND IMMEDIATELY WENT BACK INTO THE

11   HOUSE; CORRECT?

12   A    NO, I DIDN'T SAY THAT.

13   Q    WHAT DID YOU DO AFTER YOU GOT STABBED IN THE BACK?

14   A    GOT INSIDE THE APARTMENT.  I BELIEVE PETE HELPED ME

15   GET IN THERE, AND THOSE GUYS HELPED CLEANING ME OFF AND

16   CALLING THE PARAMEDICS.

17   Q    AND PETE HELPED YOU BACK INTO JEFF'S APARTMENT;

18   CORRECT?

19   A    I THINK THAT'S HOW IT HAPPENED.  YOU'D HAVE TO ASK

20   PETE.  HE WOULD KNOW.

21   Q    DO YOU REMEMBER IF YOU WALKED, IF PETE CARRIED YOU,

22   HOW YOU GOT BACK INTO THE APARTMENT?

23   A    WELL, I KNOW I DIDN'T WALK.  HE MIGHT HAVE LIFTED ME

24   UP OR -- I DON'T KNOW, CARRIED ME IN OR --.  I JUST DON'T

25   REALLY REMEMBER A WHOLE LOT ABOUT THAT LAST PART OF IT

26   THERE, JUST BITS AND PIECES.

27   Q    DO YOU REMEMBER WHERE YOU WERE IN JEFF'S APARTMENT

28   WHEN YOU WENT INSIDE?

1    A    I THINK I WAS IN THE FRONT ROOM.

2    Q    IN THE FRONT ROOM?

3    A    YEAH, IN THE FRONT ROOM.

4    Q    AND YOU REMEMBER IT WAS ACTUALLY ONE OF THE PARAMEDICS

5    WHO TOLD YOU THAT YOU HAD BEEN STABBED?

6    A    I DON'T REMEMBER THAT.

7    Q    DO YOU REMEMBER TESTIFYING AT THE PRELIMINARY HEARING

8    THAT IT WAS THE HOSPITAL PARAMEDICS WHO TOLD YOU YOU'D BEEN

9    STABBED?

10   A    THEY MAY HAVE SAID THAT.  PROBABLY DID.

11   Q    AND I'M ASKING YOU IS THAT HOW YOU LEARNED YOU WERE

12   STABBED?

13   A    I BELIEVE PETE WAS THE FIRST PERSON TO TELL ME THAT.

14   Q    DO YOU REMEMBER TESTIFYING AT THE PRELIMINARY HEARING

15   THAT IT WAS THE PARAMEDICS AT THE HOSPITAL THAT TOLD YOU YOU

16   HAD BEEN STABBED?

17   A    VAGUELY.  THEY PROBABLY DID.  I WAS PRETTY HAZED OUT

18   AT THAT TIME.

19   Q    AND THAT WAS YOUR MEMORY AT THE PRELIMINARY HEARING

20   WHEN YOU TESTIFIED?

21   A    I'M SORRY, I DIDN'T UNDERSTAND THE QUESTION.

22   Q    THAT WAS THE MEMORY YOU HAD AT THE PRELIMINARY HEARING

23   WHEN YOU TESTIFIED, WAS THAT THE PARAMEDICS AT THE HOSPITAL

24   ARE THE ONES THAT TOLD YOU YOU HAD BEEN STABBED; CORRECT?

25   A    YEAH, THAT'S PROBABLY CORRECT.

26   Q    NOW, YOU'VE HAD OCCASIONS WHEN YOU HAVE BEEN

27   INTOXICATED TO THE POINT WHERE YOU HAVE FALLEN DOWN;

28   CORRECT?

1    A    YES, AND A FEW OF THEM.

2    Q    AND IN FACT ONE OF THESE OCCASIONS HAPPENED ABOUT

3    THREE DAYS BEFORE THIS INCIDENT; CORRECT?

4    A    I DON'T RECALL.

5    Q    DO YOU REMEMBER BEING IN THE APARTMENT AND FALLING

6    WHEN YOU WERE AT THE BATHROOM DOOR ABOUT THREE DAYS BEFORE

7    THIS INCIDENT?

8    A    IT MAY HAVE HAPPENED.

9    Q    AND WHEN YOU FELL, YOU ACTUALLY HIT THE CORNER OF THE

10   MARBLE COUNTERTOP IN THE BATHROOM.  DO YOU REMEMBER THAT?

11   A    YEAH, I KIND OF DO REMEMBER THAT.

12   Q    AS YOU WERE FALLING, YOU SLAMMED INTO THE MARBLE

13   COUNTERTOP IN THE BATHROOM?

14   A    I MAY HAVE.

15   Q    AND YOU ACTUALLY HIT IT HARD ENOUGH THAT IT ACTUALLY

16   SHIFTED.  DO YOU REMEMBER THAT?

17   A    PROBABLY.

18   Q    IT ACTUALLY SHIFTED WITH ENOUGH FORCE THAT IT ACTUALLY

19   HAD TO HAVE SOME WORK DONE TO REPAIR SOME OF THE -- TO

20   REPAIR THE FAUCET.  DO YOU REMEMBER THAT?

21   A    NO.

22   Q    DID YOU EVER TAKE A LOOK AT IT AFTER IT SHIFTED?

23   A    NO.

24   Q    DO YOU REMEMBER WHAT PART OF YOUR BODY HIT THE MARBLE

25   COUNTERTOP WHEN YOU FELL?

26   A    IT WAS EITHER MY BACK OR MY HIP.

27   Q    WAS IT -- IT WAS YOUR TORSO?

28   A    COULD HAVE BEEN.

1    DAY, HE HAD A PINT OF VODKA THAT YOU GUYS SHARED?

2    A    NO, I DON'T REMEMBER THAT.  COULD HAVE BUT I DON'T --

3    I DON'T REMEMBER, SORRY.  IT'S A POSSIBILITY.

4    Q    SO YOU HAVE NO MEMORY ONE WAY OR THE OTHER.  YOU DON'T

5    SPECIFICALLY REMEMBER IT NOT HAPPENING, YOU JUST DON'T

6    REMEMBER IT HAPPENING; CORRECT?

7    A    CORRECT.

8    Q    DO YOU HAVE ANY MEMORY OF GOING INSIDE MR. HANCOCK'S

9    APARTMENT AFTER HE CAME BACK FROM THE PARK TO DRINK THE

10   VODKA?

11   A    NO, I DON'T.

12            THE COURT:  LADIES AND GENTLEMEN, LET'S TAKE A

13   LITTLE STRETCH BREAK RIGHT HERE FOR 30 SECONDS OR SO.

14        GO AHEAD.

15   Q    (BY MR. KURTZMAN)  DO YOU REMEMBER TELLING OFFICER KIM

16   THAT YOU WERE SLEEPING IN FRONT OF MR. HANCOCK'S APARTMENT

17   WHEN HE CAME HOME?

18   A    VAGUELY.

19   Q    AND DO YOU REMEMBER TELLING OFFICER KIM THAT WHEN

20   MR. HANCOCK GOT HOME, YOU TOLD HIM YOU NEEDED TO GET SOME

21   PAPERS OUT OF HIS APARTMENT?

22   A    NO.  YOU KNOW, I DON'T REMEMBER THAT.

23   Q    YOU DON'T REMEMBER THAT OR YOU DIDN'T SAY IT?

24   A    I MAY HAVE SAID IT.  I JUST DON'T REMEMBER -- I DON'T

25   HAVE LIKE TOTAL RECALL OF THAT NIGHT.

26   Q    DO YOU REMEMBER TELLING OFFICER KIM THAT YOU IN FACT

27   DID GO INSIDE THE APARTMENT TO GET THE PAPERS?

28   A    NO.

1   A    WELL, IT WAS A PUNCTURE WOUND.  WHERE ELSE WOULD IT

2   COME FROM?

3   Q    DO YOU SPECIFICALLY REMEMBER BEING STABBED IN THE HAND

4   WITH THE KNIFE DURING THE INCIDENT?

5   A    I REMEMBER HOLDING UP MY HANDS, YOU KNOW, AND SOME

6   PAIN IN THERE AFTERWARDS.  LIKE I SAID BEFORE, I DIDN'T SEE

7   ANY WEAPON, SO --.  IF I DID, I DON'T REMEMBER THAT EITHER.

8   IT WAS PRETTY FOGGY.

9   Q    WHEN YOU TESTIFIED AT THE PRELIMINARY HEARING ABOUT

10  RECEIVING THE WOUND TO YOUR HAND, DID YOU TELL THE TRUTH?

11  A    YES.

12  Q    AND DO YOU REMEMBER PREVIOUSLY TESTIFYING THAT YOU DID

13  NOT REMEMBER HOW YOU RECEIVED THE WOUNDS ON YOUR HAND?

14  A    I MAY HAVE SAID THAT.

15  Q    OKAY.  AND YOU WERE TELLING THE TRUTH THEN?

16  A    YEAH.

17  Q    OKAY.  SO BACK IN OCTOBER YOU DID NOT REMEMBER OR DID

18  NOT KNOW HOW YOU RECEIVED THE WOUND ON YOUR HAND; RIGHT?

19  A    I GUESS YOU COULD ASSUME THAT.

20  Q    THAT'S WHAT YOU TESTIFIED TO UNDER OATH; RIGHT?

21  A    RIGHT.  I WAS TELLING THE TRUTH --

22  Q    AND NOW TODAY --

23  A    -- YOU KNOW --

24  Q    NOW TODAY YOU SPECIFICALLY REMEMBER THE KNIFE CUTTING

25  YOUR HAND; RIGHT?

26  A    SOMETHING SHARP, YES.

27  Q    COULD IT HAVE BEEN THE BUSH?

28  A    I DON'T THINK SO.

1    Q      COULD IT HAVE BEEN ANYTHING OTHER THAN THE KNIFE?

2    A      I DON'T BELIEVE SO.

3    Q      SO TODAY YOU REMEMBER IT BEING THE KNIFE, BUT YOU

4    DIDN'T REMEMBER IN OCTOBER; RIGHT?

5    A      PARDON ME?

6    Q      TODAY YOU REMEMBER IT BEING THE KNIFE THAT CUT YOUR

7    HAND, BUT YOU DID NOT REMEMBER THAT IN OCTOBER; CORRECT?

8    A      YEAH, THAT WOULD PROBABLY BE CORRECT.

9    Q      NOW, AFTER YOU WERE STABBED IN THE BACK, DID YOU ROLL

10   AROUND WITH JEFF AND WRESTLE WITH JEFF?

11   A      NO, I DON'T THINK THERE WAS ANY OF THAT GOING ON AFTER

12   THAT.

13   Q      WERE YOU ROLLING AROUND AND WRESTLING WITH JEFF WHEN

14   YOU FELT THE PAIN IN YOUR HAND?

15   A      NO, JUST TRYING TO HOLD MY ARMS UP AND ASKING JEFF,

16   YOU KNOW, WHAT'S GOIN' ON.  YOU KNOW.

17   Q      DO YOU REMEMBER TESTIFYING AT THE PRELIMINARY HEARING

18   THAT YOU WERE ROLLING AROUND THERE ON THE CONCRETE AND "I

19   DID FEEL A SHARP PAIN IN MY HAND"?  DO YOU REMEMBER

20   TESTIFYING TO THAT?

21   A      I PROBABLY DID SAY THAT.

22   Q      AND THAT WAS THE TRUTH?

23   A      YEAH.  I HAVE NO REASON TO LIE ABOUT IT.

24         THE COURT:  YOU HAVE TO SPEAK UP.  WHAT WAS THE

25   LAST COMMENT YOU MADE?

26         THE WITNESS:  I'M SORRY.  OH.  I DON'T HAVE ANY

27   REASON TO LIE ABOUT THAT INCIDENT.

28   Q      (BY MR. KURTZMAN)  AND WHEN YOU HAD YOUR VERBAL

```
1    A     PETE.

2    Q     AND SOMEONE ELSE?

3    A     I THINK NEAL CAME DOWN, TOO.

4    Q     ALL RIGHT.  WHOEVER IT WAS, DO YOU REMEMBER WHAT

5    EXACTLY THEY DID FOR YOU IN TERMS OF CLEANING YOU UP?

6    A     THEY HELD A TOWEL OR TISSUES OR SOMETHING ON MY BACK

7    AND, YOU KNOW, I THINK THEY PUT A WET CLOTH ON MY FACE.

8    Q     THESE FELLAS BROUGHT YOU BACK INTO JEFF'S APARTMENT?

9    A     I'M PRETTY SURE PETE DID, I THINK.  I DON'T KNOW, I

10   MAY HAVE CRAWLED IN THERE.  I DON'T REMEMBER THAT A HUNDRED

11   PERCENT.

12   Q     FAIR ENOUGH.  COULD YOU HAVE BEEN TAKEN INTO THE

13   KITCHEN?

14   A     POSSIBLY.

15   Q     SO IF YOUR BLOOD WAS IN THE KITCHEN, MAYBE SOMEONE

16   TOOK YOU THERE, OR MAYBE YOU WENT THERE YOURSELF?

17   A     IT'S A POSSIBILITY TOO.

18   Q     YOU JUST DON'T REMEMBER CLEARLY?

19   A     NO.

20   Q     SIR, WHEN I WAS ASKING YOU QUESTIONS EARLIER, YOU

21   STARTED TO SAY SOMETHING ABOUT NOT CONTRIBUTING TO THE

22   APARTMENT OR NOT HELPING OUT -- I CAN'T REMEMBER WHAT IT

23   WAS -- AND WE MOVED ON.

24         AND I JUST WANT YOU TO EXPLAIN MORE TO THE JURY.  I

25   DON'T EVEN KNOW WHAT YOU WERE TRYING TO SAY.  WERE YOU DOING

26   SOMETHING OR CLOSER TO THE TRUTH NOT DOING SOMETHING THAT

27   YOU SAY ANNOYED JEFF?

28   A     YEAH.  I WASN'T HOLDING MY OWN.  I WASN'T PAYING RENT,
```

```
1    AND OUT OF THE GOODNESS OF HIS HEART HE LET ME STAY THERE.
2    BECAUSE I WAS PRETTY MUCH OUT OF WORK.  I HAD A LITTLE
3    PART-TIME JOB BUT --.
4    Q    WOULD THE DEFENDANT LET YOU KNOW ABOUT IT?  WOULD HE
5    EVER SAY THINGS TO YOU LIKE WHY DON'T YOU CHIP IN --
6    A    YEAH.
7    Q    -- OR AT LEAST BUY YOUR OWN SMOKES, OR THINGS LIKE
8    THAT?
9    A    YES.
10   Q    HOW LONG HAD THAT BEEN GOING ON?
11   A    I DON'T KNOW THE EXACT TIME, BUT IT HAD BEEN GOING ON
12   FOR A WHILE.  JEFF WAS GETTING KIND OF PISSED OFF AT ME,
13   EXCUSE MY LANGUAGE.  I DON'T BLAME HIM AT ALL.
14   Q    OTHER THAN CONTRIBUTING RENT OR EATING HIS FOOD OR --
15   I DON'T KNOW WHAT ELSE -- IS THERE ANYTHING ELSE THAT YOU
16   THINK MAYBE ANNOYED THE DEFENDANT?  I MEAN BIGGER THAN THAT.
17   DID YOU EVER STEAL FROM HIM, FOR INSTANCE?
18   A    NO, I NEVER.
19   Q    SO IT'S JUST YOU BEING KIND OF A DEADBEAT AROUND THE
20   APARTMENT?
21   A    YES.
22   Q    I DON'T MEAN TO EMBARRASS YOU --
23   A    IT'S EMBARRASSING.  YEAH, THAT'S THE TRUTH.
24   Q    -- BUT LET'S CALL A ROSE A ROSE.
25   A    YEAH.
26   Q    DID YOU GET THE IMPRESSION THAT WHAT HAPPENED ON
27   AUGUST 7TH WAS KIND OF EVERYTHING COMING TO A HEAD?
28        MR. KURTZMAN:  OBJECTION, LEADING, SPECULATION.
```

1    A    IT MAY HAVE BEEN.  I'M NOT A HUNDRED PERCENT POSITIVE,

2    BUT IT'S -- MOST LIKELY, SEEMS TO ME.

3    Q    LET ME ASK YOU A MORE DIRECT QUESTION.  WERE YOU

4    TELLING ME THE TRUTH EARLIER TODAY ABOUT WHAT HAPPENED THAT

5    DAY?

6    A    OH, YES.

7    Q    SO WHEN JEFF CAME BACK OUT OF THE APARTMENT, YOU DID

8    FEEL A SHARP PAIN?

9    A    YES.

10   Q    AND YOU DID THINK THAT YOU GOT STABBED?

11   A    YES.

12   Q    NOW, YOU HESITATED FOR A MOMENT.  WHY DID YOU

13   HESITATE?

14   A    YOU KNOW, WHEN IT HAPPENED I JUST COULDN'T BELIEVE

15   THIS WAS HAPPENING.  I DIDN'T WANT TO BELIEVE IT.

16   Q    AND YOU KNEW THAT IT WAS JEFF THAT JUST STABBED YOU?

17   A    YEAH.

18        MR. DEMERTZIS:  ALL RIGHT, MR. DAVIS.  THANK YOU.

19        THE COURT:  RECROSS?

20        MR. KURTZMAN:  THANK YOU, YOUR HONOR.

21             RECROSS-EXAMINATION

22   Q    (BY MR. KURTZMAN)  MR. DAVIS, WHEN MR. DEMERTZIS A

23   MINUTE AGO RESTATED MY QUESTION ABOUT PETER BEING THE FIRST

24   ONE TO TELL YOU YOU WERE STABBED AND THAT BEING THE FIRST

25   TIME YOU REALIZED YOU WERE STABBED, YOU ANSWERED HIM YEAH,

26   THAT THAT'S HOW YOU REMEMBER IT; RIGHT?

27   A    WELL, LIKE I SAID, I DON'T REMEMBER A HUNDRED PERCENT,

28   BUT I'M PRETTY SURE THAT'S WHAT HAPPENED.

1    Q    AND THEN AS MR. DEMERTZIS ASKED THE QUESTION A COUPLE

2    MORE TIMES, YOUR RESPONSES CAME AROUND TO YOU KNEW YOU WERE

3    STABBED RIGHT AWAY; RIGHT?

4    A    YEAH.

5    Q    SO BASICALLY YOUR ANSWERS EVOLVED AS MR. DEMERTZIS

6    PROGRESSED THROUGH HIS QUESTIONS; RIGHT?

7    A    PARDON ME?

8    Q    YOUR ANSWER CHANGED AS MR. DEMERTZIS WENT THROUGH HIS

9    LINE OF QUESTIONS; RIGHT?

10   A    NO, I DON'T THINK SO.

11   Q    YOU'VE TOLD ME THAT THE FIRST TIME YOU REALIZED YOU

12   WERE STABBED WAS WHEN PETER TOLD YOU; RIGHT?

13   A    YEAH, I BELIEVE THAT'S CORRECT.

14   Q    YOU'VE ALSO TESTIFIED THAT THE FIRST TIME YOU REALIZED

15   YOU WERE STABBED WAS WHEN THE PARAMEDICS TOLD YOU AT THE

16   HOSPITAL; RIGHT?

17   A    I MAY HAVE SAID THAT.

18   Q    AND YOU'VE ALSO SAID THAT YOU KNEW YOU WERE STABBED

19   RIGHT AWAY; RIGHT?

20   A    YEAH, I FELT IT.

21   Q    SO YOU'VE GIVEN THREE DIFFERENT ANSWERS TO THAT

22   QUESTION, BASICALLY; RIGHT?

23   A    THREE DIFFERENT QUESTIONS ASKED.

24   Q    OKAY.  MR. DAVIS, YOU'VE LIED UNDER OATH; RIGHT?

25   A    YEAH, I BENT THE TRUTH THERE.

26   Q    AND YOU FEEL VERY GUILTY THAT MR. HANCOCK IS SITTING

27   HERE NEXT TO ME, DON'T YOU?

28   A    YEAH, I DO.

```
 1              THE COURT:  FOR THE RECORD THE DEFENDANT.
 2              MR. DEMERTZIS:  THANK YOU, YOUR HONOR.
 3    Q    (BY MR. DEMERTZIS)  ON AUGUST 7TH OF LAST YEAR DID YOU
 4    STOP BY JEFF'S APARTMENT?
 5    A    YES.
 6    Q    WHAT TIME?
 7    A    I COULDN'T TELL YOU, OTHER THAN THE FACT THAT IT WOULD
 8    BE AFTER WORK, SO SOMETIME AFTER 4:30, 5:00.
 9    Q    WHY DID YOU STOP?
10    A    THERE WAS -- CRAIG WAS IN THE FRONT ROOM WITH ANOTHER
11    GENTLEMAN WHO I WAS INTRODUCED TO AS DUNCAN AND DUNCAN --
12    CRAIG WAS SITTING IN A CHAIR, DUNCAN WAS TREATING HIS
13    WOUNDS.
14    Q    YOU SAID CRAIG --
15    A    YES.
16    Q    DO YOU KNOW CRAIG'S LAST NAME?
17    A    NO, NOT OFF THE TOP OF MY HEAD.
18    Q    THE PERSON THAT YOU'RE TALKING ABOUT THAT WAS SITTING
19    IN JEFF'S APARTMENT THAT DAY, IS THAT THE CRAIG WHO'S BEEN
20    IN AND OUT OF THE COURTROOM TODAY?
21    A    YES.
22    Q    WEARING THE BEIGE SWEATER?
23    A    YES, THAT'S CORRECT.
24    Q    SO WHAT EXACTLY WAS CRAIG DOING WHEN YOU SAW HIM IN
25    JEFF'S APARTMENT?
26    A    HE WAS SITTING IN A CHAIR, AND A GENTLEMAN NAMED
27    DUNCAN WAS TREATING HIS WOUNDS.  HE HAD BEEN BEAT UP PRETTY
28    SERIOUSLY.
```

1   Q    WHY DO YOU SAY THAT, THAT CRAIG HAD BEEN BEAT UP

2   PRETTY SERIOUSLY?

3   A    WELL, HIS FACE WAS VERY BADLY SWOLLEN.  THERE WAS CUTS

4   AND BRUISES, AND BRUISES ON VARIOUS PLACES ON HIS BODY.  AND

5   DUNCAN HAD A T-SHIRT OR TOWEL THAT THEY HAD WADDED UP THAT

6   HE WAS HOLDING AGAINST CRAIG'S BACK, LOWER LEFT-HAND PORTION

7   OF HIS BACK.

8   Q    NOW, YOU SAID THERE WAS BRUISES ON CRAIG'S BODY.  HOW

9   MUCH OF CRAIG'S BODY COULD YOU SEE?  WHAT WAS CRAIG WEARING?

10  A    CRAIG DIDN'T HAVE A SHIRT ON AT THE TIME.

11  Q    WHERE WERE YOU STANDING WHEN YOU WERE OBSERVING THIS?

12  A    JUST INSIDE THE DOORWAY.

13  Q    I'M NOT GOING TO HAVE YOU DO A DIAGRAM, BUT IF YOU

14  COULD IN WORDS EXPLAIN FOR US, PLEASE, WHAT THE LAYOUT OF

15  THIS APARTMENT IS, AS FAR AS YOU COULD TELL FROM YOUR

16  VANTAGE POINT OF THE DOORWAY.

17  A    THE LAYOUT OF THE APARTMENT WAS SIMILAR TO MINE.  IT

18  WAS A MIRROR IMAGE OF MINE.  THE FRONT DOOR COMES INTO THE

19  FRONT ROOM, WHICH IS -- OR YOU'VE GOT THE DOORWAY, FRONT

20  ROOM, WHICH IS OFF TO YOUR LEFT, THE KITCHEN OFF TO YOUR

21  RIGHT, A DOORWAY DIRECTLY IN FRONT OF YOU WHICH LEADS TO A

22  BEDROOM AND BATHROOM.

23  Q    THIS FRONT ROOM THAT YOU DESCRIBED, HOW BIG IS IT?

24  A    NINE FEET BY NINE FEET SQUARE.

25  Q    WHAT DO YOU DO FOR A LIVING?

26  A    I'M A CARPENTER.

27  Q    BECAUSE YOU CAME UP WITH THAT PRETTY FAST.

28  A    WELL, I'VE MEASURED IT TO DO LAYOUTS FOR CARPET AND

1    A    CORRECT.

2    Q    DID YOU TALK TO HIM?  JEFF, I MEAN.

3    A    YES.

4    Q    DID YOU ASK HIM WHAT HAPPENED?

5    A    YES.

6    Q    WHAT DID THE DEFENDANT TELL YOU HAPPENED?

7    A    WELL, MY QUESTIONS WERE RATHER SPECIFIC.  I WANTED TO

8    KNOW HOW -- WHAT CRAIG WAS STABBED WITH AND HOW DEEPLY HE

9    WAS STABBED.

10   Q    SO THAT WAS YOUR FIRST QUESTION OUT OF THE GATE, IS

11   WHAT WAS CRAIG STABBED WITH?

12   A    YES, OR TO THAT EFFECT.  NOT THOSE EXACT WORDS.  AT

13   THAT POINT MY CONCERN WAS HOW DEEP THE STAB WOUND WAS AND

14   WHAT WAS USED.

15   Q    OTHER THAN YOUR OBSERVATION OF THE WOUND DID YOU HEAR

16   OR SEE ANYTHING ELSE THAT LED YOU TO BELIEVE IT WAS IN FACT

17   A STAB WOUND?  DID ANYONE ELSE SAY ANYTHING?

18   A    DUNCAN MAY HAVE SAID SOMETHING, BUT I DON'T RECALL.

19   Q    FAIR ENOUGH.  SO YOUR QUESTION IS SOMETHING ALONG THE

20   LINES OF WHAT WAS CRAIG STABBED WITH?

21   A    WHAT WAS HE STABBED WITH AND HOW DEEP.

22   Q    DID THE DEFENDANT RESPOND?

23   A    YES.  HE PICKED UP A KNIFE IN THE KITCHEN.  I THINK IT

24   WAS A STEAK KNIFE OR PARING KNIFE, SOMETHING ABOUT THAT

25   SIZE, AND USING HIS THUMB SHOWED ME HOW DEEP HE HAD STABBED

26   CRAIG.  HE INDICATED A DEPTH OF ABOUT THREE TO FOUR INCHES.

27   Q    WHEN YOU ASKED WHAT CRAIG HAD BEEN STABBED WITH, THE

28   DEFENDANT WENT TO HIS OWN KITCHEN?

1    A    YES.

2    Q    AND CAME BACK WITH A STEAK KNIFE?

3    A    IT WAS EITHER A STEAK KNIFE OR A PARING KNIFE,

4    SOMETHING ABOUT THAT SIZE.

5    Q    DESCRIBE IT IF YOU CAN.

6    A    BASICALLY THE LENGTH AND SIZE AND SHAPE OF THE STEAK

7    KNIFE, BUT I DON'T RECALL ANY SERRATIONS ON IT.

8    Q    DO YOU RECALL WHAT COLOR THE HANDLE WAS?

9    A    WOODEN.

10   Q    AND THE BLADE, APPROXIMATELY HOW LONG?

11   A    ROUGHLY SIX INCHES, MAYBE A LITTLE LONGER.

12   Q    THE DEFENDANT COMES BACK FROM THE KITCHEN HOLDING THIS

13   KNIFE, AND DOES HE SAY ANYTHING ABOUT THE KNIFE?

14   A    HE HELD IT IN HIS HAND WITH HIS THUMB -- BRINGING HIS

15   THUMB DOWN TO INDICATE HOW DEEP HE HAD STABBED HIM.  THAT

16   WAS MY PRIMARY CONCERN, WAS HOW DEEPLY HE HAD BEEN STABBED.

17   Q    YOUR UNDERSTANDING OF THE GESTURE THE DEFENDANT MADE

18   WAS THAT THE DEFENDANT HAD STABBED HIM THREE OR FOUR INCHES

19   DEEP?

20   A    THAT'S CORRECT.

21   Q    DID THE DEFENDANT SAY ANYTHING IN ADDITION TO MAKING

22   THIS GESTURE?

23   A    YES.  HOLDING THE KNIFE HE SAID, "I STABBED HIM THIS

24   DEEP."

25   Q    FOR THE RECORD YOU'RE HOLDING YOUR RIGHT HAND OUT AND

26   THEN YOUR RIGHT THUMB IS EXTENDED.

27   A    YES.

28   Q    DID THE DEFENDANT DO ANYTHING -- WAS THE DEFENDANT

1  HOLDING THE KNIFE IN HIS RIGHT HAND THE WAY YOU'RE SHOWING

2  US NOW WITH YOUR RIGHT HAND?

3  A    I'M NOT SURE IF IT WAS HIS RIGHT OR LEFT HAND, BUT HE

4  HELD IT WITH HIS THUMB ON THE BLADE TO SHOW ME THE DEPTH.

5  Q    I THINK I UNDERSTAND.

6  A    BASICALLY LIKE THAT, TO SHOW ME HOW DEEP.

7  Q    NOW YOU'RE HOLDING A PEN AND PUTTING YOUR THUMB AT A

8  CERTAIN POINT ON THE PEN?

9  A    THAT'S CORRECT.

10 Q    YOU'RE TRYING TO TELL US THAT HE WAS USING HIS THUMB

11 TO MARK A SPOT ON THE KNIFE --

12 A    YES.

13 Q    -- TO INDICATE HOW DEEP INTO CRAIG IT WENT?

14 A    THAT'S CORRECT.

15 Q    AND YOUR ESTIMATE OF WHAT THE DEFENDANT WAS SHOWING

16 YOU WAS HOW LONG AGAIN?

17 A    APPROXIMATELY THREE, MAYBE FOUR INCHES.

18 Q    DID THE DEFENDANT SAY ANYTHING ELSE?

19 A    NOT THAT I RECALL.

20 Q    AT THAT TIME WHAT DID YOU DO?  WHAT DID YOU THINK

21 SHOULD BE DONE?

22 A    AT THAT TIME, BASED ON THE DEPTH INDICATED, I THOUGHT

23 THAT WE SHOULD CALL CRAIG AN AMBULANCE.

24 Q    HOW WAS THAT SUGGESTION RECEIVED IN JEFF'S APARTMENT?

25 A    CRAIG DID NOT WANT THE PARAMEDICS THERE AND NEITHER

26 DID JEFF.

27 Q    WHAT DID JEFF SAY?

28 A    I DON'T RECALL THE EXACT WORDS, BUT THEY WERE BOTH

1  ADAMANTLY OPPOSED -- BOTH OF THEM WERE ADAMANTLY OPPOSED TO

2  HAVING THE PARAMEDICS ARRIVE.

3  Q    YOU WEREN'T IN THE COURTROOM, BUT WE KNOW THAT IN FACT

4  PARAMEDICS DID ARRIVE.

5  A    YES.

6  Q    AND YOU WERE THERE, SO YOU WOULD KNOW BETTER THAN ANY

7  OF US.  BUT HOW IS IT THAT PARAMEDICS WERE SUMMONED?  WHAT

8  HAPPENED AFTER YOU SAID WE GOT TO CALL AN AMBULANCE, AND

9  THEY SAID, NO, NO, WE DON'T WANT TO INVOLVE THEM?

10 A    BOTH CRAIG AND JEFF WERE ADAMANTLY OPPOSED TO HAVING

11 THE PARAMEDICS COME, BUT DUNCAN, THE OTHER GENTLEMAN WHO WAS

12 THERE, AND I CONVINCED THEM THAT CRAIG NEEDED MEDICAL

13 ATTENTION.  BECAUSE OF THE DEPTH OF THE WOUND HE COULD HAVE

14 INTERNAL BLEEDING OR DAMAGE TO A MAJOR ORGAN.

15     SO AFTER SOME CONVINCING FROM BOTH DUNCAN AND MYSELF

16 THEY DECIDED TO ALLOW IT, SO HE CALLED THE PARAMEDICS ON MY

17 CELL PHONE.

18 Q    HOW LONG AFTER YOU PLACED THAT CALL THAT THE

19 PARAMEDICS IN FACT ARRIVED?

20 A    I DON'T KNOW THE EXACT TIME.  I'D ESTIMATE FIVE TO

21 SEVEN MINUTES, MAYBE.

22 Q    DID YOU MAKE A CALL OUT IN THE LIVING ROOM IN VIEW OF

23 THE DEFENDANT?

24 A    I'M NOT SURE IF I WAS STANDING INSIDE OR STANDING OUT

25 FRONT.

26 Q    WELL, WHILE YOU'RE CALLING THE PARAMEDICS, WHAT WAS

27 THE DEFENDANT DOING, IF YOU KNOW?

28 A    AT THE TIME I WAS CALLING THE PARAMEDICS I COULDN'T

1   TELL YOU WHAT HE WAS DOING.

2   Q    DID YOU SEE HIM AFTER YOU GOT OFF THE PHONE?

3   A    WELL, HE WAS IN THE APARTMENT, AND DUNCAN AND I BOTH

4   SUGGESTED THAT HE LEAVE BEFORE THE PARAMEDICS ARRIVED.

5   Q    WHY DID YOU SUGGEST THAT?

6   A    WELL, IN THE CITY OF SUNNYVALE PARAMEDICS ARE ALSO

7   POLICE OFFICERS, SO WE THOUGHT IT WOULD BE BETTER FOR HIM IF

8   HE WASN'T AROUND WHEN THE PARAMEDICS ARRIVED.

9   Q    BECAUSE HE MIGHT GET IN TROUBLE?

10  A    YES.

11  Q    DID THE DEFENDANT LEAVE?

12  A    NO.

13  Q    WHAT HAPPENED?

14  A    HE DIDN'T WANT TO LEAVE, SO WE SUGGESTED THAT HE WAIT

15  IN THE BEDROOM AND CLOSE THE DOOR, AND HE AGREED TO DO THAT.

16  Q    SO THE LAST THING YOU SAW THE DEFENDANT DO WAS GO IN

17  HIS BEDROOM AND CLOSE THE DOOR BEHIND HIM?

18  A    THAT IS CORRECT.

19  Q    LET'S JUMP BACK TO THE KNIFE FOR A SECOND.  WAS THE

20  DEFENDANT TELLING YOU THAT THIS IS THE KNIFE I USED?

21  A    I'M NOT SURE IF HE WAS TELLING ME THAT OR NOT.  THAT'S

22  THE IMPRESSION THAT I GOT.

23  Q    COULD HE HAVE BEEN -- I WASN'T THERE SO I'M ASKING

24  YOU -- COULD HE HAVE BEEN JUST DEMONSTRATING WITH ANY KNIFE

25  THAT HE GRABBED?

26  A    QUITE POSSIBLY, YES.

27  Q    LAST QUESTION, SIR.  DID ANYONE THERE -- YOU, CRAIG,

28  THIS DUNCAN FELLOW, THE DEFENDANT, ANYONE -- SAY THAT

```
 1   DISTRICT ATTORNEY.

 2          MR. KURTZMAN:  IF I COULD HAVE ONE MOMENT WITH MY

 3   CLIENT, YOUR HONOR.

 4          THE COURT:  YES.

 5          MR. KURTZMAN:  NOTHING FURTHER.  THANK YOU, YOUR

 6   HONOR.

 7          THE COURT:  REDIRECT?

 8                  REDIRECT EXAMINATION

 9   Q    (BY MR. DEMERTZIS)  MR. CRAVEN, ON AUGUST 7TH LAST

10   YEAR YOU TALKED TO AT LEAST ONE POLICE OFFICER AT THE SCENE

11   AT JEFF'S APARTMENT?

12   A    YES, SIR.

13   Q    WOULD IT BE FAIR TO SAY THAT THE STATEMENT YOU GAVE

14   THAT OFFICER WAS FAIRLY BRIEF?

15   A    YES.

16   Q    AND DID NOT CONTAIN A LOT OF THE DETAILS THAT YOU JUST

17   GAVE US TODAY?

18   A    NO.  THAT WOULD BE CORRECT.

19   Q    OR THE DETAILS THAT YOU RELATED IN THE CONVERSATION

20   THAT WE HAD YESTERDAY?

21   A    THAT WOULD ALSO BE CORRECT.

22   Q    NOW, OBVIOUSLY I DIDN'T SUGGEST ANY TESTIMONY TO YOU,

23   DID I?

24   A    NO, NOT TO MY KNOWLEDGE.

25   Q    THE QUESTION IS HOW COME YOU DIDN'T TELL THE POLICE

26   THIS STUFF THAT NIGHT?

27   A    WHY DIDN'T I TELL THE POLICE?  I BELIEVE THEY GOT THE

28   INFORMATION FROM DUNCAN AND FROM CRAIG AND FROM JEFF
```

1    HIMSELF.  THEY DIDN'T ASK ME QUESTIONS ON -- OF ANY DETAIL,

2    BECAUSE THEY ALREADY KNEW WHAT WAS GOING ON.

3    Q    YOU RESPONDED TO THE QUESTIONS THAT THEY PUT TO YOU?

4    A    CORRECT.

5         MR. DEMERTZIS:  ALL RIGHT.  FAIR ENOUGH.  THANK

6    YOU, SIR.

7         THE COURT:  RECROSS?

8                    RECROSS-EXAMINATION

9    Q    (BY MR. KURTZMAN)  YOU NO LONGER RESIDE AT THE JOHANNA

10   ADDRESS; CORRECT?

11   A    I NO LONGER RESIDE IN APARTMENT NUMBER 6.

12   Q    YOU RESIDE ELSEWHERE IN THE COMPLEX?

13   A    YES.

14        MR. KURTZMAN:  NOTHING FURTHER.  THANK YOU.

15        MR. DEMERTZIS:  MAY I, YOUR HONOR?

16               FURTHER REDIRECT EXAMINATION

17   Q    (BY MR. DEMERTZIS)  MR. CRAVEN, I GOT TO ASK THIS

18   QUESTION.  DO YOU HAVE ANY AXE TO GRIND WITH THE DEFENDANT?

19   A    NO.

20   Q    DO YOU HAVE ANYTHING AGAINST THE GUY?

21   A    NO.

22        MR. DEMERTZIS:  ALL RIGHT.  THANK YOU.  THAT'S

23   ALL, YOUR HONOR.

24        THE COURT:  ANYTHING ELSE?

25        MR. KURTZMAN:  NO, THANK YOU, YOUR HONOR.

26        THE COURT:  IS HE EXCUSED?

27        MR. KURTZMAN:  YES, YOUR HONOR.

28        MR. DEMERTZIS:  YES.

1           MR. DEMERTZIS:  THANK YOU.

2       YOUR HONOR, AT THIS TIME THE PEOPLE MOVE TO HAVE

3   EXHIBIT 2 ADMITTED INTO EVIDENCE.

4           THE COURT:  ANY OBJECTION?

5           MR. KURTZMAN:  352, YOUR HONOR.  THIS WAS ONE OF

6   THE TWO --

7           THE COURT:  THE OBJECTION IS OVERRULED.

8           (WHEREUPON, PEOPLE'S EXHIBIT NUMBER 2, HAVING BEEN

9   PREVIOUSLY MARKED FOR IDENTIFICATION, WAS RECEIVED IN

10  EVIDENCE.)

11  Q    (BY MR. DEMERTZIS)  THIS IS THE PICTURE YOU JUST

12  LOOKED AT THAT WE'RE PROJECTING ONTO THE SCREEN, PEOPLE'S 2;

13  CORRECT?

14  A    YES.

15  Q    WHAT CAN YOU TELL US ABOUT MR. HANCOCK'S DEMEANOR AND

16  HIS APPEARANCE?

17  A    HE APPEARED TO BE UNDER THE INFLUENCE OF ALCOHOL.

18  Q    WHY DO YOU SAY THAT?

19  A    HE HAD A STRONG ODOR.  HE APPEARED ALSO THAT HE HAD

20  JUST BEEN IN AN ALTERCATION.  HE HAD A BLACK EYE, BLACK AND

21  BLUE EYE.  HE HAD BLOOD ON HIM.

22  Q    WHAT WAS HIS ATTITUDE LIKE?

23  A    I'D SAY POOR AT BEST.

24  Q    WHAT DO YOU MEAN BY POOR?

25  A    JUST HIS DEMEANOR TOWARDS US.  HE WASN'T OVERLY

26  COOPERATIVE.  HE WASN'T COOPERATIVE AT ALL IN THE SENSE THAT

27  WHILE WE WERE ASKING HIM QUESTIONS, HE WASN'T GIVING US

28  DIRECT ANSWERS.

1  Q     SO I TAKE IT AT THE HOSPITAL YOU ASKED MR. DAVIS ONCE

2  AGAIN WHAT HAPPENED TO HIM EARLIER THAT DAY?

3  A     YES, I DID.

4  Q     WHAT DID HE SAY THIS TIME?

5  A     HE STARTED THE CONVERSATION OFF BY TELLING ME THAT HE

6  DIDN'T WANT TO BE A RAT AND THAT HE DIDN'T WANT TO TELL ON

7  ANYONE, HE DIDN'T WANT ANYONE ARRESTED, HE DIDN'T WANT TO

8  GET ANYONE IN TROUBLE.  HE THEN TOLD ME THAT -- NOT TO TELL

9  JEFF THAT, WHAT HE WAS GOING TO TELL ME, AND THEN HE --

10  Q     TOLD YOU THE STORY?

11  A     TOLD ME THE STORY.

12  Q     WHAT WAS THE GIST OF THE STORY?

13  A     BASICALLY HE TOLD ME THAT JEFF WAS THE ONE THAT BEAT

14  HIM UP, THAT IT WAS OVER AN ARGUMENT THAT HE HAD OUT THERE.

15  JEFF WANTED HIM TO LEAVE, BUT HE NEEDED TO PICK UP SOME

16  PAPERS, AND THAT JEFF BEAT HIM UP SEVERAL DIFFERENT TIMES.

17  Q     DID MR. DAVIS SAY ANYTHING ONE WAY OR THE OTHER ABOUT

18  WHETHER THE DEFENDANT STABBED HIM?

19  A     HE TOLD ME THAT HE WAS BEATEN UP SO BAD THAT HE DIDN'T

20  KNOW IF HE HAD BEEN STABBED.

21  Q     SHOWING YOU WHAT'S BEEN MARKED AS PEOPLE'S 18, 19 FOR

22  IDENTIFICATION --

23         MR. DEMERTZIS:  THESE WERE PREVIOUSLY PROVIDED TO

24  DEFENSE COUNSEL.

25  Q     (BY MR. DEMERTZIS)  PLEASE TAKE A LOOK AT THOSE TWO

26  PHOTOGRAPHS AND DESCRIBE FOR US, OFFICER, WHAT'S DEPICTED

27  THEREIN.

28  A     18 APPEARS TO BE A PUNCTURE WOUND, AND 19 APPEARS TO

1    A    YES.

2    Q    MR. DAVIS ALSO TOLD YOU THAT HE WAS SO BEAT UP THAT HE

3    COULD NOT FIGHT BACK?

4    A    THAT'S CORRECT.

5    Q    NOW, DEFENSE COUNSEL JUST ASKED YOU IF MR. DAVIS'S

6    INJURIES WERE CONSISTENT WITH SOMEONE BEING IN A FIGHT.

7    WHAT'S YOUR UNDERSTANDING OF THE WORD "FIGHT"?  WHAT'S A

8    FIGHT?

9    A    WELL, A FIGHT WOULD BE TWO INDIVIDUALS PARTICIPATING,

10   VERSUS ONE WITH SOMEONE THAT'S NOT PARTICIPATING.

11   Q    DO YOU THINK THAT THE DEFENDANT, MR. DAVIS, HAD A

12   FIGHT?

13        MR. KURTZMAN:  OBJECTION, SPECULATION.

14        THE COURT:  SUSTAINED.

15   Q    (BY MR. DEMERTZIS)  AT BEST MR. DAVIS'S INJURIES MIGHT

16   BE CONSISTENT WITH SOMEBODY WHO WAS REALLY ON THE LOSING END

17   OF A FIGHT?

18   A    YES.

19   Q    LASTLY, IN TERMS OF WHAT MR. DAVIS TOLD YOU AT THE

20   HOSPITAL, HE MENTIONED TO YOU THAT HE MAY HAVE, QUOTE,

21   SOCKED THE DEFENDANT IN THE EYE ONCE?

22   A    THAT'S CORRECT.

23        MR. DEMERTZIS:  THAT'S ALL THE QUESTIONS I HAVE.

24   THANK YOU, OFFICER.

25        THE COURT:  RECROSS?

26                    RECROSS-EXAMINATION

27   Q    (BY MR. KURTZMAN)  OFFICER, THAT'S WHAT MR. DAVIS

28   SAID, I SOCKED -- I MAY HAVE SOCKED MR. HANCOCK IN THE EYE

1   Q       SHORT-SLEEVED BLUE SHIRT?

2   A       YES.

3           MR. DEMERTZIS:  MAY THE RECORD REFLECT THE OFFICER

4   HAS IDENTIFIED THE DEFENDANT?

5           THE COURT:  YES.

6   Q       (BY MR. DEMERTZIS)  OFFICER, TELL US WHAT THE

7   DEFENDANT'S APPEARANCE AND DEMEANOR WERE WHEN YOU FIRST

8   CONTACTED HIM THAT DAY.

9   A       HE APPEARED INTOXICATED.  HE SMELLED STRONGLY OF

10  ALCOHOL.  HE WAS VERY DEFENSIVE.

11  Q       WHAT DO YOU MEAN BY THAT?  HOW WAS HE DEFENSIVE?

12  A       HE USED PROFANITY AT US.  HE SWORE AT US, WHY WE WERE

13  IN HIS PAD.

14  Q       THAT'S MORE OFFENSIVE, ISN'T IT?

15  A       YEAH.

16  Q       LET'S BACK UP A LITTLE AND SET THE SCENE.  WHERE WERE

17  YOU WHEN YOU FIRST SAW HIM?

18  A       I WAS IN THE LIVING ROOM AREA.

19  Q       OF APARTMENT 7?

20  A       OF APARTMENT 7.  AND HE WAS IN THE BACK BEDROOM.

21  Q       HOW DID YOU FIRST BECOME AWARE OF HIM?

22  A       WHEN I ARRIVED, FIRE AND PARAMEDIC PERSONNEL WAS

23  ALREADY ON THE SCENE, AND P.S.O. KIM HEARD SOMETHING IN THE

24  BACK ROOM.

25  Q       "P.S.O." BEING "PUBLIC SAFETY OFFICER"?

26  A       YES.  KIRK KIM HEARD SOMETHING IN THE BACK BEDROOM, SO

27  WE WANTED TO CLEAR THE APARTMENT TO MAKE SURE NO ONE ELSE

28  WAS IN THE APARTMENT, AND THAT'S WHEN I HEARD THE DEFENDANT

1    A    HE WAS PRETENDING NOT TO KNOW WHAT I WAS ASKING HIM.

2    HE DIDN'T WANT TO ANSWER MY QUESTION.

3    Q    WERE YOU SPEAKING ENGLISH WITH HIM?

4    A    CORRECT.  YES.

5    Q    AND HE SEEMED TO UNDERSTAND WHAT YOU WERE SAYING?

6    A    OH, HE UNDERSTOOD.

7    Q    AND TO THE EXTENT THAT THERE WERE RESPONSES, YOU

8    UNDERSTOOD WHAT HE WAS SAYING?

9    A    YES.

10   Q    AT ANY POINT IN THE BEDROOM DID THE DEFENDANT BECOME

11   AGGRESSIVE WITH YOU OR ANYONE ELSE?

12   A    YES.

13   Q    WHAT HAPPENED?

14   A    HE STOOD UP AND HE TOLD ME THAT HE WANTED TO KICK MY

15   ASS.  IMMEDIATELY P.S.O. KIM AND I HANDCUFFED HIM AND HAD

16   HIM SIT BACK ON THE BED.

17   Q    DID YOU OR OFFICER KIM OR ANYONE ELSE DO ANYTHING

18   RIGHT BEFORE THAT THAT MAYBE -- YOU CAN'T GET INTO THE

19   DEFENDANT'S HEAD, BUT MAYBE WOULD HAVE PROVOKED SOMEONE TO

20   STAND UP AND SAY, "I WANT TO KICK YOUR ASS"?

21   A    NO.  WE WERE JUST ASKING WHAT HAPPENED TO HIM -- WHAT

22   HAPPENED TO HIS FRIEND.

23   Q    AT SOME POINT DID YOU TAKE THE DEFENDANT AWAY FROM

24   APARTMENT 7?

25   A    YES.

26   Q    WHERE DID YOU TAKE HIM?

27   A    I TOOK HIM TO SUNNYVALE D.P.S. JAIL.

28   Q    WHY DID YOU TAKE HIM?