1    I WAS FIRST ON THE SCENE, I BELIEVE, SO WE, YOU KNOW,

2    SECURED THE APARTMENT, AND THEN I STAYED IN THE ROOM WITH

3    THE DEFENDANT THE ENTIRE TIME UNTIL I TRANSPORTED HIM TO

4    SUNNYVALE DEPARTMENT OF PUBLIC SAFETY JAIL.

5    Q    HOW LONG WOULD YOU SAY YOU WERE IN THE DEFENDANT'S

6    APARTMENT BEFORE YOU TRANSPORTED HIM?

7    A    FIFTEEN, TWENTY MINUTES AT LEAST.

8    Q    AND HOW LONG OF A DRIVE IS IT FROM JOHANNA TO

9    SUNNYVALE DEPARTMENT OF PUBLIC SAFETY?

10   A    TEN MINUTES AT THE MOST.

11   Q    SO TWENTY TO TWENTY-FIVE MINUTES SO FAR?

12   A    YEAH.

13   Q    AND THEN TO GET HIM TO WHERE HE'S SEATED, TO START

14   ASKING HIM THE BOOKING QUESTIONS, HOW MUCH TIME IS THAT?

15   A    MAYBE A COUPLE OF MINUTES AS SOON AS I PULLED INTO THE

16   SALLYPORT.

17   Q    TELL US WHAT THE DEFENDANT WAS LIKE DURING BOOKING.

18   A    TOTALLY UNCOOPERATIVE.  HE CHALLENGED ME TO FIGHT

19   NUMEROUS TIMES.  I HAD TO CALL ADDITIONAL OFFICERS TO ASSIST

20   ME WITH BOOKING.  I BELIEVE AT ONE TIME WE HAD AT LEAST SIX

21   OR SEVEN OFFICERS IN THERE.  WE HAD TO COLLECT EVIDENCE.  WE

22   COLLECTED BLOOD FROM HIM.  WE HAD TO RESTRAIN HIM TO COLLECT

23   BLOOD WITH THE TECHNOLOGIST THERE.

24   Q    SO WE ALL KNOW WHY, IS IT TYPICAL FOR YOU TO COLLECT

25   BLOOD FOR ALL FELONY ARRESTS?

26   A    YES.

27   Q    SO THERE'S NOTHING SPECIAL ABOUT THE DEFENDANT?

28   A    NO.

1    Q    IT'S PART OF BOOKING?

2    A    CORRECT.

3    Q    BUT HE DIDN'T WANT THAT TO HAPPEN?

4    A    CORRECT.

5    Q    WHEN YOU SAY HE WAS CHALLENGING YOU TO FIGHT, WHAT

6    SPECIFICALLY WAS HE SAYING?

7    A    HE WAS SAYING HE WAS GOING TO KICK MY ASS WHEN I TAKE

8    OFF THESE CUFFS, HE'S GOING TO BEAT ME UP.

9    Q    PLEASE TELL THE JURY WHAT A WRAP IS.

10   A    A WRAP?

11   Q    YEAH.

12   A    A WRAP IS A RESTRAINING DEVICE.

13   Q    AND I'M SAYING W-R-A-P.

14   A    YEAH.  IT'S A RESTRAINING DEVICE THAT WE USE FOR

15   PEOPLE THAT ARE UNCONTROLLED.  BASICALLY IT WRAPS AROUND

16   THEIR LEGS.  IT VELCROS LIKE A SMALL BLANKET THAT WRAPS

17   AROUND THEIR LEGS.  WE HANDCUFF THEM.

18         AND THERE'S A HARNESS THAT GOES ON THE FRONT PART OF

19   THE BODY, AND THE FRONT PART OF THE BODY TO A LEG, THERE'S A

20   CONNECTION THERE.  AND WE HAVE A SPIT BAG JUST IN CASE

21   PEOPLE TRY TO SPIT AND BITE, AND WE PUT THE SPIT BAG ON, AND

22   WE TRANSPORT THEM TO COUNTY JAIL THAT WAY.

23   Q    DID YOU USE A SPIT BAG IN THIS CASE?

24   A    I DON'T RECALL.  I BELIEVE WE DID.  THAT'S PRETTY

25   STANDARD.

26   Q    THE SPIT BAG, THE RESTRAINED PERSON CAN SEE OUT OF IT?

27   A    CORRECT.  THEY CAN BREATHE, THEY CAN SEE, THEY JUST

28   CAN'T SPIT ON US OR BITE US.

1  Q    IT'S NOT LIKE SOME DARK HOOD?

2  A    NO, NOT AT ALL.

3  Q    BECAUSE RECENTLY IN THE NEWS WE'VE SEEN --

4  A    NO, NOT AT ALL.

5  Q    DO YOU LIKE TO USE THE WRAP?

6  A    NO.

7  Q    DO YOU OFTEN USE IT?

8  A    NO.

9  Q    MORE OFTEN THAN NOT ARE YOU ABLE TO VERBALLY GET

10 SOMEONE TO COMPLY AND COOPERATE?

11 A    YES.

12 Q    SAME QUESTIONS AS TO THIS SPIT -- WHAT DID YOU CALL

13 IT?

14 A    A SPIT BAG.  I CALL IT A SPIT BAG.  IT'S JUST A BAG

15 THAT WE PLACE --

16 Q    DO YOU OFTEN HAVE TO USE THAT?

17 A    LIKE I SAY, THIS IS PRETTY STANDARD, EVERY TIME WE PUT

18 THE WRAP ON SOMEONE, WHICH IS VERY INFREQUENTLY, WE PUT THE

19 BAG ON THE HEAD.

20 Q    WHY DID YOU PUT THE WRAP ON THE DEFENDANT IN THIS

21 CASE?

22 A    HE WAS FIGHTING WITH THE OFFICERS.

23 Q    ACTUALLY FIGHTING?

24 A    I WAS -- AFTER WE COLLECTED BLOOD, I BELIEVE I WAS

25 OUTSIDE AT THE DESK OFFICER -- THERE'S A DESK AREA RIGHT

26 OUTSIDE THE JAIL, AND THERE'S A GLASS AREA.

27       AND WHEN I WAS GETTING THE PRINTOUT FOR THE CALL

28 SO, THE TIMES AND STUFF, AND THEN I HAD THE DESK OFFICER

1    CALL FOR CODE 3 FILLS, AND I SAW THE DEFENDANT TRYING TO

2    KICK THE DESK OFFICER, BECAUSE HE HAD ONE HAND HANDCUFFED TO

3    THE RAILING WHERE WE COLLECTED BLOOD AND FILL OUT PAPERWORK.

4    SO WE ALL RUSHED IN THERE AND RESTRAINED THE DEFENDANT.

5        MR. DEMERTZIS:  THANK YOU, OFFICER.  THAT'S ALL

6    THE QUESTIONS I HAVE.

7        THE COURT:  CROSS-EXAMINATION.

8        MR. KURTZMAN:  THANK YOU.

9                    CROSS-EXAMINATION

10   Q    (BY MR. KURTZMAN)  OFFICER, YOU PREPARED A REPORT FOR

11   THIS CASE; CORRECT?

12   A    YES.

13   Q    AND YOU REVIEWED THAT REPORT BEFORE COMING TO COURT

14   TODAY?

15   A    YES.

16   Q    AND THAT REPORT IS ACCURATE TO THE BEST OF YOUR

17   KNOWLEDGE?

18   A    YES.

19   Q    AND YOU PUT ALL THE IMPORTANT FACTS ABOUT THE CASE

20   INTO THAT REPORT?

21   A    YES.

22   Q    NOW, WHEN YOU WERE IN MR. HANCOCK'S BEDROOM AND HE

23   STOOD UP AND CHALLENGED YOU TO FIGHT, HE SWUNG AT YOU,

24   DIDN'T HE?

25   A    I DON'T REMEMBER.  I DON'T REMEMBER HIM SWINGING AT

26   ME.  NO, I DON'T BELIEVE HE DID.  I DON'T BELIEVE WE GAVE

27   HIM THAT OPPORTUNITY.

28   Q    HE STOOD UP.  DID HE DO ANYTHING MORE THAN STAND UP

1   WOUND, OR DO YOU REMEMBER?

2   A    I JUST REMEMBER HIM HAVING A BLACK EYE, AS I STATED

3   BEFORE.

4           MR. KURTZMAN:  NOTHING FURTHER.  THANK YOU.

5           THE COURT:  ANYTHING ELSE ON REDIRECT?

6           MR. DEMERTZIS:  I JUST HAVE A COUPLE OF QUESTIONS,

7   YOUR HONOR.  WHILE I ASK HIM, WOULD IT BE ALL RIGHT WITH THE

8   COURT IF I PUBLISH THE PHOTOS TO THE JURY?

9           THE COURT:  VIA THE SCREEN?

10          MR. DEMERTZIS:  I DIDN'T PUT THEM ON THE

11  PROJECTOR.

12          THE COURT:  YOU THINK THEY NEED TO SEE THEM BEFORE

13  YOU ASK THE QUESTIONS?

14          MR. DEMERTZIS:  NOT BEFORE BUT DURING SO THEY KNOW

15  WHAT WE'RE DOING.

16          THE COURT:  IF YOU PASS THEM AROUND WHILE YOU'RE

17  ASKING QUESTIONS, THEY WON'T HEAR THE TESTIMONY.  IS IT

18  ESSENTIAL THEY SEE THE PICTURES BEFORE YOU ASK QUESTIONS

19  ABOUT THE PICTURES?

20          MR. DEMERTZIS:  IT'S NOT ESSENTIAL.

21          THE COURT:  ALL RIGHT.  THEN ASK HIM THE

22  QUESTIONS.

23          MR. DEMERTZIS:  MAY I HOLD THE PICTURE UP?

24          THE COURT:  YOU CAN SHOW THEM THE PICTURES AS YOU

25  GO DOWN THE RAIL.  PEOPLE IN THE TOP ROW, YOU CAN STAND UP

26  IF YOU'D LIKE.

27                  FURTHER REDIRECT EXAMINATION

28  Q    (BY MR. DEMERTZIS)  OFFICER, YOU DON'T KNOW HOW THE

1    ARGUMENTS ABOUT MR. DAVIS'S FAILURE TO HELP OUT WITH SOME OF

2    THE COSTS SUCH AS RENTAL AND FOOD.

3        BASICALLY HE TOLD ME THAT MR. HANCOCK HAD BEEN PAYING

4    FOR HIM, HIS SUSTENANCE AND HOUSING.  ON THE FRIDAY WHEN

5    THIS INCIDENT OCCURRED, MR. HANCOCK AND MR. DAVIS HAD GONE

6    OVER TO THE PARK AND THEY HAD SPENT SOME TIME AT THE PARK

7    WITH SOME MUTUAL FRIENDS.

8        ACTUALLY, MR. DAVIS REFERRED TO THE PEOPLE AT THE PARK

9    AS PEOPLE HE DIDN'T PARTICULARLY LIKE, AND MR. DAVIS SAID

10   THAT AT THE PARK HE HAD MADE SOME COMMENTS TOWARDS THESE

11   PEOPLE THAT HE DID NOT LIKE AFTER THEY HAD SPENT SOME

12   TIME --

13           THE COURT:  EXCUSE ME, THAT WHO DIDN'T --

14           THE WITNESS:  MR. DAVIS HAD MADE THESE COMMENTS TO

15   THE GROUP OF PEOPLE AT THE PARK, PEOPLE THAT HE DID NOT

16   LIKE.  HAD MADE RUDE COMMENTS.  HE DIDN'T SPECIFY WHAT TYPE

17   OF COMMENTS HE MADE, BUT MR. DAVIS MADE IT KNOWN THAT HE

18   DIDN'T LIKE THESE PEOPLE.  THEY RETURNED LATER THAT DAY TO

19   MR. HANCOCK'S APARTMENT --

20   Q    (BY MR. DEMERTZIS)  WHO'S "THEY"?

21   A    MR. HANCOCK AND MR. DAVIS RETURNED ALONE, RETURNED TO

22   MR. HANCOCK'S APARTMENT.  SO THEY LEFT THOSE PEOPLE AT THE

23   PARK.  ONCE THEY HAD RETURNED TO MR. HANCOCK'S APARTMENT,

24   MR. DAVIS AND MR. HANCOCK BEGAN ARGUING.

25       HE SAID THAT MR. HANCOCK CONFRONTED HIM ABOUT THE

26   COMMENTS HE HAD MADE, MR. DAVIS HAD MADE TO THESE FRIENDS AT

27   THE PARK.  THAT CONFRONTATION BETWEEN MR. HANCOCK AND

28   MR. DAVIS RESULTED IN A FIGHT, AND MR. DAVIS SAID THAT

1    RELATIVELY FRESH, SINCE IT'S RED.

2    Q    ALL RIGHT.  THIS IS PEOPLE'S 18 NOW BEING PROJECTED.

3    DESCRIBE WHAT YOU SEE IN THAT PHOTOGRAPH, PLEASE.

4    A    IT LOOKS LIKE IT'S A PHOTO OF HIS BACK WITH A PUNCTURE

5    WOUND BELOW THE LEFT SCAPULA.

6    Q    "HIS" BEING CRAIG DAVIS?

7    A    THAT'S CORRECT.

8    Q    WHAT'S A SCAPULA?

9    A    SCAPULA IS THE BONE THAT'S PART OF YOUR -- BACK OF

10   YOUR SHOULDER.

11   Q    IF I WERE TO CALL THAT A SHOULDER BLADE --

12   A    THAT WOULD BE THE EXACT TERM I WOULD USE.

13   Q    SO IT'S A PUNCTURE WOUND BELOW MR. DAVIS'S LEFT

14   SHOULDER BLADE?

15   A    YES.

16   Q    DO YOU RECALL -- NOW YOU'RE LOOKING AT THE PICTURE, SO

17   I'M SURE THAT HELPS REFRESH YOUR MEMORY, BUT DO YOU RECALL

18   FROM TREATING HIM HOW LARGE THAT WOUND WAS?

19   A    I REMEMBER IT NOT BEING THE LARGEST STAB WOUND I'VE

20   EVER SEEN.  PROBABLY AROUND ONE TO TWO CENTIMETERS.

21   Q    LET ME SHOW YOU PEOPLE'S 19.  THIS PICTURE IS A

22   CLOSE-UP OF THE PUNCTURE WOUND WE JUST SAW?

23   A    YES.

24   Q    AND THIS PICTURE HAS A RULER IN IT.

25   A    IT DOES.

26   Q    LET'S TALK ABOUT THIS INJURY, THIS PUNCTURE WOUND.

27   DID YOU TALK TO MR. DAVIS ABOUT HOW HE SUFFERED THIS INJURY?

28   A    I DO NOT RECALL.

1   EARLIER, WOULD THAT LEAD YOU TO BELIEVE THAT MAYBE HE HAD

2   HAD AN EARLIER INJURY TO THAT PART OF HIS BODY THAT HAD BEEN

3   HEALING AND THEN HE HIT THAT PART AGAIN?

4           MR. DEMERTZIS:  OBJECTION, VAGUE AS TO TIME.

5   EARLIER THAN WHAT?

6           MR. KURTZMAN:  EARLIER THAN THE FRESH WOUND.

7           THE COURT:  DO YOU UNDERSTAND THE QUESTION?

8           THE WITNESS:  YEAH, BASICALLY COULD HE HAVE BEEN

9   PUNCHED EARLIER, LIKE A WEEK OR TWO BEFORE, AND THEN GOTTEN

10  PUNCHED THAT DAY.

11  Q    MR. KURTZMAN:  CORRECT.  AND WHAT WAS YOUR RESPONSE?

12  A    IT'S DEFINITELY A POSSIBILITY WITH THE YELLOWING

13  THERE.

14  Q    AND IN FACT THAT WOULD BE THE LOGICAL ASSUMPTION,

15  GIVEN THE YELLOWING, IS HE HAD SOME KIND OF PRIOR INJURY

16  THERE FROM EITHER FALLING OR GETTING PUNCHED OR HOWEVER HE

17  SMACKED HIS HEAD, HE PROBABLY HAD SOME EARLIER INJURIES AND

18  THEN GOT THESE AGAIN?

19  A    THAT'S -- YEAH, I WOULD ASSUME THAT.

20  Q    THE WOUNDS ON HIS FACE -- WHEN THERE IS FOREIGN MATTER

21  IN A WOUND, AS IN DIRT OR SOMETHING LIKE THAT, YOU CLEAN

22  THAT OUT; CORRECT?

23  A    WE TRY TO, YEAH.

24  Q    AND IN MR. DAVIS'S CASE WAS THERE FOREIGN MATTER IN

25  THE WOUNDS TO THE FACE THAT NEEDED TO BE CLEANED OUT?

26  A    I DON'T RECALL, BUT USUALLY WE HAVE TO CLEAN THEM OUT

27  BY THE TIME THE PEOPLE ARE TAKING PHOTOS, SO IT'S HARD FOR

28  ME TO SAY FOR SURE WHETHER OR NOT -- THE ANSWER IS I DON'T

1    PHOTO IT LOOKED LIKE THERE MIGHT HAVE BEEN A CONTUSION

2    MISSED.   THE OTHER PLACES TO LOOK MIGHT BE TO CHECK THE

3    NURSES' NOTES.   THEY ALSO TAKE INFORMATION WHEN THEY'RE

4    GOING THROUGH, BUT LOOKING AT THAT, I DON'T SEE IT MARKED

5    THERE EITHER.

6    Q    WHICH PAGE IS THAT?

7    A    THAT WOULD BE PAGE 21.

8         MR. KURTZMAN:  THAT'S ALL I HAVE.  THANK YOU.

9    NOTHING FURTHER.

10        THE COURT:  REDIRECT?

11        MR. DEMERTZIS:  THANK YOU, YOUR HONOR.

12                  REDIRECT EXAMINATION

13   Q    (BY MR. DEMERTZIS)  DOCTOR, IN TERMS OF THE LIST OF

14   INJURIES -- AND I'M SURPRISED I DIDN'T ASK YOU, IT SEEMS SO

15   OBVIOUS TO LIST THE INJURIES THAT YOU OBSERVED.   BUT IN

16   TERMS OF THE LIST OF INJURIES WOULD IT BE ACCURATE TO

17   CATEGORIZE THEM AS EXTERNAL AND INTERNAL?

18   A    YES.

19   Q    IN TERMS OF EXTERNAL INJURIES WHAT ARE YOU AWARE OF

20   THAT MR. DAVIS SUFFERED THAT DAY?

21   A    MULTIPLE ABRASIONS AND CONTUSIONS, AND I BELIEVE HE

22   HAD A LACERATION NEAR HIS FACE, AS WELL AS A STAB WOUND ON

23   THE OUTSIDE.

24   Q    AND WHAT INTERNAL INJURIES?

25   A    INTERNAL INJURIES WOULD INCLUDE RIB FRACTURES,

26   PNEUMOTHORAX.

27   Q    DO YOU HAVE ANY IDEA HOW HE GOT THE RIB FRACTURES?

28   A    BASED ON THE NUMBER OF CONTUSIONS HE HAD ON HIS BODY I

1  OF THEM GET BETTER, A THIRD STAY THE SAME, AND A THIRD GET

2  WORSE.  IN HIS CASE IT WAS THE THIRD THAT GETS BETTER.  SO

3  IT PROBABLY WOULD TAKE THE COURSE OF A WEEK FOR IT TO BE

4  HEALED SO THAT YOU WOULD KNOW FOR SURE IT WASN'T GOING TO

5  GET WORSE.

6  Q    IS IT YOUR TESTIMONY, DOCTOR, THAT SOMEBODY WHO

7  SUFFERS A PNEUMOTHORAX, EVEN SLIGHT, AND THAT PORTION OF THE

8  LUNG THAT SUFFERS THE PNEUMOTHORAX WOULD ALWAYS REMAIN

9  SOMEWHAT DIMINISHED?

10  A    IT'S A POSSIBILITY.

11  Q    YOU SAID A THIRD WOULD STAY THE SAME?

12  A    RIGHT.

13  Q    SO OF ALL THE -- SAY THE SEVERE PNEUMOTHORAX AND NOT

14  VERY SEVERE -- LET'S TALK ABOUT THOSE NOT VERY SEVERE.

15  YOU'RE CHARACTERIZING MR. DAVIS IN THAT GROUP THAT'S NOT

16  VERY SEVERE; CORRECT?

17  A    CORRECT.

18  Q    OF THOSE NOT VERY SEVERE PNEUMOTHORAX, OR WHATEVER, OF

19  THOSE HOW MANY WOULD NEVER GET BETTER?

20  A    THAT WOULD BE -- IT'S AGAIN A THIRD, THIRD, AND THIRD,

21  SO TWO-THIRDS I GET WOULD BE THE ANSWER TO THE QUESTION.

22  BECAUSE ONE-THIRD WOULD GET WORSE AND A THIRD WOULD STAY THE

23  SAME.

24  Q    WITHOUT GETTING INTO TOO MUCH MATH, WOULD IT BE

25  ACCURATE TO SAY THAT MR. DAVIS HAD A 33 PERCENT CHANCE THAT

26  HIS PNEUMOTHORAX WOULD NEVER GET BETTER?

27  A    YES.

28  Q    AND THE FACT THAT HIS DID, AS FAR AS YOU KNOW, IS JUST

1    TELL YOU -- OKAY, I WENT -- WITHIN THE NEXT FEW MINUTES TIME

2    FRAME I WENT TO THE BATHROOM, I DRANK A FEW SHOTS OF VODKA,

3    I THINK I TURNED THE RADIO ON, AND I MAY HAVE GRABBED ONE

4    MORE THING OUT OF THE REFRIGERATOR, SOMETHING TO EAT.

5    ANYWAY, I PUT A FEW THINGS AWAY THAT I BROUGHT BACK WITH ME

6    FROM THE BARBECUE.

7    Q    AND AT SOME POINT DID CRAIG DAVIS COME BY YOUR PLACE

8    THAT AFTERNOON OR EVENING?

9    A    YES, HE DID.  HE KNOCKED ON THE DOOR, ON THE SCREEN

10   DOOR, MAYBE -- I'M GOING TO SAY MAYBE TEN MINUTES AFTER I

11   GOT THERE.

12   Q    AND WHAT HAPPENED WHEN HE KNOCKED ON YOUR DOOR?

13   A    I HEARD HIS VOICE, I HEARD HIM SAY "ANYBODY HOME?"  I

14   KNEW IT WAS HIM.  I SAID, "YEAH, COME ON IN."  SO HE CAME

15   IN.

16   Q    WHAT HAPPENED AFTER HE CAME IN?

17   A    HE SAID, "HEY, WHAT ARE YOU DOING?"

18   A    I SAID "NUTHIN'."  AND I LOOKED AT HIM AND I SAID,

19   "THERE'S THE VODKA."  AND IT WAS RIGHT THERE ON THE COUNTER.

20   Q    WAS THIS NORMAL FOR YOU GUYS OR WAS THIS UNUSUAL?

21   A    NO, THIS WAS NORMAL.

22   Q    AND WHAT DID MR. DAVIS DO?

23   A    HE WENT OVER AND TOOK A DRINK OF THE VODKA.

24   Q    WHAT HAPPENED NEXT?

25   A    NOTHING.  WE STOOD -- WE JUST STOOD THERE AND, YOU

26   KNOW, BASICALLY JUST WERE BULLSHITTING -- EXCUSE ME, WE WERE

27   JUST TALKING AND HAVING A FEW DRINKS.

28        AND I -- I DID BRING UP -- PART OF THE CONVERSATION

1   WAS I DID BRING UP THE -- AT THE PARK WE HAD DISCUSSED THIS

2   TOO.  IF WE ARE GOING TO GO BACK TO TALKING ABOUT THAT --

3   BUT I'LL ANSWER YOUR QUESTION.

4       WE TALKED A LITTLE BIT ABOUT A COUPLE OF COMPLAINTS

5   THAT I HAD RECEIVED AT MY APARTMENT COMPLEX.  AND THAT I HAD

6   JUST RECENTLY HEARD ABOUT, LIKE MAYBE I THINK IT WAS EITHER

7   ONE OR TWO DAYS EARLIER I HAD HEARD ABOUT THE COMPLAINT.

8   Q    WHAT KIND OF COMPLAINTS WERE THEY?

9   A    THE OWNER -- THE APARTMENT COMPLEX I LIVE IN DOES NOT

10  HAVE AN ONSITE MANAGER OR OWNER ONSITE.  THEY LIVE UP IN THE

11  SACRAMENTO AREA.  THEY COME DOWN ONCE A WEEK, THE MANAGER

12  DOES, MONDAY MORNING BETWEEN 8:00 IN THE MORNING AND LIKE

13  NOON.  THAT'S THE ONLY TIME THEY'RE THERE.

14      SO MY MOM -- I TALKED TO MY MOM A FEW DAYS EARLIER,

15  AND SHE TOLD ME THAT THE OWNER HAD CALLED HER AND TOLD

16  HER --

17          MR. DEMERTZIS:  JUDGE, I'M GOING TO OBJECT AS

18  HEARSAY UNLESS THERE'S SOME OTHER REASON WE'RE HEARING ABOUT

19  IT.

20          MR. KURTZMAN:  HIS STATE OF MIND, YOUR HONOR.

21          MR. DEMERTZIS:  WHO'S STATE --

22          MR. KURTZMAN:  SHOULD WE APPROACH?

23          THE COURT:  YOU NEED TO, BECAUSE I'M NOT

24  UNDERSTANDING.

25          (DISCUSSION OFF THE RECORD.)

26          THE COURT:  I'M GOING TO OVERRULE THE OBJECTION AT

27  THIS TIME.

28  Q    (BY MR. KURTZMAN)  WHAT IS IT THAT THE APARTMENT

1   MANAGER TOLD YOUR MOTHER?

2   A    THAT HE HAD HAD TWO COMPLAINTS ABOUT -- RELATED TO

3   APARTMENT 7, WHICH IS MY APARTMENT.

4   Q    WHAT WAS THE NATURE OF THOSE COMPLAINTS?

5   A    THE FIRST ONE --

6        THE COURT:  BEFORE WE GO ANY FURTHER, I WANT TO

7   SAY FOR THE RECORD THAT I OVERRULED THE HEARSAY OBJECTION

8   BECAUSE I BELIEVE THAT IT'S NOT BEING -- THIS CONVERSATION

9   IS NOT BEING OFFERED FOR THE TRUTH BUT IT'S BEING OFFERED,

10  AS YOU SAID AT THE BENCH, TO SHOW STATE OF MIND OF THE

11  DEFENDANT.  TRUE?  IS THAT --

12       MR. KURTZMAN:  IF I COULD JUST EXPAND, YOUR HONOR.

13  IT'S NOT -- MY CLIENT IS TELLING THE TRUTH AS TO WHAT HE'S

14  SAYING.  IT'S THE TRUTH OF THE UNDERLYING FACTS OF THE

15  CONVERSATION IS WHAT WE'RE NOT OFFERING IT FOR.

16       THE COURT:  THIS IS A CONVERSATION -- IT STARTED

17  OFF WITH A CONVERSATION BETWEEN YOUR CLIENT AND MR. DAVIS?

18       MR. KURTZMAN:  CORRECT.

19       THE COURT:  IS IT THE CONVERSATION YOU WISH THE

20  JURY TO HEAR BETWEEN MR. DAVIS AND YOUR CLIENT, IS THAT WHAT

21  YOU WANT THEM TO HEAR, THE CONVERSATION THEY WERE HAVING?

22       MR. KURTZMAN:  WHAT MY CLIENT IS TALKING ABOUT IS

23  WHY HE WAS HAVING THE CONVERSATION WITH MR. DAVIS, THE

24  SOURCE OF HIS INFORMATION FOR HAVING THE CONVERSATION WITH

25  MR. DAVIS.

26       THE COURT:  WHAT IS IT YOU WANT THE JURY TO HEAR,

27  THE CONVERSATION THAT HE HAD WITH MR. DAVIS?  IS THAT

28  ULTIMATELY WHAT YOU WANT THEM TO HEAR?

1          MR. KURTZMAN:  YES, YOUR HONOR.

2          THE COURT:  THEN LET'S GO TO THAT CONVERSATION.

3     Q    (BY MR. KURTZMAN)  WHAT IS IT THAT YOU TOLD MR. DAVIS?

4     A    I TOLD MR. DAVIS THAT I'VE HAD A COUPLE OF COMPLAINTS,

5     AND THAT THE LAST COMPLAINT THAT I HAD WAS ABOUT A PERSON

6     THAT WAS FROM APARTMENT 7 THAT HAD BEEN SEEN URINATING

7     OUTSIDE THE APARTMENT AND ALSO VOMITING NEAR THE MAILBOXES

8     OF THE APARTMENTS AT APPROXIMATELY 10:00 ON A PREVIOUS

9     SUNDAY NIGHT.

10    Q    WAS THIS PERSON YOU?

11    A    THIS PERSON WAS MR. DAVIS.

12         MR. DEMERTZIS:  OBJECTION, SPECULATION.

13         THE COURT:  I'M TAKING THAT ANSWER TO MEAN THAT

14    YOU TOLD DAVIS THAT YOU THOUGHT THE REPORT WAS THAT HE WAS

15    URINATING IN FRONT OF THE APARTMENT.

16         THE WITNESS:  YES.

17         THE COURT:  YOU TOLD DAVIS -- THIS IS WHAT YOU

18    TOLD DAVIS?

19         THE WITNESS:  YEAH, I TOLD HIM THAT FOR A REASON,

20    IF YOU WANT ME TO EXPLAIN.

21         THE COURT:  I THINK I UNDERSTAND THE REASON.  YOU

22    HEARD REPORTS ABOUT THINGS, AND YOU WERE TALKING TO

23    MR. DAVIS ABOUT THESE REPORTS; IS THAT CORRECT?

24         THE WITNESS:  YES.

25         THE COURT:  AND YOU TOLD MR. DAVIS YOU HAD HEARD

26    THAT HE WAS URINATING IN FRONT OF THE APARTMENT; AM I

27    CORRECT?

28         THE WITNESS:  YES.

1        THE COURT:  SO IT WOULD NOT BE SPECULATION.  IT'S

2   JUST PART AND PARCEL OF THE CONVERSATION.

3        MR. DEMERTZIS:  THANK YOU FOR CLARIFYING THAT,

4   YOUR HONOR.

5        THE COURT:  GO AHEAD.

6   Q    (BY MR. KURTZMAN)  AFTER YOU TOLD MR. DAVIS ABOUT

7   THESE COMPLAINTS, WHAT HAPPENED NEXT?

8   A    WELL, HE TRIED TO DENY IT AND SAY THAT IT WASN'T HIM.

9   Q    AND WHAT HAPPENED AFTER THAT?

10  A    I -- I EXPLAINED TO HIM THAT THE REPORT WAS -- STEMMED

11  FROM SUNDAY NIGHT AT 10:00 AT NIGHT THE PREVIOUS SUNDAY, AND

12  THAT ON THAT SUNDAY NIGHT AT APPROXIMATELY 9:00 AT NIGHT WAS

13  ONE OF THE TIMES THAT I HAD ASKED HIM TO LEAVE THE HOUSE.

14  SO HE WAS OUTSIDE THE APARTMENT COMPLEX AFTER 9:00 AT NIGHT

15  ON SUNDAY NIGHT.  I DIDN'T SEE HIM DO THAT.

16       MR. DEMERTZIS:  JUDGE, I'M GOING TO OBJECT AS

17  NARRATIVE AND AT THIS POINT IRRELEVANT.  WE'RE NOT TALKING

18  ABOUT MR. CRAIG DAVIS.

19       THE COURT:  NO, BUT IT MAY BE RELEVANT, THE

20  CONVERSATION THEY HAD, BECAUSE IT LEADS UP TO THE ALLEGED

21  INCIDENT.  THAT'S WHY I FIND RELEVANCE HERE.  BUT I WANT TO

22  STICK WITH THE CONVERSATION ITSELF.  AND AGAIN, IF YOU COULD

23  KEEP IT QUESTION AND ANSWER, THAT'S THE WAY WE DO THINGS

24  HERE IN COURT.

25       MR. KURTZMAN:  YES, YOUR HONOR.

26  Q    (BY MR. KURTZMAN)  WAS THERE OTHER THINGS THAT YOU

27  TOLD CRAIG DAVIS, THAT CRAIG DAVIS TOLD YOU DURING THAT

28  CONVERSATION THAT LED UP TO THE INCIDENT THAT ULTIMATELY

1   WE'RE HERE FOR?

2   A     WELL, I -- WE TALKED ABOUT A NUMBER -- A COUPLE OF

3   THINGS.  WE TALKED ABOUT THE PARK, ABOUT WHAT HAPPENED AT

4   THE PARK EARLIER, ABOUT THE GIRLS.

5   Q     WHAT ABOUT WHAT HAPPENED AT THE PARK?

6   A     WELL, WHAT HAPPENED AT THE -- THOSE PEOPLE THAT WERE

7   SITTING OVER THERE, AND PARTICULARLY THE GIRLS, ARE PEOPLE

8   THAT I'VE KNOWN FOR APPROXIMATELY THREE YEARS, MR. DAVIS HAS

9   PROBABLY KNOWN FOR -- I KNOW HE'S KNOWN THEM FOR AT LEAST

10  SEVEN YEARS.  SO THEY ARE -- WE USED TO BE FRIENDS.  AND

11  THEY HAD THEIR LITTLE SPATS -- I MEAN MR. DAVIS AND THE

12  GIRLS.

13  Q     WHAT DID YOU AND MR. DAVIS TALK ABOUT ABOUT THE PARK?

14  A     OKAY.  WHEN I APPROACHED HIM, WHEN HE WAS 50 YARDS

15  AWAY AND I WENT OVER AND APPROACHED HIM, I'LL TELL YOU WHAT

16  WE TALKED ABOUT.

17  Q     IN YOUR APARTMENT, AFTER YOU CAME HOME, YOU AND

18  MR. DAVIS HAD A CONVERSATION ABOUT WHAT HAPPENED AT THE

19  PARK.  WHAT DID YOU TWO TALK ABOUT IN YOUR APARTMENT THAT

20  EVENING ABOUT THE PARK?

21  A     ONE OF THE THINGS I HAD MENTIONED TO HIM WAS THAT -- I

22  SAID WHY -- WHY DID YOU GO OVER THERE AND START BEING RUDE

23  AND VULGAR TO THOSE GIRLS WHEN JUST SECONDS 30 SECONDS PRIOR

24  TO THAT YOU AND I WERE WALKING UP TO THE TABLE, I TOLD YOU

25  DON'T GIVE THEM, YOU KNOW, A HARD TIME.  THAT WAS ONE OF THE

26  THINGS I DIDN'T UNDERSTAND, WHY HE TURNED AROUND AND DID

27  THAT AND GOT HIMSELF THROWN OFF THE TABLE.

28  Q     HOW DID HE REACT, TELLING HIM THIS?

```
 1   A    HE TRIED TO LIKE -- HE TRIED TO LIKE -- HE TRIED TO
 2   KIND OF DENY IT, MAKE IT LIKE IT WAS LESS, LIKE IT WASN'T A
 3   BIG DEAL, LIKE, YOU KNOW, OH THEY'RE JUST DEBBIE AND LINDA,
 4   THERE WAS NO BIG DEAL.
 5   Q    SO YOU TALKED ABOUT THE INCIDENT AT THE APARTMENT?
 6   A    RIGHT.
 7   Q    YOU TALKED ABOUT THE INCIDENT AT THE PARK?
 8   A    RIGHT.
 9   Q    WERE THERE OTHER TOPICS THAT YOU TALKED ABOUT THAT
10   CAUSED FRICTION BETWEEN THE TWO OF YOU THAT EVENING?
11   A    THERE -- ALONG WITH THE TALKING ABOUT THE -- OKAY,
12   YES, WELL, FRICTION, YES.
13   Q    WHO WAS THAT?
14   A    THAT WAS THE FACT THAT AT THAT POINT IN TIME HE WAS IN
15   THE APARTMENT, HE WAS EXTREMELY INTOXICATED, AND I REMINDED
16   HIM OF THE FACT THAT THE COMPLAINTS -- AND I TOLD HIM,
17   CRAIG, YOU CANNOT SPEND THE NIGHT HERE TONIGHT.  I SAID,
18   "SORRY, I KNOW YOU HAVE NO PLACE TO GO, BUT YOU'VE BEEN HERE
19   THREE MONTHS.  YOU HAVE TO LEAVE."
20   Q    HOW DID HE REACT TO THAT?
21   A    WELL, HE -- HE -- HE WASN'T REALLY ANGRY.  I COULD
22   TELL HE WAS PROBABLY -- PROBABLY UPSET HIM A LITTLE BIT.  HE
23   WASN'T YELLING, THOUGH OR, YOU KNOW, MAD OR SWINGING AT ME
24   OR ANYTHING.
25   Q    WHERE WERE YOU STANDING WHEN THIS CONVERSATION WAS
26   HAPPENING?
27   A    IN THE KITCHEN AREA, BORDERLINE KITCHEN AREA, LIVING
28   ROOM AREA.
```

1    Q    HOW BIG IS THE KITCHEN AREA?

2    A    FROM THE STOVE TO THE KITCHEN COUNTER IS ABOUT THIS

3    WIDE (INDICATING).

4    Q    AND YOU'RE GESTURING THE WIDTH OF THE PODIUM YOU'RE --

5    A    RIGHT, THAT'S THE SIZE OF THE FLOOR.

6    Q    -- SITTING AT.

7         ONLY ONE OF US CAN TALK AT A TIME.

8    A    I'M SORRY.

9    Q    AFTER THIS CONVERSATION -- THESE SERIES OF

10   CONVERSATIONS WHAT HAPPENED BETWEEN YOU AND MR. DAVIS?

11   A    WELL, AFTER ABOUT, I'D SAY A HALF AN HOUR TO

12   FORTY-FIVE MINUTES, THE BOTTLE WAS GONE.  I TOLD CRAIG -- I

13   SAID, "OKAY, CRAIG, LOOK, THE BOTTLE IS GONE.  YOU HAVE TO

14   LEAVE NOW."

15   Q    AND WHAT DID MR. DAVIS DO?

16   A    HE KIND OF LOOKED AT ME A LITTLE BIT SURPRISED, LIKE I

17   REALLY WASN'T GOING TO MAKE HIM LEAVE.

18   Q    WHAT HAPPENED NEXT?

19   A    I SAID, "LOOK, CRAIG," I SAID -- BEFORE I SAID, "I'M

20   SORRY, CRAIG, BUT YOU HAVE TO GO."  I SAID, "I KNOW YOU

21   DON'T HAVE ANYPLACE TO GO, BUT I CAN'T HAVE ANOTHER INCIDENT

22   LIKE THIS HAPPEN, YOU KNOW, OTHERWISE I'M GOING TO GET

23   KICKED OUT OF HERE."  SO I ASKED HIM TO LEAVE.

24   Q    AND WHAT DID MR. DAVIS DO?

25   A    AT THAT POINT HE SAID HE WAS GOING TO JUST WALK OUT

26   AND LEAVE, AND HE SAID SOMETHING TO THE EFFECT OF, OH, I'VE

27   GOT TO GET MY PAPERS.  I HAVE MY PAPERS OVER THERE.

28   Q    AND WHAT DID YOU DO?

1    A    HE WAS POINTING TOWARDS A CLOSET THAT'S IN THE KITCHEN

2    AREA.  AND I SAID -- I DIDN'T KNOW WHAT KIND OF PAPERS HE

3    WAS TALKING, ABOUT SO I SAID "JUST A MINUTE, I'LL GET YOUR

4    PAPERS."  I OPENED THE CLOSET, I LOOKED THROUGH THE CLOSET.

5    I DIDN'T FIND ANY PAPERS.

6    Q    WHAT HAPPENED NEXT?

7    A    I CLOSED THE CLOSET DOOR, AND I WALKED BACK AND I

8    SAID, "I CAN'T FIND YOUR PAPERS.  IF YOU COME BACK TOMORROW,

9    I'LL GIVE YOU YOUR PAPERS.  I'M NOT GOING TO STEAL YOUR

10    PAPERS.  JUST GRAB YOUR BACKPACK AND LEAVE."

11    Q    WHAT DID MR. DAVIS DO?

12    A    HE GRABBED HIS BACKPACK AND HE LEFT.  HE WALKED OUT

13    THE DOOR.

14    Q    WHAT DID YOU DO?

15    A    I WALKED BACK IN THE KITCHEN AND WENT TO THE

16    REFRIGERATOR.  I GRABBED SOMETHING OUT OF THE FRIDGE.  I

17    DON'T RECALL WHAT.  I THINK I GRABBED SOME JUICE.

18    Q    AND WHAT DID YOU DO THEN?

19    A    NEXT I -- I WAS IN THE KITCHEN FOR JUST A COUPLE OF

20    MINUTES.  I MAY HAVE GONE TO THE BATHROOM, AND THEN AFTER

21    THAT I WENT -- THE KITCHEN AND LIVING ROOM ARE CONNECTED,

22    AND THERE'S A CHAIR THAT I NORMALLY SIT IN IN THE LIVING

23    ROOM.  AND I SAT DOWN THERE IN THE CHAIR, LISTENED TO SOME

24    MUSIC, DRANK A LITTLE BIT OF THAT JUICE.  THAT WHOLE THING,

25    PROBABLY THE WHOLE TIMELINE THERE WAS PROBABLY ABOUT MAYBE

26    TEN MINUTES.

27    Q    AND AFTER THAT TEN MINUTES HAD PASSED, WHAT HAPPENED?

28    A    AFTER THAT TEN MINUTES HAD PASSED -- OKAY, I'M GOING

300

1    TO TELL YOU WHAT I DID.  IT WAS LIKE -- I'M GOING TO HAVE TO

2    KIND OF SET IT UP, BUT I WON'T DO THAT, I'LL JUST TELL YOU

3    WHAT I DID.  I GOT UP TO GO OUTSIDE TO LOOK TO SEE IF CRAIG

4    DAVIS WAS PASSED OUT ON THE OTHER SIDE OF MY APARTMENT

5    BUILDING ON THE STREET SIDE.

6    Q    WHY DID YOU GO DO THAT?

7    A    I DID THAT BECAUSE ON TWO OR THREE OCCASIONS PRIOR TO

8    THAT THAT'S WHAT HE HAS DONE IN BROAD DAYLIGHT.  HE'S WALKED

9    OVER THERE AND JUST PASSED OUT RIGHT ON THE PARKWAY GRASS

10   ALONG THE SIDEWALK ON THE STREET CALLED CALIENTE.

11   Q    AND WHAT HAPPENED WHEN YOU WENT OUTSIDE TO LOOK FOR

12   MR. DAVIS?

13   A    I WALKED OUT THE DOOR, EXPECTING HIM TO BE ON THE

14   OTHER SIDE OF THE BUILDING, WHICH IS WHERE THE STREET WAS.

15   AND AS SOON AS I WALKED OUT -- I OPENED THE DOOR TO WALK

16   OUT, I GLANCED TO MY RIGHT, WHICH IS THE DIRECTION I WAS

17   GOING TO GO, AND HE WAS PASSED OUT ON THE GROUND, ON THE

18   CEMENT, ON HIS BACK, WITH HIS BACKPACK UP UNDER HIS HEAD,

19   HIS ARMS LIKE THIS (INDICATING).  AND HE WAS APPROXIMATELY

20   FROM MY DOOR MAYBE TO WHERE THE STENOGRAPHER IS, MAYBE EVEN

21   ABOUT A FOOT CLOSER THAN THAT.

22        MR. KURTZMAN:  FOR THE RECORD, TWO THINGS:  WHEN

23   MR. HANCOCK GESTURED "LIKE THIS," HE SPLAYED HIS ARMS OUT AT

24   ABOUT SHOULDER HEIGHT, SPREAD WIDE.  AND THE DISTANCE

25   BETWEEN MR. HANCOCK AND THE STENOGRAPHER IS ABOUT FOUR FEET.

26        THE COURT:  THE RECORD WILL REFLECT BOTH.

27        MR. KURTZMAN:  THANK YOU.

28   Q    (BY MR. KURTZMAN)  AND SO YOU SAW MR. DAVIS LAYING ON

```
 1    THE CEMENT?

 2    A    YES.

 3    Q    AND WAS HE AWAKE?  WAS HE ASLEEP?  WHAT WAS HIS

 4    CONDITION?

 5    A    HE WAS ASLEEP.

 6    Q    AND WHAT DID YOU DO?

 7    A    I -- I WALKED OVER TO HIM.  AND I SAID, "COME ON,

 8    CRAIG, WAKE UP, YOU CAN'T STAY HERE.  YOU GOT TO GET UP."

 9    Q    WHAT DID MR. DAVIS DO?

10    A    HE DIDN'T MOVE.  HE WAS OUT.

11    Q    WHAT WAS YOUR REACTION TO THAT?

12    A    I RAISED MY VOICE A LITTLE BIT LOUDER, TOLD HIM, "HEY,

13    SOME ON, CRAIG, GET UP, YOU CAN'T SLEEP HERE."

14    Q    WHAT DID MR. DAVIS DO?

15    A    NOTHING.  DIDN'T MOVE.

16    Q    WHAT DID YOU DO?

17    A    I REACHED DOWN AND I GRABBED HIS ARM, AND I BELIEVE --

18    WOULD HAVE BEEN HIS LEFT ARM.  GRABBED HIS LEFT ARM AND

19    STARTED TO SHAKE HIM A LITTLE BIT AND SAYING, "COME ON,

20    CRAIG, WAKE UP, WAKE UP, WAKE UP."

21    Q    WHAT DID MR. DAVIS DO?

22    A    NO RESPONSE.

23    Q    WHAT DID YOU DO NEXT?

24    A    NEXT AFTER SHAKING HIM A FEW TIMES, "A FEW" MEANING, I

25    DON'T KNOW, PROBABLY THREE OR FOUR TIMES JUST SHAKING HIM,

26    AND I SLAPPED HIM, NOT -- I DIDN'T SLAP HIM HARD.  I SLAPPED

27    HIM LIGHTLY ON HIS FACE.  I WASN'T TRYING TO HURT HIM.

28    Q    WHAT MR. DAVIS DO?
```

1    A    NOTHING.  IT WAS LIKE HE WAS DEAD.

2    Q    WHAT DID YOU DO NEXT?

3    A    I SLAPPED HIM -- I CONTINUED TO SLAP HIM A LITTLE BIT

4    HARDER, A LITTLE BIT HARDER, NOT AS HARD AS I CAN OR

5    ANYTHING LIKE THAT, BUT I CONTINUED TO SLAP HIM, AT THE SAME

6    TIME SAYING "WAKE UP, WAKE UP, COME ON, CRAIG, WAKE UP WAKE

7    UP."

8    Q    WHAT DID MR. DAVIS DO?

9    A    HE DIDN'T WAKE UP.

10    Q    WHAT DID YOU DO NEXT?

11    A    I CONTINUED TO DO THAT.  AND I INCREASED HOW HARD I

12    WAS SLAPPING HIM.  I PROBABLY DID THAT -- WHOLE SCENE FROM

13    START TO FINISH PROBABLY WAS MAYBE THREE MINUTES.

14    Q    DID MR. DAVIS ULTIMATELY WAKE UP, OR DID HE CONTINUE

15    TO SLEEP?

16    A    NO, HE WOKE UP.

17    Q    WHAT HAPPENED AFTER HE WOKE UP?

18    A    HE WOKE UP, AND HE WAS GROGGY, AND I ASSISTED HIM TO

19    HIS FEET.  AND WALKED HIM INTO MY APARTMENT.

20    Q    AND WHEN YOU WALKED HIM INTO YOUR APARTMENT, WHAT

21    HAPPENED?

22    A    WELL, I WALKED HIM INTO THE APARTMENT.  AS SOON AS YOU

23    WALK IN, YOU'RE IN THE LIVING ROOM AREA.  I WALKED HIM IN

24    PROBABLY ABOUT FOUR OR FIVE FEET FROM THE FRONT DOOR INSIDE

25    THE APARTMENT.

26    Q    AND WHAT HAPPENED AFTER HE WAS FOUR OR FIVE FEET INTO

27    THE APARTMENT?

28    A    I TOLD -- I -- OKAY, I LOOKED AT HIS FACE, AND HE HAD

1    A LITTLE -- A SMALL TRICKLE OF BLOOD ON HIS FACE.  HIS FACE

2    WAS A LITTLE BIT RED BUT WE HAD BEEN -- THE LAST THREE DAYS

3    WE HAD BEEN OUTSIDE AND AT THE PARK FOR, YOU KNOW, FOR

4    PROBABLY -- I DON'T KNOW, I'M JUST GOING TO SAY THREE OR

5    FOUR HOURS OF THE DAY IN THE SUN.  AND MY FACE WAS RED AS

6    WELL.  BUT I UNDERSTAND HIS FACE WAS PROBABLY ALSO RED FROM

7    ME SLAPPING HIM.

8    Q    AND WHAT DID HE DO ABOUT THE TRICKLE OF BLOOD?

9    A    I -- WELL, HE DIDN'T DO ANYTHING.  HE WAS -- HE WAS

10   STANDING THERE, HE WAS CONSCIOUS, BUT HE WAS LIKE -- I DON'T

11   KNOW, HE WAS -- HE WASN'T SAYING ANYTHING.  I WAS SAYING,

12   "COME ON, CRAIG, YOU KNOW, YOU GOT TO GET CLEANED UP AT

13   LEAST."

14   Q    WHAT DID YOU DO?

15   A    OKAY, I WENT IN THE BEDROOM AND I GRABBED A TOWEL, I

16   GRABBED A COUPLE OF RAGS.  ONE, I BELIEVE, WAS A TOWEL AND

17   ANOTHER ONE WAS A PAIR OF UNDERWEAR.  MIGHT SOUND FUNNY.  IT

18   WAS A CLEAN PAIR OF UNDERWEAR OUT OF THE UNDERWEAR DRAWER,

19   AND I GAVE THOSE TO HIM TO WIPE HIS FACE OFF.

20   Q    WHAT HAPPENED AFTER HE WIPED HIS FACE OFF?

21   A    AS HE WAS DOING THAT I WAS TELLING HIM, "LOOK, CRAIG,

22   WHY DON'T YOU GET THE SHOWER.  I'LL GIVE YOU SOME CLEAN

23   CLOTHES, YOU KNOW, TO PUT ON."

24        AND THE REASON I SAID THAT IS BECAUSE OFTENTIMES HE

25   MIGHT GO A FEW DAYS WITHOUT CHANGING HIS CLOTHES.  AND I HAD

26   A LOT OF CLEAN CLOTHES IN MY HOUSE, AND SO I DIDN'T MIND,

27   GIVE HIM A SHIRT OR PAIR OF UNDERWEAR OR PAIR OF PANTS.

28   Q    DID MR. DAVIS GET INTO THE SHOWER?

1   A    RIGHT ON THE BORDER OF WHERE THE LINOLEUM -- WHERE THE

2   KITCHEN AND THE LIVING ROOM BORDER EACH OTHER.  THE LIVING

3   ROOM IS CARPETED AND THE KITCHEN HAS LINOLEUM, AND IT WAS

4   BASICALLY RIGHT NEAR THAT BORDERLINE THERE.

5   Q    AND WHAT DID MR. DAVIS DO NEXT?

6   A    NOTHING.

7   Q    WHAT DID YOU DO?

8   A    I REPEATED MYSELF PROBABLY -- I DON'T KNOW,

9   PROBABLY -- PROBABLY FIVE OR SIX TIMES I REPEATED MYSELF.

10  Q    DID MR. DAVIS REACT AT ALL TO WHAT YOU WERE TELLING

11  HIM?

12  A    NO, HE ALMOST ACTED LIKE HE DIDN'T HEAR ME.

13  Q    AND WHAT DID YOU DO?

14  A    I JUST RAISED -- I RAISED MY VOICE A NUMBER OF TIMES

15  AND BASICALLY REPEATED THE SAME THING, "YOU HAVE TO GET OUT

16  OF HERE, YOU HAVE TO LEAVE.  YOU CAN'T STAY HERE."

17  Q    AT ANY POINT DID MR. DAVIS REACT TO WHAT YOU WERE

18  DOING OR SAYING?

19  A    WELL, I MEAN HE MOVED A LITTLE BIT BUT HE COULDN'T --

20  HE WASN'T -- WE WEREN'T HAVING A CONVERSATION.

21  Q    WHAT DID YOU DO ABOUT THAT?

22  A    OKAY, WELL, I TRIED TO -- I TRIED TO PUT MY -- WELL, I

23  PUT MY ARM ON HIS BACK AND KIND OF LIKE LEAD HIM TOWARDS THE

24  DOOR, BUT HE STILL WOULDN'T MOVE.  I PUT MY ARM ON HIS BACK.

25  HE STILL WASN'T MOVING, HE WAS JUST STANDING THERE LIKE, I

26  DON'T KNOW, LIKE A STATUE.

27  Q    AND WHAT HAPPENED NEXT?

28  A    OKAY, NEXT -- OKAY, THEN NEXT I GRABBED -- I HAD A

1  HOLD OF ONE OF HIS -- I GRABBED ONE OF HIS ARMS.  I PUT MY

2  LEFT HAND ON HIS LOWER BACK -- IT WAS HIGHER -- HIS LOWER

3  BACK OR HIS ARM -- HIS ARM WAS AT HIS SIDE.  MY RIGHT HAND

4  WAS ON HIS RIGHT SHOULDER.

5  Q    AND WHAT HAPPENED NEXT?

6  A    I WAS STILL REPEATING MYSELF, TRYING TO GET HIM TO

7  GO -- THE DOOR WAS THAT WAY, AND WE WERE HERE, AND I WAS

8  TRYING TO GET HIM TO GO TO THE LEFT TOWARDS THE DOOR.

9        MR. KURTZMAN:  AND FOR THE RECORD MR. HANCOCK HAS

10  GESTURED TO HIS LEFT AND HAS MADE MOVEMENT, PIVOTING HIS

11  BODY, WITH HIS RIGHT HAND RAISED TO A LITTLE ABOVE SHOULDER

12  LENGTH, AND HIS LEFT HAND IN CUPPED FASHION AS HE'S SEATED,

13  ABOUT CHEST LEVEL, GESTURING IN A WAY TO TRY AND TURN

14  SOMEBODY TO THEIR LEFT.

15        THE COURT:  IS THAT WHAT YOU DID?

16        THE WITNESS:  YEAH.

17        THE COURT:  PROCEED.

18  Q    (BY MR. KURTZMAN)  AND WHAT HAPPENED AFTER YOU STARTED

19  TO TRY AND GUIDE HIM TOWARD THE DOOR?

20  A    OKAY.  HE WAS -- HE STILL WASN'T MOVING.  IT WAS

21  ALMOST LIKE HE WASN'T GOING TO MOVE.  OVER THE COURSE OF

22  PROBABLY THE NEXT THREE OR FOUR MINUTES -- I DIDN'T STAND

23  RIGHT THERE WITH HIM THE WHOLE TIME.

24        I STEPPED BACK AWAY FROM HIM, WALKED INTO THE KITCHEN,

25  GOT SOMETHING TO DRINK OUT OF THE REFRIGERATOR, AND I WAS

26  TALKING TO HIM, NOT EVERY -- ALMOST THE WHOLE TIME I WAS

27  TALKING TO HIM, SAYING, "CRAIG, YOU CAN'T DO THIS.  YOU GOT

28  TO GO.  YOU HAVE TO LEAVE."

1      I THEN WALKED BACK UP TO HIM AND SAY, "COME ON," PUT

2  MY ARM AROUND HIS SHOULDER, "COME ON, LET'S GO," AND ONCE

3  AGAIN HE'S NOT GOING.

4  Q    DID HE EVER RESPOND TO THOSE VERBAL OR PHYSICAL

5  COMMANDS?

6  A     HE MUMBLED -- HE MUMBLED SOMETHING ONCE OR TWICE.  IT

7  WAS -- YOU KNOW, I DIDN'T EVEN UNDERSTAND -- I MEAN I DON'T

8  RECALL EVEN WHAT IT WAS THAT HE SAID.

9  Q     AND WHAT DID YOU DO NEXT?

10  A     WELL, THAT -- THAT -- THAT -- OKAY.  ON EITHER THE

11  SECOND OR THIRD TIME THAT I WALKED UP TO HIM AND GRABBED HIM

12  LIKE THAT, I TRIED TO GET HIM TO GO, I WAS KIND OF -- YOU

13  KNOW, I WASN'T PUSHING HIM HARD, BUT I WAS TRYING TO LEAD

14  HIM TOWARD THE DOOR, AND HE JERKED AWAY FROM ME.  HE JERKED

15  AWAY FROM ME ACTUALLY A COUPLE OF TIMES.

16      BUT HE JUST JERKED AWAY AND JUST -- HE DIDN'T -- HE

17  DIDN'T -- HE DIDN'T GO ANYWHERE, HE JERKED AWAY, AND THEN HE

18  STILL STOOD THERE LIKE HE WASN'T GOING TO MOVE OR THAT WAS

19  HIS SPOT OR SOMETHING.  I DON'T KNOW.

20  Q    AT SOME POINT DID THIS DYNAMIC OF YOU TRYING TO GET

21  HIM TO LEAVE AND HIM REFUSING TO MOVE, DID ANYTHING CHANGE

22  IN THAT DYNAMIC?

23  A     WELL, ME.  MAYBE I MAY HAVE TRIED TO -- TRIED A LITTLE

24  HARDER TO GET HIM TO MOVE, AS FAR AS GRABBING HIM WITH MY

25  HANDS.  I MEAN I DIDN'T HIT HIM WITH ANYTHING OR SOCK HIM OR

26  ANYTHING LIKE THAT.  NO.  I JUST -- THE ONLY DYNAMIC WAS,

27  THE CHANGE MAYBE WAS ME TRYING A LITTLE BIT HARDER TO GET

28  HIM TO GO TO THE DOOR.

1    Q    HOW LONG DID YOU TRY AND GET HIM TO GO TO THE DOOR?

2    A    PROBABLY -- THAT WHOLE THING PROBABLY TOOK BETWEEN

3    FIVE AND TEN MINUTES.

4    Q    AND YOU EVENTUALLY STOPPED TRYING TO GET HIM TO GO TO

5    THE DOOR?

6    A    NO.  I -- WELL, I TRIED FOR A MINUTE OR SO AND THEN

7    STOPPED FOR A MINUTE OR TWO AND JUST RECEDED FIVE OR SIX

8    FEET BACK INTO THE KITCHEN.  I DIDN'T STOP TALKING TO HIM.

9    I WAS STILL SAYING, "COME ON, CRAIG, DON'T MAKE ME GO

10   THROUGH THIS AGAIN."

11   Q    DID MR. DAVIS EVENTUALLY LEAVE YOUR APARTMENT?

12   A    NO.

13   Q    WHY NOT?

14   A    BECAUSE ONE OF THE TIMES WHEN I WAS TRYING TO GRAB HIM

15   TO GET HIM TO GO -- AND NOW AT THIS POINT I'M USING MORE

16   FORCE, TRYING TO GET HIM TO GO, HE TURNED.  HE TURNED

17   QUICKLY, OKAY, AND I WASN'T EXPECTING IT, AND WHEN HE TURNED

18   QUICKLY, I GOT HIT RIGHT HERE ON THE LEFT-HAND SIDE OF MY

19   FACE.

20   Q    AND YOU SAY, "I GOT HIT."  DID YOU FALL INTO

21   SOMETHING?  WHAT HAPPENED?

22   A    YES.  WHEN I GOT HIT, I GOT HIT ESPECIALLY HARD.  I

23   FELT -- LIKE I SAID, THE DISTANCE OF THE KITCHEN WAS ABOUT

24   THIS WIDE.  I FELL BACK TO THE COUNTER, WHICH WAS ONLY THIS

25   FAR, A FOOT BEHIND ME, PUT MY HAND ON THE COUNTER TO BRACE

26   MYSELF.

27   Q    YOU SAID YOU GOT HIT.  DID YOU HIT YOUR HEAD ON THE

28   WALL?  WHEN YOU SAID YOU GOT HIT, FOR THE RECORD YOU

1    GESTURED TOWARD THE LEFT SIDE OF YOUR FACE.  DID YOU GET HIT

2    ON THE WALL?  WHAT HIT YOU?

3    A     I BELIEVE IT WAS A PAN OFF THE STOVE.

4    Q     AND HOW IS IT THAT YOU HIT A PAN OFF THE STOVE WITH

5    YOUR FACE?

6    A     MR. DAVIS HIT ME WITH IT.

7    Q     OKAY.  SO YOU WERE TRYING TO GUIDE MR. DAVIS OUT OF

8    THE APARTMENT, AND MR. DAVIS HIT YOU WITH A PAN OFF THE

9    STOVE?

10   A     YES.

11   Q     HOW IS IT THAT HE HIT YOU WITH A PAN OFF THE STOVE?

12   HOW DID HE GET THE PAN?

13   A     OKAY, HE HAD HIS -- WE WERE BOTH IN THE KITCHEN, IN

14   THE BORDERLINE KITCHEN AREA AND THE LIVING ROOM AREA.  RIGHT

15   THERE IN THE BORDERLINE -- I THINK THERE'S A PICTURE OVER

16   THERE.

17        BUT ON THE SIDE -- HE HAD HIS BACK TO ME, AND THE

18   STOVE WAS RIGHT -- WAS RIGHT IN FRONT OF HIM.  THE

19   COUNTERTOP WHERE THE KITCHEN -- WHERE THE UTENSILS AND ALL

20   THAT STUFF ARE WAS RIGHT BEHIND ME IN AN AREA -- WE WERE

21   BOTH IN AN AREA THIS NARROW.

22   Q     SO AS YOU WERE STANDING IN THE KITCHEN, HOW FAR WAS

23   MR. DAVIS FROM THE STOVE?

24   A     ONE FOOT.

25   Q     WAS THERE ANYTHING ON THE STOVE?

26   A     YES, THERE WAS.

27   Q     WHAT WAS ON THE STOVE?

28   A     THERE WAS A -- A COUPLE OF FRYING PANS AND, I BELIEVE,

1    A  POT.

2    Q     AND IS THAT WHERE YOU BELIEVE MR. DAVIS GOT THE FRYING

3    PAN FROM?

4    A     YES.

5    Q     SO MR. DAVIS SPUN AND HIT YOU IN THE FACE WITH THE

6    FRYING PAN.  WHAT HAPPENED NEXT?

7    A     I FELL BACK MAYBE A FOOT AND CAUGHT MY BALANCE WITH MY

8    HAND, MY LEFT HAND ON THE KITCHEN COUNTER, RIGHT NEAR THE

9    SINK.

10   Q     AND WHAT HAPPENED AFTER YOU PUT YOUR HAND ON THE

11   KITCHEN COUNTER?

12   A     I LANDED THIS WAY, AND THERE WAS A KNIFE ABOUT MAYBE

13   SIX INCHES FROM MY HAND, SIX INCHES OR CLOSER.  IT WAS CLOSE

14   TO MY HAND.

15   Q     AND FOR THE RECORD YOU LEANED BACK AND REACHED BACK

16   WITH YOUR LEFT ARM WHEN YOU SAID "LIKE THIS"; CORRECT?

17   A     CATCHING MY BALANCE, YEAH.

18   Q     WHAT HAPPENED NEXT?

19   A     I GRABBED THE KNIFE AND I LASHED OUT WITH IT.

20   Q     AND WHAT DO YOU MEAN BY "I LASHED OUT"?  WHAT DID YOU

21   DO WITH IT?

22   A     I WENT LIKE THIS (INDICATING).  I GRABBED THE KNIFE

23   AND I WENT LIKE THAT.

24   Q     AND YOU'RE GESTURING THAT YOU REACHED BACK WITH YOUR

25   LEFT HAND, CLOSED YOUR LEFT HAND LIKE YOU WERE STABBING AN

26   OBJECT, AND THEN MOVED YOUR BODY SO YOUR LEFT HAND CAME

27   FORWARD IN FRONT OF YOUR BODY?

28   A     RIGHT.

1    Q    AND WHAT HAPPENED WITH THE KNIFE?

2    A    WELL, I PULLED IT OUT REAL QUICK, AND MR. DAVIS

3    SAID -- HE MADE A COMMENT LIKE -- LIKE -- LIKE "OOH, WHAT

4    WAS THAT" OR --.

5    Q    WHAT DID YOU PULL THE KNIFE OUT OF?

6    A    OUT OF HIM.

7    Q    SO WHEN YOU LASHED OUT WITH THE KNIFE, DID IT GO INTO

8    MR. DAVIS?

9    A    YES, IT DID.

10    Q    AND THEN MR. DAVIS MADE A COMMENT?

11    A    YEAH.  HE REACHED BACK WITH HIS HAND AND HE SAID -- HE

12    SAID SOMETHING LIKE -- ONCE AGAIN, IT WASN'T VERY AUDIBLE.

13    HE SAID SOMETHING LIKE, "OH, WHAT WAS THAT," OR -- AND

14    RUBBED IT WITH HIS HAND.

15    Q    WHAT HAPPENED NEXT?

16    A    NEXT I -- I -- I TURNED THE WATER -- I -- OKAY, I

17    TURNED THE WATER ON IN THE SINK.  I RINSED AND WASHED THE

18    KNIFE OFF, I PUT THE KNIFE INSIDE -- I HAVE A BUCKET IN THE

19    SINK WHERE THE DIRTY DISHES GO -- AND THREW THE KNIFE IN

20    THERE.  TURNED THE WATER OFF.

21         I LOOKED -- LOOK AT CRAIG, AND HE WAS ONCE AGAIN JUST

22    STANDING THE SAME WAY HE HAD BEEN STANDING THE LAST FIVE OR

23    TEN MINUTES, AND I GRABBED A COUPLE OF PAPER TOWELS, I

24    WADDED THEM UP, I WALKED OVER AND I SAID, "COME ON."  I

25    SAID, "ARE YOU GOING TO LEAVE NOW, CRAIG?"

26    Q    WHAT HAPPENED NEXT?

27    A    THAT'S WHAT I SAID.  I PLACED THE PAPER TOWELS ON THE

28    -- I COULD SEE A LITTLE BIT OF BLOOD RIGHT HERE.  I MEAN IT

1    WAS A SMALL AMOUNT.  I KNOW I SAW THE PICTURES THERE, BUT IT

2    WAS NOTHING LIKE THAT.  IT WAS A SMALL AMOUNT.  AND I PUT

3    THE PAPER TOWELS ON IT AND WITH MY ARM ON HIS SHOULDER AND

4    APPLYING DIRECT PRESSURE TO STOP THE BLEEDING.

5    Q    YOU'VE INDICATED YOUR LEFT SIDE, BASICALLY JUST AROUND

6    NIPPLE HEIGHT ON THE LEFT SIDE TOWARDS THE BACK.

7    A    YES, IT WAS LIKE RIGHT AROUND HERE.  I KNOW IT SAYS

8    "BACK" ON THERE, BUT IT WAS LIKE -- MAYBE IT WAS -- I DON'T

9    KNOW HOW YOU CONSIDER "BACK."  IT WAS LIKE ON THE SIDE IN

10   THE BACK AREA.

11   Q    AND WHAT HAPPENED AFTER YOU STARTED PUTTING THE DIRECT

12   PRESSURE ON THE CUT?

13   A    NOTHING.  I JUST -- HE MAY HAVE MUMBLED A COUPLE OF

14   THINGS, BUT WE WEREN'T STANDING THERE LIKE HAVING A

15   CONVERSATION.  I WAS JUST HOLDING THE PAPER TOWEL WITH HIM

16   THERE, AND THEN I SAID, "HERE, HOLD THIS" -- I SAID, "HERE,

17   HOLD THIS ON THERE" AND APPLIED DIRECT PRESSURE AND TRIED TO

18   GET HIM TO HOLD IT THERE, RIGHT, AND HE DID HOLD IT THERE.

19   AND I SAYS, "JUST A SECOND, I'LL BE RIGHT BACK," AND I

20   WALKED FROM THE LIVING ROOM INTO MY BATHROOM.

21   Q    AND WHAT HAPPENED AFTER YOU WALKED INTO YOUR BATHROOM?

22   A    I WENT INTO MY BATHROOM AND I OPENED THE MEDICINE

23   CABINET, BECAUSE I THOUGHT IT MIGHT HAVE HAD SOME BAND-AIDS

24   IN THERE, BECAUSE THAT'S WHAT I THOUGHT WOULD HELP STOP THE

25   BLEEDING, WAS THE BAND-AID, AND I OPENED THE CABINET, AND I

26   DIDN'T HAVE ANY BAND-AIDS.

27   Q    WHAT HAPPENED NEXT?

28   A    NEXT AFTER THAT I -- OKAY, AFTER THAT I CAME BACK OUT,

1  BUT I MAY HAVE GRABBED A TOWEL ON THE WAY OUT.  I HAVE MY

2  TOWEL IN MY BEDROOM, WHICH IS ON THE WAY OUT.  IT'S ALL A

3  MATTER OF FIFTEEN OR TWENTY FEET FROM THE BATHROOM TO WHERE

4  THEY WERE STANDING.

5  Q    WHAT HAPPENED WHEN YOU WENT OUT?

6  A    I WENT OUT AND I GOT SOME MORE PAPER TOWELS.  I

7  GRABBED SOME TOILET PAPER FROM THE BATHROOM, AND I BROUGHT

8  THAT OUT AND GAVE A WAD OF THAT TO HIM TO REPLACE THE PAPER

9  TOWELS HE ALREADY HAD ON THERE.  AND I TOOK AND I THREW THE

10 PAPER TOWELS AWAY AND -- OKAY.

11 Q    WHAT HAPPENED AFTER YOU THREW THE PAPER TOWEL AWAY?

12 A    AFTER I THREW THE PAPER TOWELS AWAY, I WAS ONCE AGAIN

13 STANDING OVER THERE RIGHT NEXT TO CRAIG, AND HE HAD THE

14 TOILET PAPER ON THERE, AND IT WAS STARTING TO GET -- WHAT DO

15 YOU WANT TO CALL IT, SATURATED.  AND SO I HAD TO GRAB

16 SOMETHING ELSE.  I DIDN'T HAVE ANY MORE TOILET PAPER, SO I

17 WENT INTO THE KITCHEN, PROBABLY FROM HERE TO THE JUDGE,

18 WHATEVER THAT IS, TEN FEET OR --

19        THE COURT:  ABOUT TEN FEET.

20        THE WITNESS:  AND THERE WAS A CABINET THERE, AND I

21 OPENED IT UP AND, THERE WAS SOME PAPER TOWELS THERE, AND I

22 GRABBED SOME AND BROUGHT THEM OUT AND PUT THEM BACK ON THERE

23 ONCE AGAIN.

24 Q    (BY MR. KURTZMAN)   AND WHAT HAPPENED AFTER YOU

25 APPLIED SOME MORE DIRECT PRESSURE TO MR. DAVIS?

26 A    ABOUT -- PROBABLY AFTER ABOUT, I'LL SAY BETWEEN FIVE

27 AND TEN MINUTES SINCE THE INCIDENT HAPPENED, ABOUT FIVE TO

28 TEN MINUTES LATER THERE WAS A KNOCK ON THE DOOR.

1  A    NO.

2  Q    WERE YOU ABLE TO HEAR WHAT WAS GOING ON IN THE FRONT

3  ROOM WHILE YOU WERE IN YOUR ROOM?

4  A    NOT -- NOT REALLY, NO.  THE DOOR WAS CLOSED.

5  Q    SO YOU CLOSED THE DOOR BEHIND YOU WHEN YOU WENT INTO

6  YOUR ROOM?

7  A    YES.

8  Q    AND YOU WERE IN THERE FOR ABOUT TEN MINUTES AND THEN

9  WHAT HAPPENED?

10  A    AND THEN -- AND THEN I WENT TO -- OKAY, AND THEN WHAT

11  HAPPENED.  I JUST WENT TO STEP OUTSIDE AND GO BACK INTO THE

12  LIVING ROOM.

13  Q    AND WHAT HAPPENED WHEN YOU TRIED TO GO BACK INTO THE

14  LIVING ROOM?

15  A    I OPENED THE DOOR AND THE DOOR OPENED ABOUT -- I

16  OPENED THE DOOR AND BUMPED INTO SOMETHING AFTER ABOUT LIKE

17  SIX INCHES OR EIGHT INCHES OF OPENING UP.

18  Q    AND WHAT HAPPENED NEXT?

19  A    I MADE A COMMENT, KIND OF A RUDE COMMENT.  I DIDN'T

20  UNDERSTAND WHY THE DOOR ONLY OPENED UP SIX INCHES AND BUMPED

21  INTO SOMETHING, BECAUSE IT SHOULDN'T HAVE.  I MADE -- I

22  DON'T KNOW IF YOU WANT ME TO SAY THE COMMENT.  I SAID, "WHAT

23  THE," EXPLETIVE, AND I CLOSED THE DOOR.

24      AND A FEW SECONDS LATER I TRIED TO OPEN THE DOOR

25  AGAIN, AND IT SLAMMED INTO SOMETHING AGAIN, AND I DIDN'T

26  KNOW THAT THE SOMETHING IT WAS SLAMMING INTO WAS AN OFFICER,

27  SUNNYVALE POLICE OFFICER'S FOOT, APPARENTLY.  AND HE SAID,

28  "STEP AWAY FROM THE DOOR, SUNNYVALE POLICE."  AND "OPEN THE

1  "OUT."  I DON'T KNOW IF I CAN -- CAN I SAY "PASSED OUT"?

2  THAT'S THE IMPRESSION I HAD, IS THAT HE HAD FALLEN DOWN AND

3  PASSED OUT.

4  Q    AND WHEN YOU WENT BACK THERE, THE VANITY WAS OUT OF

5  PLACE?

6  A    YES.

7  Q    THE TOP OF IT?

8  A    YES, IT WAS.

9  Q    DO YOU KNOW OF ANY OTHER EXPLANATION FOR HOW THAT TOP

10  OF THE VANITY COULD HAVE BEEN MOVED OTHER THAN STEVE DAVIS

11  (SIC) FALLING INTO IT?

12  A    NO.

13  Q    I'M SORRY, CRAIG DAVIS.

14  A    CRAIG DAVIS.

15          THE COURT:  APPROACH THE BENCH, PLEASE.

16          (DISCUSSION OFF THE RECORD.)

17          THE COURT:  LADIES AND GENTLEMEN, IT'S 4:30.

18  WE'RE GOING TO TAKE OUR RECESS THIS EVENING.  I ASKED THE

19  ATTORNEYS TO APPROACH SO THAT WE CAN GIVE YOU SOME IDEA OF

20  WHAT'S IN STORE TOMORROW FOR YOU.

21          WE'RE GOING TO CONTINUE TESTIMONY OF THE WITNESS.  THE

22  ATTORNEYS BELIEVE THAT THE TESTIMONY WILL GO THE BETTER PART

23  OF THE MORNING.  THE LIKELIHOOD IS THE TESTIMONY OF

24  MR. HANCOCK WILL FINISH TOMORROW MORNING, BUT THEY DON'T

25  MAKE ANY GUARANTEES, AND NEITHER DO I, BUT THEY TELL ME THE

26  LIKELIHOOD IS WE'LL FINISH BY NOONTIME WITH HIS TESTIMONY,

27  WHICH MEANS THEN THAT THERE IS A LIKELIHOOD THAT -- LET ME

28  TELL YOU PART TWO OF THE STORY.

1    HE WAS MOVING REAL SLOWLY.

2    Q    OKAY.  YOU HAVE A PRIOR CONVICTION FOR ROBBERY;

3    CORRECT?

4    A    YES.

5    Q    THAT'S FROM ABOUT 1985?

6    A    YES.

7    Q    NOW, WHEN YOU WERE TALKING TO OFFICER -- OR DETECTIVE

8    ANDERSON AT THE JAIL, HOW LONG -- WHAT WAS YOUR STATE AT

9    THAT POINT?  HOW WERE YOU FEELING?

10   A    I -- WELL, I MEAN -- UM, I -- I DON'T KNOW HOW TO

11   ANSWER THAT.  I -- I WOULD SAY THAT I WAS A LITTLE BIT

12   GROGGY.  THAT WAS PROBABLY HOW I WAS FEELING, A LITTLE BIT

13   GROGGY.

14   Q    HAD YOU NOT BEEN SLEEPING WELL?  WHY WERE YOU A LITTLE

15   BIT GROGGY?

16   A    YEAH, THE COMBINATION OF -- WELL, IT'S A COMBINATION

17   OF NOT SLEEPING THAT WELL AND I JUST GOT OUT OF THE

18   HOSPITAL.

19   Q    WHY HAD YOU BEEN IN THE HOSPITAL?

20   A    I HAD A GRAND MAL SEIZURE AND -- I HAD A GRAND MAL

21   SEIZURE.

22   Q    AND WERE YOU TAKING ANY MEDICATIONS AT THE TIME THAT

23   YOU TALKED TO OFFICER ANDERSON -- DETECTIVE ANDERSON?

24   A    YES, I WAS.

25   Q    AND DID THOSE MEDICATIONS HAVE ANY EFFECT ON YOUR

26   ABILITY TO UNDERSTAND WHAT WAS GOING ON?

27   A    THEY DO A LITTLE BIT.  THEY -- APPEARED -- YES, YES,

28   THEY DO.

1    Q    DO YOU REMEMBER WHAT MEDICATIONS THOSE WERE?

2    A    YES, I DO.  IT WAS LIBRIUM.

3    Q    IS THAT THE ONLY THING THAT YOU WERE TAKING AT THE

4    TIME?

5    A    I BELIEVE THAT WAS THE ONLY THING THAT THEY WERE

6    GIVING ME, THE NURSE HAD GIVEN ME AT THE TIME.

7    Q    NOW, YOU HAD A CHANCE TO LISTEN TO THE TAPE YESTERDAY;

8    CORRECT?

9    A    YES, I DID.

10    Q    AND IN GOING OVER THE TAPE, LISTENING TO THE TAPE NOW,

11    WERE THERE A COUPLE OF AREAS WHERE YOU REMEMBER THINGS

12    DIFFERENTLY NOW THAN YOU TOLD DETECTIVE ANDERSON?

13    A    OKAY, I'M NOT SURE -- I'M NOT SURE HOW YOU MEAN THAT.

14    Q    WAS THE TAPE COMPLETELY ACCURATE IN HOW YOU DESCRIBED

15    THINGS?

16    A    THE TAPE -- WELL, I REALLY DON'T KNOW WHAT YOU'RE

17    ASKING.  ARE YOU ASKING COMPARED TO THE MANUSCRIPT OR --

18    Q    DO YOU AGREE WITH EVERYTHING SAID IN THE TAPE AS BEING

19    COMPLETELY TRUE?

20    A    NO.

21    Q    SO THERE ARE PLACES WHERE YOU REMEMBER THINGS TODAY

22    DIFFERENTLY THAN HOW THEY WERE DESCRIBED ON THE TAPE; RIGHT?

23    A    THERE ARE -- THERE ARE A FEW.

24    Q    WHAT ARE THE PLACES WHERE YOU REMEMBER THINGS

25    DIFFERENTLY TODAY THAN HOW THEY'RE DESCRIBED ON THE TAPE?

26    A    WELL --

27    Q    DO YOU REMEMBER?

28    A    YEAH, I DO REMEMBER SOME OF THEM.  I NOTED A BUNCH OF

1  THEM OVER THERE ON THE TRANSCRIPT.  OKAY, LET ME SEE.

2  THERE'S A PART ON THERE THAT'S TALKING ABOUT ME DRAGGING

3  HIM, DRAGGING MR. DAVIS.

4  Q    CORRECT.

5  A    I NEVER DRAGGED MR. DAVIS ANYWHERE.  THERE'S A PART ON

6  THERE ABOUT ME KICKING MR. DAVIS.  I NEVER KICKED MR. DAVIS.

7  THERE'S A PART THAT HE -- I DON'T MENTION BUT HE MENTIONS --

8  Q    THE ONLY THINGS THAT REALLY MATTER ARE WHAT YOU SAID,

9  BECAUSE THE OFFICER'S STATEMENTS ARE THE OFFICER'S

10  STATEMENTS.  IT'S THE THINGS THAT YOU SAID -- THAT YOU SAID

11  ON THE TAPE THAT YOU DISAGREE WITH.

12  A    OKAY.  THERE'S ANOTHER PART IN THERE ABOUT -- ABOUT --

13  ABOUT THE STABBING THAT'S -- IT'S -- THE WAY IT'S SAID ON

14  THERE IS -- IS SIMILAR TO HOW IT HAPPENED BUT IS NOT EXACTLY

15  -- IT'S OFF A LITTLE BIT.

16  Q    AND THERE'S ONLY ABOUT TWO LINES ABOUT THE STABBING.

17  IS THAT REALLY TOO BRIEF A SUMMARY TO UNDERSTAND WHAT

18  HAPPENED?  IS IT SOMETHING WHERE IT'S A PARTIAL TRUTH?

19  A    I NEED TO LOOK IT AT, IF I CAN.  I REMEMBER IT WAS OFF

20  A LITTLE BIT.

21          MR. KURTZMAN:  IF I MAY APPROACH, YOUR HONOR, HE

22  MAY BE ABLE TO FIND IT MORE QUICKLY THAN I CAN.

23          THE COURT:  THAT'S FINE.

24  Q    (BY MR. KURTZMAN)  DON'T SAY ANYTHING, JUST LOOK TO

25  THE PART YOU'RE THINKING ABOUT.

26          MR. HANCOCK, WERE YOU ABLE TO FIND THE PORTION THAT

27  YOU WERE TALKING ABOUT?

28  A    YES, ONE OF THEM I DID.

1    Q    IS THAT PORTION PAGE 31 OF THE TRANSCRIPT?

2    A    YES.

3    Q    AND IS IT TOWARDS THE BOTTOM OF THE TRANSCRIPT ON THAT

4    PAGE?

5    A    YES.

6    Q    AND IN THAT PORTION OF THE TRANSCRIPT OR THE TAPE IS

7    THAT WHERE DETECTIVE ANDERSON ASKED YOU IF YOU STABBED

8    MR. DAVIS ONE TIME?

9    A    YES.

10   Q    AND YOU ACKNOWLEDGE THAT YOU STABBED HIM ONE TIME?

11   A    YES.

12   Q    WHAT'S INACCURATE ABOUT THAT?

13   A    THE WAY THAT HE'S DESCRIBED -- THE WAY THAT HE

14   DESCRIBES IT HAPPENING.

15   Q    HOW IS IT INACCURATE?

16   A    WELL, THE TWO -- OKAY.  HE'S SAYING THAT WHILE I'M

17   TRYING TO GET MR. DAVIS OUT OF THE APARTMENT, I SEE THAT

18   HE'S RESISTING AND SO I GRABBED A KNIFE AND I STAB HIM.  AND

19   THAT'S NOT WHAT HAPPENED.  IT'S INCORRECT.

20   Q    AND WHAT IS INCORRECT ABOUT THAT STATEMENT?

21   A    EVERYTHING -- EVERYTHING UP TO THE POINT TO WHERE I

22   GRAB THE KNIFE AND STAB HIM.  EVEN THAT PART.

23   Q    WHAT HAPPENED?

24   A    WHAT HAPPENED WAS I WAS TRYING TO GET MR. DAVIS OUT OF

25   THE APARTMENT AND MR. DAVIS TURNED -- HE HAD HAD HIS BACK TO

26   ME, AND HE TURNED AND HIT ME WITH SOMETHING, AND WHEN HE

27   DID, I LOST MY -- I WAS STUNNED AND I FELL BACK.  IT WAS

28   ONLY ABOUT A FOOT, AND THE SINK WAS THERE, AND I PUT MY LEFT

1  SEIZURES?  AND, INCIDENTALLY, YOUR ANSWER, "ABOUT TEN OF

2  THEM," DOES THAT MEAN YOU'VE HAD TEN GRAND MAL SEIZURES AS

3  OPPOSED TO PETIT MAL SEIZURES?

4  A     I'VE HAD TEN GRAND MAL SEIZURES.  I'M GIVING YOU A

5  BALLPARK SEIZURES.  I MAY HAVE HAD A FEW MORE -- I'VE BEEN

6  HOSPITALIZED APPROXIMATELY SEVEN, EIGHT TIMES.

7  Q     SO WHAT HAPPENS TO YOU AFTER YOU HAVE ONE OF THESE

8  SEIZURES?

9  A     GENERALLY YOU GO UNCONSCIOUS.  YOUR BODY SHAKES.

10  Q     LET ME INTERRUPT YOU, BECAUSE I DON'T THINK YOU'RE

11  ANSWERING THE QUESTION I'M ASKING.  SO YOU KNOW WHERE I'M

12  HEADED, YOU WANT US TO BELIEVE THAT WHAT YOU'RE SAYING ON

13  THE TRANSCRIPT OF THE TAPE ISN'T TOTALLY ACCURATE BECAUSE

14  YOU WERE A BIT OUT OF IT; RIGHT?

15  A     YEAH.

16  Q     SO WITH AN EYE TOWARD THAT, I'M WONDERING WHAT HAPPENS

17  TO YOU PHYSICALLY THAT YOU WOULDN'T BE ACCURATE WITH OFFICER

18  ANDERSON.

19  A     WELL, YOU LOSE CONSCIOUSNESS.  AND WHEN YOU LOSE

20  CONSCIOUSNESS, YOU SHAKE VIOLENTLY, AND IF YOU'RE STANDING

21  UP, YOU FALL DOWN.  IF -- IN MY CASE I WAS LAYING ON A BUNK.

22  I FELL OFF ONTO THE CEMENT.

23  Q     LET ME INTERRUPT YOU.  THAT'S WHEN YOU'RE HAVING THE

24  SEIZURE?

25  A     RIGHT.

26  Q     BUT THIS INTERVIEW TOOK PLACE A FEW DAYS AFTER THAT?

27  A     THAT'S RIGHT.

28  Q     SO I'M WONDERING WHAT EFFECT THAT SEIZURE HAD ON YOU

1    PHYSICALLY A FEW DAYS AFTER, AT THE TIME OF THE INTERVIEW

2    WITH OFFICER ANDERSON.

3    A    WELL, YOU'RE -- WHEN YOU HAVE -- OKAY, WHAT EFFECT.  I

4    WOULD SAY THAT MENTALLY I WASN'T PROBABLY A HUNDRED PERCENT,

5    AND PHYSICALLY I WASN'T A HUNDRED PERCENT.  MY WALKING, MY

6    EQUILIBRIUM WAS OFF.  IT WAS ABOUT A WEEK BEFORE I COULD

7    WALK COMFORTABLY AGAIN.

8    Q    YOU DON'T NEED TO BE ABLE TO WALK STRAIGHT TO TELL THE

9    TRUTH, DO YOU?

10   A    WELL, OKAY.  I -- I -- I -- I GUESS YOU DON'T HAVE TO

11   BE ABLE TO WALK STRAIGHT TO TELL THE TRUTH.  I'M -- YOU

12   KNOW, I GUESS -- I MEAN --.

13   Q    YOU KNEW WHAT WAS GOING ON ENOUGH TO MAKE THE DECISION

14   THAT YOU WERE JUST GOING TO PAY LIP SERVICE TO THIS OFFICER.

15   A    DO YOU WANT ME TO ANSWER THAT?

16   Q    PLEASE.  IN FACT, ANY QUESTION I ASK YOU, PLEASE

17   ANSWER IT.

18   A    IF YOU LOOK AT THAT TRANSCRIPT, WHATEVER IT IS, FORTY

19   SOME ODD PAGES, YOU CAN SEE THAT A LARGE MAJORITY OF THE

20   TIME IS THIS OFFICER SAYING THINGS, AND HE'S SAYING THINGS

21   LIKE HE KNOWS THAT I DID THIS AND I DID THAT, AND I'M JUST

22   LISTENING TO HIM, WAITING FOR HIM TO STOP TALKING SO I CAN

23   SAY YEAH, UH-HUH, OR NO, OR SHAKE MY HEAD, OR WHATEVER SO

24   THAT HE'LL GO ON.

25   Q    WERE YOU PAYING LIP SERVICE?

26   A    A LARGE -- WELL, NOT ALL THE TIME BUT A PORTION OF THE

27   TIME I WAS.

28   Q    AND IN ORDER TO PAY LIP SERVICE YOU NEED TO MAKE A

1    AFFECTS YOUR THINKING FOR -- AND I DON'T MEAN YOU DON'T KNOW

2    WHICH WAY IS UP OR DOWN.  IT AFFECTS -- YOU DON'T THINK A

3    HUNDRED PERCENT FOR A PERIOD OF TIME AFTER YOU'VE HAD THAT

4    SEIZURE.  IT COULD BE SIX HOURS, IT COULD BE THREE OR FOUR

5    DAYS.

6          AND IN MY CASE, IN THAT PARTICULAR CASE I KNOW I

7    NOTICED MY WALKING FOR PROBABLY -- I'M GOING TO SAY ABOUT A

8    WEEK.  IT MAY HAVE BEEN FIVE DAYS BUT ABOUT A WEEK AFTER

9    THAT WAS OFF.  IT WAS LIKE I WAS -- IT WAS LIKE -- IT WAS

10   KIND OF LIKE I WAS DRUNK.  BUT I MEAN I HADN'T BEEN

11   DRINKING, BUT IT WAS LIKE I WAS DRUNK.

12         AND NOT ONLY THAT, A NUMBER OF PEOPLE AROUND ME

13   COMMENTED ON IT, SAID, "WHAT'S WRONG WITH YOU?  WHAT ARE

14   YOU, STILL DRUNK?"  I WASN'T DRUNK, I WAS JUST SO -- SO --

15   SOMETHING WAS WRONG WITH MY EQUILIBRIUM.

16   Q     MR. HANCOCK, ARE ANY OF THE STATEMENTS ON THE TAPE OR

17   ON THE TRANSCRIPT, ARE ANY OF THOSE ACCURATE?

18   A     YES.

19   Q     SO YOU WERE ABLE TO PROVIDE ACCURATE RESPONSES TO

20   OFFICER ANDERSON'S QUESTIONS?

21   A     YEAH, I WOULD SAY YEAH, FOR THE MOST -- YEAH.

22   Q     SOME OF THE ANSWERS YOU PROVIDED ARE NOT ACCURATE,

23   YOU'RE TELLING US.

24   A     I'LL SAY THAT -- OKAY.

25   Q     SIR, I'M NOT TRYING TO TRICK YOU.  I DON'T WANT YOU TO

26   BE UP THERE ANY LONGER THAN NECESSARY.  IS IT FAIR TO SAY

27   THAT SOME OF THE STATEMENTS ON THE TAPE THAT YOU MADE ARE

28   NOT ACCURATE?

1    A    YES.

2    Q    AND THAT'S BECAUSE OF THE SEIZURE AND THIS MEDICATION?

3    A    THAT -- I WOULD THINK -- IT'S IN PART.  SOME OF THE

4    STATEMENTS THEY SHOW ON THERE ARE HALF A STATEMENT, AND YOU

5    CAN'T SEE WHAT THE BEGINNING OF IT IS, OR THE END OF IT IS.

6    YOU CAN'T EVEN SEE WHAT THE FULL QUESTION IS THAT'S BEING

7    ASKED.  SO IT'S LIKE, I MEAN --

8    Q    YOU KNOW WHAT, LET'S BE HONEST.  ALL WE'RE REALLY

9    TALKING ABOUT IS WHY YOU STABBED HIM.  YOU'VE ALREADY TOLD

10   US YOU STABBED HIM, AND THIS WHOLE THING IS ABOUT WHY YOU

11   STABBED HIM.  AND NOW YOU'RE TELLING US ABOUT THIS FRYING

12   PAN.  DID YOU NOT THINK TO TELL OFFICER ANDERSON ABOUT THE

13   FRYING PAN?

14   A    OKAY, I'LL ANSWER THAT.  AT THE TIME WHEN OFFICER

15   ANDERSON WAS ASKING ME ABOUT THAT, I WAS UNDER THE

16   IMPRESSION THAT HE WAS THERE TO WRAP THINGS UP, THAT THIS

17   WAS GOING TO BE OKAY, THIS GUY IS GOING TO COME HERE,

18   INTERVIEW ME, WE'RE GOING TO TAKE CARE OF THIS, AND THIS IS

19   GOING TO BE OVER WITH, AND MAYBE I'M GOING TO DO A LITTLE

20   BIT OF TIME ON THE FARM.

21        SO WHEN HE ASKED ABOUT THE ALTERCATION, I DID NOT WANT

22   TO SAY -- I HAD THE WHEREWITHAL TO KNOW I DIDN'T WANT TO

23   INVOLVE CRAIG DAVIS.  I DIDN'T WANT CRAIG DAVIS TO GET IN

24   TROUBLE.  HE WAS MY FRIEND.  SO WHY SHOULD I, YOU KNOW -- IF

25   I TELL HIM THAT HE HIT ME WITH SOMETHING, THEN WHAT, IS HE

26   GOING TO GO GET CHARGED WITH AN OFFENSE?

27   Q    YOU'RE SITTING IN JAIL.

28   A    I UNDERSTAND.

1    Q    AND YOU KNOW THAT YOU'RE BEING CHARGED WITH ASSAULT

2    WITH A DEADLY WEAPON.

3    A    OKAY.

4    Q    RIGHT?

5    A    AT THE TIME I DIDN'T KNOW.

6    Q    RIGHT?

7    A    NOW I AM, YEAH.  NOW I KNOW.

8    Q    OFFICER ANDERSON DIDN'T TELL YOU WHY HE WAS THERE?

9    A    YES, HE DID.

10    Q    SO YOU KNEW --

11    A    NOT AT THE BEGINNING.

12    Q    WHEN'S THE FIRST TIME YOU BECAME AWARE THAT YOU WERE

13    BEING CHARGED WITH ASSAULT WITH A DEADLY WEAPON?

14    A    PROBABLY ABOUT -- I DON'T KNOW, I'M GOING TO GUESS

15    MAYBE HALFWAY THROUGH THE INTERVIEW.

16    Q    YOU GOT ARRESTED ON THE 7TH OR 8TH?

17    A    RIGHT.

18    Q    AND THE INTERVIEW WAS ON THE 12TH?

19    A    RIGHT.

20    Q    OKAY.  8TH, LET'S SAY THE 8TH, GIVE YOU THE BENEFIT OF

21    THE DOUBT.  9TH, 10TH, 11TH, 12TH.  IN FIVE DAYS YOU NEVER

22    ASKED ANYBODY, AND NOBODY EVER TOLD YOU WHY YOU WERE IN

23    JAIL?

24    A    OKAY.  NO, I KNEW THAT.  I KNEW WHEN I WAS ARRESTED, I

25    KNEW THE NEXT DAY THAT I'D BEEN CHARGED WITH ASSAULT WITH A

26    DEADLY WEAPON.

27    Q    OKAY, LET'S TAKE IT FROM THERE.  SO YOU'RE FACING

28    ASSAULT WITH A DEADLY WEAPON CHARGE.

1   A      RIGHT.

2   Q      BUT YOUR LOYALTY TO CRAIG DAVIS OVERRIDES PROTECTING

3   YOURSELF AS YOU FACE THIS CHARGE; IS THAT WHAT YOU'RE

4   TELLING US?

5   A      I'M SAYING THAT I THOUGHT AT THE TIME OF THE

6   INTERVIEW, I THOUGHT THAT MY CHARGE WAS GOING TO BE REDUCED,

7   THAT IT WAS GOING TO BE LESS THAN ASSAULT WITH A DEADLY

8   WEAPON.

9         AND I THOUGHT WHY SHOULD I INVOLVE MR. DAVIS, AND I'M

10  -- IF MY DISCHARGE IS GOING TO BE REDUCED AND I'LL DO 30 OR

11  60 DAYS, AND WHY SHOULD I GET HIM IN TROUBLE AND MAKE HIM GO

12  DO 30 AND 60 DAYS WITH ME?

13        I THOUGHT THAT WAS WHAT OFFICER ANDERSON WAS THERE

14  FOR, TO WRAP THINGS UP, THAT I WAS GOING TO BE CHARGED WITH

15  A BATTERY.  IN MY EYES THAT WAS OKAY, I'M JUST GOING TO GO

16  DO 30 DAYS OR 60 DAYS OR SIX MONTHS COUNTY JAIL TIME AT THE

17  FARM.  THAT'S WHAT I THOUGHT.

18  Q      WHY DID YOU THINK THAT?

19  A      WELL, HE MENTIONED THE WORD "BATTERY" TO ME.  BUT I

20  MEAN -- AND I THOUGHT HE MENTIONED "WRAP THINGS UP" TO ME,

21  BUT AS I READ THAT, I DIDN'T SEE -- I DON'T THINK I SAW THE

22  EXACT WORDS "WRAP THINGS UP."  I THOUGHT AS I -- THINKING

23  BACK ON IT, I THOUGHT HE DID SAY THAT TO ME.

24  Q      HOW MANY TIMES HAVE YOU LISTENED TO THE TAPE?

25  A      I'VE LISTENED TO -- I'VE LISTENED TO THE TAPE AT THAT

26  SPEED -- THAT'S THE SECOND -- YESTERDAY WAS THE SECOND TIME

27  I'VE HEARD IT, OKAY, IN NINE AND A HALF MONTHS.

28  Q      HOW MANY TIMES HAVE YOU LISTENED TO IT AT DIFFERENT

1    TIME." REALLY SHORT POLICE REPORT AND REALLY DIFFICULT TO

2    CONVICT ANYONE IF THAT'S HOW IT WORKS. I DON'T THINK ANYONE

3    IS OFFENDED BY THAT TECHNIQUE.

4        HE TRIES TO GET THE DEFENDANT'S CONFIDENCE TO FIND OUT

5    WHAT HAPPENED THAT NIGHT. AND THE DEFENDANT, I THINK, WAS

6    FORTHCOMING. OF COURSE, WHEN I ASKED HIM ABOUT IT ON

7    CROSS-EXAMINATION, THOSE PARTS OF THE TAPE THAT HURT HIM

8    AREN'T REALLY ACCURATE. BECAUSE HE HAD HAD A GRAND MAL

9    SEIZURE THAT WE DON'T HAVE ANY EVIDENCE OF.

10        AND AGAIN, I'M NOT SHIFTING THE BURDEN. THE BURDEN IS

11    ON ME COMPLETELY. THE DEFENSE DOESN'T HAVE TO OFFER

12    ANYTHING, BUT IF YOU'RE GOING TO GET ON THE STAND AND SAY

13    YOU HAD A SEIZURE AND THAT'S WHY PARTS OF THE TAPE ARE NOT

14    ACCURATE, OKAY, DID YOU HAVE A SEIZURE? ARE YOU ON

15    MEDICATION? AND IF YOU HAD A SEIZURE AND YOU WERE ON

16    MEDICATION AND YOU ARE KIND OF GROGGY, HOW IS IT THAT THE

17    PARTS THAT HELP YOU ARE ACCURATE? IT DOESN'T WORK LIKE

18    THAT. DON'T BUY THAT.

19        THE DEFENDANT'S CREDIBILITY. THE JUDGE READ YOU

20    INSTRUCTION 2.20, AND IT TALKS ABOUT FACTORS THAT YOU CAN

21    CONSIDER WHEN ASSESSING SOMEONE'S TESTIMONY. THE CHARACTER

22    AND QUALITY OF THAT TESTIMONY IS A FACTOR. THE DEMEANOR AND

23    MANNER OF THE WITNESS WHILE TESTIFYING.

24        REMEMBER HOW UNCOMFORTABLE IT WAS AT SOME POINTS WHEN

25    I WAS CROSS-EXAMINING THE DEFENDANT? IT WAS FRUSTRATING.

26    BACK AND FORTH AND BACK AND FORTH, AND SIMPLE QUESTIONS

27    COULDN'T JUST BE ANSWERED. WE HAD TO GO AROUND AND AROUND.

28        AND THAT CROSS-EXAMINATION ENDED UP TAKING MUCH LONGER

1    APPROPRIATELY.

2        AS FOR THIS LESSER INCLUDED OFFENSE OF MISDEMEANOR

3    ASSAULT, THE LAW REQUIRES THAT THAT INSTRUCTION BE GIVEN.  I

4    DIDN'T CHARGE IT THAT WAY.  THE LAW REQUIRES THAT THAT

5    INSTRUCTION BE GIVEN.

6        IF YOU FIND AN ASSAULT IN THIS CASE AND YOU BELIEVE

7    THAT THE DEFENDANT USED A KNIFE, YOU HAVE TO FIND ASSAULT

8    WITH A DEADLY WEAPON.  IT'S LOGICALLY INCONSISTENT TO SAY,

9    WELL, THERE WAS AN ASSAULT, BUT I DON'T THINK IT WAS WITH A

10   DEADLY WEAPON, UNLESS SOMEONE ON THE JURY THINKS A KNIFE IS

11   NOT A DEADLY WEAPON, BUT I DON'T THINK ANYONE WOULD THINK

12   THAT.

13       WHEN MR. KURTZMAN WAS TALKING ABOUT THE BELIEVABILITY

14   OF MR. DAVIS VERSUS MR. HANCOCK AND THEN KIND OF LUMPED THEM

15   BOTH TOGETHER AND SAID THEY'RE DRUNKS, THEY WERE DRUNK, AND

16   SHOULD WE BELIEVE MR. DAVIS, SHOULD WE BELIEVE MR. HANCOCK,

17   AND HE SAID "NONE OF THE ABOVE."  THE DEFENSE IS ACTUALLY

18   URGING YOU TO BELIEVE NEITHER.

19       WELL, LET'S THINK ABOUT THAT.  IF YOU DON'T BELIEVE

20   THE DEFENDANT, IF YOU THROW OUT THE DEFENDANT'S TESTIMONY,

21   THEN YOU HAVE ZERO EVIDENCE OF SELF-DEFENSE.  NONE.  YOU

22   COULD GO BACK THERE AND ALL VOTE GUILTY RIGHT AWAY, BECAUSE

23   THERE IS SIMPLY NO EVIDENCE OF SELF-DEFENSE BEFORE YOU.  IT

24   IS NOT YOUR JOB TO CREATE A DEFENSE.

25       YOU TOOK AN OATH TO APPLY THE EVIDENCE, THE FACTS YOU

26   HEARD FROM THE WITNESS STAND, OF THE EXHIBITS, TO THE LAW.

27   I SUBMIT TO YOU THAT THE DEFENDANT WAS LYING.  I USED THE

28   WORD "LIE" A FEW TIMES, BECAUSE HE LIED.  AND THAT

1    MR. DAVIS'S VERSION IS ACCURATE.

2        BUT LET'S JUST FOR A SECOND DO WHAT THE DEFENSE WANTS

3    US TO DO.  LET'S THROW OUT BOTH VERSIONS.  WELL, THEN WE'RE

4    LEFT WITH WHAT?  WE'RE LEFT WITH SOMETHING THAT DOESN'T GET

5    DRUNK, WE'RE LEFT WITH SOMETHING THAT DOESN'T LIE.  WE'RE

6    LEFT WITH PHYSICAL EVIDENCE.

7        YOU'LL HAVE ALL THE PICTURES.  THERE'S BLOOD ALL OVER

8    THE OUTSIDE OF THE APARTMENT.  THERE'S A BLOODY KNIFE

9    OUTSIDE OF THE APARTMENT.  THERE'S A STAB WOUND IN

10    MR. DAVIS'S BACK.  THERE'S A BLOODY SHIRT WITH A STAB WOUND

11    -- I SHOULDN'T SAY STAB WOUND -- THERE'S A HOLE IN THE SHIRT

12    THAT MATCHES UP WITH THE STAB WOUND ON MR. DAVIS'S BACK.

13    THERE IS THAT SAME SHIRT, WITH BLOOD ALL OVER IT, WITH A

14    FOOTPRINT THAT MATCHES THE DEFENDANT'S SHOES.

15        I INVITE YOU WHEN YOU GO BACK THERE, LOOK AT THE

16    SHIRT, HOLD UP THE PICTURES OF THE BOTTOM OF THE DEFENDANT'S

17    SHOES AND TELL ME IF THAT DOESN'T MATCH.

18        NOW, THE DEFENDANT SAYS, OH, I SLAPPED HIM AROUND A

19    FEW TIMES.  WELL, NO, YOU DIDN'T.  YOU STOMPED ON HIM.  A

20    COUPLE OF TIMES.  AND WHEN HE WAS ASKED, "HOW DID THE BLOOD

21    GET ON THE POST OUTSIDE OF YOUR APARTMENT?"  "I DON'T KNOW."

22    OH, OKAY.  "I DON'T KNOW."

23        IF YOU BUY THE DEFENSE ARGUMENT, NO ONE CAN EVER BE

24    CONVICTED IF THEY'RE DRINKING.  ALL YOU GOT TO DO IS DRINK

25    AND COMMIT A CRIME AGAINST SOMEBODY WHO'S HAD A DRINK, AND

26    NOBODY CAN HAVE ANY IDEA WHAT HAPPENED.  HOW CAN WE POSSIBLY

27    KNOW?  THEY WERE DRUNK.  WELL, THE LAW ANTICIPATES THIS.

28    THAT'S WHY YOU GET THE INSTRUCTION VOLUNTARY INTOXICATION IS

```
 1   SUNNYVALE, CALIFORNIA                SEPTEMBER 3, 2004
     DEPARTMENT 81                        8:30 A.M.
 2

 3                  P R O C E E D I N G S:

 4        MR. SCHROEDER:  MATTER 11 ON THE 8:30 CALENDAR,

 5   HANCOCK.

 6        THE COURT:  PEOPLE VERSUS JEFF JAY HANCOCK.

 7        MR. DEMERTZIS:  JIM DEMERTZIS FOR THE PEOPLE, YOUR

 8   HONOR.

 9        MR. SCHROEDER:  COULD WE APPROACH ON THAT MATTER,

10   YOUR HONOR?

11        (DISCUSSION OFF THE RECORD.)

12        THE COURT:  MATTER OF PEOPLE VERSUS JEFF JAY

13   HANCOCK FOR SENTENCING.  APPEARANCES.

14        MR. SCHROEDER:  WESLEY SCHROEDER FOR MR. HANCOCK.

15        MR. DEMERTZIS:  JIM DEMERTZIS FOR THE PEOPLE.

16        THE COURT:  IS FORMAL ARRAIGNMENT FOR JUDGMENT

17   WAIVED?

18        MR. SCHROEDER:  YES.

19        THE COURT:  IS THERE ANY LEGAL CAUSE WHY SENTENCE

20   SHOULD NOT BE PRONOUNCED?

21        MR. SCHROEDER:  NONE.

22        THE COURT:  THERE IS A MOTION ON FILE TO STRIKE

23   THE PRIOR STRIKE CONVICTION, BROUGHT BY MR. KURTZMAN,

24   BRIEFED BY THE PEOPLE.  DO YOU WISH TO PURSUE THAT MATTER OR

25   HAVE IT WITHDRAWN AND TAKEN OFF CALENDAR?

26        MR. SCHROEDER:  WITHDRAWN AND TAKEN OFF CALENDAR,

27   YOUR HONOR.

28        THE COURT:  THE REPORT HAS A RECOMMENDATION HERE
```

1   AS FAR AS THE SENTENCING IN THIS CASE.  I'M INCLINED TO

2   FOLLOW IT, BUT IF COUNSEL WISH TO BE HEARD, I'LL ALLOW THAT.

3         MR. DEMERTZIS:  SUBMITTED YOUR HONOR.

4         MR. SCHROEDER:  SUBMITTED, YOUR HONOR.  I'VE HAD

5   EXTENSIVE DISCUSSIONS WITH MY CLIENT ABOUT THIS ACTION, AND

6   WE'VE DETERMINED IT'S IN HIS BEST INTEREST TO PROCEED AS WE

7   ARE THIS MORNING.

8         THE COURT:  THE COURT UNDERSTANDS THIS.

9         MR. SCHROEDER:  THANK YOU.

10        THE COURT:  THE MATTER COMES BEFORE THE COURT ON A

11  GUILTY VERDICT BY JURY, AND THERE WERE ADMISSIONS OF THE

12  PRIORS.

13        THE COURT BELIEVES THAT PROBATION IN THIS CASE SHOULD

14  BE DENIED IN VIEW OF THE SERIOUSNESS OF THE OFFENSE.  THE

15  COURT ALSO NOTES THAT PROBATION WOULD BE INELIGIBLE PURSUANT

16  TO 667(C)(2) OF THE PENAL CODE, BUT REGARDLESS OF ANY

17  STATUTORY PRECLUSION THE SERIOUSNESS OF THIS OFFENSE WOULD

18  WARRANT A DENIAL OF PROBATION NEVERTHELESS.

19        AS FAR AS THE PRISON TERM IN THIS CASE THE COURT WILL

20  SELECT THE MIDDLE TERM IN STATE PRISON OF SIX YEARS.  THE

21  COURT ENHANCES TERM -- AND SIX YEARS, THE COURT SHOULD NOTE,

22  WOULD BE TWICE THE ORDINARY MIDDLE TERM.  AND THIS IS FOR

23  THE CLERK'S BENEFIT TODAY, WHO IS NOT NORMALLY WITH THE

24  COURT AND WAS NOT SITTING ON THE TRIAL, THIS WOULD BE TWICE

25  THE BASE BECAUSE OF THE STRIKE.  THE COURT ENHANCES SAID

26  TERM BY FIVE YEARS FOR THE 667(A) PENAL CODE ALLEGATION.

27        THERE WAS A 12022.7(A) PENAL CODE FINDING THAT WAS

28  MADE BY THE JURY; HOWEVER, THE COURT WILL SHARE THE -- THE

1    COURT WILL FOLLOW THE RECOMMENDATION OF THE PROBATION

2    OFFICER AND STRIKE THAT ADDITIONAL PUNISHMENT PURSUANT TO

3    1385 OF THE PENAL CODE, THERE BEING NO OBJECTION BY THE

4    PEOPLE AS TO THAT ORDER.

5         SO THAT LEAVES THE TOTAL TERM AT ELEVEN YEARS, WHICH

6    WAS THE ONE RECOMMENDED BY PROBATION.  MR. HANCOCK, YOU ARE

7    ADVISED THAT SUBSEQUENT TO YOUR RELEASE FROM PRISON YOU'LL

8    BE PLACED ON PAROLE FOR THREE YEARS.  I WILL ORDER

9    RESTITUTION TO THE VICTIM TO BE DETERMINED FOR ANY ECONOMIC

10   LOSSES.  DIRECTOR OF THE DEPARTMENT OF CORRECTIONS IS

11   ORDERED TO COLLECT THIS RESTITUTION FROM YOUR EARNINGS IN

12   PRISON OR WHILE ON PAROLE.

13        YOU SHALL NOT POSSESS FIREARMS PURSUANT TO 12021 OF

14   THE PENAL CODE.  YOU ARE ORDERED TO PROVIDE TWO BLOOD AND

15   ONE SALIVA SAMPLE PURSUANT TO 296 OF THE PENAL CODE.  I WILL

16   ORDER A COURT SECURITY FEE OF $20 PURSUANT TO 1465.8 OF THE

17   PENAL CODE.

18        I'LL ORDER A RESTITUTION FINE OF $2200 PURSUANT TO THE

19   FORMULA PERMITTED BY PENAL CODE SECTION 1202.4(B).  I WILL

20   ORDER AN ADDITIONAL RESTITUTION FINE OF THAT AMOUNT PURSUANT

21   TO 1202.4 OF THE PENAL CODE AND ORDER IT SUSPENDED PURSUANT

22   TO 1202.45 OF THE PENAL CODE.

23        I DON'T HAVE THE UPDATED CREDITS.  MAYBE COUNSEL CAN

24   FOLLOW ALONG WITH ME AND WE CAN DO THIS.  THE CREDITS WERE

25   AS OF THE PROBATION REPORT DATE, JULY 1ST, AND WE DON'T HAVE

26   A PROBATION OFFICER HERE TODAY.  SO WE'RE TALKING ABOUT 31

27   DAYS ACTUAL IN JULY AND THEN ANOTHER 31 DAYS IN AUGUST, AND

28   THEN TODAY'S THE 3RD, SO MY MATH IS 65 ACTUAL DAYS EXTRA.

**CT 6**

```
 1          THE COURT:  YOUR WITNESS.

 2          MR. DEMERTZIS:  THANK YOU, YOUR HONOR.

 3                      DIRECT EXAMINATION

 4   Q    (BY MR. DEMERTZIS)  MR. DAVIS, LET ME BEGIN BY

 5   THANKING YOU FOR COMING TO COURT THIS AFTERNOON.  SIR, DO

 6   YOU WANT TO BE HERE?

 7   A    NO.

 8   Q    WHY NOT?

 9   A    I DIDN'T WANT TO TESTIFY.  HE'S MY FRIEND.  HE MADE A

10   MISTAKE.

11   Q    SO WHY ARE YOU HERE?

12   A    'CAUSE I WAS SUBPOENAED.

13   Q    HOW DO YOU KNOW THE PERSON SITTING HERE IN THE GREEN

14   NEXT TO DEFENSE COUNSEL?

15   A    WE'VE BEEN FRIENDS FOR THREE, FOUR YEARS.

16   Q    DO YOU KNOW HIS NAME?

17   A    JEFF HANCOCK.

18          MR. DEMERTZIS:  YOUR HONOR, MAY THE RECORD PLEASE

19   REFLECT MR. DAVIS HAS IDENTIFIED THE DEFENDANT?

20          THE COURT:  IT WILL.

21   Q    (BY MR. DEMERTZIS)  WERE YOU FRIENDS WITH THE

22   DEFENDANT IN AUGUST OF THIS YEAR?

23   A    YES.

24   Q    SPECIFICALLY ON AUGUST 8TH WERE YOU WITH THE

25   DEFENDANT?

26   A    AUGUST 8TH, YES, I BELIEVE SO.  WE WERE AT FAIR OAKS

27   PARK AT A PICNIC.

28   Q    WHAT TIME DID YOU ARRIVE AT THIS PICNIC AT THE PARK?
```

C.T.14

1    Q    DID THE DEFENDANT KICK OR PUNCH YOU IN THE FACE AT ALL

2    WHEN YOU WERE FIGHTING?

3    A    I DON'T RECALL.

4    Q    ALL RIGHT.  TAKE A LOOK AT PEOPLE'S 5.  DO YOU

5    RECOGNIZE WHAT'S IN THAT PICTURE?

6    A    LOOKS LIKE A PUNCTURE WOUND.

7    Q    LOOKS LIKE A PUNCTURE WOUND?

8    A    UH-HUH.

9    Q    WHEN YOU AND THE DEFENDANT WERE FIGHTING, DID YOU EVER

10   FEEL ANY SHARP PAIN ANYWHERE ON YOUR BODY?

11   A    YEAH, BUT I THOUGHT I -- I THOUGHT I FELL ON LIKE ONE

12   OF THE PLANTS OR SOMETHING.  I DIDN'T SEE ANY --

13   Q    YOU DIDN'T SEE WHAT?

14   A    YOU KNOW, ANY WEAPONS OR ANYTHING, YOU KNOW.  WHEN I

15   FELL AND HIT MY HEAD ON THE CONCRETE, THE KIND OF DAZED ME

16   OUT, SO I DON'T REALLY REMEMBER A WHOLE LOT, YOU KNOW.

17   Q    MR. DAVIS, WE GET THE IDEA.  YOU DON'T WANT TO BE

18   HERE; RIGHT?

19   A    NO, I DON'T WANT TO BE HERE.

20   Q    DO YOU REMEMBER TALKING TO OFFICERS WHEN YOU WERE IN

21   THE HOSPITAL?

22   A    YES.  YEAH.

23   Q    AND DO YOU REMEMBER TELLING THEM WHAT HAPPENED THAT

24   NIGHT?

25   A    YEAH, I LIED AND TOLD OFFICER KIM THAT I GOT JUMPED IN

26   THE PARK.

27   Q    WHEN YOU TOLD OFFICER KIM THAT SOME -- I THINK YOU

28   USED THE PHRASE "SOME MEXICAN GUYS" JUMPED YOU; RIGHT?

CT15

1    A    YEAH.  NOTHING AGAINST MEXICANS, BUT THAT'S ALL I

2    COULD COME UP WITH.

3    Q    BUT WHEN YOU TOLD OFFICER KIM THAT, THAT WASN'T THE

4    TRUTH; RIGHT?

5    A    CORRECT.

6    Q    THE TRUTH WAS THAT THE DEFENDANT BEAT YOU UP?

7    A    YEAH.

8    Q    NOW, WHEN THE DEFENDANT WAS BEATING YOU UP, DID YOU

9    FEEL ANY SHARP PAINS ANYWHERE ON YOUR BODY?

10   A    YEAH, MY RIBS HURT.

11   Q    DID YOU FEEL A SHARP PAIN LIKE BEING STABBED, OR A

12   PUNCTURE?

13   A    LIKE I SAID BEFORE, I DON'T RECALL.  I -- WELL, I TAKE

14   THAT BACK.  I THOUGHT I FELL ON ONE OF THE BUSHES THERE.

15   YOU KNOW.  THAT'S WHAT I THOUGHT.

16   Q    DO YOU REMEMBER TALKING TO ME A FEW MINUTES AGO

17   OUTSIDE THE COURTROOM?

18   A    YES.

19   Q    DO YOU REMEMBER SHOWING ME YOUR LEFT HAND, THE AREA

20   BETWEEN YOUR INDEX FINGER AND YOUR THUMB?

21   A    YEAH.

22   Q    DO YOU HAVE A SCAR THERE?

23   A    YEAH.

24   Q    WHAT'S THAT SCAR FROM?

25   A    BEING STABBED.

26   Q    BY WHO?

27   A    I GUESS JEFF DID IT.

28   Q    BUT YOU GOT STABBED THAT DAY IN AUGUST THAT YOU AND

CT16

1    THE DEFENDANT WERE FIGHTING?

2    A    I GUESS SO.  THAT'S WHAT THE HOSPITAL PARAMEDICS TOLD

3    ME.  THAT'S ALL I CAN GO WITH.  I DON'T REALLY REMEMBER A

4    WHOLE LOT.  I DON'T LIKE DOING THIS A BIT.

5    Q    THAT'S UNDERSTANDABLE.

6    A    I DON'T WANT TO RAT ON MY FRIEND.

7    Q    DO YOU CONSIDER THE DEFENDANT YOUR FRIEND?

8    A    YEAH.  I TOTALLY FORGIVE HIM.  I DON'T HAVE ANY HARD

9    FEELINGS.

10   Q    FORGIVE HIM FOR WHAT?

11   A    FOR THAT LITTLE BRAWL WE HAD.

12   Q    DID YOU START THAT FIGHT?

13   A    NO.  MAYBE I DID VERBALLY, BUT I DIDN'T START ANY

14   PHYSICAL ACTION.  I KNOW BETTER THAN THAT.  JEFF IS A BIG

15   MAN.

16   Q    DID YOU CHALLENGE THE DEFENDANT TO FIGHT THAT DAY?

17   A    NO, HUH-UH.  I WOULDN'T DO THAT.

18   Q    WHEN THE DEFENDANT WAS KICKING YOU AND PUNCHING YOU,

19   DID YOU EVER LOSE CONSCIOUSNESS?

20   A    LIKE I TOLD YOU BEFORE, I WAS DAZED.  I DIDN'T

21   COMPLETELY GO OUT AND LOST CONSCIOUSNESS.

22   Q    YOU USED THE PHRASE EARLIER "I WAS GOING IN AND OUT."

23   WHAT DOES THAT MEAN?

24   A    WELL I SLAMMED MY HEAD, MY FACE IN THE CONCRETE.  IT

25   DAZES YOU, AND YOU JUST KIND OF GET DIZZY.  PLUS I WAS

26   DRUNK.

27   Q    DID YOU EVER HIT THE DEFENDANT?

28   A    I DON'T RECALL.

CT17

```
1   Q    DO YOU RECALL TRYING TO DEFEND YOURSELF AT ALL?

2   A    A LITTLE BIT.

3   Q    HOW?

4   A    JUST HOLDING MY HANDS UP, ARMS.

5   Q    ALL RIGHT.  BUT YOU DON'T RECALL THROWING ANY PUNCHES?

6   A    NO, NOT A HUNDRED PERCENT.  I DON'T REMEMBER ALL THAT.

7   Q    ALL RIGHT.  AGAIN, I APPRECIATE YOU COMING DOWN HERE.

8   I KNOW YOU DON'T WANT TO BE HERE BUT THANKS FOR TELLING THE

9   TRUTH.  THAT'S ALL THE QUESTIONS I HAVE.

10  A    OKAY.

11          THE COURT:  CROSS-EXAMINATION.

12                   CROSS-EXAMINATION

13  Q    (BY MR. CAMPERI)  NOW, MR. DAVIS, I WANT TO TALK TO

14  YOU INITIALLY ABOUT WHEN YOU WERE AT THE PARK AT THIS LITTLE

15  PARTY OR GET-TOGETHER THAT YOU GUYS WERE HAVING.

16  A    UH-HUH.

17  Q    YOU INDICATED THAT YOU HAD BEEN DRINKING SOME VODKA

18  DURING THAT TIME FRAME; CORRECT?

19  A    RIGHT.  YOU'RE CORRECT.

20  Q    AND YOU SAID THAT YOU DRANK THREE-QUARTERS OF A FIFTH

21  OF VODKA?

22  A    YES.

23  Q    DID YOU HAVE ANYTHING ELSE TO DRINK BESIDES THAT?

24  A    I DON'T RECALL.  I MIGHT HAVE HAD A BEER, POSSIBLY.

25  Q    SO IT IS POSSIBLE THAT YOU HAD --

26  A    YEAH.  THERE WERE SOME GUYS THERE AT THE PICNIC TABLE

27  THAT WERE DRINKING SOME BEERS.

28  Q    I'LL ASK FOR TO YOU WAIT FOR ME TO FINISH MY QUESTION
```

CT 18

1   AGAIN, BECAUSE THE COURT REPORTER --

2   A    OKAY.  I'M SORRY.

3   Q    YOU SORT OF JUST TALKED OVER ME AGAIN.  JUST WAIT TILL

4   I'M FINISHED WITH THE QUESTION, OKAY?

5   A    YES, SIR.

6   Q    THANK YOU.  SO YOU MIGHT HAVE HAD ONE OR TWO MORE

7   BEERS WHILE YOU WERE THERE ALSO?

8   A    THERE WAS A GOOD CHANCE OF THAT.

9   Q    DID YOU HAVE ANY DRINKING -- DID YOU DO ANY DRINKING

10  PRIOR TO GOING TO THE PARTY ON THAT SAME DAY?

11  A    I DON'T RECALL.

12  Q    WAS IT YOUR NORMAL PATTERN TO START DRINKING WHEN YOU

13  FIRST GOT UP IN THE MORNING?

14  A    YES.

15  Q    SO YOU COULD HAVE HAD SOMETHING TO DRINK EARLIER THAT

16  DAY BEFORE YOU WENT TO THE PARK?

17  A    YES.

18  Q    IT WOULD NOT BE UNUSUAL FOR YOU TO DO THAT?

19  A    NO IT WOULDN'T.

20  Q    NOW, AT SOME POINT YOU LEAVE THIS GATHERING TO GO BACK

21  TO JEFF'S HOUSE; CORRECT?

22  A    YES.

23  Q    DID YOU LEAVE BECAUSE YOU FELT YOU WERE TOO DRUNK AND

24  OBNOXIOUS?

25  A    YEAH.  I WAS GETTING PRETTY TIRED OUT.

26  Q    AND IS THIS AS A RESULT OF YOUR DRINKING DURING THE

27  COURSE OF THE DAY?

28  A    THERE WAS ONE OF THE GIRLS THERE THAT WAS STARTING TO

CT<sub>19</sub>

1   GET ON MY NERVES, SO I LEFT.

2   Q     AND WERE YOU BEING OBNOXIOUS WITH THIS GIRL?

3   A     PROBABLY SO.

4   Q     YOU'RE NOT SURE?

5   A     IT WOULD BE A GOOD GUESS.

6   Q     SO YOU DON'T REMEMBER BECAUSE YOU WERE --

7   A     NOT A HUNDRED PERCENT.

8   Q     YOU DON'T REMEMBER BECAUSE YOU WERE TOO INTOXICATED?

9   A     YEAH, I WAS HAMMERED.

10  Q     NOW, WHEN YOU LEFT THE PARTY, DID YOU DRIVE BACK TO

11  THE APARTMENT?

12  A     NO, I WALKED.

13  Q     HOW FAR AWAY IS THE APARTMENT FROM THIS PARTY?

14  A     PROBABLY THREE BLOCKS.

15  Q     THREE BLOCKS.

16  A     THREE AND A HALF BLOCKS.

17  Q     AND DURING THE COURSE OF YOUR WALK WERE YOU STAGGERING

18  WHEN YOU WERE WALKING BACK, OR WERE YOU ABLE TO WALK

19  COHERENTLY, WITHOUT STAGGERING AS A RESULT OF THE ALCOHOL?

20  A     I DON'T -- I MAY HAVE BEEN STAGGERING.  I DON'T

21  RECALL.  USUALLY WHEN I GET THAT DRUNK AND I'M AT THE PARK,

22  I JUST LAY DOWN ON THE LAWN.

23  Q     NOW, WHEN YOU GOT BACK TO THE APARTMENT, YOU DIDN'T

24  HAVE A KEY TO ENTER THE APARTMENT; CORRECT?

25  A     NO, SIR.

26  Q     SO, ISN'T IT TRUE THAT WHEN YOU GOT NEXT TO JEFF'S

27  DOOR, THAT YOU JUST LAID DOWN RIGHT THERE?

28  A     YEAH.

CT 20

1    Q    NOW, WHEN YOU LAID DOWN, WERE YOU IN FACT PASSED OUT

2    FROM THE ALCOHOL?

3    A    NO, I WAS AWAKE.

4    Q    DID YOU GO TO SLEEP AT ALL?

5    A    I DON'T THINK SO.

6    Q    NOW, BEFORE JEFF CAME BACK TO THE APARTMENT, YOU

7    INDICATE THAT YOU HAD A RATHER SERIOUS FALL WHERE YOU

8    SMASHED YOUR FACE AGAINST SOME ASPHALT; CORRECT?

9    A    YES.

10    Q    WAS THAT -- DID THAT OCCUR PRIOR TO GETTING TO THE

11    APARTMENT?

12    A    I BELIEVE SO.

13    Q    I'M NOT ASKING WHAT YOU BELIEVE, I'M ASKING WHAT YOU

14    ACTUALLY RECALL.  DID YOU FALL ON THE PAVEMENT --

15    A    I REMEMBER FALLING DOWN.

16    Q    AND DID YOU FALL ON THE ASPHALT OF THE STREET?

17    A    NO.  THERE'S A WALKWAY THERE THAT LEADS TO THE

18    APARTMENT.  IT'S EXPOSED AGGREGATE.

19    Q    AND THIS IS THE AGGREGATE THAT YOU FELL ON?

20    A    YES.

21    Q    AND THIS WAS PRIOR TO JEFF ARRIVING?

22    A    YES.

23    Q    AND THE INJURIES --

24         MR. CAMPERI:  YOUR HONOR, IF I MAY APPROACH.

25         THE COURT:  YES, YOU MAY.

26    Q    (BY MR. CAMPERI)  ON DIRECT EXAMINATION THE DISTRICT

27    ATTORNEY SHOWED YOU A NUMBER OF PHOTOGRAPHS.  DO YOU RECALL

28    LOOKING AT THESE PHOTOGRAPHS?

CT 21

1   A    YEAH.

2   Q    I'M SHOWING YOU WHAT'S MARKED AS PEOPLE'S EXHIBIT

3   NUMBER 4 AND PEOPLE'S EXHIBIT NUMBER 3.  THERE'S A SHOWING

4   THAT THERE'S SOME SCRAPING OR REDNESS ON THE SIDE OF YOUR

5   CHEEK.  DO YOU SEE THAT?

6   A    YES.

7   Q    AND I'M LOOKING AT PEOPLE'S EXHIBIT NUMBER 4 WHERE

8   THERE'S A RULER THAT'S AGAINST YOUR FACE TO SHOW THE WIDTH

9   AND LENGTH OF THE INJURY.  DO YOU SEE THAT?

10  A    YES, SIR.

11  Q    WAS THAT INJURY AS A RESULT OF FALLING ON YOUR FACE ON

12  THE ASPHALT?

13  A    COULD HAVE BEEN, YES.

14  Q    I'M NOT ASKING WHETHER IT COULD HAVE BEEN.  I'M ASKING

15  WHETHER IT WAS.

16  A    I DON'T KNOW.  MY MEMORY IS A LITTLE VAGUE ON THAT.

17  Q    IS YOUR MEMORY A LITTLE VAGUE BECAUSE YOU HAD BEEN SO

18  INTOXICATED THAT YOU COULDN'T REALLY REMEMBER WHAT HAPPENED?

19  A    YEAH, I FELL AND WHACKED MY FACE.

20  Q    BUT WERE YOU SO INTOXICATED THAT YOU DON'T REMEMBER

21  WHICH SIDE OF THE FACE, YOUR FACE, YOU FELL ON?

22  A    NO, I CAN'T TELL YOU.

23  Q    BUT YOU'RE CERTAIN THAT YOU DID RECEIVE --

24  A    I KNOW PART OF THOSE INJURIES ARE FROM FALLING DOWN.

25  Q    AND THOSE INJURIES WOULD BE --

26  A    THAT WOULD BE PRIOR TO JEFF AND I GETTING IN AN

27  ARGUMENT.

28  Q    YOU GOT TO LET ME FINISH MY QUESTION.

C.T.22

```
 1   A    OKAY.
 2   Q    PRIOR TO GETTING INTO THE ARGUMENT YOU HAVE RECEIVED
 3   SOME INJURIES TO YOUR FACE FROM FALLING ON TO THE GROUND;
 4   CORRECT?
 5   A    YES.
 6   Q    AND THAT COULD EXPLAIN THE SCRAPING INJURIES THAT WE
 7   SEE IN PHOTOGRAPHS 3 AND 4?
 8   A    I WOULD THINK SO.
 9   Q    NOW, WHEN YOU TALKED TO THE POLICE INITIALLY ABOUT
10   THIS OFFENSE, DO YOU RECALL HAVING A CONVERSATION WITH THE
11   OFFICERS?
12   A    ONLY AT THE HOSPITAL.
13   Q    YOU DON'T REMEMBER TALKING TO THE OFFICERS AT THE
14   APARTMENT?
15   A    NOT REALLY.
16   Q    WHEN DISCUSSING THESE INJURIES WITH THE POLICE
17   OFFICER, DO YOU RECALL TELLING THE OFFICER THAT YOU BELIEVE
18   THE INJURIES THAT YOU RECEIVED AS A RESULT OF THIS FIGHT
19   WITH MR. HANCOCK OCCURRED ON THE PRIOR DAY?
20   A    I DON'T RECALL SAYING THAT.
21   Q    FAIR ENOUGH.  NOW, WHEN JEFF ARRIVED BACK AT THE
22   APARTMENT, WERE YOU LAYING DOWN IN FRONT OF THE APARTMENT?
23   A    I MAY HAVE BEEN.
24   Q    DID JEFF MAKE ANY ATTEMPT TO WAKE YOU UP OR ALERT YOU
25   TO HIS PRESENCE?
26   A    I THINK SO.
27   Q    YOU THINK SO OR YOU ACTUALLY REMEMBER THIS?
28   A    I DON'T -- I CAN'T SAY WHETHER I REMEMBER OR NOT.
```

C.T.23

1   IT'S VAGUE.

2   Q      AND IS IT VAGUE BECAUSE OF YOUR INGESTION OR YOUR

3   CONSUMPTION OF ALL THAT ALCOHOL PRIOR TO ARRIVING AT JEFF'S

4   APARTMENT?

5   A      I WOULD ASSUME SO.

6   Q      I'M NOT ASKING YOU TO ASSUME ANYTHING.  I'M ASKING YOU

7   BASED ON YOUR OWN UNDERSTANDING OF THE EVENTS WAS IT AS A

8   RESULT OF THE ALCOHOL CONSUMPTION THAT YOU DON'T RECALL?

9   A      YES.

10  Q      SO YES OR NO, IT WAS AS A RESULT OF THE ALCOHOL THAT

11  YOU DON'T RECALL WHAT POSITION YOU WERE IN WHEN JEFF

12  ARRIVED?

13  A      YES.

14  Q      NOW, DO YOU RECALL TELLING THE OFFICERS ON THIS DAY

15  THAT YOU BELIEVED THAT THREE MEXICANS ASSAULTED YOU?

16  A      YES.

17  Q      DID THREE MEXICANS IN FACT ASSAULT YOU?

18  A      NO.

19  Q      ARE YOU FAMILIAR WITH A PERSON BY THE NAME OF STEVE

20  DUNCAN?

21  A      YES, I KNOW HIM.

22  Q      IS STEVE DUNCAN A FRIEND OF YOURS?

23  A      HE'S AN ACQUAINTANCE.

24  Q      WAS STEVE DUNCAN PRESENT ON THAT DAY THAT THIS ASSAULT

25  OCCURRED AT JEFF'S APARTMENT?

26  A      I DON'T RECALL.

27  Q      SO YOU DON'T REMEMBER IF STEVE DUNCAN WAS ACTUALLY

28  THERE?

CT 24

1    A    WELL, IT WOULDN'T BE FAIR FOR ME TO SAY, BECAUSE THERE

2    WERE SOME OTHER FOLKS THERE THAT TOLD ME HE WAS THERE, BUT I

3    DON'T REALLY REMEMBER IF HE WAS THERE OR NOT.  BUT THEY

4    DON'T HAVE ANY REASON TO LIE ABOUT THAT, SO I DON'T KNOW FOR

5    SURE.

6    Q    WHEN YOU WERE BEING ASSAULTED BY THE PERSON THAT YOU

7    SAID WAS JEFF, ACTUALLY ASSAULTING YOU, DID YOU SEE THIS

8    PERSON'S FACE WHEN THE ASSAULT WAS OCCURRING?

9    A    YES.

10   Q    AND YOU'RE CERTAIN THAT IT WAS JEFF?

11   A    YES.

12   Q    IS IT POSSIBLE THAT IT COULD HAVE BEEN STEVE DUNCAN

13   ASSAULTING YOU?

14   A    I DOUBT IT.  I DON'T THINK SO.

15   Q    WHEN YOU SAY YOU DON'T THINK SO, WHY DO YOU SAY THAT?

16   A    BECAUSE HE WOULDN'T HAVE ANY REASON TO.

17   Q    SO YOU'RE BASING YOUR DETERMINATION THAT IT WASN'T

18   STEVE DUNCAN THAT ASSAULTED YOU BASED ON THE FACT THAT HE

19   HAD NO MOTIVE TO ASSAULT YOU?

20   A    HE -- YES.

21   Q    YOU'RE NOT CERTAIN WHETHER OR NOT HE ACTUALLY

22   ASSAULTED YOU?

23   A    I DON'T BELIEVE STEVE DID ANYTHING.

24   Q    AGAIN, I'M GOING TO ASK YOU, YOU SAY THAT YOU DO NOT

25   BELIEVE THAT HE DID ANYTHING.  WHY DO YOU SAY THAT?

26   A    HE DIDN'T HAVE ANY MOTIVE TO DO THAT.

27   Q    SO IT IS POSSIBLE THAT STEVE DUNCAN COULD HAVE

28   ASSAULTED YOU?

CT25

```
1    A      I DOUBT IT.
2    Q      BUT YOU DOUBT IT BASED ON THE FACT THAT HE HAD NO
3    MOTIVE, NOT BECAUSE YOU DIDN'T SEE HIM?
4    A      I'VE ONLY KNOWN THE GUY FOR LIKE A COUPLE OF MONTHS.
5    THERE'S NO REASON TO DO ANYTHING LIKE THAT.
6    Q      NOW, WHEN YOU SAY THAT YOU SAW JEFF AT SOME POINT
7    ASSAULTING YOU, DID HE AT ANY TIME THROW A PUNCH?
8    A      YEAH.
9    Q      AND DO YOU RECALL WHERE THIS PUNCH -- WHERE THIS FIRST
10   PUNCH OCCURRED?  WAS IT OUTSIDE?  IN FRONT OF THE APARTMENT?
11   A      YES.  EVERYTHING HAPPENED OUTSIDE OF THE APARTMENT.
12   Q      HOW MANY TIMES DID HE PUNCH YOU?
13   A      I DON'T KNOW.
14   Q      YOU DON'T KNOW?
15   A      NO.
16   Q      DO YOU NOT KNOW BECAUSE YOU CAN'T REMEMBER AS A RESULT
17   OF THE INTOXICATION, OR YOU DON'T REMEMBER BECAUSE YOU
18   DIDN'T COUNT?
19   A      IT JUST HAPPENED FAST, YOU KNOW AND, YOU KNOW, IT WAS
20   LIKE, YOU KNOW, A TWO-MINUTE DEAL GOING ON, YOU KNOW.  LIKE
21   I SAID, I DON'T REMEMBER EVERYTHING.
22   Q      SO YOU DON'T REMEMBER HOW MANY TIMES HE PUNCHED YOU
23   WITH HIS FIST?
24   A      NO, NO.  THERE WASN'T A REFEREE THERE COUNTING.
25   Q      WHEN YOU WERE BEING PUNCHED, WERE YOU LAYING ON THE
26   GROUND OR WERE YOU STANDING UP?
27   A      ON THE GROUND.
28   Q      WAS YOUR -- WERE YOU LYING ON YOUR BACK, OR WERE YOU
```

*C.T.*26

1    LAYING ON YOUR FACE WHEN YOU WERE BEING PUNCHED?

2    A    COULD HAVE BEEN BOTH.

3    Q    YOU DON'T RECALL?

4    A    NO, IT'S PRETTY VAGUE.

5    Q    IS IT PRETTY VAGUE AGAIN BECAUSE YOU WERE INTOXICATED

6    AND YOU HAD SO MUCH TO DRINK?

7    A    THAT'S PART OF IT, YES.

8    Q    NOW, YOU INDICATE THAT AT SOME POINT YOU FELL ON A

9    SECOND TIME INTO A BUSH; IS THAT CORRECT?

10   A    YEAH.

11   Q    AND WHEN YOU FELL INTO THE BUSH, YOU BELIEVE THAT YOU

12   FELT A STABBING PAIN IN YOUR BACK; IS THAT CORRECT?

13   A    THAT'S WHAT I THOUGHT.

14   Q    NOW, WAS THIS -- DID THIS OCCUR BEFORE JEFF CAME OVER,

15   OR WAS IT AFTER JEFF CAME BACK HOME?

16   A    IT WAS AFTER JEFF CAME HOME.

17   Q    AND WHEN YOU FELL INTO THE BUSH, WAS IT AS A RESULT OF

18   YOU SIMPLY LOSING YOUR BALANCE AND FALLING, OR WAS IT AS A

19   RESULT OF --

20   A    MOST LIKELY.

21   Q    SO YOU BELIEVE THAT YOU SIMPLY FELL BY LOSING YOUR

22   BALANCE?

23   A    YES.

24         MR. CAMPERI:  MAY I APPROACH THE WITNESS AGAIN,

25   YOUR HONOR?

26         THE COURT:  YES.

27   Q    (BY MR. CAMPERI)  I'M SHOWING YOU PEOPLE'S EXHIBIT

28   NUMBER 5, WHAT YOU PREVIOUSLY DESCRIBED AS A PUNCTURE WOUND.

CT₂₇

```
1    DO YOU SEE THAT?

2    A     UH-HUH.

3    Q     IS THAT "YES"?

4    A     YES.

5          THE COURT:  YOU HAVE TO SAY "YES" OR "NO."

6          THE WITNESS:  I'M SORRY.  YES.

7    Q     (BY MR. CAMPERI)  NOW, ON DIRECT EXAMINATION AND IN

8    EXAMINING PEOPLE'S EXHIBIT NUMBER 5 THERE'S A RULER NEXT TO

9    THIS PUNCTURE WOUND.  DO YOU SEE THAT?

10   A     YES, I DO.

11   Q     AND IT'S MEASURING THE SIZE OF THE PUNCTURE WOUND.  DO

12   YOU SEE THAT?

13   A     RIGHT.

14   Q     IN EXAMINING THIS PUNCTURE WOUND DO YOU BELIEVE THAT

15   IT IS A RESULT OF YOU LOSING YOUR BALANCE AND FALLING INTO A

16   BUSH WHICH POKED YOU?

17   A     AT FIRST I THOUGHT THAT'S WHAT HAPPENED BUT --

18   Q     LET'S STOP RIGHT THERE.  EXPLAIN WHAT YOU MEAN BY AT

19   FIRST THAT'S WHAT YOU THOUGHT HAPPENED.  NOT BASED ON WHAT

20   OTHER PEOPLE TOLD YOU BUT WHAT YOU THOUGHT.

21   A     I'VE HAD SO MANY MIXED FEELINGS ABOUT THAT, IT'S --

22   LIKE I SAID, I CAN'T RECALL EVERYTHING THAT HAPPENED, YOU

23   KNOW.

24   Q     DO YOU BELIEVE THAT AS A RESULT -- AFTER THINKING

25   ABOUT IT WITHOUT WHAT OTHER PEOPLE TOLD YOU, DO YOU BELIEVE

26   THAT YOU RECEIVED THAT PUNCTURE WOUND AS A RESULT OF FALLING

27   INTO A BUSH?

28   A     NO.
```

C.T.28

1    Q    YOU INDICATED PREVIOUSLY THAT THAT WAS WHAT YOU AT

2    FIRST THOUGHT HAPPENED; IS THAT CORRECT?

3    A    YES.

4    Q    NOW YOU'RE CHANGING THAT.  CAN YOU EXPLAIN WHY?

5    A    I WAS TOLD THAT IT WAS A STAB WOUND.

6    Q    FAIR ENOUGH.  WHAT YOU ACTUALLY REMEMBER, THOUGH, IS

7    THAT YOU FELL INTO A BUSH, AND THAT'S HOW YOU BELIEVE YOU

8    RECEIVED THAT WOUND; IS THAT CORRECT?

9    A    YEAH.

10    Q    THANK YOU.

11    A    YOU'RE WELCOME.

12    Q    AT ANY TIME DO YOU RECALL EVER ENTERING JEFF'S

13    APARTMENT AFTER JEFF ARRIVED THAT AFTERNOON OR EVENING?

14    A    NO.  I HAVE BEEN TOLD SOMEBODY PICKED ME UP AND PULLED

15    ME IN THE APARTMENT.

16    Q    SO YOU DON'T EVER ACTUALLY REMEMBER ENTERING THE

17    APARTMENT YOURSELF?

18    A    NO.

19    Q    IS THIS BECAUSE YOU WERE SO INTOXICATED ON ALCOHOL?

20    A    YEAH, THAT AND WOUNDED.

21        MR. CAMPERI:  IF I COULD HAVE JUST ONE MOMENT,

22    YOUR HONOR.

23    Q    (BY MR. CAMPERI)  WHEN YOU FELL AND HIT YOUR HEAD ON

24    THE ASPHALT AREA THAT WE PREVIOUSLY DISCUSSED ON

25    CROSS-EXAMINATION, DID THAT DAZE YOU IN ANY WAY; IN OTHER

26    WORDS, DID THAT AFFECT YOUR ABILITY TO THINK CLEARLY?

27    A    IT'S A POSSIBILITY.

28    Q    I'M ASKING WHAT YOU REMEMBER.  DO YOU REMEMBER HAVING

CT 29

1   TROUBLE THINKING AFTER YOU FELL ON YOUR FACE?

2   A    YEAH, I WAS DAZED.  I WASN'T UNCONSCIOUS, BUT I WAS

3   DAZED.

4   Q    AND THIS WAS AFTER YOU FELL ON YOUR OWN, WITHOUT

5   ANYBODY PUSHING YOU?

6   A    YEAH, I TRIPPED AND FELL.

7   Q    BEFORE JEFF ARRIVED; CORRECT?

8   A    YEAH.

9   Q    AS A RESULT OF ANY FIGHTING THAT YOU BELIEVE YOU HAD

10  WITH JEFF IS IT A FAIR STATEMENT TO SAY THAT YOU NEVER LOST

11  ANY CONSCIOUSNESS AT ALL?

12  A    YEAH, THAT'S A FAIR STATEMENT.

13  Q    IS THAT WHAT HAPPENED, YOU NEVER LOST CONSCIOUSNESS AS

14  A RESULT OF ANY FIGHTING WITH JEFF?

15  A    YEAH.  I WAS HAZED, BUT LIKE I SAID, I DON'T RECALL

16  PASSIN' OUT TOTALLY.

17  Q    FAIR ENOUGH.  THANK YOU.

18        MR. CAMPERI:  I HAVE NO OTHER QUESTIONS.

19        THE COURT:  ANY REDIRECT?

20        MR. DEMERTZIS:  YES, YOUR HONOR.

21              **REDIRECT EXAMINATION**

22  Q    (BY MR. DEMERTZIS)  MR. DAVIS, DO YOU THINK IT'S OKAY

23  FOR SOMEONE TO BEAT UP ANOTHER PERSON?

24        MR. CAMPERI:  I'M GOING TO OBJECT, RELEVANCE.

25        THE COURT:  DO YOU WANT TO BE HEARD ON THAT?

26        MR. DEMERTZIS:  YES, YOUR HONOR.  I WANT TO TRY

27  AND DETERMINE WHY MR. DAVIS IS COVERING UP FOR THE

28  DEFENDANT.

CT30

1          THE COURT:  WELL, I'M GOING TO SUSTAIN THE

2    OBJECTION.  YOU CAN APPROACH IT A DIFFERENT WAY, PERHAPS, IF

3    YOU'D LIKE, BUT I'LL SUSTAIN THAT OBJECTION.

4    Q     (BY MR. DEMERTZIS)  YOU TOLD US EARLIER THAT YOU THINK

5    THE DEFENDANT IS AN OKAY GUY.  I DON'T REMEMBER WHAT WORDS

6    YOU USED, BUT YOU THINK HE'S AN OKAY GUY; RIGHT?

7    A     YEAH, HE'S A GOOD GUY.

8    Q     HE'S A GOOD GUY?

9    A     YEAH.

10   Q     DO YOU WANT TO SEE HIM GET IN TROUBLE?

11   A     NO, I DON'T.

12   Q     ARE YOU PROTECTING HIM RIGHT NOW WITH YOUR TESTIMONY?

13   A     I'M JUST TRYING TO TELL YOU THE TRUTH.

14   Q     FAIR ENOUGH.

15   A     WHAT I RECALL.  AND I DON'T REMEMBER EVERYTHING.

16   Q     FAIR ENOUGH.  DO YOU NOT REMEMBER CERTAIN THINGS

17   BECAUSE YOU BLACKED OUT?

18   A     I DON'T THINK I BLACKED OUT.  I WAS HAZED, YOU KNOW,

19   DAZED.

20   Q     HAVE YOU TALKED TO THE DEFENDANT SINCE THIS ALL

21   HAPPENED?

22   A     NO, I HAVEN'T.

23   Q     NOT AT ALL?

24   A     NO, I HAVEN'T.

25   Q     ALL RIGHT.  YOU REMEMBER TALKING TO OFFICER KIM THAT

26   DAY, THE GENTLEMAN SEATED HERE IN UNIFORM?

27   A     AT THE HOSPITAL.

28   Q     DO YOU REMEMBER TALKING TO HIM AT THE SCENE?

CT31

1   A    I DON'T RECALL.

2   Q    DO YOU REMEMBER TELLING OFFICER KIM AT THE SCENE THAT

3   YOU THOUGHT THREE MEXICAN GUYS JUMPED YOU AT THE FAIR OAKS

4   APARTMENT?

5   A    OH, OKAY.  YEAH, I DID SAY THAT.

6   Q    DID YOU TELL OFFICER KIM THAT ONE OF THESE THREE

7   MEXICAN GUYS CAME UP FROM BEHIND AND STABBED YOU?

8   A    I DON'T RECALL SAYING THAT.

9   Q    DID YOU TELL OFFICER KIM THAT THE THREE MEXICAN GUYS

10  THEN, QUOTE, TOOK THE BOOTS, UNQUOTE TO YOU?

11  A    YEAH, HE --

12      MR. CAMPERI:  YOUR HONOR, I'LL OBJECT, BECAUSE I

13  BELIEVE THE DISTRICT ATTORNEY IS ATTEMPTING TO IMPEACH THE

14  DEFENDANT, AND I DON'T KNOW IF THERE'S ANY -- THIS IS

15  IMPROPER, AND IT SHOULD BE REFRESHING RECOLLECTION FIRST,

16  AND AT THAT POINT THERE MUST BE A DETERMINATION AS TO

17  WHETHER IMPEACHMENT IS APPROPRIATE.

18      THE COURT:  I'LL OVERRULE THAT OBJECTION.

19  Q    (BY MR. DEMERTZIS)  DO YOU RECALL TELLING OFFICER KIM

20  THAT THESE THREE MEXICAN GUYS TOOK THE BOOTS TO YOU?

21  A    YEAH, I BELIEVE I SAID THEY GAVE ME THE BOOT MASSAGE.

22  Q    DID OFFICER KIM AT THE SCENE TELL YOU THAT HE DID NOT

23  THINK YOU WERE TELLING HIM THE TRUTH?

24  A    HE TOLD ME THAT AT THE HOSPITAL.  I DON'T REMEMBER HIM

25  SAYING THAT AT THE SCENE, AT JEFF'S PLACE.

26  Q    SO OFFICER KIM COULD HAVE SAID AT THE SCENE THAT HE

27  DID NOT BELIEVE YOU, YOU JUST DON'T REMEMBER?

28  A    HE COULD HAVE.

CT 32

1    Q    DO YOU RECALL THEN JUST NOT WANTING TO TALK ABOUT IT
2    WITH OFFICER KIM AT THE SCENE?
3    A    YEAH.  LIKE I SAID EARLIER, I WAS LYING.
4    Q    YOU WERE LYING ABOUT THE THREE MEXICAN GUYS?
5    A    YEAH.
6    Q    WHY WERE YOU LYIN'?
7    A    I DIDN'T WANT TO SEE JEFF GET IN TROUBLE.
8    Q    IS THAT BECAUSE JEFF'S THE GUY WHO BEAT YOU UP?
9    A    YES.
10   Q    IS JEFF THE GUY THAT STABBED YOU?
11   A    WHAT FOLKS TELL ME.  I DIDN'T SEE HIM DO IT.
12   Q    AND YOU'RE TELLING ME THAT --
13   A    I DON'T RECALL THAT.  I JUST RECALL FEELING, YOU KNOW,
14   SOME PAIN.
15   Q    DESCRIBE THAT PAIN FOR US.
16   A    IT WAS KIND OF A SHARP PAIN.  MY RIBS HURT.  MY FACE
17   HURT.
18   Q    DID YOU FEEL THE SHARP PAIN WHILE THE DEFENDANT WAS
19   BEATIN' YOU UP?
20   A    I DON'T REMEMBER.
21   Q    DID YOU SUSTAIN ANY INJURIES OTHER THAN THOSE IN THE
22   PHOTOGRAPHS AND THIS PUNCTURE WOUND, WHICH IS ALSO IN THE
23   PHOTOGRAPHS.  DID YOU SUSTAIN ANY OTHER INJURIES THAT I
24   HAVEN'T ASKED YOU ABOUT?
25   A    YEAH, I HAD -- I HAD BUMPS ALL OVER THE BACK OF MY
26   HEAD.
27   Q    HOW ABOUT YOUR RIBS?
28   A    THREE CRACKED RIBS, BRUISED STERNUM.

33

1    Q      HOW DO YOU KNOW YOU HAD THREE CRACKED RIBS?

2    A      THE DOCTORS TOLD ME THAT AT STANFORD HOSPITAL.  THEY

3    RAN ME THROUGH ONE OF THOSE -- WHAT IS THAT?  M.R.I.

4    Q      AND THEY TOLD YOU YOU HAD BROKEN RIBS?

5    A      YEAH.

6           MR. CAMPERI:  YOUR HONOR, I'M GOING TO OBJECT TO

7    THIS MEDICAL TESTIMONY, BASED ON HEARSAY.

8           THE COURT:  I'LL SUSTAIN THE OBJECTION AND STRIKE

9    THE ANSWER THAT THE RIBS WERE CRACKED, BECAUSE IT APPEARS TO

10   BE HEARSAY FROM THAT, THE DOCTOR WHO IS NOT PRESENT.

11   Q      (BY MR. DEMERTZIS)  DID YOU EVER PLAY SPORTS AT ALL

12   GROWING UP?

13   A      OH, YES.

14   Q      DID YOU EVER GET INJURED PLAYING SPORTS?

15   A      YES.

16   Q      DID YOU EVER BREAK A RIB?

17   A      YES.

18   Q      DO YOU KNOW WHAT THAT FEELS LIKE?

19   A      YES.

20   Q      ALL RIGHT.  AFTER THE BEATING YOU TOOK BY THE

21   DEFENDANT, DID IT FEEL LIKE YOU GOT BROKEN RIBS?

22   A      I KNEW THEY WERE BROKEN.

23   Q      BECAUSE OF YOUR PAST EXPERIENCE GETTING BROKEN RIBS?

24   A      YES, IN CAR WRECKS.

25   Q      IN CAR WRECKS YOU'VE HAD RIBS BROKEN?

26   A      YEAH.

27   Q      AND THE FEELING THAT YOU HAD AFTER THE DEFENDANT BEAT

28   YOU UP IN YOUR RIBS WAS SIMILAR TO THE FEELING YOU HAD

CT34

1    GETTING INJURED PLAYING SPORTS AND BREAKING RIBS IN CAR

2    WRECKS; IS THAT CORRECT?

3    A    YES.

4    Q    YOU REMEMBER TALKING TO OFFICER KIM AT THE HOSPITAL;

5    RIGHT?

6    A    YES.

7    Q    DID YOU TELL OFFICER KIM AT THE HOSPITAL THAT YOU'RE

8    NOT A QUOTE, UNQUOTE, RAT AND YOU DID NOT WANT TO PRESS ANY

9    CHARGES AGAINST ANYONE?

10    A    YES, I RECALL THAT.

11    Q    OFFICER KIM TOLD YOU THAT HE NEEDED YOU TO BE HONEST

12    WITH HIM; RIGHT?

13    A    RIGHT.

14    Q    DID YOU THEN TELL OFFICER KIM THAT YOU DIDN'T WANT THE

15    OFFICER TO TELL JEFF THAT YOU RATTED HIM OUT?

16    A    YES.

17    Q    DID YOU THEN TELL OFFICER KIM THAT YES, JEFF, TO USE

18    YOUR WORDS, BEAT THE SHIT OUT OF YOU?

19    A    YES.

20    Q    DID YOU TELL OFFICER KIM THAT YOU WERE SLEEPING IN

21    FRONT OF THE DEFENDANT'S APARTMENT DOOR WHEN THE DEFENDANT

22    CAME HOME?

23    A    PROBABLY SO.

24    Q    YOU TOLD OFFICER KIM THAT YOU SOMETIMES STAY WITH THE

25    DEFENDANT BECAUSE YOU'RE FRIENDS WITH THE DEFENDANT; RIGHT?

26    A    RIGHT.

27    Q    AND THAT WHILE YOU WERE SLEEPING IN FRONT OF HIS CAR,

28    THE DEFENDANT CAME HOME AND HE WAS IN A BAD MOOD; YOU TOLD

CT38

1    Q      BUT THAT YOU THOUGHT MAYBE YOU, QUOTE, SOCKED, UNQUOTE

2    THE DEFENDANT IN THE EYE?

3    A      I MAY HAVE DONE THAT.

4    Q      DID YOU TELL THE OFFICER THAT YOU THOUGHT MAYBE YOU

5    SOCKED THE DEFENDANT IN THE EYE?

6    A      I KNOW I WAS TRYING TO FIGHT BACK.  I WASN'T SURE IF I

7    GOT HIM OR NOT.

8    Q      LAST QUESTION ABOUT THE CONVERSATION BETWEEN YOU AND

9    OFFICER KIM AT THE HOSPITAL:  DID YOU TELL OFFICER KIM THAT

10   IF THE DEFENDANT FOUND OUT THAT YOU WERE A RAT, THAT HE

11   WOULD KILL YOU?

12   A      I DON'T RECALL SAYING THAT.

13   Q      YOU MAY HAVE SAID THAT?

14   A      LIKE I SAID, I DON'T RECALL.

15   Q      DO YOU BELIEVE THAT?

16   A      NO, I DON'T BELIEVE THAT.

17   Q      BUT YOU STARTED THAT CONVERSATION WITH OFFICER KIM AT

18   THE HOSPITAL BY TELLING HIM, "DON'T TELL JEFF THAT I'M

19   RATTING HIM OUT"; RIGHT?

20   A      YEAH, I DIDN'T WANT TO DO THAT.  I DIDN'T WANT TO SEE

21   HIM GET IN TROUBLE.

22   Q      IT'S NOT THAT YOU'RE AFRAID OF HIM?

23   A      NO, I'M NOT AFRAID OF HIM.

24   Q      YOU'RE NOT AFRAID OF A GUY WHO BEAT YOU UP?

25   A      WELL, YEAH.  YOU KNOW, I'M NO SPRING CHICKEN, YOU

26   KNOW.

27   Q      WHEN THE DEFENDANT GOT BACK TO HIS APARTMENT, YOU WERE

28   WAITING OUT FRONT, WAS STEVE DUNCAN EVEN THERE?

CT39

1   A       YOU KNOW, I DON'T RECALL, BUT I WAS TOLD LATER THAT HE

2   WAS THERE.

3           MR. DEMERTZIS:  MOVE TO STRIKE THAT LAST RESPONSE

4   AS HEARSAY AND NONRESPONSIVE.

5           THE COURT:  APPEARS TO BE.  IT'S STRICKEN.

6   Q       (BY MR. DEMERTZIS)  WHAT I'M ASKING YOU, MR. DAVIS, IS

7   YOU WERE WAITING OUT IN FRONT OF THE DEFENDANT'S APARTMENT

8   FOR HIM TO GET HOME FOR HOW LONG?

9   A       PROBABLY WAS AN HOUR, MAYBE AN HOUR AND A HALF.

10  Q       SO IF IN THAT HOUR, HOUR AND A HALF DID YOU EVER SEE

11  STEVE DUNCAN AT ALL?

12  A       I DON'T THINK SO.

13  Q       I MEAN YOU KNOW THE GUY; RIGHT?

14  A       YEAH, I KNOW HIM.

15  Q       AND YOU DON'T RECALL SEEING HIM WHILE YOU WERE WAITING

16  IN FRONT OF THE DEFENDANT'S APARTMENT?

17  A       NO, I DON'T REMEMBER THAT.

18  Q       ALL RIGHT.  THAT'S ALL THE QUESTIONS I HAVE.  THANK

19  YOU, SIR.

20          THE COURT:  RECROSS.

21          MR. CAMPERI:  JUST BRIEFLY, YOUR HONOR.

22                    **RECROSS-EXAMINATION**

23  Q       (BY MR. CAMPERI)  ON DIRECT EXAMINATION AND ON

24  REDIRECT THERE WERE SOME QUESTIONS ABOUT YOUR INJURIES.

25  WITH REGARDS TO THE STAB TO THE HAND THAT YOU SAID YOU

26  RECEIVED, YOU NEVER SAW MR. HANCOCK ACTUALLY STAB YOU IN THE

27  HAND; CORRECT?

28  A       NO.

CT40

1   Q    YOU DON'T REALLY REMEMBER HOW THAT WOUND OCCURRED; IS

2   THAT CORRECT?

3   A    I DON'T REMEMBER A LOT ABOUT THAT NIGHT.

4   Q    I'M ASKING YOU SPECIFICALLY ABOUT THE WOUND TO YOUR

5   HAND.

6   A    NO, I DON'T REMEMBER.

7   Q    NOW, WITH REGARDS TO THE QUESTIONING BY OFFICER KIM I

8   JUST HAVE A COUPLE OF THINGS I WANTED TO ADD.  YOU SPOKE --

9   WHEN YOU SPOKE TO OFFICER KIM, ISN'T IT TRUE THAT YOU TOLD

10  HIM YOU DID NOT BLACK OUT, BUT YOU CAME CLOSE TO IT?

11  A    YES, I COULD HAVE SAID THAT.

12  Q    AND --

13  A    THAT'S THE WAY I FELT.

14  Q    AND YOU ALSO INDICATED TO OFFICER KIM THAT YOU SOCKED

15  MR. HANCOCK IN THE EYE; IS THAT CORRECT?

16  A    I DON'T REMEMBER EXACTLY.

17         MR. CAMPERI:  MAY I APPROACH THE WITNESS, YOUR

18  HONOR?

19         THE WITNESS:  I MAY HAVE.

20         THE COURT:  YES, YOU MAY.

21  Q    (BY MR. CAMPERI)  DO YOU RECALL SOCKING MR. HANCOCK IN

22  THE EYE?

23  A    NO, NOT -- NO.

24  Q    I'M SHOWING YOU A COPY OF OFFICER KIM'S POLICE REPORT

25  ON PAGE 8 OF 11, LINE 5.  I WANT YOU TO READ THAT TO

26  YOURSELF, AND IT'S AN UNDERLINED PORTION, AND LET ME KNOW

27  WHEN YOU'RE DONE READING IT.

28  A    YEAH, I PROBABLY SAID THAT.

**CT**44

1   A     NO.

2   Q     DID YOU SAY ANYTHING THAT --

3   A     I -- LIKE I SAID, WE HAD SOME WORDS ABOUT THE GIRLS AT

4   THE PICNIC.  THAT'S -- AND I BARELY REMEMBERED SAYING THAT

5   BUT, YOU KNOW, ALL THIS TIME I THOUGHT ABOUT IT, AND I

6   REMEMBERED SAYING THAT TO JEFF, AND HE GOT MAD AT ME.

7   Q     SAYING WHAT TO JEFF?

8   A     OH, BECAUSE I WAS MAD AT THE GIRLS.  AND HE WAS LIKE

9   DEFENDING THEM, SAYING I WAS OBNOXIOUS, WHICH IS PROBABLY

10  TRUE.  SO IT WAS JUST A VERBAL CONFRONTATION AT THAT POINT,

11  THEN IT GOT A LITTLE OUT OF HAND SO -- I DON'T KNOW.

12  Q     DID YOU THINK THAT THIS VERBAL CONFRONTATION BETWEEN

13  YOU AND THE DEFENDANT OVER THESE GIRLS AT THE PARK WOULD

14  LEAD TO A PHYSICAL ALTERCATION?

15  A     NO.

16  Q     WHY NOT?

17  A     IT'S NEVER HAPPENED BEFORE.  I NEVER HAD ANY PROBLEMS

18  WITH JEFF BEFORE, YOU KNOW, OR ANY OF THAT.  HE'S NEVER BEEN

19  VIOLENT WITH ME.  WE'VE ALWAYS BEEN GOOD, YOU KNOW, FRIENDS.

20        MR. DEMERTZIS:  THANK YOU, SIR.

21        THE WITNESS:  YOU'RE WELCOME.

22        THE COURT:  ANYTHING ELSE?

23        MR. CAMPERI:  ONE OTHER QUESTION, YOUR HONOR.

24              **FURTHER RECROSS-EXAMINATION**

25  Q     (BY MR. CAMPERI)  IS IT TRUE, MR. DAVIS, THAT YOU'VE

26  NEVER SEEN MR. HANCOCK ACT VIOLENTLY OTHER THAN THIS

27  OCCASION THAT YOU ALLEGE?

28  A     THAT'S TRUE.

1    ALTHOUGH THE ROBBERY WAS FROM 1985, BETWEEN NOW AND THEN

2    MR. HANCOCK REFUSES TO ABIDE BY THE LAWS OF THIS STATE AND

3    COUNTY AND, THEREFORE, IF HE TESTIFIES, THE JURY SHOULD AT

4    LEAST BE AWARE OF THAT PRIOR CONVICTION INSOFAR AS IT SHEDS

5    LIGHT ON HIS CREDIBILITY.  WITH THAT THE PEOPLE SUBMIT.

6            THE COURT:  DO YOU WISH TO BE HEARD FURTHER BEFORE

7    I RULE?

8            MR. KURTZMAN:  YOUR HONOR, I WOULD POINT OUT TO

9    THE COURT THAT THE VAST MAJORITY OF THESE OFFENSES ARE

10   SUBSTANCE ABUSE OFFENSES, AND THAT'S BASICALLY WHAT YOU

11   HAVE, IS YOU HAVE SOMEBODY WHO HAS A SUBSTANCE ABUSE PROBLEM

12   WHO TWENTY YEARS AGO COMMITTED A CRIME OF MORAL TURPITUDE.

13       I THINK IT ACTUALLY SPEAKS VOLUMES TO MR. HANCOCK'S

14   CHARACTER THAT HE IS UNLIKE MOST OTHER SUBSTANCE ABUSE

15   PEOPLE IN THAT HE APPEARS TO HAVE WORKED FOR THE MONEY TO

16   PROCURE THE SUBSTANCES.  UNFORTUNATELY, HE PROCURED THE

17   SUBSTANCES, MOSTLY ALCOHOL.

18       BUT THAT HE HASN'T BEEN STEALING AND COMMITTING OTHER

19   CRIMES OF MORAL TURPITUDE TO SUPPORT HIS HABIT, AND I THINK

20   THAT GOES TO SHOW THAT HE DOES NOT HAVE THE MORAL TURPITUDE

21   CHARACTERISTIC IN HIS CHARACTER THAT THE USE FOR PRIOR

22   IMPEACHMENT WOULD BE GEARED FOR.

23           THE COURT:  I'VE HEARD ENOUGH HISTORY THERE

24   BETWEEN 1985 AND TODAY, MR. HANCOCK, BOTH SUBSTANCE ABUSE --

25   DIRECT SUBSTANCE ABUSE RELATED CRIMES AND THOSE THAT ARE

26   NONSUBSTANCE ABUSE RELATED CRIMES TO BELIEVE THAT BECAUSE

27   MR. HANCOCK HAS NOT LED A CRIME-FREE LIFESTYLE SINCE THE

28   DATE OF HIS ROBBERY CONVICTION, THAT THE CONVICTION SHOULD

1   NOT BE DEEMED TO BE SO REMOTE AS TO EXCLUDE IT.  SO I WILL

2   FIND THE CASTRO TEST FOR ADMISSIBILITY BEING MET HERE.

3        FURTHERMORE, IN THE 352 ANALYSIS THE COURT IS

4   CONDUCTING I DO FIND THE PROBATIVE VALUE OF ALLOWING

5   IMPEACHMENT, SHOULD MR. HANCOCK TESTIFY, WITH HIS PRIOR

6   CONVICTION TO OUTWEIGH ANY CONSUMPTION OF TIME IT WOULD

7   TAKE, AND I DO FIND SPECIFICALLY THAT THE PERMISSION TO

8   ALLOW THIS FELONY CONVICTION TO IMPEACH WOULD OUTWEIGH ANY

9   POSSIBILITY OF SUBSTANTIAL DANGER.

10       I DO NOT, GIVEN THE JURY INSTRUCTIONS I GIVE TO THE

11  JURY, FEEL THAT IT WOULD CREATE A SUBSTANTIAL DANGER OF

12  UNDUE PREJUDICE TO ALLOW IMPEACHMENT, GIVING THE LIMITING

13  INSTRUCTION IN THIS AREA THAT THE COURT WOULD GIVE, AND

14  GIVEN THE FACT THAT THIS JURY WILL PROMISE TO FOLLOW ALL

15  INSTRUCTIONS THAT I GIVE IT IN ORDER FOR THEM TO QUALIFY FOR

16  THIS JURY.

17       ANY OTHER REQUESTS BY THE PROSECUTION?

18       MR. DEMERTZIS:  YES, YOUR HONOR.  THE OTHER TWO

19  ARE A COUPLE OF STIPULATIONS THAT I'LL GO THROUGH NOW, AND

20  I'D LIKE TO TAKE UP THE ISSUE OF PHOTOGRAPHS.  BUT THE

21  STIPULATIONS SO FAR, THE PEOPLE WOULD OFFER THREE, AND THESE

22  ARE PREVIOUSLY DISCUSSED WITH DEFENSE COUNSEL.  THIS MAY

23  CHANGE, DEPENDING ON HOW THE EVIDENCE COMES IN DURING THE

24  TRIAL.

25       BUT AS AN OFFICER OF THE COURT I'M RELATING THAT OUR

26  CRIME LAB IN SANTA CLARA COUNTY HAS TESTED BLOOD SAMPLES

27  FOUND AT THE SCENE AND ON THE ALLEGED WEAPON IN THIS CASE

28  AGAINST THE VICTIM'S DNA, AND THEY MATCH, AND THEREFORE THE

1    Q    (BY MR. KURTZMAN)  YOU'VE HAD -- ABOUT HOW MANY

2    CONVERSATIONS HAVE YOU HAD WITH MR. DEMERTZIS ABOUT THIS

3    CASE?

4    A    I DON'T KNOW.  JUST GUESSING, MAYBE TEN.

5    Q    YOU'RE GUESSING TEN.  IT'S DEFINITELY MORE THAN FIVE,

6    PROBABLY LESS THAN TWENTY; RIGHT?

7    A    YES, RIGHT IN THERE.  JUST KEEPING TRACK OF IT, JUST

8    TRYING TO KEEP IN TOUCH, YOU KNOW.

9    Q    SO YOU'VE TALKED ABOUT THE FACTS OF THIS CASE WITH

10   MR. DEMERTZIS ABOUT TEN TIMES; CORRECT?

11   A    YEAH, THAT WOULD PROBABLY BE PRETTY CLOSE, I WOULD

12   GUESS.

13   Q    AND YOU'VE TALKED TO INVESTIGATORS THAT WORK FOR

14   MR. DEMERTZIS ABOUT THIS CASE; CORRECT?

15   A    I TALKED TO POLICE OFFICERS.

16   Q    YOU'VE TALKED TO POLICE OFFICERS ABOUT THIS CASE?

17   A    YEAH.  I TALKED TO OFFICER KIM, AND A DETECTIVE CAME

18   AND SAW ME AT STANFORD.  I ONLY TALKED TO HIM LIKE TWICE, I

19   THINK.

20   Q    SO YOU TALKED TO THE DETECTIVE ABOUT TWO TIMES.  ABOUT

21   HOW MANY TIMES HAVE YOU TALKED TO OFFICER KIM ABOUT THE

22   FACTS OF THIS CASE?

23   A    MAYBE TWICE, MAYBE THREE TIMES, THAT'S -- RIGHT IN

24   THERE.

25   Q    AND THOSE CONVERSATIONS -- ALL OF THOSE CONVERSATIONS

26   HAVE BEEN OVER THE COURSE OF THE LAST NINE MONTHS OR SO;

27   CORRECT?

28   A    OH, YEAH.

1    GIVE; RIGHT?

2    A    WE DIDN'T DO A WHOLE LOT OF THAT TODAY.

3    Q    BUT YOU DID IT PREVIOUSLY?

4    A    YES, WE'VE TALKED ABOUT THE CASE PREVIOUSLY.

5    Q    HOW WAS IT THAT YOU FIRST KNEW YOU HAD BEEN STABBED?

6    A    I FELT A SHARP PAIN IN MY BACK.

7    Q    AND WHEN YOU WERE FIRST STABBED, WHAT IS IT THAT YOU

8    THOUGHT HAD HAPPENED?

9    A    ORIGINALLY I THOUGHT THAT I FELL ON SOMETHING

10   WRESTLING AROUND IN THE BUSHES.  I DIDN'T KNOW WHAT

11   HAPPENED.

12   Q    AND YOU THOUGHT YOU HAD JUST HURT YOURSELF ON THE

13   BUSHES?

14   A    YEAH, THAT'S WHAT I THOUGHT, BUT THAT ISN'T WHAT

15   HAPPENED.

16   Q    AND IN FACT THE REASON YOU NOW SAY THAT ISN'T WHAT

17   HAPPENED IS BECAUSE SOMEBODY TOLD YOU THAT YOU WERE STABBED

18   WITH A KNIFE, DIDN'T THEY?

19   A    YEAH, I THINK THE NEIGHBOR TOLD ME THAT FIRST.

20   Q    WHICH NEIGHBOR TOLD YOU YOU WERE STABBED WITH A KNIFE?

21   A    PETER.  I THINK PETER.

22        THE COURT:  CAN I HAVE THE NAME AGAIN?  WHAT WAS

23   YOUR ANSWER?

24        THE WITNESS:  I'M SORRY.  HIS NAME IS PETER.

25   PETER CARBON, I THINK.

26   Q    (BY MR. KURTZMAN)  SO THE FIRST KNOWLEDGE THAT YOU HAD

27   YOU WERE STABBED YOU'RE NOW SAYING WAS BECAUSE PETER TOLD

28   YOU; CORRECT?

```
1   Q     DID YOU ASK CRAIG WHAT HAPPENED?

2   A     YES.

3   Q     WHAT DID HE TELL YOU?

4   A     CRAIG TOLD ME THAT HE GOT ROLLED IN THE PARK, FAIR

5   OAKS PARK.

6   Q     DID YOU BELIEVE HIM?

7   A     NO.

8   Q     WHY NOT?

9   A     JEFF HAD COMBATIVE INJURIES TO HIS HANDS.

10  Q     JEFF, THE DEFENDANT?

11  A     YES.

12  Q     OKAY.  TELL US ABOUT THAT.

13  A     HIS HANDS WERE SWOLLEN AND CUT UP.  IT LOOKED LIKE

14  HE'D BEEN BEATING ON CRAIG, WHICH --

15  Q     WELL, BEATING ON SOMETHING?

16  A     YEAH.

17  Q     YOU DIDN'T KNOW AT THAT POINT.  TELL US IN DETAIL AS

18  BEST YOU CAN, SIR, WHAT YOU OBSERVED ON THE DEFENDANT'S

19  HANDS.

20  A     I JUST DID.  HIS KNUCKLES WERE SWOLLEN RED AND SOME

21  MINOR CUTS.

22  Q     BASED ON WHAT YOU OBSERVED ON JEFF YOU DIDN'T BELIEVE

23  CRAIG'S STORY THAT HE GOT ROLLED IN THE PARK?

24  A     NO, I DID NOT.

25  Q     IS THERE ANYTHING ELSE THAT MADE YOU SUSPECT THAT

26  CRAIG WAS NOT TELLING THE TRUTH?

27  A     CRAIG WAS VERY DEPENDENT ON JEFF, SO HE WOULD COVER

28  FOR HIM IN A SITUATION LIKE THAT.
```

1    THE COURT:  YOU'RE EXCUSED.  THANK YOU FOR COMING

2    IN.  APPROACH THE BENCH ON THE PRIOR WITNESS.

3    (DISCUSSION OFF THE RECORD.)

4    THE COURT:  WE'LL TAKE A RECESS AT THIS TIME.  THE

5    NEXT WITNESS WILL TAKE AT LEAST HALF AN HOUR, SO THIS IS A

6    BETTER TIME TO TAKE A RECESS.  REMEMBER THE ADMONITION,

7    LADIES AND GENTLEMEN.

8    (RECESS.)

9    THE COURT:  FOR THE RECORD THE COURT CALLS THE

10    MATTER OF PEOPLE VERSUS HANCOCK.  MR. KURTZMAN, YOU WISH TO

11    PUT SOMETHING ON THE RECORD OUTSIDE OF THE PRESENCE OF THE

12    JURY BEFORE THE JURY IS RECALLED HERE.  WHAT WOULD THAT BE,

13    MR. KURTZMAN?

14    MR. KURTZMAN:  YOUR HONOR, AT THIS POINT, AS A

15    MATTER TO PRESERVE THE RECORD, GIVEN I'M NOT SURE OF WHICH

16    POINT THE MOTION BECOMES UNTIMELY, I FEEL I HAVE TO MAKE A

17    MOTION UNDER 1054.1(B) AND MOVE FOR A MISTRIAL.

18    1054.1(B) OF THE PENAL CODE IS THE CODE SECTION THAT

19    STATES THAT THE PEOPLE HAVE A DUTY TO DISCLOSE ALL

20    STATEMENTS MADE BY THE DEFENDANT TO THE DEFENSE.  IT'S CLEAR

21    FROM THE TESTIMONY WE JUST HEARD BEFORE THE RECESS, AND I

22    NEEDED TO RESEARCH THIS BEFORE I COULD BRING THE MOTION,

23    THAT THE PEOPLE HAD AT LEAST A DAY'S NOTICE OF MR. CRAVEN'S

24    TESTIMONY.

25    THE DEFENSE HAD NO NOTICE OF WHAT IS OBVIOUSLY VERY

26    DRAMATIC AND SIGNIFICANT TESTIMONY, IN THAT IT IS ANOTHER

27    CONFESSION ALLEGEDLY MADE BY MR. HANCOCK.  THE CONVERSATION

28    I'M CURRENTLY HAVING WITH MR. HANCOCK IS WHETHER OR NOT HE

1    SUBMIT IT.

2            THE COURT:  MR. DEMERTZIS, WHAT WOULD YOU LIKE TO

3    SAY ABOUT THIS?

4            MR. DEMERTZIS:  YOUR HONOR, THE NIGHT BEFORE

5    MR. CRAVEN CAME TO COURT AND TESTIFIED I CALLED HIM TO GIVE

6    HIM A SPECIFIC ARRIVAL TIME FOR COURT.  IN THE COURSE OF

7    THAT CONVERSATION I ASKED HIM IS THERE -- WAS THERE ANYONE

8    ELSE AT THE SCENE OR IS THERE ANYTHING ELSE THAT I NEED TO

9    LOOK INTO THAT'S NOT IN THE POLICE REPORT.  AND HE WENT ON

10   TO DESCRIBE THE DEFENDANT MAKING A DEMONSTRATION WITH THE

11   KNIFE.

12           NOW, I STOPPED MR. CRAVEN, BECAUSE I DIDN'T WANT TO

13   MAKE MYSELF A WITNESS IN THE TRIAL, AND I DIDN'T HAVE AN

14   OPPORTUNITY TO HAVE AN INVESTIGATOR GO AND TALK TO

15   MR. CRAVEN.  AS FOR THIS STATEMENT BY THE DEFENDANT I WOULD

16   AGREE THAT THE DEFENDANT'S RESPONSE TO A QUESTION FROM

17   MR. CRAVEN AT THE CRIME SCENE, WHICH IS NONVERBAL BUT RATHER

18   A DEMONSTRATION, WOULD BE TANTAMOUNT TO A STATEMENT.

19           ASSUMING IT'S A STATEMENT, THE PENAL CODE PROVIDES

20   THOSE STATEMENTS SHOULD BE TURNED OVER TO THE DEFENSE IN A

21   TIMELY MANNER.  WHILE I DID NOT CALL DEFENSE COUNSEL AT 9:00

22   AT NIGHT TO MAKE HIM AWARE OF THOSE STATEMENTS, AND WHEN WE

23   GOT TO COURT THAT MORNING --

24           THE COURT:  YESTERDAY MORNING.

25           MR. DEMERTZIS:  -- YESTERDAY MORNING, WE WERE

26   FINISHING UP WITH A WITNESS AND TALKED ABOUT SCHEDULES, AND

27   WE WERE GOING TO PUT ON MR. CRAVEN.  FRANKLY, IT DID NOT

28   OCCUR TO ME TO DISCUSS THIS POTENTIAL STATEMENT THE

1  OPPOSED TO THE NEIGHBOR, PERHAPS HE WOULD HAVE MORE EASILY

2  REMEMBERED TO TELL YOU YESTERDAY MORNING, MR. KURTZMAN, OF

3  WHAT HE HAD FOUND OUT.

4       THE FACT OF THE MATTER IS THAT WHEN YOU GET INTO A

5  TRIAL SITUATION, SOMETIMES THERE ARE SLIPS, AND IN MY MIND

6  THIS WAS A MINOR SLIP, IN VIEW OF THE FACT THAT THE

7  DISCOVERY HERE, WHICH WAS NOT GIVEN TO YOU AND WHICH YOU

8  FIRST LEARNED ABOUT WHEN HE TESTIFIED, WAS IN MY MIND NOT

9  MATERIAL ENOUGH TO BE PREJUDICIAL TO YOUR CASE, IN VIEW OF

10  WHAT I'VE HEARD.

11       ALSO IN VIEW, FRANKLY, OF THE OPENING STATEMENT IN

12  WHICH YOU TOLD THE JURY IN ESSENCE THIS WAS GOING TO BE A

13  SELF-DEFENSE CASE.  I WOULD THINK THAT THE WITNESS'S

14  TESTIMONY YESTERDAY WOULD NOT ALTER THAT STRATEGY IN ANY

15  WAY.  YOU'VE GONE ON RECORD WITH THIS JURY TELLING THEM THAT

16  IT'S A SELF-DEFENSE CASE, AT THE VERY OUTSET.

17       GIVEN THE FACT THAT I DON'T BELIEVE THERE'S ANY

18  PREJUDICE BECAUSE OF THAT, GIVEN THE FACT THAT I DON'T THINK

19  THAT THE DISTRICT ATTORNEY VIOLATED 1054 INTENTIONALLY, AND

20  GIVEN THE FACT THAT THE WITNESS WAS SUBJECT TO YOUR FULL

21  EXAMINATION, THE REMEDY THAT YOU SEEK FOR MISTRIAL IS

22  DENIED.

23       I DO NOT BELIEVE YOUR CLIENT HAS BEEN -- HAS SUFFERED,

24  AT THIS POINT AT ANY RATE, AN UNFAIR TRIAL DUE TO WHAT DID

25  NOT HAPPEN YESTERDAY MORNING, THAT IS, YOUR NOT BEING TOLD

26  RIGHT AWAY IN THE MORNING BY MR. DEMERTZIS AS TO WHAT HE HAD

27  FOUND OUT IN A TELEPHONE CALL THE NIGHT BEFORE.  SO I'M

28  DENYING YOUR MOTION.  THANK YOU.

R.T. 211

1    DOESN'T ALLEGE POLICE ABUSE AT THAT TIME; RIGHT?

2    A    YES.

3    Q    SO THE FACT YOU DON'T NOTE ANY INJURIES ON HIS ARMS

4    MEANS THERE WEREN'T ANY; CORRECT?

5    A    YES.

6    Q    NO INJURIES TO HIS ELBOWS; CORRECT?

7    A    I DON'T KNOW.  WHEN WE HAD TO RESTRAIN HIM IN THE

8    JAIL, HE WAS FIGHTING, SO AS SOON AS WE RESTRAINED HIM, PUT

9    HIM IN THE WRAP, I DON'T KNOW WHAT INJURIES OCCURRED DURING

10   THAT SCUFFLE.

11   Q    WE'RE TALKING ABOUT THE BEDROOM RIGHT NOW.

12   A    OKAY.

13   Q    ANY INJURIES TO HIS ELBOWS?

14   A    NOT TO MY RECOLLECTION.

15   Q    HOW ABOUT HIS HANDS?

16   A    NOT TO MY RECOLLECTION.

17   Q    HOW ABOUT TO HIS LEGS OTHER THAN THE KNEES?

18   A    NOT TO MY RECOLLECTION.

19   Q    AND YOU COULDN'T SEE HIS FEET BECAUSE HE WAS WEARING

20   HIS SHOES?

21   A    CORRECT.

22   Q    AND IF HE HAD HAD ANY INJURIES OR SWELLING OR CUTS OR

23   ANYTHING LIKE THAT, YOU WOULD -- OR BRUISING, YOU WOULD HAVE

24   NOTED THAT; RIGHT?

25   A    YES.

26   Q    ON A SCALE OF ONE TO TEN HOW INTOXICATED DID

27   MR. HANCOCK APPEAR TO BE?

28   A    ON A SCALE --

1    THE INTERVIEW ROOM ALONE, I HAD BROUGHT A MICROCASSETTE

2    RECORDER.  I TURNED ON THE MICROCASSETTE RECORDER AND HID IT

3    INSIDE MY MIDDLE FOLDER, MY CASE FOLDER, BASICALLY.

4    Q    WHEN YOU SAY HID IT, DOES THAT MEAN THAT YOU RECORDED

5    THE SUBSEQUENT CONVERSATION WITH MR. HANCOCK UNBEKNOWNST TO

6    HIM, WITHOUT TELLING HIM?

7    A    YES, I DID NOT TELL HIM HE WAS BEING RECORDED.

8    Q    WHAT WAS YOUR PURPOSE IN GOING THERE TO TALK TO

9    MR. HANCOCK?

10   A    I WANTED TO GET A STATEMENT FROM HIM ABOUT THE

11   INCIDENT.  HE APPARENTLY HAD NOT PROVIDED A STATEMENT THE

12   NIGHT THIS OCCURRED WITH THE OFFICERS ON SCENE, AND I WANTED

13   TO GET A STATEMENT FROM HIM.

14   Q    WHAT WAS MR. HANCOCK LIKE WHEN YOU FIRST CONTACTED

15   HIM?

16   A    AT THE JAIL HE WAS COOPERATIVE AND SEEMED LIKE HE WAS

17   WILLING TO TALK.

18   Q    WHERE WERE YOU EXACTLY?

19   A    I CAN'T TELL YOU A SPECIFIC -- I DON'T KNOW HOW IT'S

20   ARRANGED THERE, BUT I WAS IN AN INTERVIEW ROOM WHICH IS

21   INSIDE THE SECURE FACILITY WITHIN THE MAIN JAIL.

22   Q    THAT'S WHAT I'M TALKING ABOUT, THIS ROOM.  WHAT WAS IT

23   LIKE?

24   A    OH, VERY SMALL.  I WOULD SAY IT WAS FOUR FEET BY SIX

25   TO EIGHT FEET AT THE BIGGEST, AND IT HAD A SMALL DESK, MAYBE

26   THE SIZE OF THE TOP OF THIS PODIUM I'M SITTING AT, WITH TWO

27   CHAIRS.

28   Q    FOR THE RECORD THIS DESK YOU DESCRIBED IS MAYBE FOUR

1    PEOPLE RECALL CRAIG DAVIS.

2            THE COURT:  MR. DAVIS, STEP FORWARD.  AND I'LL

3    REMIND YOU YOU'RE STILL UNDER OATH, SIR.

4            THE WITNESS:  OKAY.

5            THE COURT:  YOU MAY TAKE A SEAT.

6            THE COURT:  DIRECT, MR. DEMERTZIS.

7            MR. DEMERTZIS:  THANK YOU, YOUR HONOR.

8                     **DIRECT EXAMINATION**

9    Q    (BY MR. DEMERTZIS)  MR. DAVIS, THANK YOU FOR COMING

10   BACK TO COURT.

11   A    OKAY.

12   Q    ON AUGUST 7TH OF LAST YEAR JUST BEFORE JEFF HANCOCK

13   STABBED YOU, DID YOU HIT HIM WITH A FRYING PAN?

14   A    NO.

15           MR. DEMERTZIS:  THAT'S ALL THE QUESTIONS I HAVE.

16           THE COURT:  CROSS?

17           MR. KURTZMAN:  NOTHING FURTHER.  THANK YOU, YOUR

18   HONOR.

19           THE COURT:  THANK YOU FOR COMING IN.  YOU'RE

20   EXCUSED, SIR.  APPROACH THE BENCH, COUNSEL, PLEASE.

21           (DISCUSSION OFF THE RECORD.)

22           THE COURT:  LADIES AND GENTLEMEN, THE PARTIES HAVE

23   AGREED UPON THREE STIPULATIONS, WHICH I WILL READ TO YOU AT

24   THIS TIME.  REMEMBER THAT STIPULATIONS ARE AGREEMENTS

25   BETWEEN THE PARTIES AS TO WHAT THE FACTS ARE, AND YOU MUST

26   DEEM THEM CONCLUSIVELY PROVEN.

27           IT IS HEREBY STIPULATED BY THE PARTIES THAT ONE, THE

28   SMEARED, DRIED BLOOD ON THE CONCRETE WALK OUTSIDE

1    AS FAR AS THE SENTENCING IN THIS CASE.  I'M INCLINED TO

2    FOLLOW IT, BUT IF COUNSEL WISH TO BE HEARD, I'LL ALLOW THAT.

3            MR. DEMERTZIS:  SUBMITTED YOUR HONOR.

4            MR. SCHROEDER:  SUBMITTED, YOUR HONOR.  I'VE HAD

5    EXTENSIVE DISCUSSIONS WITH MY CLIENT ABOUT THIS ACTION, AND

6    WE'VE DETERMINED IT'S IN HIS BEST INTEREST TO PROCEED AS WE

7    ARE THIS MORNING.

8            THE COURT:  THE COURT UNDERSTANDS THIS.

9            MR. SCHROEDER:  THANK YOU.

10           THE COURT:  THE MATTER COMES BEFORE THE COURT ON A

11   GUILTY VERDICT BY JURY, AND THERE WERE ADMISSIONS OF THE

12   PRIORS.

13       THE COURT BELIEVES THAT PROBATION IN THIS CASE SHOULD

14   BE DENIED IN VIEW OF THE SERIOUSNESS OF THE OFFENSE.  THE

15   COURT ALSO NOTES THAT PROBATION WOULD BE INELIGIBLE PURSUANT

16   TO 667(C)(2) OF THE PENAL CODE, BUT REGARDLESS OF ANY

17   STATUTORY PRECLUSION THE SERIOUSNESS OF THIS OFFENSE WOULD

18   WARRANT A DENIAL OF PROBATION NEVERTHELESS.

19       AS FAR AS THE PRISON TERM IN THIS CASE THE COURT WILL

20   SELECT THE MIDDLE TERM IN STATE PRISON OF SIX YEARS.  THE

21   COURT ENHANCES TERM -- AND SIX YEARS, THE COURT SHOULD NOTE,

22   WOULD BE TWICE THE ORDINARY MIDDLE TERM.  AND THIS IS FOR

23   THE CLERK'S BENEFIT TODAY, WHO IS NOT NORMALLY WITH THE

24   COURT AND WAS NOT SITTING ON THE TRIAL, THIS WOULD BE TWICE

25   THE BASE BECAUSE OF THE STRIKE.  THE COURT ENHANCES SAID

26   TERM BY FIVE YEARS FOR THE 667(A) PENAL CODE ALLEGATION.

27       THERE WAS A 12022.7(A) PENAL CODE FINDING THAT WAS

28   MADE BY THE JURY; HOWEVER, THE COURT WILL SHARE THE -- THE

1    COURT WILL FOLLOW THE RECOMMENDATION OF THE PROBATION

2    OFFICER AND STRIKE THAT ADDITIONAL PUNISHMENT PURSUANT TO

3    1385 OF THE PENAL CODE, THERE BEING NO OBJECTION BY THE

4    PEOPLE AS TO THAT ORDER.

5         SO THAT LEAVES THE TOTAL TERM AT ELEVEN YEARS, WHICH

6    WAS THE ONE RECOMMENDED BY PROBATION.  MR. HANCOCK, YOU ARE

7    ADVISED THAT SUBSEQUENT TO YOUR RELEASE FROM PRISON YOU'LL

8    BE PLACED ON PAROLE FOR THREE YEARS.  I WILL ORDER

9    RESTITUTION TO THE VICTIM TO BE DETERMINED FOR ANY ECONOMIC

10   LOSSES.  DIRECTOR OF THE DEPARTMENT OF CORRECTIONS IS

11   ORDERED TO COLLECT THIS RESTITUTION FROM YOUR EARNINGS IN

12   PRISON OR WHILE ON PAROLE.

13        YOU SHALL NOT POSSESS FIREARMS PURSUANT TO 12021 OF

14   THE PENAL CODE.  YOU ARE ORDERED TO PROVIDE TWO BLOOD AND

15   ONE SALIVA SAMPLE PURSUANT TO 296 OF THE PENAL CODE.  I WILL

16   ORDER A COURT SECURITY FEE OF $20 PURSUANT TO 1465.8 OF THE

17   PENAL CODE.

18        I'LL ORDER A RESTITUTION FINE OF $2200 PURSUANT TO THE

19   FORMULA PERMITTED BY PENAL CODE SECTION 1202.4(B).  I WILL

20   ORDER AN ADDITIONAL RESTITUTION FINE OF THAT AMOUNT PURSUANT

21   TO 1202.4 OF THE PENAL CODE AND ORDER IT SUSPENDED PURSUANT

22   TO 1202.45 OF THE PENAL CODE.

23        I DON'T HAVE THE UPDATED CREDITS.  MAYBE COUNSEL CAN

24   FOLLOW ALONG WITH ME AND WE CAN DO THIS.  THE CREDITS WERE

25   AS OF THE PROBATION REPORT DATE, JULY 1ST, AND WE DON'T HAVE

26   A PROBATION OFFICER HERE TODAY.  SO WE'RE TALKING ABOUT 31

27   DAYS ACTUAL IN JULY AND THEN ANOTHER 31 DAYS IN AUGUST, AND

28   THEN TODAY'S THE 3RD, SO MY MATH IS 65 ACTUAL DAYS EXTRA.

**August 12, 2003 Interview of Jeff Hancock by Officer Anderson**

Anderson:   (Inaudible voices in background). Hey.

Hancock:    (Inaudible).

Anderson:   It was pretty much, it was, I'm a Sunnyvale police (inaudible). And I'm a
            Sunnyvale police (inaudible). And ah, um, ah, I went up and ah, visited
            ah, you're buddy ah, up in (inaudible), 'cause it was...

Hancock:    Craig.

Anderson:   (inaudible), yeah, Craig. Um, he's doing okay. Um, you know, he could
            be, you got the better of him, but (inaudible), he's fine. They'll probably
            release him today or tomorrow or something like that. But he's , he's
            gonna make it. Um, talked to him to him a little bit. He, he didn't really
            want to say what, what really went down. It sounds more like two buddies
            kind of got in an argument And ah, that they're, and ah, the officers, when
            they responded, they really had to pry it out of him to tell them what really
            happened. Ah, basically kind of what he told me is that you guys have
            been having a little few little squabble about ah, finances. You both are
            looking for work, having some problems. You got out Thursdays or
            Friday night, whatever it was. And ah, and you guys both have been
            drinking a little bit that night. You 're (inaudible) right now. Ah, I don't
            know if you want, basically what the deal is, he's got court tomorrow.
            Okay. Ah, there's nothing in there as far as what your side of the story is
            to this at all in the report that's gonna go to the DA, the judge, and all that.
            So, this is kind of your last chance to say what you want to say about the

2

whole thing. I'll write it down. I'll submit the tape today. Hoping the DA can take a look at it tomorrow (inaudible). If that's something you're willing to do, I can read you the Miranda saying, then we can talk. Totally up to you if you want, if you want to leave your side of the story here, um, that's up to you. But ah, that's just (inaudible). Ah, let me, let me read this to you. And then if you want to talk about it, then you can. You have the right to remain silent. Anything you say may be used against you in court. You have the right to the presence of an attorney before and during any questioning. If you cannot afford to hire an attorney, one will be appointed to you free of charge before any questioning. Do you understand all that I read to you?

Hancock:    Yeah.

Anderson:   Okay. Ah, don't mind if I am saying what I read to you for you, is all I'm saying. And like I said, he ah, the night this happened, he didn't want to say anything. Um, the officer basically had to force him to talk about what happened. But, but I, I went and visited him today. He's doing all right. You know, he's pretty beat up. But ah, he's not gonna die or nothing like that, you know. Okay. And ah, that's kind of what he told me, is that ah, he said he just kind of lost (inaudible) bigger, bigger than him. And you got the best of him. That was kind of the story. Um, you want to talk a little bit about what the, what the deal with ah, with,

**MEDICATION ADMINISTRATION RECORD**

Santa Clara Valley Medical Center

ADULT INSTITUTIONS MEDICAL UNITS

Month AUG    Year 2003

SCVMC 6959-9

8662-2 REV 5/97

| Medication | Start / Stop / Renewal Date | MAR by |
|---|---|---|
| LIBRIUM 50 mg x 2 days QID | | |
| LIBRIUM 50 mg x 1 day TID | | |
| LIBRIUM 25 mg x 1 day TID | | |
| LIBRIUM 25 mg x 1 day BID | | |
| THIAMINE 100 mg x 7 days QD | | |
| PRE-NATAL VITAMIN x 7 days QD | | |

Consent Signed    Instruction Given by    Y    N

C = Court    TSO = Temporary Signed Out    S = Med to Court/Clinic    SA = Self Administered    R = Refused    NA = Not Available    L = Lockdown    N = No show

Allergies _____

Diagnosis  ALCOHOL DETOX

AKA Name Alert _____

Housing _____

DOB  11/02/58

Booking # D304587

PFN  BBI262 / DTP 897

Name  Hancock, Jeff

EL CAMINO HOSPITAL
MOUNTAIN VIEW, CALIFORNIA
XIANDA YANG, MD

Hancock, Jeff Jay
MR#: 700168
DOB: 11/02/1958
**DISCHARGE SUMMARY**

cc:    XIANDA YANG, MD

**ADMISSION DATE:**        04/09/2003

**DISCHARGE DATE:**        04/18/2003

**HISTORY OF PRESENT ILLNESS:**
The patient is a 44-year-old, white male with history of head trauma and seizures for about three years. The patient has not been taking his antiseizure medication prior to admission for about three days. The patient then developed a generalized seizure and lost his consciousness, and 911 was called by the patient's roommate, and he was brought to the El Camino Hospital.

**HOSPITAL COURSE:**
Initial physical examination was remarkable for a blood pressure of 135/71 and slightly shaky hands. The patient was subsequently admitted to the El Camino Hospital with the diagnosis of seizure and possible early stage of alcohol withdrawal. The patient has a history of heavy alcohol abuse for more than ten years.

Soon after admission, the patient developed visual hallucinations and shaking with tremors all over his body. He required a large amount of Valium and Ativan to control his symptoms. Because of the severity of his symptoms, he was subsequently transferred to the CCU, where an Ativan drip was started. At one time, the patient was requiring as much as 35 mg of Ativan per hour.

The patient also received supportive care including nutritional supplements. Thiamine and multivitamins were provided to the patient. The patient also received a supplement for low potassium and low magnesium and low phosphorus. The patient's condition improved with the above treatment, and the patient was transferred out of the CCU on 04/17/03. The patient has been doing well ever since his transfer out of the CCU, and at the time of discharge he has no tremors, no shakiness. He has been taking Dilantin, 300 mg, by mouth per day ever since he was admitted, and he has not had a seizure since admission. The patient, therefore, will be discharged home to follow up with his own primary care physicians.

**EL CAMINO HOSPITAL**
**MOUNTAIN VIEW, CALIFORNIA**
**XIANDA YANG, MD**

Hancock, Jeff Jay
700168

**DISCHARGE SUMMARY**

Page 2 of 2

DISCHARGE DIAGNOSES:

1.    Alcohol abuse with alcohol withdrawal syndrome.  Delirium tremens with visual
      hallucinations, resolved.

2.    History of seizures.  The patient needs to take his antiseizure medications, specifically
      Dilantin, 300 mg, per day.

3.    The patient is advised to follow up with his own primary care physician as soon as he
      leaves the hospital.

XIANDA YANG, MD

YX:tls
D000005064 C330483
D: 04/18/2003  9:08 A
T: 04/20/2003  4:17 P

```
                                                              CASE NO.        EE302496
41  SUPERIOR COURT                                            CEN             030419B7
    605 W. EL CAMINO                                    DATE   09/03/2004  8:30 A DEPT.    81
    SUNNYVALE, CA 94087                                        11/02/1958  CAN4777473
PEOPLE VS.  JEFF JAY HANCOCK                            CLERK  CARRIE WOOLLEY         BBI263 M
L.K.A.     675          JOHANNA      7                  HEARING PROBATION AND SENTENCING
           SUNNYVALE, CA 94085                          AGENCY SV-04316-93501-CHAVARRIA
JUDGE      HON. JOHN J. GARIBALDI                       STATUS I-SET -100000           TW    Y
REPORTER   CARLA GOMEZ
DEF. ATTY. SCHROEDER, WESLEY D.A. DCMutzis              APO
CHARGES    F(001) PC245(A)(1)   001                                          VIOLATION DATE
                                                                            08/07/2003
```

**NEXT APPEARANCE**

☑ Defendant Present ☐ Not Present      ☑ Atty Present _Wesley Schroeder_          ☐ AD / PD / Legal Aide / Special Appr
☐ WFA ☐ Arr'd ☐ Amended complt         ☐ Arr ☐ Plea ☐ IDC ☐ Prob / Sent    ☐ Interp ____
☐ PC977 Waiver ☐ Filed ☐ On file       ☐ Bail/ OR/ SORP ☐ Rect Dr Rpt ☐ FAR  ☐ Pretrial Services to Contact Gateway for Assm't
☐ NG ☐ Entered by CRT ☐ NGBRI / Adv    ☐ PSet ☐ Prelim ☐ PTC ☐ S/B MTC      ☐ Bail Reinstated ☐ Bail Exonerated
☐ Priors / Allegations / Enhancements Denied  ☐ Further ☐ Jury ☐ CT ☐ Peo/Def Wav Jury  ☐ Forfeited   Bond # ____
☐ TW ☐ TNW ☐ TW / WD ☐ for Sent        ☐ Proof of ____                       ☐ Reassumption Filed ☐ Forfeiture Set Aside
☐ Ref / Appt PD / ADO ☐ Conflict Decl  ☐ Refd ____                           ☐ Costs Within 30 Days to Court
☐ Ref _____ Appt'd                    ☐ Crim Proc Susp ☐ Rein               SORP / OR ☐ Revoked ☐ Reinstated
☑ Hrg on Motion _Demual_                ☐ Doubt Decl Pursuant PC 1368          ☐ BW Ordered $ ____          ☐ Stayed
☐ Granted ☐ Den ☐ Subm _POC/wkvp        ☐ Subm on rept ☐ Found               ☐ BW Set Aside ☐ Recalled ☐ To Issue
☐ Drs. Appointed                        ☐ Max Term ____ ☐ Committed ____       Other: ____
☐ Prelim Waived ☐ Certified to General Jurisdiction  ☐ MDA / COM Amended to ____

**PLEA Conditions:** ☐ None ☐ No State Prison ☐ PC17 after 1 Yr Prob ☐ Includes VOP ____
☐ Jail / Prison Term of ____
☐ Dismissal / Striking ____                                                              ☐ Subm time of sent ____
☐ Adv ☐ Max Pen ☐ Parole/Probation ☐ Appeal ☐ Immlg ☐ Reg PC290/HS11590/PC457.1/PC186.30 ☐ Future serious felony prior ☑ PC12021 (gun)
☐ Waives Constit Rights ☐ Written Waiver filed ☐ PC17 REDUCTION ☐ Waives Arbuckle ☐ Harvey Stip ____
☐ COP PLEADS ☐ GUILTY ☐ NOLO CONTENDERE to charges & admits enhs/priors (see below) ☐ Factual Basis found ☐ Findings stated
☐ Notice of Eligibility Filed ☐ DEJ Granted ☐ Rpt to DADS ☐ DEJ Rein ☐ DEJ Term ☐ Guilty Plea Rendered
☐ Waives Referral ☐ Ref'd to APO Full Rpt ☑ PROBATION DENIED   **FINES/FEES:**  PAY TO  ☐ Ref to DOR  ☐ COURT
☐ Sentenced to ____ State Prison/County Jail ☐ Sent Suspended   COUNT ____ $ ____ + PA $ ____    ☐ Purs HS11350d
**PROBATION** ☐ Execution ☐ Imposition of sentence suspended for probation period  COUNT ____ $ ____ + PA $ ____
☐ COURT ☐ FORMAL PROBATION GRANTED for ____ Days / Mos / Yrs  DPF / AIDS $ ____ + PA $ ____
☐ Report to APO within ____ Days ☐ Upon Release ☐ Terminated  DRE / RF/ $2200 Add'l RF$ 2200 ☐Susp'd PC1202.45
☐ Commun Altern Program ☐ Perform ____ hrs Volunteer Work      DEJ   $ ____ CTS PC 2900.5 $ ____
☐ Submit Search / Testing ☐ Educ / Voc Trng / Empl            AEF   $ ____ **TOTAL DUE** $ ____
☐ Not drive w/o valid DL & Ins ☐ DVPO Issued / mod / term Exp  ADPA  $ ____ ☐ Committed @ $ ____ /Day
☐ Not own/possess deadly weapons ☐ Weapon ordered destroyed   LAB   $ ____ ☐ Consec/Conc to ____
☐ No contact w/Victim or family / co-defts unless appr by APO ☐ PC1202.05  NC $ ____ ☐ Payments Granted / Modified
☐ No alcohol / drugs or where sold ☑ Restitution _Victim General_  ASF / CPF $ ____ / Mo beginning ____
☐ Substance abuse, Domestic Violence, Psychological, Parenting cnsl / prgm  AR  $ ____ ☐ FINE STAYED
☑ PC296 (DNA) ☐ PC12021 (Aids Testing) ☐ Aids Education Program  SHELTER $ ____ ☐ Fine Deemed Satisfied ☐ Commuted
Other: ____                                                    DV    $ ____ ☐ Vol Wk ____ Hrs in Lieu of Fine
**VOP:** ☐ Arr'd VOP ☐ Admits/Denies Violation ☐ Court Finds VOP / No VOP  ATTY $ ____ ☐DSA thru APO / DOR / CRT ☑ Filed
☐ Prob Rein / Mod / Term / Revoked ☐ Remains Revoked / Ext to ____  P/INV $ ____ ☐ P/SUP $ ____ /Mo
☐ Original Terms & Conditions Except as Amended Herein           CJAF  $ ____
Coterminous with ____                    ☐ No Further Penalties  ☐ Restitution $ ____   to ____
**JAIL/PRISON** ☐ See Attachm't Pg for Add'l Orders, Charges, PC1385 Reasons  ☐ Referred to VWAC  ☐ As Determined APO / CRT

| Count | F/M | Violation | Prison Term / Yrs | Enhancement / Priors | Yrs / Styd / Strkn | County Jail |
|---|---|---|---|---|---|---|
| 1 | F | PC245(a)(1) | M (4 yrs  PC667(b)(i)1702  2x base term to 04 F | | | |
|   |   | (2x base)  PC1022.7(A)(1)209(x)3 = strike prix to PC1365 | | | |
|   |   | due to PC667(b)-(i)/170.12 | | | |

| Enhancement | Yrs/S | Enhancement | Yrs/S | Enhancement | Yrs/S | Enhancement | Yrs/S | Total |
|---|---|---|---|---|---|---|---|---|
| PC667(b)(i)/170.12 - 2x base | | PC1022.7(A)(1)209x3 to Ct 1 | | | | | | 04yrs |

CTS = ___ ACT + _09_ ___ ☐ PC4019 ☑ PC2933.1 = _453_ TOTAL DAYS  TOTAL TERM _11 yrs CDC_
☐ Straight time ☐ WWP ☐ PC1209 Fees ☐ Waived ☐ Cred  ☐ Except ☐ EMP/FWP/FE/PDBP/C/B Parole/NP  CT283
☐ Sent Deemed Srvd ☑ Rpt to Local Parole ☐ Adv of _3_ Yrs Parole/Appeal Rights ☐ Consec ☐ Conc to ____
☐ Bal CJ Susp ☐ All but ___ Days/Mos ☐ On Cond Complete Residential Treatment Prgm ☐ Serve Consec MO/TU/WE/TH/FR/SA/SU
☐ Pre-process ____ AM/PM ☐ Stay/Surrender Transport to ____ @ ____ AM/PM or Sooner

☐ REMANDED-BAIL $ ____  ☐ NO BAIL ☑ COMMITTED  ☐ RELEASED ☐ OR ☐ SORP ☐ DOC TO CONTACT JAC FOR ASSM'T
☐ AS COND OF SORP ☐ BAIL INCREASED / REDUCED    ☐ TO PRGM AS REC BY JAC-DOC TO TRANSPORT FOR BALANCE OF JAIL

DISTRIBUTION:  BLACK - FILE COPY,  GREEN - DOC,  BLUE - CJIC,  PURPLE - DOR/PROBATION,  BROWN - DEFENDANT