1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  JULIET B. HALEY
   Deputy Attorney General
6  State Bar No. 162823
    455 Golden Gate Avenue, Suite 11000
7   San Francisco, CA 94102-3664
    Telephone: (415) 703-5960
8   Fax: (415) 703-1234
    Email: juliet.haley@doj.ca.gov
9  Attorneys for Respondent

10            IN THE UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                    OAKLAND DIVISION

13 | JEFF JAY HANCOCK,                    | C 07-04469
14 |                         Petitioner,  |
15 |      v.                              |
16 | JAMES D. HARTLEY, Acting Warden,     |
17 |                         Respondent.  |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SUPPLEMENTAL ANSWER**

# TABLE OF CONTENTS

| | Page |
|---|---|
| STATEMENT OF THE CASE | 1 |
| STATEMENT OF FACTS | 2 |
| STANDARD OF REVIEW | 6 |
| ARGUMENT | 7 |
|     **THE FLIGHT INSTRUCTION WAS PROPERLY GIVEN** | 7 |
|         A.  The State Court's Analysis Of The Claim | 8 |
|         B.  The State Court's Rejection Of The Claim Was Neither Contrary To Nor An Unreasonable Application Of Supreme Court Authority | 10 |
| CONCLUSION | 13 |

# TABLE OF AUTHORITIES

Page

**Cases**

*Brecht v. Abrahamson*
507 U.S. 619 (1993) ... 7

*Carey v. Musladin*
127 S.Ct. 649 (2006) ... 6

*Early v. Packer*
537 U.S. 3 (2002) (per curiam) ... 6

*Estelle v. McGuire*
502 U.S. 62 (1991) ... 10

*Fry v. Pliler*
___ U.S. ___ , 127 S.Ct. 2321 (2007) ... 7, 12

*Hernandez v. Small*
282 F.3d 1132 (9th Cir. 2002) ... 2

*Houston v. Roe*
177 F.3d 901 (9th Cir. 1999) ... 12

*Karis v. Calderon*
283 F.3d 1117 (9th Cir. 2002) ... 12

*Leary v. United States*
395 U.S. 6 (1969) ... 10

*Lockyer v. Andrade*
538 U.S. 63 (2003) ... 6

*McMillan v. Gomez*
19 F.3d 465 (9th Cir. 1994) ... 11

*Miller-El v. Cockrell*
357 U.S. 322 (2003) ... 7

*People v. Bradford*
14 Cal.4th 1005 (1997) ... 10, 11

*People v. Crandell*
46 Cal.3d 833 (1988) ... 11

*People v. Escobar*
48 Cal.App.4th 999 (1996) ... 11

*People v. Smithey*
20 Cal.4th 936 (1999) ... 10

## TABLE OF AUTHORITIES (continued)

| | Page |
|---|---|
| *People v. Turner*<br>50 Cal.3d 668 (1990) | 11 |
| *People v. Visciotti*<br>2 Cal.4th 1 (1992) | 11 |
| *Ulster County Court v. Allen*<br>442 U.S. 140 (1979) | 7, 10 |
| *Williams v. Taylor*<br>529 U.S. 362 (2000) | 6 |
| *Woodford v. Visciotti*<br>537 U.S. 19 (2002) (per curiam) | 6, 7 |

**Constitutional Provisions**

United States Constitution
    Sixth Amendment    7
    Fourteenth Amendment    7

**Statutes**

United States Code, Title 28
    § 2254(d)    6
    § 2254(e)(1)    2, 7

California Penal Code
    § 245(a)(1)    1
    § 667    1
    § 667(a)    1
    § 1170.12    1
    § 1192.7    1
    § 1203 (e)(3)    1
    § 12022.7(a)    1

**Other Authorities**

California Jury Instructions, Criminal
    No. 2.52    7, 11
    No. 17.31    12

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  JULIET B. HALEY
   Deputy Attorney General
6  State Bar No. 162823
     455 Golden Gate Avenue, Suite 11000
7    San Francisco, CA 94102-3664
     Telephone: (415) 703-5960
8    Fax: (415) 703-1234
     Email: juliet.haley@doj.ca.gov
9  Attorneys for Respondent

10                IN THE UNITED STATES DISTRICT COURT

11              FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                         OAKLAND DIVISION

13
    JEFF JAY HANCOCK,                           C 07-04469
14
                              Petitioner,       MEMORANDUM OF POINTS
15                                              AND AUTHORITIES IN
           v.                                   SUPPORT OF
16                                              SUPPLEMENTAL ANSWER
    JAMES D. HARTLEY, Acting Warden,
17
                              Respondent.
18

19

20                        **STATEMENT OF THE CASE**

21         By an information filed on October 10, 2003, the Santa Clara County District Attorney

22  charged Jeff Jay Hancock, ("petitioner") with one count of assault with a deadly weapon (Cal. Penal

23  Code § 245(a)(1)) and alleged that petitioner personally used a deadly weapon (Cal. Penal Code §§

24  667 and 1192.7) and personally inflicted great bodily injury (Cal. Penal Code §§ 12022.7(a), 1203

25  (e)(3)). It further alleged one prior strike conviction within the meaning of California Penal Code

26  sections 667 and 1170.12 (Three Strikes law) and one prior serious felony conviction within the

27  meaning of California Penal Code sections 667(a), and 1192.7. CT 93-96.

28         On May 24, 2004, a jury found petitioner guilty of the crime and found the conduct

Memorandum Of Points And Authorities In Support Of Supplemental Answer - C 07-04469

1

allegations true. CT 206, 210; RT 533-534. On the same date, petitioner admitted the prior conviction allegations. CT 211; RT 537-540.

On September 3, 2004, petitioner was sentenced to 11 years in prison. CT 283-284; RT 542-545. Petitioner appealed. His convictions were affirmed by the California Court of Appeal on March 24, 2006. By separate order his petition for writ of habeas corpus was summarily denied. Exh. C, at 2. Petitioner's petition for review was also summarily denied by the California Supreme Court on June 14, 2006.

On May 18, 2007, Petitioner filed an unexhausted federal habeas petition in this Court. This Court dismissed the action without prejudice to filing once all state court post-conviction challenges were completed. Petitioner filed two additional habeas petitions in this Court. On January 15, 2008, this Court ordered that the petitions be consolidated and that Respondent file a supplemental Answer to Petitioner's Supplemental Petition.

**STATEMENT OF FACTS**

The state court of appeal found the facts to be as follows. This summary constitutes a factual finding that is presumed correct under 28 U.S.C. § 2254(e)(1). *Hernandez v. Small*, 282 F.3d 1132, 1135 n. 1 (9th Cir. 2002).

> Craig Davis testified that he and defendant had been good friends. Davis had been staying at defendant's apartment at the time of the stabbing incident but Davis did not have his own key. Davis testified that he was "out of work" and "wasn't paying rent" but defendant was letting him stay in the apartment "out of the goodness of his heart...."
>
> Davis and defendant had been hanging out with others at a nearby park earlier in the day. Davis recalled returning to defendant's apartment from the park before defendant arrived and sitting on the walkway in front of the apartment and waiting for defendant's return.
>
> Both men had been drinking that day. Davis acknowledged that he was an alcoholic. Davis typically woke up and began drinking almost immediately. He admitted that on a few occasions he has been intoxicated to the point of falling down. He admitted that he may have fallen and slammed into the countertop in the apartment's bathroom about three days before the stabbing incident. Davis acknowledged that he had testified at the preliminary hearing to drinking three-quarters of a fifth of vodka the day of the incident. He thought he also had a couple of beers at the park.
>
> Davis recalled that, after defendant returned, they had a verbal altercation, which turned physical. Davis testified that defendant was upset about some comment Davis had made to "some ladies" at the park. Davis acknowledged that he could have said something out of line at the park, which is what defendant indicated to him. The confrontation had escalated. Defendant had punched and kicked him and had dragged him away from the front door of defendant's apartment across the concrete walkway. Davis could not recall

whether or not he had gone into the apartment before he was beaten.

Davis indicated defendant reentered the apartment after the beating. Davis crawled toward the front door because he could not get up. He managed to sit up on the walkway. A minute or so later, defendant came back out of the apartment. Davis thought that defendant then stabbed him in the back and, when he tried to defend himself, defendant also stabbed him in the hand. He denied hitting defendant with a frying pan.

Davis indicated that his memories of what happened next were "kind of vague." He recalled a neighbor, Peter Craven, coming over to help. The paramedics came. Davis recalled talking to Officer Kim before he was taken to the hospital. Davis had not wanted to get defendant in trouble and had lied that he "got jumped in the park."

Peter Craven testified that, on the date of the incident, he lived in apartment number six and knew his neighbor who lived in apartment number seven, identified as defendant at trial, by first name. Sometime after work on that date, that is sometime after 4:30 or 5:00 p.m., he stopped by defendant's apartment. He observed a male named Duncan treating Davis, who "had been beat up pretty seriously." Davis's "face was very badly swollen," he had cuts and bruises on his body, and a stab wound to his lower back. Although Davis said he had been "rolled in the park," Craven did not believe Davis because defendant's "hands were swollen and cut up" and Davis "was very dependent on [defendant], so he would cover for [defendant] in a situation like that."

Craven testified that he was concerned whether an ambulance should be summoned and tried to determine the depth of the stab wound. The wound was not bleeding badly but some blood was pumping out of the wound every second or so. Craven inquired how deep Davis had been stabbed. Defendant went to the kitchen, returned with a knife, indicated a depth of three to four inches using his thumb, and said, " 'I stabbed him this deep." Craven thought an ambulance should be called but both Davis and defendant were "adamantly opposed." Duncan and he convinced them that Davis needed medical attention and the paramedics were called.

Craven testified that both Duncan and he suggested that defendant leave before the paramedics arrived. Craven testified that the suggestion was made because defendant might get in trouble. Defendant did not want to leave. They suggested that defendant "wait in the bedroom and close the door, and he agreed to do that." Defendant went into the bedroom and closed the door behind him.

Kirk Kim, a public safety officer with the City of Sunnyvale, testified that, on August 8, 2003, at approximately 8:23 p.m. he was dispatched to an apartment unit to investigate a possible stabbing. Officer Kim proceeded to that apartment and spoke with Craig Davis, who was sitting in a chair just inside the doorway. Steve Duncan was attending to Davis and "holding some sort of bandage on Mr. Davis's back."

After entering the apartment, Officer Kim heard noises in the back room. Officer Kim testified that "the door started to come open" and he "blocked the door from opening up onto [them] with [his] foot." "[A] male voice from behind the door" "yelled something like ''What the fuck?'' "Officer Kim identified himself as Sunnyvale Police and continued to block the door from opening. "The door closed and then seconds later slammed open again...." Keeping the door open about four inches, Officer Kim instructed an individual, who was identified as defendant at trial, to step away from the door. Officer Kim and another officer entered the bedroom and directed defendant to sit down on the bed.

Officer Kim testified that defendant appeared to be under the influence of alcohol and a

Memorandum Of Points And Authorities In Support Of Supplemental Answer - C 07-04469

strong odor emanated from him. In addition, he appeared to have "just been in an altercation" because he had a black and blue eye and had blood on him. Defendant likewise appeared intoxicated to Officer Andrew Zarriello, who also had responded to the dispatch. He stated that defendant "smelled strongly of alcohol," "[h]is speech was thick and slurred," and he "was very defensive."

Defendant did not give direct answers to the officers' questions and he did not volunteer any information. When asked how his eye was injured, defendant denied any injury to his eye. He indicated that he did not know what Officer Kim was talking about when the officer asked about blood on defendant's sock and a pair of underwear in the bedroom. Defendant denied being injured. When questioned about Davis, defendant "said something to the effect of [Davis] must have beat himself up." Defendant was placed under arrest.

Davis initially told Officer Kim that he had been jumped and stabbed at Fair Oaks Park but the officer did not believe him. Officer Kim was familiar with Davis from previous encounters and sensed Davis was not telling the truth. Later at the hospital, Davis told Officer Kim that defendant had beaten him up and told him to leave the apartment. Davis had explained that defendant let him in to retrieve some articles but then pushed him out the door and caused defendant to hit his head on a post. Davis reported that defendant had repeatedly gone into the apartment and then returned to rough him up. Eventually, defendant had helped Davis back into the apartment. Davis told Officer Kim that he may have blacked out and he also told the officer that he may have "socked" defendant in the eye. Officer Kim testified that Davis appeared to have been drinking.

Dr. Gregory Gilbert, an emergency physician at Stanford University, saw Davis when he came into the emergency room on August 8, 2003 at about 2100 or 9:00 p.m. Dr. Gilbert testified that Davis's external injuries included multiple abrasions and contusions, a laceration near his face, and a stab wound and his internal injuries included rib fractures and a very small pneumothorax. A pneumothorax is a condition in which "air ... gets trapped between the chest wall cavity and the cavity lung and the lung deflates." The doctor explained that the pneumothorax meant that the stab wound went "all the way through to the pleural cavity." The doctor acknowledged that it was not possible to determine whether the rib fractures were two to three days old.

In photographs of Davis, Dr. Gilbert identified fresh contusions and abrasions to Davis's face and a puncture wound below Davis's left shoulder blade. The number of contusions on Davis's body indicated he had been hit and struck. Dr. Gilbert acknowledged that the medical records did not note any injury to Davis's hands but he stated that a photograph suggested that a contusion might have been missed.

On August 12, 2003, Officer Craig Anderson interviewed Davis at the hospital. Davis told Officer Anderson that he had been staying at defendant's apartment and, during the previous few weeks, they had argued repeatedly regarding "Davis's failure to help out with some of the costs such as rental and food." Davis remembered that defendant had confronted him about comments he had made at the park and the argument had led to defendant beating him up. Davis was unable to recall being stabbed specifically or much about the altercation.

Officer Anderson also interviewed defendant in jail and recorded the interview. Defendant told Anderson that he had been supporting Davis for the past nine months and they were "best friends." He stated that Davis was an alcoholic and drank every single day. Defendant had been helping Davis with housing, rather than letting him sleep in the park, and most everything else, including food, clothing and tobacco.

Defendant explained that, about a week before the stabbing incident, the apartment owner

had received a complaint that someone was urinating in the front yard and throwing up outside defendant's unit at about 10:00 p.m. The owner had spoken with defendant's mother and informed her that defendant would have to move if there were another incident. Defendant told Officer Anderson that he kicked Davis out of his apartment on the day of the stabbing because he did not want another incident. A short time after ejecting Davis, defendant went out to check if Davis had passed out on the front lawn.

Defendant told Officer Anderson that he found Davis passed out in front of his door and he "tried to wake him up or shoved him away." He said he "slapped him around" but he "wouldn't wake up." He admitted slapping Davis in the face a few times, kicking and dragging him. He indicated that he "ended up having to smack him a little bit harder" because Davis was not waking up.

According to defendant's interview statements, Davis finally woke up and defendant brought him into the house. Davis had "a little bit of blood on him." Defendant told Davis to take a shower and gave him a wash cloth to clean himself up. Defendant indicated that, after Davis was cleaned up, Davis was not listening or cooperating with defendant's efforts to get Davis to leave and they had "a little tango," "a little confrontation."

Defendant recalled that he had been drinking and Davis "was pretty much drunk." Defendant agreed that he was thinking that he had "to get this guy out of here" or he was going to "get kicked out" of his apartment and be "homeless" again. Defendant was "trying to drag him out" but Davis was not going. Defendant recalled trying to explain to Davis that he did not want another incident but it was "going in one ear and out the other." Defendant said he grabbed Davis and was struggling to get Davis to leave his house. Defendant indicated that he had been at the end of his rope for weeks.

In the interview, defendant admitted that, while struggling to get Davis out, he had grabbed a knife lying on counter and jabbed Davis in the back one time. He had said, "now will you get out of here?" Defendant agreed that he had felt remorseful because Davis was his friend. Defendant stated that he had "never done that to anybody" in his life and he "could have killed him." Defendant indicated that when he saw that Davis had "a little puncture wound," he tried to stop the bleeding.

Defendant told Officer Anderson that he thought the police had been called because someone had seen him trying to wake up Davis while Davis was passed out in front of his apartment.

At trial, defendant conceded that he drinks a lot and is an alcoholic. Defendant recalled that, after the events in the park, he returned to his apartment before Davis. When Davis arrived, defendant invited him in and they shared a pint of vodka. Defendant then asked Davis to leave. Davis left but, when defendant went outside a short time later, defendant found Davis passed out in front of the door. Defendant testified: "I had to slap him to try to wake him up. First, I shoved him, [he] wouldn't wake up. I slapped him. So I did hit him." Defendant helped Davis back inside the apartment because Davis "was extremely drunk" and urged him to take a shower and clean up. Defendant acknowledged that Davis had "a small trickle of blood on his face."

After Davis had changed clothes, defendant again told Davis that he could not stay and he had to go. When Davis did not respond to defendant's requests to leave, defendant tried to direct Davis toward the door by pushing him "lightly" but Davis resisted going. According to defendant, Davis suddenly turned and hit defendant with a frying pan and defendant was "stunned and frightened." Defendant then grabbed a knife off the kitchen counter and stabbed Davis.

Defendant admitted, however, that Davis was no longer facing him and Davis's back was

Memorandum Of Points And Authorities In Support Of Supplemental Answer - C 07-04469

"almost directly" toward defendant when the stabbing occurred. The prosecutor inquired, "You reach back, turn, saw a knife, grabbed it, lash out, saw Mr. Davis. Now you're standing there with a knife that you just stabbed him with?" Defendant replied, "Right." The prosecutor then asked, "Is Mr. Davis holding the pan?" Defendant answered, "No." Defendant also testified that immediately after stabbing Davis with a knife, he "pull[ed] it out real quick, realizing what had happened, turned around and rinsed the knife off." At trial, defendant's explanation for not mentioning the frying pan during the jail interview was that he was "under the impression that [Officer Anderson] was there to wrap things up," he believed he was merely facing limited jail time on a battery charge, and he wanted to protect Davis from getting in trouble too.

Defendant recalled that Steve Duncan dropped by five to 10 minutes later and then his next door neighbor, Peter Craven, came over. Defendant admitted that Craven suggested calling 911 and, after 911 was called, he went into his room and closed the door. At trial, he maintained that he simply went in to his bedroom to use the bathroom there.

Defendant testified that he was aware of an accident about three days earlier in which Davis "would have injured his ribs." Davis had fallen in the apartment bathroom and smashed into the bathroom sink. Defendant recalled hearing a crashing sound and figuring that Davis had fallen down because he was drunk and he had fallen down before. Defendant discovered Davis on the floor and the vanity countertop had been jarred loose.

Exh. C, at 2-6.

## STANDARD OF REVIEW

A federal court may grant a writ of habeas corpus to a state prisoner only if the state court's rulings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or were "based on an unreasonable determination of the facts in light of the evidence presented" in the state courts. 28 U.S.C. § 2254(d). Under the "contrary to" clause, a state court's decision is contrary to federal law if it "contradicts the governing law set forth in our cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Williams v. Taylor*, 529 U.S. 362, 405-406 (2000); *see also Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). If there is no Supreme Court precedent that controls a legal issue raised by a petitioner in state court, the state court's decision cannot be contrary to, or an unreasonable application of, clearly established federal law. *Carey v. Musladin,* 127 S.Ct. 649, 653-54 (2006) (denying habeas relief in absence of clearly established federal law).

In order to warrant habeas relief, the state court's application of clearly established federal law must not be merely erroneous, incorrect, or even "clear error," but "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003); *see also Williams v. Taylor*, 529 U.S. at 409; *Woodford*

1  *v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam). It is the habeas petitioner's burden to make that
2  showing. *Woodford,* at 25. In the same way, a "decision adjudicated on the merits in a state court
3  and based on a factual determination will not be overturned on factual grounds unless objectively
4  unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*,
5  357 U.S. 322, 340 (2003). State court factual determinations are presumed correct unless rebutted
6  by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Even if the state court's ruling is contrary to or an unreasonable application of Supreme Court precedent, that error justifies overturning the conviction only if the error had "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). The *Brecht* standard applies to all § 2254 cases, regardless of the type of harmless error review conducted by the state courts. *Fry v. Pliler*, ___ U.S. ___, 127 S.Ct. 2321 (2007).

## ARGUMENT

### THE FLIGHT INSTRUCTION WAS PROPERLY GIVEN

Without objection, the court instructed the jury:

> The flight of a person immediately after the commission of a crime or after he is accused of a crime is not sufficient in itself to establish his guilt but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding whether a defendant is guilty or not guilty. The weight to which this circumstance is entitled is a matter for you to decide.

CALJIC No. 2.52; CT 163; RT 477.

Petitioner claims that giving the flight instruction lessened the prosecution's burden of proof and violated his Sixth and Fourteenth Amendment rights. Specifically, Petitioner cites *Ulster County Court v. Allen*, 442 U.S. 140, 157 (1979), for the proposition that an instruction that permits a permissive inference violates due process where there is no rational way the trier of fact could make the connection permitted by the inference. Here, however, as found by the state court and as will be demonstrated below, there were substantial facts supporting the inference that petitioner retreated to his bedroom to avoid detection.

### A. The State Court's Analysis Of The Claim

The trial court instructed pursuant to former CALJIC No. 2.52: "The flight of a person immediately after the commission of a crime or after he is accused of a crime is not sufficient in itself to establish his guilt but is a fact which, *if proved,* may be considered by you in the light of all other proved facts in deciding whether a defendant is guilty or not guilty. The weight to which this circumstance is entitled is a matter for you to decide." (Italics added.)

Defendant contends that the flight instruction was not supported by the evidence and it lessened the prosecution's burden of proof and violated his constitutional right to jury trial under the Sixth Amendment and to due process under the Fourteenth Amendment. The People argue that any challenge to the flight instruction was waived by defendant's failure to object and, in any event, the instruction was proper.

*2. Propriety of the Flight Instruction*
Defendant maintains that it was error to give a flight instruction because he "never departed the crime scene" and "he actually attempted to meet police in the living room when he heard them arrive." "In general, a flight instruction ''is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt.'' [Citations.] '' [F]light requires neither the physical act of running nor the reaching of a far-away haven. [Citation.] Flight manifestly does require, however, a purpose to avoid being observed or arrested." '' [Citations.] '' *Mere* return to familiar environs from the scene of an alleged crime does not warrant an inference of consciousness of guilt [citations], but the *circumstances* of departure from the crime scene may sometimes do so.'' [Citation.]" ( *People v. Bradford* (1997) 14 Cal.4th 1005, 1055.)

In this case, the evidence was legally sufficient to support the flight instruction even though defendant also testified to an innocent purpose in leaving the living areas of his apartment and going into his bedroom and closing the door. Craven testified that, although he could not talk defendant into leaving the apartment, he did convince defendant to retreat to the bedroom before help arrived for Davis. This evidence, if believed by the jury, supported an inference the defendant's purpose in moving into the bedroom was to avoid being observed by responding authorities from which the jury could infer consciousness of guilt.

*3. Flight Instruction Did Not Violate Due Process*
"The Due Process Clause of the Fourteenth Amendment denies States the power to deprive the accused of liberty unless the prosecution proves beyond a reasonable doubt every element of the charged offense. *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970)." ( *Carella v. California* (1989) 491 U.S. 263, 265 [109 S.Ct. 2419].) "Under established law, instructional error relieving the prosecution of the burden of proving beyond a reasonable doubt each element of the charged offense violates the defendant's rights under both the United States and California Constitutions." ( *People v. Flood* (1998) 18 Cal.4th 470, 479-480; see *Carella v. California, supra,* 491 U.S. at p. 265.)

"[M]andatory presumptions violate the Due Process Clause if they relieve the State of the burden of persuasion on an element of the offense. *Patterson v. New York,* 432 U.S. 197, 215, 97 S.Ct. 2319, 2329-30, 53 L.Ed.2d 281 (1977); *Sandstrom, supra,* 442 U.S., at 520-524, 99 S.Ct., at 2457-2459. By contrast, a permissive inference is *not a violation of due process* because the State still has the burden of persuading the jury that the suggested conclusion should be inferred based on the predicate facts proved. *Ulster County Court v. Allen,* 42 U.S. 140, 157-163, 99 S.Ct. 2213, 2224-2228, 60 L.Ed.2d 777 (1979)."

(*Estelle v. McGuire* (1991) 502 U.S. 62, 78-79 [112 S.Ct. 475], italics added.) "A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury. *Ulster County Court, supra,* 442 U.S., at 157-163, 99 S.Ct., at 2224-2227." (*Francis v. Franklin* (1985) 471 U.S. 307, 314-315 [105 S.Ct. 1965].) "The due process clauses of the federal Constitution (U.S. Const., 5th & 14th Amends.) require a relationship between the permissively inferred fact and the proven fact on which it depends." (*People v. Mendoza* (2000) 24 Cal.4th 130, 180.)

It is defendant's position that the flight instruction created an unconstitutional "permissive inference" because it allowed the jury to infer consciousness of guilt from the defendant's "retreat to his bedroom." "[W]e review an assertedly erroneous instruction not in isolation, but in the context of the entire charge. (*People v. Haskett* (1990) 52 Cal.3d 210, 235 [276 Cal.Rptr. 80, 801 P.2d 323].)" (*People v. Johnson* (1992) 3 Cal.4th 1183, 1250; see *Estelle v. McGuire, supra,* 502 U.S. 62, 72.)

As already indicated, we do not agree that there was no evidence justifying the flight instruction. Moreover, as charged, the jury could not infer guilt from defendant's withdrawal to his bedroom without first concluding that such withdrawal constituted flight. The flight instruction "did not assume that flight was established, but instead permitted the jury to make that factual determination and to decide what weight to accord it. [Citation.]" (*People v. Carter* (2005) 36 Cal.4th 1114, 1182-1183.) There is a reasonable relationship between a permissive inference of consciousness of guilt and a proven fact of flight. (See *People v. Williams* (1997) 55 Cal.App.4th 648, 652.)

In addition, the court specifically told the jury: "Whether some instructions apply will depend upon what you find to be the facts. Disregard any instruction which applies to facts determined by you not to exist. Do not conclude that because an instruction has been given that I am expressing an opinion as to the facts."

The court also told the jury: "You must base your decision on the facts and the law. You have two duties to perform: First, you must determine what facts have been proved from the evidence received in the trial and not from any other source.... [¶¶] Second, you must apply the law that I state to you to the facts as you determine them...." It instructed: "[A] finding of guilt as to any crime may not be based on circumstantial evidence unless the proved circumstances are not only, one, consistent with the theory that the defendant is guilty of the crime; but, two, cannot be reconciled with any other rational conclusion. [¶¶] Further, each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance on which that inference necessarily rests must be proved beyond a reasonable doubt. [¶¶] Also, if the circumstantial evidence permits two reasonable inferences, one of which points to the defendant's guilt and the other to his innocence, you must adopt that interpretation that points to the defendant's innocence and reject that interpretation that points to his guilt."

Finally, the court gave the standard jury instructions regarding the presumption of innocence and the People's burden of proving the defendant guilty beyond a reasonable doubt. It also defined reasonable doubt.

" When reviewing a supposedly ambiguous [i.e., potentially misleading] jury instruction, "we inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." "(*People v. Welch, supra,* 20 Cal.4th 701, 766.)" (*People v. Ayala* (2000) 24 Cal.4th 243, 289.) Here, there is simply no reasonable likelihood that the challenged flight instruction, in the context of the

instructions as a whole, misled the jury to make an irrational inference of consciousness of guilt or lessened the prosecution's burden of proof in violation of due process.

*4. Any Error Harmless*
Moreover, even if we were to assume arguendo that the flight instruction should not have been given, any error would be harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836. The jury was specifically instructed to disregard any instruction that applied to a state of facts that it determined did not exist. At trial, defendant admitted to shoving, slapping, and hitting Davis outside his apartment. Uncontroverted evidence established that defendant stabbed Davis in the back and, a moment later, defendant did not see Davis holding the frying pan. Defendant failed to mention anything about acting in his own self-defense when he spoke with police the day of the incident or during his jail interview. It is not reasonably probable that the result would have been more favorable to the defendant had the flight instruction not been given. (*People v. Watson, supra*, 46 Cal.2d at p. 836.)

Exh. C, at 7-8.

### B. The State Court's Rejection Of The Claim Was Neither Contrary To Nor An Unreasonable Application Of Supreme Court Authority

A claim of state instructional error can be the basis of federal habeas relief only if the error, considered in light of all the instructions given in addition to the trial record, "'so infected the entire trial that the resulting conviction violates due process.'" *Estelle v. McGuire,* 502 U.S. 62, 72 (1991) (citation omitted). An instruction that merely creates a permissive inference does not shift the burden of proof, but it nonetheless violates due process unless it can be said " 'with substantial assurance' 'that the inferred fact is " 'more likely than not to flow from the proved fact on which it is made to depend." ' *County Court of Ulster County v. Allen,* 442 U.S. 140, 167 & n. 28, quoting *Leary v. United States*, 395 U.S. 6, 36 (1969).

Under California law, a flight instruction is generally appropriate where the circumstances suggest that the defendant's movement is motivated by a consciousness of guilt. *People v. Smithey*, 20 Cal.4th 936, 982 (1999); *People v. Bradford*, 14 Cal.4th 1005, 1055 (1997). Here, the evidence showed that petitioner fled the immediate scene of the crime (the area outside his apartment) and retreated to his bedroom inside his apartment behind a closed door. Petitioner's neighbor, Peter Craven, convinced petitioner that he should leave the scene and hide from the police because petitioner might get into trouble for stabbing the victim. RT 141. The fact that petitioner chose to hide in his room rather than leave the apartment completely does not change the fact that he did so to evade apprehension by the police. Additionally, "mere return to familiar environs from the scene

of an alleged crime does not warrant an inference of consciousness of guilt (citations), but the circumstances of departure from the crime scene may sometimes do so." *People v. Turner*, 50 Cal.3d 668, 695 (1990). Moreover, flight does not require "the reaching of a far-away haven." *People v. Visciotti*, 2 Cal.4th 1, 60 (1992). Here, Mr. Craven made it clear to petitioner that the reason he should get out of sight was so that petitioner would not get into trouble when the police arrived. Petitioner agreed with Mr. Craven. RT 141. Given these facts, the jury could reasonably and rationally have inferred a consciousness of guilt from petitioner's actions after he stabbed the victim.

Petitioner's reliance on *People v. Crandell*, 46 Cal.3d 833 (1988), is misplaced. In *Crandell*, the defendant left the scene of the crime without knowledge or expectation that the police would discover him or, even, the fact that a crime had been committed. Here, petitioner knew that the police were being called and, as a result, agreed to hide in the bedroom.

Petitioner's attempts to distinguish this case from *People v. Bradford*, 14 Cal.4th 1005, are equally without merit. In *Bradford*, the defendant never left the apartment building where the crime occurred, made statements that he needed to 'get the hell out of here,' and made preparations to leave. However, he did leave the immediate area of the crime and his statements and actions supported the inference that he did so to evade detection. Here, petitioner likewise left the immediate area of the crime and the statements of his neighbor, Peter Craven, along with petitioner's action of hiding behind the closed door of his bedroom, supported the inference that petitioner also left the crime scene in an attempt to evade detection. These actions logically permit an inference that petitioner movements was motivated by guilty knowledge.

Even more significant, the instruction leaves the factual determination of flight and its significance to the jury. *People v. Visciotti*, 2 Cal.4th at 61 (CALJIC No. 2.52 does not assume that flight was established, but leaves that factual determination and its significance to the jury); *People v. Escobar*, 48 Cal.App.4th 999, 1029 (1996) (CALJIC No 2.52 assumes neither the guilt, nor the flight, of the defendant but rather allows the jury, if upon proof it finds flight occurred, to consider flight as a fact in deciding whether the defendant is guilty or not guilty). The Ninth Circuit has specifically upheld CALJIC No. 2.52 on this basis. *McMillan v. Gomez*, 19 F.3d 465, 469 (9th Cir.

1994) (jury instruction on flight proper where the jury was expressly instructed, as here, that defendant's flight was evidence of guilt only if defendant's flight was proved; *see also Houston v. Roe,* 177 F.3d 901, 910 (9th Cir. 1999); *Karis v. Calderon,* 283 F.3d 1117, 1131-32 (9th Cir. 2002).

The jury was also instructed to disregard any instruction that applied to facts it found did not exist. CALJIC No. 17.31; CT 191; RT 526. Had the jury decided the flight instruction was not applicable to petitioner, it simply would have disregarded it

In sum, petitioner has failed to demonstrate that the flight instruction lowered the burden of proof. The state court's conclusion to that effect was not unreasonable.

Finally, even if the flight instruction should not have been given, it did not have a substantial or injurious effect on the verdict. *Fry v. Pliler,* ___ U.S. ___ , 127 S.Ct. 2321. Petitioner admitted stabbing the victim to his neighbor, Peter Craven, immediately after the crime occurred. RT 137-138. Petitioner also admitted the stabbing to Officer Anderson four days later. (ACT 29-31.) In neither statement did petitioner mention self defense or the victim hitting him with a frying pan. *See* RT 137-138, ACT 2-44. The victim's statement, on the other hand, was consistent with regard to the central facts of the assault from the time he was interviewed at the hospital on the night of the incident through the time of the trial. RT 55-69, 167, 176-178. Further, there was objective evidence supporting the victim's version of the attack. The victim's blood was found in several places outside the apartment, the victim had substantial injuries, blood was found on petitioner's shoe, and a heel print from petitioner's shoe was found on the upper torso of the victim's shirt despite the fact that petitioner admitted only to slapping the victim in the face and stabbing him in self defense. RT 131-132, 234-237, 242, 267, 455-460, 467-468. Although the prosecutor did not mention the flight instruction or the facts supporting it in his closing argument, the jury only required 46 minutes to find petitioner guilty of the assault and to find that petitioner had personally used a knife and inflicted great bodily injury on the victim. *See* RT 488-509, 519-525; CT 211. Petitioner is not entitled to relief.

## CONCLUSION

Accordingly, respondent respectfully requests that the petition be denied.

Dated: March 10, 2008

        Respectfully submitted,

        EDMUND G. BROWN JR.
        Attorney General of the State of California

        DANE R. GILLETTE
        Chief Assistant Attorney General

        GERALD A. ENGLER
        Senior Assistant Attorney General

        PEGGY S. RUFFRA
        Supervising Deputy Attorney General

        /s/ Juliet B. Haley

        JULIET B. HALEY
        Deputy Attorney General

        Attorneys for Respondent

JBH:jw
40226590.wpd