1
2
3
4
5
6
7        IN THE UNITED STATES DISTRICT COURT
8        FOR THE NORTHERN DISTRICT OF CALIFORNIA
9  JEFF J. HANCOCK,                    )   No. C 07-04469 CW (PR)
                                       )
10           Petitioner,               )   ORDER DENYING PETITION
                                       )   FOR A WRIT OF HABEAS
11      v.                             )   CORPUS
                                       )
12 D. SEDLEY, Warden,                  )
                                       )
13           Respondent.               )
                                       )
14 ─────────────────────────────────────)

15                        INTRODUCTION

16      Petitioner Jeff J. Hancock, a prisoner of the State of

17 California who is incarcerated at the California Medical Facility

18 in Vacaville, filed this <u>pro se</u> petition for a writ of habeas

19 corpus pursuant to 28 U.S.C. § 2254.  Thereafter, Petitioner filed

20 another petition in a new case, Case No. 07-4664 CW, that was

21 deemed a supplemental petition and refiled in the instant case.[1]

22      The Court ordered Respondent to show cause why the petition

23 should not be granted.  Respondent has filed an answer and two

24 supplemental answers, along with supporting memoranda and exhibits.

25 Petitioner has filed traverses to the answer and to each

26

27      _____
             [1]For simplicity, and unless otherwise indicated, the petition
28 and supplemental petition are referred to in this order
   collectively as "the petition."

supplemental answer.

For the reasons outlined below, the Court DENIES the petition for a writ of habeas corpus on all claims.

PROCEDURAL HISTORY

On May 24, 2004, a jury in Santa Clara County Superior Court found Petitioner guilty of assault with a deadly weapon, and found true the allegations that Petitioner personally used a deadly weapon (a knife) and inflicted great bodily injury. (Resp't Ex. A (Clerk's Transcript) ("CT") at 211.) Petitioner admitted to having suffered a prior felony conviction for robbery that qualified as both a "serious" felony conviction and as a "strike" under California Penal Code sections 667(a)-(i) and 1170.12. (Id.) On July 22, 2005, the trial court sentenced Petitioner to a term of eleven years in state prison. (Id. at 283-84.)

Petitioner filed a direct appeal and a petition for a writ of habeas corpus to the California Court of Appeal. (Resp't Exh. C, L.) On March 24, 2006, the Court of Appeal denied the direct appeal in an unpublished opinion, and summarily denied the petition for a writ of habeas corpus in a separate opinion. (Att. to Resp't Ex. C; Pet. Ex. I.) Petitioner filed separate petitions for review challenging each of these decisions. (Resp't Exh. F, I.) On June 14, 2006, the California Supreme Court summarily denied the petition for review of the denial of his direct appeal, and on July 19, 2006, denied the petition for review of the denial of his habeas petition. (Pet. Ex. J.)[2] Two subsequent petitions for a

_____

[2]The California Supreme Court's June 14, 2006 denial of the petition for review in Petitioner's direct appeal does not appear
(continued...)

writ of habeas corpus to the California Supreme Court were summarily denied on July 25, 2007. (Pet. Exh. 12, 13.)

Petitioner filed the original petition in this matter on August 28, 2007, raising seven claims. On September 10, 2007, he filed what has been deemed a supplemental petition containing one additional claim. The somewhat convoluted briefing on Petitioner's eight claims is as follows.

On March 10, 2008, Respondent filed a "supplemental" answer and supporting memorandum denying the claim in the supplemental petition that the flight instruction was improper. On June 9, 2008, Petitioner filed a "supplemental" traverse addressing this claim.

On October 22, 2008, Respondent filed an answer and supporting memorandum opposing six of the seven claims in the original petition, to wit: (1) a violation of Petitioner's right to counsel based on the admission of the audiotape recording of his interview with Officer Craig Anderson on August 12, 2003; (2) prosecutorial misconduct based on the failure to disclose statements made by Petitioner to prosecution witness Peter Craven; (3) prosecutorial misconduct based on the knowing use of perjured testimony from the victim; (4) ineffective assistance of trial counsel based on "cumulative errors of counsel" at trial; (5) ineffective assistance of trial counsel for failing to present mitigating evidence at sentencing; and (6) violation of Petitioner's due process rights based on the prosecutor's failure "to allow the defence [sic

---

[2](...continued)
to have been included in the parties' exhibits, but it is not in dispute.

1  inspection of evidence relevant, material, and favorable to

2  defense," including the audiotape recording of the interview with

3  Officer Anderson.  Petitioner filed a traverse to this answer on

4  November 20, 2008, which he entitled "Denial and Exception to the

5  Return to the Order to Show Cause."

6      On December 10, 2008, Respondent filed a second supplemental

7  answer and supporting memorandum opposing the seventh claim in the

8  original petition, i.e. that trial counsel rendered ineffective

9  assistance by failing adequately to investigate and present

10  exculpatory and mitigating evidence at trial.  In response,

11  Petitioner filed a "Supplemental Supplemental Traverse" on January

12  5, 2009.

13                          STATEMENT OF FACTS

14      In its written opinion, the California Court of Appeal

15  summarized the factual background as follows:

16          Craig Davis testified that he and defendant had been
            good friends.  Davis had been staying at defendant's
17          apartment at the time of the stabbing incident but Davis
            did not have his own key.  Davis testified that he was
18          "out of work" and "wasn't paying rent" but defendant was
            letting him stay in the apartment "out of the goodness of
19          his heart . . . ."

20          Davis and defendant had been hanging out with
            others at a nearby park earlier in the day.  Davis
21          recalled returning to defendant's apartment from the
            park before defendant arrived and sitting on the walkway
22          in front of the apartment and waiting for defendant's
            return.

23
            Both men had been drinking that day.  Davis
24          acknowledged that he was an alcoholic.  Davis typically
            woke up and began drinking almost immediately.  He
25          admitted that on a few occasions he has been intoxicated
            to the point of falling down.  He admitted that he may
26          have fallen and slammed into the countertop in the
            apartment's bathroom about three days before the
27          stabbing incident.  Davis acknowledged that he had
            testified at the preliminary hearing to drinking three
28          quarters of a fifth of vodka the day of the incident.

                                   4

He thought he also had a couple of beers at the park.

Davis recalled that, after defendant returned, they had a verbal altercation, which turned physical. Davis testified that defendant was upset about some comment Davis had made to "some ladies" at the park. Davis acknowledged that he could have said something out of line at the park, which is what defendant indicated to him. The confrontation had escalated. Defendant had punched and kicked him and had dragged him away from the front door of defendant's apartment across the concrete walkway. Davis could not recall whether or not he had gone into the apartment before he was beaten.

Davis indicated defendant reentered the apartment after the beating. Davis crawled toward the front door because he could not get up. He managed to sit up on the walkway. A minute or so later, defendant came back out of the apartment. Davis thought that defendant then stabbed him in the back and, when he tried to defend himself, defendant also stabbed him in the hand. He denied hitting defendant with a frying pan.

Davis indicated that his memories of what happened next were "kind of vague." He recalled a neighbor, Peter Craven, coming over to help. The paramedics came. Davis recalled talking to Officer Kim before he was taken to the hospital. Davis had not wanted to get defendant in trouble and had lied that he "got jumped in the park."

Peter Craven testified that, on the date of the incident, he lived in apartment number six and knew his neighbor who lived in apartment number seven, identified as defendant at trial, by first name. Sometime after work on that date, that is sometime after 4:30 or 5:00 p.m., he stopped by defendant's apartment. He observed a male named Duncan treating Davis, who "had been beat up pretty seriously." Davis's "face was very badly swollen," he had cuts and bruises on his body, and a stab wound to his lower back. Although Davis said he had been "rolled in the park," Craven did not believe Davis because defendant's "hands were swollen and cut up" and Davis "was very dependent on [defendant], so he would cover for [defendant] in a situation like that."

Craven testified that he was concerned whether an ambulance should be summoned and tried to determine the depth of the stab wound. The wound was not bleeding badly but some blood was pumping out of the wound every second or so. Craven inquired how deep Davis had been stabbed. Defendant went to the kitchen, returned with a knife, indicated a depth of three to four inches using his thumb and said "'I stabbed him this deep.'" Craven thought an ambulance should be called but both Davis and

defendant were "adamantly opposed." Duncan and he
convinced them that Davis needed medical attention and
the paramedics were called.

Craven testified that both Duncan and he suggested
that defendant leave before the paramedics arrived.
Craven testified that the suggestion was made because
defendant might get in trouble. Defendant did not want
to leave. They suggested that defendant "wait in the
bedroom and close the door, and he agreed to do that."
Defendant went into the bedroom and closed the door
behind him.

Kirk Kim, a public safety officer with the City of
Sunnyvale, testified that, on August 8, 2003, at
approximately 8:23 p.m., he was dispatched to an
apartment unit to investigate a possible stabbing.
Officer Kim proceeded to that apartment and spoke with
Craig Davis, who was sitting in a chair just inside the
doorway. Steve Duncan was attending to Davis and
"holding some sort of bandage on Mr. Davis's back."

After entering the apartment, Officer Kim heard
noises in the back room. Officer Kim testified that
"the door started to come open" and he "blocked the door
from opening up onto [them] with [his] foot." "[A] male
voice from behind the door" "yelled something like 'What
the fuck?'" Officer Kim identified himself as Sunnyvale
Police and continued to block the door from opening.
"The door closed and then seconds later slammed open
again . . .." Keeping the door open about four inches,
Officer Kim instructed an individual, who was identified
as defendant at trial, to step away from the door.
Officer Kim and another officer entered the bedroom and
directed defendant to sit down on the bed.

Officer Kim testified that defendant appeared to be
under the influence of alcohol and a strong odor
emanated from him. In addition, he appeared to have
"just been in an altercation" because he had a black and
blue eye and had blood on him. Defendant likewise
appeared intoxicated to Officer Andrew Zarriello, who
also had responded to the dispatch. He stated that
defendant "smelled strongly of alcohol," "[h]is speech
was thick and slurred," and he "was very defensive."

Defendant did not give direct answers to the
officers' questions and he did not volunteer any
information. When asked how his eye was injured,
defendant denied any injury to his eye. He indicated
that he did not know what Officer Kim was talking about
when the officer asked about blood on defendant's sock
and a pair of underwear in the bedroom. Defendant
denied being injured. When questioned about Davis,
defendant "Said something to the effect of [Davis] must

have beat himself up." Defendant was placed under arrest.

Davis initially told Officer Kim that he had been jumped and stabbed at Fair Oaks Park but the officer did not believe him. Officer Kim was familiar with Davis from previous encounters and sensed Davis was not telling the truth. Later at the hospital, Davis told Officer Kim that defendant had beaten him up and told him to leave the apartment. Davis had explained that defendant let him in to retrieve some articles but then pushed him out the door and caused defendant to hit his head on a post. Davis reported that defendant had repeatedly gone into the apartment and then returned to rough him up. Eventually, defendant had helped Davis back into the apartment. Davis told Officer Kim that he may have blacked out and he also told the officer that he may have "socked" defendant in the eye. Officer Kim testified that Davis appeared to have been drinking.

Dr. Gregory Gilbert, an emergency physician at Stanford University, saw Davis when he came into the emergency room on August 8, 2003 at about 2100 or 9:00 p.m. Dr. Gilbert testified that Davis's external injuries included multiple abrasions and contusions, a laceration near his face, and a stab wound and his internal injuries included rib fractures and a very small pneumothorax. A pneumothorax is a condition in which "air . . . gets trapped between the chest wall cavity and the cavity [sic] lung and the lung deflates." The doctor explained that the pneumothorax meant that the stab wound went "all the way through to the pleural cavity." The doctor acknowledged that it was not possible to determine whether the rib fractures were two to three days old.

In photographs of Davis, Dr. Gilbert identified fresh contusions and abrasions to Davis's face and a puncture wound below Davis's left shoulder blade. The number of contusions on Davis's body indicated he had been hit and struck. Dr. Gilbert acknowledged that the medical records did not note any injury to Davis's hands but he stated that a photograph suggested that a contusion might have been missed.

On August 12, 2003, Officer Craig Anderson interviewed Davis at the hospital. Davis told Officer Anderson that he had been staying at defendant's apartment and, during the previous few weeks, they had argued repeatedly regarding "Davis's failure to help out with some of the costs such as rental and food." Davis remembered that defendant had confronted him about comments he had made at the park and the argument had led to defendant beating him up. Davis was unable to recall being stabbed specifically or much about the

altercation.

Officer Anderson also interviewed defendant in jail and recorded the interview. Defendant told Anderson that he had been supporting Davis for the past nine months and they were "best friends." He stated that Davis was an alcoholic and drank every single day. Defendant had been helping Davis with housing, rather than letting him sleep in the park, and most everything else, including food, clothing and tobacco.

Defendant explained that about a week before the stabbing incident, the apartment owner had received a complaint that someone was urinating in the front yard and throwing up outside defendant's unit at about 10:00 p.m. The owner had spoken with defendant's mother and informed her that defendant would have to move if there were another incident. Defendant told Officer Anderson that he kicked Davis out of his apartment on the day of the stabbing because he did not want another incident. A short time after ejecting Davis, defendant went out to check if Davis had passed out on the front lawn.

Defendant told Officer Anderson that he found Davis passed out in front of his door and he "tried to wake him up or shoved him away." He said he "slapped him around" but he "wouldn't wake up." He admitted slapping Davis in the face a few times, kicking and dragging him. He indicated that he "ended up having to smack him a little bit harder" because Davis was not waking up.

According to defendant's interview statements, Davis finally woke up and defendant brought him into the house. Davis had "a little bit of blood on him." Defendant told Davis to take a shower and gave him a wash cloth to clean himself up. Defendant indicated that, after Davis was cleaned up, Davis was not listening or cooperating with defendant's efforts to get Davis to leave and they had "a little tango," "a little confrontation."

Defendant recalled that he had been drinking and Davis "was pretty much drunk." Defendant agreed that he was thinking that he had "to get this guy out of here" or he was going to "get kicked out" of his apartment and be "homeless" again. Defendant was "trying to drag him out" but Davis was not going. Defendant recalled trying to explain to Davis that he did not want another incident but it was "going in one ear and out the other." Defendant said he grabbed Davis and was struggling to get Davis to leave his house. Defendant indicated that he had been at the end of his rope for weeks.

In the interview, defendant admitted that, while

struggling to get Davis out, he had grabbed a knife
lying on the counter and jabbed Davis in the back one
time. He had said, "now will you get out of here?"
Defendant agreed that he had felt remorseful because
Davis was his friend. Defendant stated that he had
"never done that to anybody" in his life and he "could
have killed him." Defendant indicated that when he saw
that Davis had "a little puncture wound," he tried to
stop the bleeding.

Defendant told Officer Anderson that he thought the
police had been called because someone had seen him
trying to wake up Davis while Davis was passed out in
front of his apartment.

At trial, defendant conceded that he drinks a lot
and is an alcoholic. Defendant recalled that, after the
events in the park, he returned to his apartment before
Davis. When Davis arrived, defendant invited him in and
they shared a pint of vodka. Defendant then asked Davis
to leave. Davis left but, when defendant went outside a
short time later, defendant found Davis passed out in
front of the door. Defendant testified, "I had to slap
him to try to wake him up. First, I shoved him, [he]
wouldn't wake up. I slapped him. So I did hit him."
Defendant helped Davis back inside the apartment because
Davis "was extremely drunk" and urged him to take a
shower and clean up. Defendant acknowledged that Davis
had "a small trickle of blood on his face."

After Davis had changed clothes, defendant again
told Davis that he could not stay and he had to go.
When Davis did not respond to defendant's requests to
leave, defendant tried to direct Davis toward the door
by pushing "lightly" but Davis resisted going.
According to defendant, Davis suddenly turned and hit
defendant with a frying pan and defendant was "stunned
and frightened." Defendant then grabbed a knife off the
counter and stabbed Davis.

Defendant admitted, however, that Davis was no
longer facing him and Davis's back was "almost directly"
toward defendant when the stabbing occurred. The
prosecutor inquired, "you reach back, turn, saw a knife,
grabbed it, lash out, saw Mr. Davis. Now you're
standing there with a knife that you just stabbed him
with?" Defendant replied, "Right." The prosecutor then
asked, "Is Mr. Davis holding the pan?" Defendant
answered, "No." Defendant also testified that
immediately after stabbing Davis with a knife, he
"pull[ed] it out real quick, realizing what had
happened, turned around and rinsed the knife off." At
trial, defendant's explanation for not mentioning the
frying pan during the jail interview was that he was
"under the impression that [Officer Anderson] was there

to wrap things up," he believed he was merely facing limited jail time on a battery charge, and he wanted to protect Davis from getting in trouble too.

Defendant recalled that Steve Duncan dropped by five to 10 minutes later and then his next door neighbor, Peter Craven, came over. Defendant admitted that Craven suggested calling 911 and, after 911 was called, he went into his room and closed the door. At trial, he maintained that he simply went into his bedroom to use the bathroom there.

Defendant testified that he was aware of an accident about three days earlier in which Davis "would have injured his ribs." Davis had fallen in the apartment bathroom and smashed into the bathroom sink. Defendant recalled hearing a crashing sound and figuring that Davis had fallen down before. Defendant discovered Davis on the floor and the vanity countertop had been jarred loose.

People v. Hancock, No. H027917, slip op. at 2-9 (Cal. Ct. App. Mar. 24, 2006) (attached to Resp't Ex. F) (hereinafter "Slip Op.").

LEGAL STANDARD

A federal court may entertain a habeas petition from a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.

§ 2254(d).

A decision is contrary to clearly established federal law if it fails to apply the correct controlling authority, or if it applies the controlling authority to a case involving facts materially indistinguishable from those in a controlling case, but nonetheless reaches a different result. Clark v. Murphy, 331 F.3d 1062, 1067 (9th. Cir. 2003).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. The reasonableness inquiry under the "unreasonable application" clause is objective. Id. at 409.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is the holdings of the Supreme Court as of the time of the relevant state court decision. Id. at 412.

Even if the state court's ruling is contrary to or an unreasonable application of Supreme Court precedent, that error justifies habeas relief only if the error resulted in "actual prejudice." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

To determine whether the state court's decision is contrary to, or involved an unreasonable application of, clearly established

1  law, a federal court looks to the decision of the highest state

2  court that addressed the merits of a petitioner's claim in a

3  reasoned decision.  LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th

4  Cir. 2000).  If the state court only considered state law, the

5  federal court must ask whether state law, as explained by the state

6  court, is "contrary to" clearly established governing federal law.

7  Lockhart v. Terhune, 250 F.3d 1223, 1230 (9th Cir. 2001).

8      In this case, the first seven claims in the original petition

9  were raised in the state courts in habeas petitions and were

10 summarily denied.  In such a case, where the state court gives no

11 reasoned explanation of its decision on a petitioner's federal

12 claim and there is no reasoned lower court decision on the claim, a

13 review of the record is the only means of deciding whether the

14 state court's decision was objectively reasonable.  Plascencia v.

15 Alameida, 467 F.3d 1190, 1197-98 (9th Cir. 2006).  When confronted

16 with such a decision, a federal court should conduct "an

17 independent review of the record" to determine whether the state

18 court's decision was an objectively unreasonable application of

19 clearly established federal law.  Id. at 1198.  "[W]hile we are not

20 required to defer to a state court's decision when that court gives

21 us nothing to defer to, we must still focus primarily on Supreme

22 Court cases in deciding whether the state court's resolution of the

23 case constituted an unreasonable application of clearly established

24 federal law."  Fisher v. Roe, 263 F.3d 906, 914 (9th Cir. 2001).

25     Petitioner's eighth claim challenging the instruction

26 regarding flight was raised on direct appeal.  The last explained

27 decision to address this claim was by the California Court of

28 Appeal and, consequently, under Lockhart, that is the state court

12

decision that is reviewed under 28 U.S.C. § 2254(d)(1).

DISCUSSION

I. MIRANDA VIOLATION

Petitioner claims that the admission of his interview with Officer Anderson at the jail violated his constitutional right to counsel because Officer Anderson did not adhere to the requirements of Miranda v. Arizona, 384 U.S. 436 (1966). Miranda requires that a person subjected to custodial interrogation be advised prior to the interrogation that he has the right to remain silent, that statements made can be used against him, that he has the right to counsel, and that he has the right to have counsel appointed. Id. at 444.

Both the tape recording and a transcript of the interview with Officer Anderson were admitted into evidence. (Resp't. Ex. G; Augmented CT at 2-44).[3] At the beginning of the interview, Officer Anderson identified himself as a police officer, made some introductory remarks and read Petitioner his Miranda warnings before asking questions. (Augmented CT at 2-3; RT at 223).

Petitioner does not dispute that Officer Anderson read the proper Miranda warning, but he contends that Anderson violated Miranda by making remarks prior to reading the warning. The following remarks were made prior to the Miranda warning:

Anderson: (Inaudible voices in background) Hey.

Hancock: (Hey)

Anderson: It was pretty much, it was, I'm a Sunnyvale

---

[3]Respondent's Exhibit G herein is the tape recording of the interview. The transcript of the interview is included in the Augmented Clerk's Transcript, which is included with the Clerk's Transcript in Respondent's Exhibit A.

police (inaudible). And I'm a Sunnyvale police (inaudible). And ah, um, ah, I went up and ah, visited ah, you're buddy ah, up in (inaudible), 'cause it was . . .

Hancock: Craig.

Anderson: (Inaudible), yeah, Craig. Um, he's doing okay. Um, you know, he could be, you got the better of him, but (inaudible), he's fine. They'll probably release him today or tomorrow or something like that. But he's, he's gonna make it. Um, talked to him a little bit. He, he didn't really want to say what, what really went down. It sounds more like two buddies kind of got in an argument and ah, they they're, and ah, the officers, when they responded, they really had to pry it out of him to tell them what really happened. Ah, basically kind of what he told me is that you guys have been having a little few little squabble[s] about ah, finances. You both are looking for work, having some problems. You got Thursdays or Friday night, whatever it was. And ah, and you guys both have been drinking a little bit that night. You're (inaudible) right now. Ah, I don't know if you want, basically what the deal is, he's got court tomorrow. Okay. Ah, there's nothing in there as far as what your side of the story is to this at all in the report that's gonna go to the DA, the judge, and all that. So, this is kind of your last chance to say what you want to say about the whole thing. I'll write it down. I'll submit the tape today. Hoping the DA can take a look at it tomorrow (inaudible). If that's something you're willing to do, I can read you the Miranda [thing], then we can talk. Totally up to you if you want, if you want to leave your side of the story here, um, that's up to you. But ah, that's just (inaudible). Ah, let me, let me read this to you. And then if you want to talk about it, then you can. You have the right to remain silent. Anything you say may be used against you in court. You have the right to the presence of an attorney before and during any questioning. If you cannot afford to hire an attorney, one will be appointed to you free of charge before any questioning. Do you understand all that I read to you?

Hancock: Yeah.

(Augmented CT at 2-3; Resp't. Exh. G.)

Petitioner argues that Anderson's pre-warning remarks caused the interview to be an impermissible and deliberate "two-step" interrogation. The "two-step interrogation strategy, termed 'question-first, warn later' . . . called for the deliberate

14

withholding of the <u>Miranda</u> warning until the suspect confessed,
followed by a <u>Miranda</u> warning and a repetition of the confession
already given." <u>United States v. Williams</u>, 435 F.3d 1148, 1154
(9th Cir. 2006) (citing <u>Missouri v. Seibert</u>, 542 U.S. 600, 611-14
(2004). If the police deliberately use the "two-step strategy,"
the post-warning statements must be suppressed unless the police
take curative measures to apprise the defendant of his rights; if
the strategy is not deliberate, the post-warning statements are
admissible if voluntarily made. <u>United States v. Mejia</u>, 559 F.3d
1113, 1117 (9th Cir. 2009).

The record is clear in this case, however, that there was no
"two-step interrogation" or "midstream" <u>Miranda</u> warning of the kind
addressed in <u>Seibert</u> and its progeny. <u>Cf.</u> <u>Seibert</u>, 542 U.S. at
611-14 ("question first, warn later" procedure consists of police
obtaining confession without giving <u>Miranda</u> warning, then giving
warning and obtaining confirmation a second time). Here,
Petitioner made no confession and Anderson asked him no questions
prior to the <u>Miranda</u> warnings. The <u>Miranda</u> warnings came within
the first two minutes of a forty-one-minute interview.[4] The few
remarks by Anderson prior to the warning were introductory in
nature, insofar as he simply introduced himself, gave a brief
summary of what the victim told the police, and informed Petitioner
that he could make a statement if he wished. Under these
circumstances, the <u>Miranda</u> warnings were not issued "midstream," as
in <u>Seibert</u>, but rather were properly issued prior to any

---

[4]Specifically, the interview started at 0:42 of the recording,
the warnings were given at 2:24, and the interview concluded at
42:58. (Resp't. Exh. G.)

1   questioning of Petitioner.

2        Petitioner also asserts that Officer Anderson did not identify

3   himself as a police officer and that he falsely told Petitioner

4   that Petitioner was charged with battery prior to reading the

5   Miranda warning.  Both the tape recording and the transcript of the

6   interview clearly indicate to the contrary, however.  Officer

7   Anderson identified himself as a police officer at the beginning of

8   the interview, and did not tell Petitioner that he was charged with

9   battery prior to the Miranda warning.  (See Resp't. Exh. G;

10  Augmented CT at 2-3.)

11       For the reasons discussed, the interview of Petitioner at the

12  jail did not violate Petitioner's Miranda rights.  Consequently,

13  the state courts' rejection of Petitioner's Miranda claim was

14  neither contrary to nor an unreasonable application of federal law.

15  Petitioner is not entitled to habeas relief on this claim.

16  II.  PROSECUTORIAL MISCONDUCT – FAILURE TO DISCLOSE EVIDENCE

17       Petitioner claims that the prosecutor committed misconduct by

18  failing to disclose to him that Peter Craven would testify to

19  statements Petitioner had made to him after the altercation with

20  Davis.  On the evening before Craven testified, the prosecutor

21  called him to verify that he would appear, and during that

22  conversation, Craven told the prosecutor that Petitioner had shown

23  him the knife and demonstrated how deeply he had stabbed Davis.

24  (Reporter's Transcript ("RT") at 149.)[5]  The prosecutor did not

25  inform the defense that Craven would testify to this effect before

26  Craven testified at the trial the following day.  (RT at 146-47.)

27

28       ─────────────────────

         [5]Respondent's Exhibit B is the Reporter's Transcript.

                              16

When Craven gave this testimony, defense counsel moved for a mistrial. (Id.) The prosecutor told the trial court that he did not disclose the conversation because it was not exculpatory and was consistent with the defense theories of self-defense and mutual combat. (Id.) The trial court denied the motion for a mistrial. (Id. at 195-96.) First, the trial court found that the prosecutor did not intentionally withhold exculpatory evidence. (Id.) The trial court further found that there was no prejudice to Petitioner because he never disputed that he had stabbed the victim. (Id.) In addition, learning about Craven's testimony earlier could not have affected Petitioner's decision to testify because Petitioner learned about Craven's testimony before Petitioner decided to take the stand. (Id.)

In Brady v. Maryland, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. The Supreme Court has since made clear that the duty to disclose such evidence applies even when there has been no request by the accused, United States v. Agurs, 427 U.S. 97, 107 (1976), and that the duty encompasses impeachment evidence as well as exculpatory evidence, United States v. Bagley, 473 U.S. 667, 676 (1985). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Id. at 682.

The failure to disclose Craven's testimony to defense counsel did not violate <u>Brady</u> because it was not "favorable" to Petitioner. "There are three components of a true <u>Brady</u> violation: [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999). Craven's testimony that Petitioner admitted to stabbing Davis was neither exculpatory, nor was it impeaching. As a result, it was not "favorable" evidence that must be disclosed under <u>Brady</u>.

Furthermore, the failure to disclose Craven's testimony was not prejudicial. As noted by the trial court, Petitioner did not dispute that he stabbed Davis. In addition, Craven's testimony did not cause Petitioner to admit to the stabbing and pursue a self-defense theory because Petitioner had already decided to present that defense theory in opening argument, before Craven testified. If anything, learning that Craven would testify that Petitioner admitted to stabbing Davis would have bolstered Petitioner's decision to pursue a self-defense theory. Petitioner's contention herein that he would not have testified had he known of Craven's testimony is belied by the fact that he testified in this case after Craven testified. Under these circumstances, there is no reasonable probability that the outcome of the trial would have been different had Craven's testimony been disclosed to Petitioner the evening before Craven testified.

Because the failure to disclose Craven's testimony that Petitioner admitted stabbing Davis did not violate Petitioner's

rights under <u>Brady</u>, the state courts' rejection of this claim was neither contrary to nor an unreasonable application of federal law. Petitioner is not entitled to habeas relief on this claim.

III. PROSECUTORIAL MISCONDUCT – PERJURED TESTIMONY

Petitioner claims that the prosecutor committed misconduct by knowingly using perjured testimony from the victim, Craig Davis. He claims that Davis's testimony that he did not hit Petitioner with a frying pan was false, as evidenced by Davis's poor memory of the incident and the inconsistencies in his various accounts of the incident to the police, at the preliminary hearing, and at trial. Petitioner claims the prosecutor knew that Davis's testimony was "perjured" when he presented it at trial.

When a prosecutor obtains a conviction by the use of testimony which he knows or should know is perjured, it has been consistently held that such conviction must be set aside if there is any reasonable likelihood that the testimony could have affected the judgment of the jury. <u>United States v. Agurs</u>, 427 U.S. 97, 103 (1976). The same result obtains when the prosecutor, although not soliciting false evidence, allows it to go uncorrected when it appears. <u>Napue v. Illinois</u>, 360 U.S. 264, 269 (1959). To prevail on a claim based on <u>Agurs</u> or <u>Napue</u>, a petitioner must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material. <u>United States v. Zuno-Arce</u>, 339 F.3d 886, 889 (9th Cir. 2003) (citing <u>Napue</u>, 360 U.S. at 269-71).

The conflict between Petitioner's testimony and Davis's as to whether Davis struck Petitioner with a frying pan does not

establish that Davis's testimony, as opposed to Petitioner's, was false.  Prosecutors will not be held accountable for discrepancies in testimony where there is no evidence from which to infer prosecutorial misconduct.  See United States v. Zuno-Arce, 44 F.3d 1420, 1423 (9th Cir. 1995) (no evidence of prosecutorial misconduct where discrepancies in testimony could as easily flow from errors in recollection as from lies); see also United States v. Sherlock, 962 F.2d 1349, 1364 (9th Cir. 1992) (holding that mere inconsistencies in testimony of prosecution witness do not establish prosecutor's knowing use of perjured testimony).  Davis's inconsistent accounts and memory lapses may be cited to urge the fact-finder not to find Davis credible, but they do not, without more, establish that Davis's testimony was false, let alone that the prosecutor knew it to be false.

Petitioner's claim that the prosecutor knowingly presented perjured testimony fails.  Accordingly, the state courts' rejection of this claim was neither contrary to nor an unreasonable application of federal law, and Petitioner is not entitled to federal habeas relief on this claim.

IV.  INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner raises three claims that he received ineffective assistance of counsel: (1) that "cumulative errors of counsel" at trial amounted to ineffective assistance; (2) that counsel was ineffective for failing to present mitigating evidence at sentencing; and (3) that counsel rendered ineffective assistance by failing adequately to investigate and present "exculpatory and

mitigating evidence" at trial.[6]  (Pet. at 8.)

A.    Applicable Law

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel.  Strickland v. Washington, 466 U.S. 668, 686 (1984).  In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, a petitioner must establish two things.  First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms.  Id. at 687-88.  Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  Id.

The Strickland framework for analyzing ineffective assistance of counsel claims is considered to be "clearly established Federal law, as determined by the Supreme Court of the United States" for the purposes of 28 U.S.C. § 2254(d) analysis.  Williams (Terry) v. Taylor, 529 U.S. 362, 404-08 (2000).  For a state court's denial of a claim of ineffective assistance of counsel to be an unreasonable application of federal law, a petitioner must show that the state court applied Strickland in an objectively unreasonable manner.  Id.

---

[6]These are the fourth, fifth and seventh claims in the original petition.

United States District Court
For the Northern District of California

B.   "Cumulative Errors"

Petitioner claims that his trial counsel made various errors that cumulatively amounted to ineffective assistance of counsel under the Sixth Amendment.

First, Petitioner complains that counsel failed to move to suppress Petitioner's interview with Officer Anderson, described above.  Whether counsel's failure to file a motion to suppress amounted to ineffective assistance of counsel turns on whether such a motion would have had merit, because failing to raise a meritless motion does not constitute ineffective assistance of counsel.  See Juan H. v. Allen, 408 F.3d 1262, 1273 (9th Cir. 2005); Rupe v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996).

Petitioner argues that if his attorney had listened to the beginning of the taped interview with Anderson, he would have learned that the tape could have been suppressed on the grounds that Officer Anderson violated Miranda and "coercively obtained" Petitioner's confession.  (Pet. at 26.)  For the reasons explained above, Officer Anderson did not violate Petitioner's Miranda rights, and consequently a motion to suppress on that basis would have failed.

The record also would not have supported a motion to suppress on the grounds that Officer Anderson coerced Petitioner's confession.  Due process forbids the use of a coerced confession at trial.  Schneckloth v. Bustamonte, 412 U.S. 218, 226-27 (1973). "The test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne."  United States v. Leon Guerrero, 847

22

F.2d 1363, 1366 (9th Cir. 1988). Petitioner contends that his confession was coerced because Officer Anderson failed to identify himself as a police officer and told Petitioner that he would be charged only with battery. (Pet. at 12.) As discussed above, however, a review of both the tape recording and the transcript of the interview clearly indicates that Officer Anderson did in fact identify himself as a police officer and did not tell Petitioner that he was charged with battery. (Resp't. Ex. G; Augmented CT at 2-3.) Consequently, the argument that the confession was coerced on these grounds was not supported by the record and trial counsel was not ineffective for failing to file such a motion.[7]

Petitioner also claims that his attorney had not familiarized himself with the preliminary hearing and consequently did not effectively cross-examine Davis at trial, in particular when Davis denied hitting Petitioner with a frying pan. (RT at 467.) Petitioner's claim is not supported by the record. Defense counsel cross-examined Davis in detail about numerous inconsistencies between Davis's preliminary hearing and trial testimony, and about Davis's poor memory and intoxication when the altercation occurred; counsel even obtained Davis's admission to lying at the preliminary hearing. (RT at 72-114.) Counsel could not have used Davis's preliminary hearing testimony to cross-examine Davis about hitting Petitioner with a frying pan because Davis did not admit to doing so; Davis simply admitted telling the police that he punched

---

[7]Petitioner also states that his attorney should have pursued a motion to suppress based on evidence that at the time of the interview he was taking medication and suffering the after-effects of a seizure three days earlier. (Pet. at 12.) This is the basis of Petitioner's seventh claim in the petition, and is discussed in detail in Part V.D., below.

1  Petitioner, and defense counsel cross-examined Davis about that

2  admission at trial.  (CT at 17, 40-41; RT at 96.)  In sum, the

3  record does not support Petitioner's contention that his attorney

4  was unfamiliar with Davis's preliminary hearing testimony or that

5  he did not properly use such testimony on cross-examination.

6      As counsel did not err either in failing to file a motion to

7  suppress or in cross-examining Davis, Petitioner's claim that these

8  were "cumulative errors" fails.

9      C.   Mitigating Evidence at Sentencing

10      Petitioner claims that the attorney who represented him at

11  sentencing failed adequately to investigate and present mitigating

12  evidence at sentencing.  Specifically, Petitioner argues that the

13  attorney should have argued that the sentence should be mitigated

14  because his prior conviction did not involve a weapon and because

15  the victim, Davis, had not wanted to press charges and had

16  described Petitioner as a "good guy" who did not "act violently."

17  (Pet. at 26-27.)

18      Based on his conviction for assault with a deadly weapon and

19  inflicting great bodily injury, as well the finding that he had one

20  prior that qualified as both a strike and as a serious felony,

21  Petitioner faced a possible sentence of sixteen years in state

22  prison.  (CT at 232-39.)  Such a sentence would have consisted of

23  the upper term of four years for assault, doubled under the Three

24  Strikes Law due to the prior strike, an additional five years for

25  the prior "serious felony" conviction, and three more years based

26  on the great bodily injury allegation.  (Id.)

27      Prior to sentencing, trial counsel had filed a motion to

28  dismiss Petitioner's strike "in furtherance of justice" pursuant to

California Penal Code section 1385(a), supported by letters from Petitioner's family. (*Id.* at 218-22.) At the outset of the sentencing hearing, the sentencing attorney, who had substituted in for trial counsel, and the prosecutor held a brief conference off the record with the sentencing judge. (RT at 542.) After the conference, defense counsel withdrew the motion to dismiss the strike. (*Id.*) Petitioner states that he agreed to follow the advice to withdraw the motion because counsel informed him that the judge had indicated that he would impose a sentence of eleven years if Petitioner withdrew the motion to dismiss the strike, but fourteen years if he did not. (Pet. at 27.) Whether or not Petitioner's allegations on this point are true, after the motion to dismiss the strike was withdrawn, the judge indicated that he was "inclined to follow" the probation report's recommendation of eleven years and imposed an eleven-year sentence consisting of the middle term of three years for the assault, doubled based on the prior strike, plus five years for the prior "serious felony." (RT at 543-44; CT at 239, 283-84.) Although the judge did not dismiss the strike, he did dismiss the three-year enhancement for great bodily injury pursuant to California Penal Code section 1385(a). (RT at 544.)

Counsel's recommendation to withdraw the motion to dismiss the strike and proceed with sentencing was a reasonable strategic decision. By withdrawing the motion, he obtained the immediate and certain benefit of an eleven-year sentence, five years lower than the maximum sentence Petitioner could have received. If Petitioner's allegations are correct, moreover, the judge would have imposed a longer sentence of fourteen years if counsel had not

withdrawn the motion to dismiss the strike. Moreover, the success of the motion to dismiss the strike was far from certain. Under California law, a prior strike may be dismissed only if the defendant falls "outside the spirit" of the Three Strikes law. <u>People v. Williams</u>, 17 Cal. 4th 148, 161 (1998). The judge could well have viewed Petitioner as having an escalating pattern of criminal behavior inasmuch as the prior conviction being charged as a strike was a robbery of a convenience store while in the instant offense he beat and stabbed his friend to the point of causing serious injury. Although the strike conviction was eighteen years old, in the interim Petitioner had a substantial number of other felony convictions for driving under the influence with priors, reckless driving while evading the police, possession of a controlled substance, battery with serious bodily injury, vandalism, and assault on a police officer. (CT at 232-40.) Given this record of recidivism and escalating criminal behavior, defense counsel could reasonably have advised that Petitioner did not have a good chance of succeeding on his motion to dismiss the strike and recommended that Petitioner take the lower sentence being offered instead.

Because counsel's advice at sentencing was objectively reasonable, Petitioner's claim that he received ineffective assistance of counsel in this regard fails.

D.   Mitigating Evidence at Trial

Petitioner claims that counsel was ineffective in failing to investigate and present evidence of his mental impairment. He argues that such evidence would have enabled counsel to (1) argue that Petitioner did not have the mental state necessary

for assault; (2) suppress Petitioner's interview with Officer Anderson; and (3) support an argument to dismiss his prior strike or mitigate his sentence.  Petitioner raised this claim in a petition for a writ of habeas corpus to the California Supreme Court.  In support of that petition, he included declarations from himself, his mother, his trial attorney, and Dr. John Shields, a licensed forensic psychologist.  Petitioner has included these declarations among the exhibits to the instant petition.

    1.  Background

    Petitioner and his mother state in their declarations that they informed trial counsel prior to trial that Petitioner has suffered from seizures for several years, and after a seizure he does not feel like himself, he feels "groggy," and his thinking is confused.  (Hancock Decl. ¶¶ 2, 5; Smith Decl. ¶¶ 2, 3, 5.)  They also explained to counsel that three days prior to the interview with Officer Anderson, Petitioner suffered a seizure in the jail, was prescribed the wrong medication, and as a result felt "groggy," "drowsy," and "out of it" during the interview.[8]  (Hancock Decl. ¶¶ 4-5; Smith Decl. ¶¶ 5-6.)

    Trial counsel did not investigate Petitioner's medical records or hire an expert to testify about Petitioner's medical condition and its effect on his mental capacity to commit the crime or to participate in the interview with Officer Anderson.  (Kurtzman Decl. ¶ 3).  Counsel explained that he did not believe that Petitioner's medical condition was relevant to the crime itself

---

[8]The seizure occurred on August 9, 2003 (Hancock Decl. at ¶ 3, Shields Decl. at ¶ 9), and the interview took place on August 12, 2003 (Augmented CT at 2).

because Petitioner had not said that he suffered from any seizure around the time of the offense and because assault is a general intent crime. (Id.) He also did not want to use Petitioner's medical condition to try to suppress Petitioner's statements to Officer Anderson because he wanted the interview to come into evidence. (Id. at ¶ 4.) He believed that the interview would garner sympathy for Petitioner because it showed that Petitioner took care of Davis, paid for his food, gave him a place to stay, was remorseful for his act, and had not meant to hurt him. (Id. at ¶ 4.) In his judgment, these favorable aspects of the interview outweighed its negative aspects, particularly because other evidence would be introduced that Petitioner had beat and stabbed Davis. (Id.) In addition, Petitioner's trial attorney did not want to have an expert testify that Petitioner's mental impairment was the reason he did not mention during the interview with Officer Anderson that Davis had struck him with a frying pan because this risked that the jury would disregard the entire interview, including its beneficial aspects described above.[9] (Id. at ¶ 7.)

Dr. Shields reviewed Petitioner's medical records but did not interview or examine Petitioner in person. (Shields Decl. ¶¶ 4-5.) He found that Petitioner had a history of seizures caused by a blunt head trauma several years earlier, and possibly exacerbated

---

[9]Petitioner did not mention to Officer Anderson or to the officers at the crime scene that Davis hit him with a frying pan, or that Petitioner stabbed Davis in self-defense. At trial, Petitioner offered three explanations for failing to mention this to Officer Anderson: that he was groggy and not lucid during the interview due to the after-effects of the seizure and medication he was taking; that because he believed that Officer Anderson was wrapping up the investigation he only paid "lip service" to the interview; and that he did not want to get Davis in trouble by saying that Davis hit him with a pan. (RT at 332-47.)

by severe alcoholism. (<u>Id.</u> at ¶ 5-7.)  He noted a number of

hospital visits due to the severe alcoholism and related

psychiatric problems.  (<u>Id.</u> at ¶ 5.)  During a period of time when

Petitioner was not taking his anti-seizure medication, Petitioner

showed "symptoms of severe mental illness and/or a severe

compromise in his mental status" requiring involuntary psychiatric

commitment.  (<u>Id.</u> at ¶ 8; Pet. Exh. D.)  Dr. Shields noted that in

the past it has taken several days for Petitioner to regain his

mental faculties following a seizure.  (<u>Id.</u> at ¶ 11.)  Dr. Shields

opined that Officer Anderson used suggestive interrogation

techniques to which Petitioner was vulnerable because he "may have

had" impaired mental faculties during the interview as an after-

effect of his seizure approximately three days earlier.  (<u>Id.</u> at

¶¶ 13, 15.)  Dr. Shields concluded that trial counsel could have

used Petitioner's medical records and an expert to raise issues

about Petitioner's mental capacity to form the "specific intent" to

commit the crime, and whether Petitioner knowingly and voluntarily

waived his rights or was unduly suggestible during the interview

with Officer Anderson.  (<u>Id.</u> at ¶ 19.)

> 2.   Applicable Law

A defense attorney has a general duty to make reasonable

investigations or to make a reasonable decision that makes

particular investigations unnecessary.  <u>See</u> <u>Strickland</u>, 466 U.S. at

691.  <u>Strickland</u> directs that "'a particular decision not to

investigate must be directly assessed for reasonableness in all the

circumstances, applying a heavy measure of deference to counsel's

judgments.'"  <u>Silva v. Woodford</u>, 279 F.3d 825, 836 (9th Cir. 2002)

(quoting <u>Strickland</u>, 466 U.S. at 491).  "[W]hen the facts that

29

support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether." <u>Strickland</u>, 466 U.S. at 691.

### 3. Mental State Defense

Trial counsel reasonably decided not to pursue evidence of Petitioner's mental condition for purposes of disproving the assault charge. Petitioner never indicated, nor is there any evidence, that he had recently had a seizure or that he was suffering from any effects of a seizure at the time of the altercation with Davis. Moreover, assault is a general intent crime, <u>People v. Williams</u>, 26 Cal. 4th 779, 788 (2001), and evidence of Petitioner's mental health was not admissible under California law to disprove a general intent crime. <u>See</u> <u>People v. Rathert</u>, 24 Cal.4th 200, 205 (2000) (jury may not consider evidence of mental disease, defect or intoxication to determine whether defendant committed a general intent crime); Cal. Penal Code § 25(a) (evidence of mental illness, disease or defect are not admissible to negate purpose, intent, knowledge or other mental state); Cal. Penal Code § 28(a) (evidence of mental disease or defect not admissible to negate purpose, intent, knowledge or other mental state, only admissible to negate specific intent); Cal. Penal Code § 29 (expert may not testify whether defendant's mental illness, disorder or defect negated defendant's purpose, intent, knowledge, or other mental state). Because evidence of Petitioner's mental impairment and expert testimony regarding his condition would not have been admissible to show that Petitioner did not have the requisite general intent to commit the assault,

trial counsel reasonably decided not to investigate the condition further for that purpose.

Finally, trial counsel could have reasonably chosen not to pursue a mental condition theory in order to avoid a conflict with the self-defense theory Petitioner chose to advance. Where counsel reviews the preliminary facts of the case and reasonably decides to pursue only one of two conflicting defense theories, he need not investigate the abandoned defense theory further. Williams v. Woodford, 384 F.3d 567, 611-12 (9th Cir. 2004); see Turk v. White, 116 F.3d 1264, 1266 (9th Cir. 1997)(counsel's selection of self-defense theory obviated his need to investigate defendant's conflicting mental incompetency defense). If Petitioner had claimed that his mental disorder prevented him from knowing what he was doing when he struck and stabbed Davis, such evidence would have conflicted with his theory of self-defense, which posited that he acted knowingly. Once Petitioner chose to advance a theory of self-defense, counsel's failure to pursue the investigation into the conflicting mental state defense was reasonable.

> 4. Suppression of Interview with Officer Anderson

Trial counsel's decision not to investigate further Petitioner's mental impairment for the purpose of seeking to suppress Petitioner's interview with Officer Anderson can also be found reasonable. Counsel reflected on the decision not to pursue medical evidence in order to try to suppress the interview with Officer Anderson. To be sure, Petitioner admitted in the interview that he stabbed Davis and beat him up. However, counsel indicated in his declaration that he decided not to move to suppress the interview because its negative aspects were outweighed by the

benefit of showing sympathetic aspects of Petitioner, including his having housed and fed Davis, his concern for Davis, and his regret for committing the crime.

The state courts could reasonably decide that counsel's tactical choice was reasonable. The evidence that Petitioner was the perpetrator was very strong. Davis was found bleeding and beaten up outside Petitioner's apartment where he had been staying, and the police found a bloody knife in Petitioner's kitchen, a shoe-print in the victim's blood outside of Petitioner's apartment, and blood on the sole of Petitioner's shoe. (RT at 451-56, 468.) In addition, Davis identified Petitioner as the person who assaulted him. Although Davis had given inconsistent accounts of the incident and had admitted to not remembering details and being drunk, his account was corroborated by Peter Craven and the physical evidence. Davis's description of the severity of the beating was also corroborated by hospital records showing that he had a badly swollen face, fresh scrapes and bruises on his face and body, a broken clavicle, broken ribs and a stab wound in his back that punctured his lung. (RT at 131-32, 234-37, 242, 267.) Furthermore, when the police arrived at the scene, Petitioner challenged the officers to a fight and offered the very unconvincing explanation that Davis had beat himself up. (RT at 160-61, 202, 205.) Lastly, Craven testified that Petitioner confessed shortly after the incident to stabbing and beating Davis. (RT at 137-38.)

In light of the very strong evidence against Petitioner, his attorney could reasonably have decided that the jury was very likely to find that he was the perpetrator even if the interview

was suppressed, and that the interview would show sympathetic aspects of Petitioner to the jury. Consequently, the state court could reasonably conclude that trial counsel's failure to investigate Petitioner's mental condition in order to use it to try to suppress the interview was objectively reasonable and did not amount to deficient performance under Strickland.

In any event, even if counsel had performed deficiently in this regard, there was no prejudice. First, a motion to suppress would not have been likely to succeed even with the proffered evidence of Petitioner's mental capacity that counsel may have discovered. To establish that his Miranda waiver was invalid, Petitioner would have had to show that he did not waive his rights voluntarily, knowingly and intelligently. See Miranda, 384 U.S. at 475. The voluntariness component turns on the absence of police overreaching, i.e., external factors, whereas the cognitive component depends upon the defendant's mental capacity. Cox v. Del Papa, 542 F.3d 669, 675 (9th Cir. 2008). The tape and transcript do not indicate overreaching by the police. Petitioner was properly given Miranda warnings, Officer Anderson did not threaten or try to intimidate him, and, as discussed above and contrary to Petitioner's assertion, Officer Anderson did in fact identify himself as a police officer and did not state that the only charge against Petitioner would be battery. (Resp't. Ex. G; Augmented CT at 2-44.) Furthermore, the tape and transcript show that Petitioner's answers were coherent and responsive, and there is no indication that he did not understand what he was being asked. (Resp't. Ex. G; Augmented CT at 2-44.) Petitioner's evident cognitive ability on the tape and transcript would have likely

outweighed both Petitioner's post-hoc statements that he was "very groggy," "drowsy" and "not completely with it" during the interview, and Dr. Shields's statement that Petitioner "may have" been cognitively impaired from the seizure three days earlier. (Hancock Decl. ¶ 5; Shields Decl. ¶ 12.) Trial counsel would not likely have succeeded in showing that Petitioner's <u>Miranda</u> waiver was invalid by investigating and presenting evidence of his mental condition.

The totality of the circumstances surrounding the interview does not indicate that Petitioner's confession was coerced. Officer Anderson interviewed Petitioner in the jail interview room, the interview lasted less than one hour, Anderson read him his <u>Miranda</u> rights at the outset, and he told Petitioner that he did not have to talk and that the decision was "totally up to" him. (Resp't. Ex. G; Augmented CT at 3.) Petitioner did not inform Officer Anderson of his medical condition or the medication he was taking, nor is there any evidence Anderson was aware of it. (Augmented CT at 2-44; Shields Decl. ¶ 12.) Petitioner was in his forties and had considerable experience with police interrogations and procedures from a substantial history of convictions and arrests.[10] There was no conflict or hostility between Anderson and Petitioner in the interview, and the overall atmosphere of the interview was friendly. (Resp't. Ex. G; Augmented CT at 2-44.) Such circumstances, even when considered with the proffered evidence of Petitioner's mental condition, do not indicate that Petitioner's free will was "overborne" so as to render the

United States District Court
For the Northern District of California

---

[10]His criminal history is discussed in Part V.C., above.

confession coerced.  See, e.g., United States v. Heller, 551 F.3d
1108, 1112-13 (9th Cir. 2009) (rejecting defendant's argument that
his ingestion of medication rendered his confessions involuntary
where defendant didn't tell officers that he took medication,
defendant appeared to be alert and able, atmosphere of interview
was friendly and cordial, interview was only two hours long, and
defendant was repeatedly told that he was free to leave);
Cunningham v. Perez, 345 F.3d 802, 810-11 (9th Cir. 2003) (finding
officer did not undermine free will of petitioner taking bi-polar
medication where interrogation lasted for eight hours, and officer
allowed breaks for food and water, suggested cooperation could lead
to treatment rather than prison, stated that he had put people in
prison for similar conduct, and denied petitioner's request to call
therapist).

Finally, even if trial counsel had managed to get the
interview suppressed, the outcome of the trial would have likely
been the same.  Petitioner argues that if the interview had been
suppressed, he would not have testified.  But without his
testimony, there would have been no evidence to support his self-
defense theory.  Petitioner's defense would have rested solely on
challenging the credibility of Davis's account and the other
prosecution evidence.  For the reasons discussed above, while Davis
had given inconsistent statements, had been drunk, and had memory
problems, his account of the incident was largely corroborated by
other, reliable evidence.  In addition, Petitioner's confession to
Craven and the physical evidence would have made conviction likely
even without Petitioner's confession to Officer Anderson.  Under
these circumstances, there is no reasonable probability that, even

if his interview with Officer Anderson had been suppressed, Petitioner would have been acquitted.

### 5.   Sentence Mitigation

There is also no reasonable probability that the evidence of Petitioner's mental condition would have caused the sentencing judge to dismiss his strike or further mitigate his sentence, as Petitioner argues.  As described above, the trial court had already dismissed the great bodily injury enhancement, and given Petitioner the middle, as opposed to the aggravated, term.  There is no evidence that Petitioner committed the crime while suffering from a seizure or any mental impairment resulting from his medical condition that would warrant further mitigation of his sentence. Consequently, Petitioner was not prejudiced at sentencing by his attorney's decision not to investigate Petitioner's mental condition further.

### 6.   Summary

For the reasons discussed, Petitioner's attorney acted reasonably in declining to investigate Petitioner's medical condition further for a mental state defense to the assault charge. In addition, the state courts reasonably concluded that counsel made a reasonable tactical decision not to move to suppress the confession based on his mental condition, a decision that was also not prejudicial.  Finally, there is no reasonable likelihood that Petitioner's sentence was affected by the lack of investigation into his mental condition.

Consequently, the state courts' denial of Petitioner's claims of ineffective assistance of counsel was neither contrary to nor an unreasonable application of federal law.  Petitioner is not

entitled to habeas relief on these claims.

V.    PROSECUTORIAL MISCONDUCT – INSPECTION OF TAPED CONFESSION

Petitioner claims that the prosecutor violated his due process rights by failing to allow the defense to inspect the tape recording of Officer Anderson's interview of him at the jail. (Pet. at 7-8.)  According to Petitioner, he received a copy of the taped confession prior to the preliminary hearing, but it was inaudible.  (Pet. at 29.)

Even if it is true that the copy of the tape Petitioner received prior to his preliminary hearing was inaudible, this did not amount to a due process violation.  The record is clear, and Petitioner does not dispute, that he did eventually receive an audible copy of the taped confession.  His counsel listened to the tape with the prosecutor and made edits the transcript before it was admitted during the prosecution's case in chief.  (RT at 282.) Petitioner has demonstrated no prejudice from the fact that the first copy of the tape that he received was inaudible.  Petitioner contends that if he had received an audible copy, he would have been able to demonstrate that the confession was coerced and violated Miranda, the confession would have been suppressed, and he would not have testified at trial.  For the reasons discussed above, however, the taped confession did not demonstrate either a Miranda violation or a coerced confession.  Consequently, an audible tape of the interrogation would not have enabled Petitioner to file a meritorious motion to suppress.

Petitioner has shown no prejudice from any inaudible recording he might have received initially.  His due process claim is without merit.  Accordingly, the state courts' rejection of this claim was

37

neither contrary to nor an unreasonable application of federal law,

and Petitioner is not entitled to habeas relief on this claim.

VI.   FLIGHT INSTRUCTION

In his supplemental petition, Petitioner claims that the trial

court violated his federal right to due process by issuing the

following jury instruction pursuant to CALJIC No. 2.52:

> The flight of a person immediately after the commission of a
> crime or after he is accused of a crime is not sufficient in
> itself to establish his guilt but is a fact which, if proved,
> may be considered by you in the light of all other proved
> facts in deciding whether a defendant is guilty or not guilty.
> The weight to which this circumstance is entitled is a matter
> for you to decide.

(RT at 477.)  According to Petitioner, the instruction lowered the

prosecution's burden to prove every element of the case beyond a

reasonable doubt because it allowed the jury to infer that his

"flight" -- of which there was insufficient evidence -- reflected

consciousness of guilt.  (Br. Attached to Suppl. Pet. at 9-11.)[11]

The Due Process Clause of the Fourteenth Amendment protects

the accused against conviction except upon proof beyond a

reasonable doubt of every fact necessary to constitute the crime

with which he or she is charged.  In re Winship, 397 U.S. 358, 364

(1970).  This constitutional principle prohibits the state from

using evidentiary presumptions in a jury charge that have the

effect of relieving the state of its burden to prove every

essential element of a crime.  See Yates v. Evatt, 500 U.S. 391,

---

[11]In an earlier portion of his brief, Petitioner also argues
that there was insufficient evidence to establish "flight" under
California law.  (Br. Attached to Suppl. Pet. at 5-9.)  This state
law claim is not cognizable on federal habeas review.  See Estelle
v. McGuire, 502 U.S. 62, 67-68 (1991).  In addition, the California
Court of Appeal's rejection of this claim as a matter of state law
(Slip Op. at 10) is binding on this Court.  See Hicks v. Feiock,
485 U.S. 624, 629-30 & n.3 (1988).

400-03 (1991)

Petitioner complains that the instruction allows permissive inferences. An instruction that allows a permissive inference does not shift the burden of proof, but it nonetheless violates due process unless it can be said "'with substantial assurance'" that the inferred fact is "'more likely than not to flow from the proved fact on which it is made to depend.'" County Court of Ulster County v. Allen, 442 U.S. 140, 167 & n.28 (1979) (quoting Leary v. United States, 395 U.S. 6, 36 (1969)). Courts "determine the constitutionality of a permissive inference instruction on a case-by-case basis" by reviewing the record evidence to see if the court can say with substantial assurance that the inferred fact flows more probably than not from the facts proven in the particular case. United States v. Warren, 25 F.3d 890, 898 (9th Cir. 1994).

First, Petitioner appears to argue that the instruction was erroneous simply by allowing consciousness of guilt to be inferred from evidence of flight. The Ninth Circuit has upheld an instruction allowing such an inference which required, as the instruction did here, that evidence of the defendant's flight be proved. See McMillan v. Gomez, 19 F.3d 465, 469 (9th Cir. 1994); Karis v. Calderon, 283 F.3d 1117, 1131-32 (9th Cir. 2002). Consequently, the instruction was not erroneous simply because it allowed the jury to infer consciousness of guilt from evidence of flight.

Secondly, Petitioner argues that allowing the jury to infer consciousness of guilt violated due process in "a case like this one, where there was no evidence of flight at all." (Br. Attached to Suppl. Pet. at 11.) The California Court of Appeal rejected

this argument, finding that there was "legally sufficient" evidence of flight in that Craven testified that he talked Petitioner into retreating from the living room, where Davis was, into the back bedroom, before the police arrived. (Slip Op. at 10.) Further, the instruction explicitly stated that the jury could only infer consciousness of guilt if flight was proved. The jury was elsewhere told to disregard any instruction which applied to facts that it determined did not exist. See McMillan, 19 F.3d at 469 (flight instruction proper because it instructed jury it could draw inference of guilt only if flight was proved). The state appellate court reasonably concluded that, in allowing the jury to draw a "permissive inference" of consciousness of guilt from the evidence, the flight instruction did not violate due process.

Even if the flight instruction had improperly allowed a permissive inference in this case, such an error was not prejudicial under Brecht, 507 U.S. at 637-38. If, as Petitioner contends, there was no evidence of flight, there would be no harm in the instruction, because it simply allowed the jury to consider such evidence. Moreover, as discussed above, the evidence of Petitioner's guilt was very strong. Any evidence of flight found by the jury pursuant to CALJIC No. 2.52 would have been a relatively insignificant addition to the strong evidence of his guilt.

Accordingly, the state court's denial of Petitioner's challenge to the flight instruction was neither contrary to nor an unreasonable application of federal law. Petitioner is not entitled to habeas relief on this claim.

//

CONCLUSION

The petition for a writ of habeas corpus is DENIED.

No certificate of appealability is warranted in this case.
See Rule 11(a) of the Rules Governing § 2254 Cases, 28 U.S.C. foll.
§ 2254 (requiring district court to rule on certificate of
appealability in same order that denies petition). Petitioner has
failed to make a substantial showing that any of his claims
amounted to a denial of his constitutional rights or demonstrate
that a reasonable jurist would find this Court's denial of his
claims debatable or wrong. See Slack v. McDaniel, 529 U.S. 473,
484 (2000).

The clerk shall enter judgment and close the file. All
pending motions are terminated. Each party shall bear his own
costs.

IT IS SO ORDERED.

DATED: 2/16/10

CLAUDIA WILKEN
United States District Judge

**United States District Court**
For the Northern District of California

1
2

# UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF CALIFORNIA

3
4
5
6
7
8

JEFF J HANCOCK,

Case Number: CV07-04469 CW

Plaintiff,

**CERTIFICATE OF SERVICE**

v.

D SEDLEY et al,

Defendant.
_____/

9
10

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

11
12

That on February 16, 2010, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

13
14
15

Jeff Jay Hancock V-49474
RB-132L
Correctional Traning Facility - North
P.O. Box 705
Soledad,  CA 93960

16
17
18

Dated: February 16, 2010

Richard W. Wieking, Clerk
By: Sheilah Cahill, Deputy Clerk

19
20
21
22
23
24
25
26
27
28